IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

   vs.                               No. CR 09-3065 MCA

KEVIN POWERS,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the following motions: *Motion to Dismiss Multiplicitous Wire Fraud Counts or, in the Alternative, Require Government to Elect Between the Multiplicitous Counts of Second Superseding Indictment* [Doc. 89], filed August 17, 2010; *Defendant's Motion to Suppress Redacted Transcript of January 17, 2008 Conversation Between Kevin Powers and Chris Sena* [Doc. 90], filed August 18, 2010; *Motion to Strike Surplusage and for an Order Requiring United States to Elect its Theory of Prosecution* [Doc. 91], filed August 18, 2010; *Motion to Require Government to Elect Between Offenses Alleged Within Duplicitous Wire Fraud Counts* [Doc. 94], filed August 18, 2010.; and *Motion To Dismiss Counts 5, 6, 9, and 10 (Cameron Counts) Of The Second Superseding Indictment* [Doc. 92], filed August 18, 2010.  The Court convened a hearing on the motions on December 7, 2010.  Having considered the parties' submissions, the relevant law, the proffers of counsel, and otherwise being fully advised in the premises, the Court

issues the following rulings.

## I. BACKGROUND

On July 27, 2010, the grand jury returned a 17-count *Second Superseding Indictment* charging defendant Kevin Powers, a real estate agent and mortgage broker, with wire fraud, in violation of 18 U.S.C. § 1343. The charges stem from Defendant's purported involvement in a "cash back" scheme, which, as alleged and recited in the indictment, is a scheme in which a buyer offers to purchase a property for more than the asking price. The seller agrees to such a sale because he receives his full asking price, and the difference is then returned to the buyer to pay the mortgage until he or she is able to resell the property at a profit. It is alleged that cash-back schemes are risky for the lender because the lender begins with negative equity in the property. Because of the risk involved, lenders do not allow buyers to receive undisclosed cash back at closings. [See Doc. 82 at 2].

According to the government, loan applications used in connection with cash-back schemes contain numerous falsities, including that the buyer intends to use the property as his or her primary residence. Buyers in cash-back schemes also (1) misrepresent their assets and income; (2) conceal debts; and (3) provide untruths about the source of their down payment. If they did not make these misrepresentations, these buyers would not qualify for their loans. In the instant case, the following title companies—First American Title Co., Fidelity Title Co., and U.S. Title Co.—acted on behalf of and collected closing funds for the following lenders—Suntrust Mortgage Inc., Cameron Financial Group, National City Mortgage, and Accredited Home Lenders. [See generally Doc. 82].

As set forth in the Second Superseding Indictment, defendant is charged with having created a system wherein, in his role as real estate agent and mortgage broker, he sought out buyers whom he then enlisted as "investors." He would find properties that appraised for more than the asking price. He and his clients would agree to purchase those properties as long as the seller raised the asking price by a specific amount of money, which post-sale would be returned to the buyers. Once terms were agreed to, the sellers' agents would then increase the asking price to an amount over even the inflated price in order to avoid detection by lenders. Defendant then allegedly assisted his buyers in preparing the necessary paperwork (Uniform Residential Loan Applications ("URLAs") and Housing and Urban Development Settlement Statements ("HUD-1s")), which contained the false statements and misrepresentations described above. Defendant also hid from the lenders the fact that a portion of each loan was paid to K&E Construction Company, a company owned by him and purportedly enlisted to remodel and repair the purchased homes. In fact, alleges the government, K&E was nothing more than a shell corporation that was used as a vehicle to funnel money back to the buyers. Once the lenders approved the falsity-based mortgages, they would wire transfer funds on behalf of the buyers to the bank accounts of New Mexico title companies. [See generally Doc. 82].

The Second Superseding Indictment then sets forth the 17 counts, including (1) date of the charged wire transmissions; (2) mortgage and title companies involved; (3) amount of money involved; and (4) address of property in question. As an example, Counts 14 and 15 charge that, on or about November 6, 2006, wire transmissions in the amounts of

$972,241.25 (Count 14) and $326,175.00 (Count 15) were made from Suntrust Mortgage (in Virginia) to First American Title (in Albuquerque) to finance the purchase of 12514 Holly NE, Albuquerque. [Doc. 82 at 13]. The body of the Second Superseding Indictment additionally explains that, at the closing for this property, a check in the amount of $350,000 was issued to K&E Construction, and that after depositing this check into his bank account, Defendant provided to the buyer, C.S., a check in the amount of $344,000, which C.S. used to make some renovations and some mortgage payments. [Id. at 10].

## II. ANALYSIS

### A. *Motion to Dismiss Multiplicitous Wire Fraud Counts or, in the Alternative, Require Government to Elect Between the Multiplicitous Counts of Second Superseding Indictment* [Doc. 89]

In this motion, Defendant points out that, of the 17 counts charged in the Second Superseding Indictment, all but one (set forth at paragraph 12(11) on page 13) are multiplicitous inasmuch as, in pairs (i.e., counts 1 and 2; counts 3 and 4; counts 5 and 6; and so on), they charge a single criminal offense because each pair alleges an identical date; identical parties (lender and title company), and identical property. The only factor that distinguishes the so-called "paired" counts, he asserts, is the amount of the wire transfer. [See Doc. 89 at 1-4]. He asks the Court to dismiss what he deems the multiplicitous counts or, in the alternative, require the government to elect between them. [Id. at 7]. The government responds that the counts are not multiplicitous, and that Defendant was properly charged because, notwithstanding the similarities of the "paired" counts, each "pair" involved two separate wirings, two separate loan applications, and receipt of two separate loans.

Moreover, the government expects and intends to prove at trial each separate wire transfer for each of the "paired" counts.  [See Doc. 100 at 1-4].

"Multiplicity is the charging of a single offense in more than one count."  United States v. Esch, 832 F.2d 531, 541 (10th Cir. 1987) (quoting United States v. De La Torre, 634 F.2d 792, 794 (5th Cir.1981)).  Multiplicity may become an issue where the same act or transaction constitutes a violation of two distinct statutory provisions, see Blockburger v. United States, 284 U.S. 299 (1932), and also where successive acts have been charged as separate crimes under the same statute. Esch, 832 F.2d at 541.  It is this second situation that Mr. Powers alleges exists here. [See Doc. 89 at 10 ("[T]he defendant is faced with an indictment charging multiple violations of the same statute. . . .")].

Where, as here, "each successive act has been charged as a separate crime under the same statute[, t]he pertinent inquiry becomes defining the correct unit of prosecution." Esch, 832 F.2d at 541 (citing Bell v. United States, 349 U.S. 81, 84 (1955) (explaining, in prosecution under Mann Act, that if Congress does not fix "clearly and without ambiguity" the punishment for a federal offense, doubt is to be resolved against turning single transaction into multiple offenses).

With heavy reliance on Blockburger, he argues that "there is a distinction between a 'continuous offense' resulting from a single impulse and the 'offense consisting of an isolated act' which may be charged for its successive impulses." [Doc. 89 at 12; see also Blockburger, 284 U.S. at 302 ("[W]hen the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even

though all unite in swelling a common stream of action, separate indictments lie.")].  Mr. He then notes that the Second Superseding Indictment charges that he "knowingly transmitted and caused to be transmitted" wire transfers in the amounts detailed in the 17 counts against him. [See Doc. 89 at 11; see also Doc. 82 at 11].  Applying Blockburger, he reasons that "knowingly transmitted" describes an individual act or impulse, while "caused to be transmitted" describes a course of conduct.  He then explains that "it is anticipated that the government will proceed on the theory that [he] 'knowingly caused to be transmitted' rather than 'knowing transmitted' wire communications." [Doc. 89 at 11].  The Second Superseding Indictment therefore is multiplicitous, because it alleges one continuous offense that cannot be separated into separate parts and charged as multiple crimes. [See id. at 12].

Defendant's position is neither persuasive nor supportable.  Moreover, a similar argument was recently rejected by the Eleventh Circuit, which refused to accept the defendant's claim that an indictment charging various counts of wire fraud against her "was multiplicitous because it alleged only one scheme to defraud, which the government manipulated into separate counts with each wire of . . . funds."  United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008).  Section 1343, explained the circuit,

> targets not the defendant's creation of a scheme to defraud, but the defendant's *execution* of a scheme to defraud. To that end, it punishes *each* interstate wire transmission that carries out that scheme.  Where one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count. In determining whether each wire transmission is an execution, courts must look to the function of the wire transmission in the context of the defendant's overall scheme and examine how that transmission furthers the scheme.

Id. (emphasis in original).  Williams also effectively anticipated, but rejected, the distinction Defendant attempts to draw between the acts of (1) "knowingly transmitting" and (2) "causing to be transmitted" wire transfers.  The circuit explained that § 1343 "plainly states that the defendant need not make a  wire transmission [himself], but may cause such wire transmission to be made to further [his] scheme to defraud. The statute thus prevents defendants from escaping criminal liability merely because another party makes the wire transmission underlying the charge."  Id. at 1241-42.

Defendant emphasizes that "the Tenth Circuit has not directly addressed the unit of prosecution under the wire fraud statute." [Doc. 102].  However this Court is not without guidance.  In United States v. Gallant, 537 F.3d 1202 (10th Cir. 2008), our Tenth Circuit addressed the multiplicity question in the context of the bank fraud statute, 18 U.S.C. § 1344. It explained:

> Under § 1344, an offense occurs upon each execution or attempted execution of a scheme to defraud.  A single scheme can be executed a number of times, and the question in each case is what constitutes an 'execution of the scheme.' The answer to this question is heavily fact-dependent and a number of factors are relevant in determining whether a single or multiple executions of bank fraud have taken place, including the number of banks, the number of transactions, and the number of movements of money involved in the scheme. Each time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud.  The central question for determining multiplicity is whether a jury could plausibly find that the actions described in the disputed counts of the indictment, objectively viewed, constituted separate executions of the bank fraud scheme.

Gallant, 537 F.3d at 1226 (internal citations and quotations omitted).  In Williams, the Eleventh Circuit specifically found in the mail and bank fraud statutes support for its conclusion that "*each* interstate wire transmission that carries out [the] scheme" to defraud is separately punishable under the wire fraud statute.  Williams, 527 F.3d at 1241 (emphasis in original); see also United States v. Lake, 472 F.3d 1247 (10th Cir. 2007) ("Interpretations of § 1341 [mail-fraud statute] are authoritative in interpreting parallel language in § 1343.").

In this case, while it is true that the "paired" counts identify a single (1) lender; (2) title company; (3) property address; and (4) date of commission of alleged offense, even Defendant concedes that the "difference distinguishing the paired counts is *the wire transfer amount*." [Doc. 89 at 10 (emphasis added)].  This distinction is sufficient to support separate counts.  The government posits—and intends to prove at trial—that separate counts are asserted because "in each purchase, the buyers sought and obtained two separate loans based on two separate loan applications and asking for two different funding amounts. The funds were thereafter sent in two separate wire transfers, one for each loan." [Doc. 100 at 4].  Thus, the government expects to show that an identifiable sum of money was obtained by each fraudulent transaction which, in turn, would support a reasonable inference by the jury that each charged count represents a separate execution of Defendant's alleged scheme to defraud.  See Gallant, 537 F.3d at 1226 (explaining that "each time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud" and that "[t]he central question for determining multiplicity is whether a jury could plausibly find that the actions described in the disputed

counts of the indictment, objectively viewed, constituted separate execution.").  In this case, Defendant is accused of concocting one overall cash-back scheme to defraud lenders by securing mortgages to which he knew the applicants were not entitled, which scheme he then executed each time he wire-transmitted or caused to be wire-transmitted documents and paperwork he knew were falsified, as set forth in each of the 17 counts against him. Charging each transmission in a separate count, notwithstanding the existence of other similarities, is proper.  The Court will deny this motion.

**B.**  ***Defendant's Motion to Suppress Redacted Transcript of January 17, 2008 Conversation Between Kevin Powers and Chris Sena* [Doc. 90]**

Through this motion, Defendant seeks "to suppress the entire contents of a redacted transcript it intends to offer at trial. . . ." [Doc. 90 at 1].  The transcript in question, which was filed on the Court's docket as document number 96, memorializes a conversation from January 17, 2008, between him and Christopher Sena, the buyer of 12514 Holly NE, the charged property in Counts 14 and 15. [See generally Doc. 96].  The government intends to play for the jury the recording from which the transcript was made.

The conversation at issue was captured and recorded by a body wire worn by Mr. Sena at the request of FBI agents.  Defendant seeks suppression on grounds that (1) the substance of this conversation is not relevant; and (2) even if relevant, the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, as well as the potential to confuse, mislead, and waste time. [Doc. 90 at 2].  Defendant additionally contends that this conversation is incomplete and if not suppressed "unfairly places a burden

on [him] to testify solely for the purpose of explaining or clarifying the issues . . . ." [Id. at

2-3].

At the motions hearing held December 7, 2010, the government agreed to redact some

of the objected-to passages, and Defendant withdrew objections to others.[1]  Specifically, the

government agreed to redact the following:

> Page 14, lines 1-21;
> Page 16, lines 7-25;
> Page 17, lines 1-25;
> Page 18, lines 1-14;
> Page 27, lines 4-25;
> Page 28, lines 1-25; and
> Page 29, lines 1-14.

Defendant withdrew his objections to the following:

> Page 14, lines 22-25; and
> Page 15, lines 1-3.

[Doc. 160 at 50-51, 55, 59, 68-70, ].

The government urges the introduction of the conversation between Mr. Sena and

Defendant on grounds including that it constitutes an admission of a party-opponent pursuant

to Rule 801(d)(2), and Defendant has not argued otherwise on this particular point.

Generally, the admissibility of evidence is presumed, and the burden of proof is on the party

opposing introduction.  See Yankee Atomic Elec. Co. v. United States, 2004 WL 2450874,

at *4 (Fed.Cl. Sept. 24, 2004); see also United States v. Townley, 472 F.3d 1267, 1274 (10th

---

[1]  At a later date, Defendant indicated that he was not satisfied with the government's proposed redactions and now argues that if the transcript and recording are not suppressed in their entirety, they should be admitted almost intact.  This request, regarding the extent of the redactions, is addressed in a separate order.

Cir. 2007) (tape-recorded conversation in which defendant can be heard discussing drug sales admissible against defendant under Rule 801(d)(2)(A)); Fischer v. Forestwood Co., Inc., 525 F.3d 972, 984-985 (10th Cir. 2008) (explaining rationale behind Rule 801(d)(2)(A)).  More specifically, "[i]t is a widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility."  Yankee Atomic Elec. Co., 2004 WL 2450874, at *8 (internal quotation marks omitted).

The wire fraud statute, 18 U.S.C. § 1343, under which Defendant has been charged, provides, in pertinent part, that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. . . .

18 U.S.C. § 1343.  Our Tenth Circuit has held that, to convict a defendant for wire fraud under the statute, the government must prove: (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises; (2) an intent to defraud; and (3) the use of interstate wire or radio communications to execute the scheme. Gallant, 537 F.3d at 1228.  As the circuit has explained,

> [a] scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be proved.

Id. (*quoting* United States v. Cochran, 109 F.3d 660, 664 (10th Cir. 1997)).  The circuit further defines "scheme to defraud" as "conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension[,]" and also notes that "[f]raudulent intent is required."  Cochran, 109 F.3d at 664, 665 (internal quotation omitted).

In this case, the government charges, in pertinent part, that

> KEVIN POWERS, with intent to defraud, knowingly and unlawfully *devised and intended to devise a scheme and artifice to defraud lenders . . . and to obtain money, funds and other property from lenders by means of materially false and fraudulent pretenses*, representations and promises, and by intentional concealment and omission of material facts.

[Doc. 82 at 3 (emphasis added)].  Thus, among other things, the government must prove that (1) Defendant acted with fraudulent intent; and (2) made affirmative misrepresentations in order to obtain lender money and funds.  See Gallant, 537 F.3d at 1228.  The conversation between Mr. Sena and Defendant is highly probative for the purpose of showing how Defendant worked with Mr. Sena to help Mr. Sena purchase a property that, absent making misrepresentations to the lender, Mr. Sena would not have been able to buy, because he would not have qualified for the required loan.

Accordingly, with respect to Defendant's remaining objections, the Court will overrule the objections to page 12, lines 12-16; page 13, lines 10-13; and page 15, lines 23-25.  [See Doc. 90 at 3-4].  In these passages, Defendant explains to Mr. Sena his understanding of the concept of "stated income."  A reasonable inference from these passages, particularly when considered in the context of the overall conversation, is that

Defendant is advising Mr. Sena to cover up the fact that he received $344,000 in cash back on 12514 Holly, and to tell the FBI that he actually earned the money instead. In these lines, Defendant tells Mr. Sena, among other things, that "you have to stick to this by saying this is what I earned on my other properties." [Doc. 96 at 15]. These excerpts are highly probative of Defendant's involvement in and knowledge of a cash-back scheme to defraud the lenders.

Defendant next objects to page 10, lines 23-25, and page 11, lines 1-8, arguing that, in these passages, "Mr. Sena's own questions and statements betray his own lack of recall of the matters he discusses with Mr. Powers and are therefore unreliable and misleading to both Mr. Powers and to the jury." [Doc. 90 at 4]. The Court disagrees because it is in these quoted lines that Defendant explains to Mr. Sena that "[t]he only way" Mr. Sena could have purchased 12514 Holly was if he said that he had rented out his other property and intended to use the Holly property as his primary residence. [Doc. 96 at 10-11]. This excerpt is relevant to the allegations that Defendant had his buyers falsify their intent to occupy purchased properties as primary residences in order to secure loans for which they otherwise would not qualify. The objections to page 10, lines 23-25, and page 11, lines 1-8 are overruled.

The Court similarly will overrule the objection to page 10, lines 7-9, which is made on the ground that what Defendant is trying to say in these lines is interrupted by Mr. Sena, thereby "leaving an incomplete answer to a question, thereby suggesting a prejudicial interpretation of Mr. Powers' truncated response for which he intended to say or explain

more accurately." [Doc. 90 at 4].  As a statement of a party-opponent, Defendant's response, even if interrupted by Mr. Sena, is presumptively admissible absent a valid reason to exclude it.  Even if the interruption "suggest[s] a prejudicial interpretation[,]" evidence must be *substantially* more prejudicial than probative before it will be excluded.  See United States v. Cerno, 529 F.3d 926, 935 (10th Cir. 2008) (repeating that "it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value." (emphasis added)).  The same is true for the objections to page 8, lines 15-25, and page 9, lines 1-4—Defendant fails to explain, much less demonstrate, how this passage is substantially more prejudicial than probative.

The next objected-to passages appear on page 15, lines 4-12 and 23-25, and page 16, lines 1-6.  Objections are made on the ground that these passages reveal a speculative conversation about fraud, as well as "Mr. Sena's taxes and tax status[, but that n]either the indictment nor its alleged scheme set forth a single allegation concerning misconduct relating to tax laws." [Doc. 90 at 4].  In lines 3 through 6 on page 16, Defendant tells Mr. Sena that "the next step, which is what I'm trying to reassure you about, would be the likelihood of them looking with the IRS[,]" [Doc. 96 at 16]. The conversation is not necessarily construed as one concerning taxes.  Instead, when read in context, these passages are highly probative of Defendant's knowledge of and/or intent to devise a scheme to defraud lenders through a cash-back system.  In this sense, the evidence in question might be prejudicial in that it helps to support an inference of Defendant's guilt, but there has been no showing that it is unfairly

prejudicial.  These objections will be overruled.

The last objection to be addressed is to page 25, lines 9-11, which Defendant seeks to exclude on the ground that this passage amounts to "a short side discussion of 'tax fraud.'" [Doc. 90 at 5].  Although the term "tax fraud" is used here, when read and considered in context, it is apparent that the challenged statement is relevant to the workings of the alleged cash-back scheme, as well as to the government's allegation that K&E Construction served as a vehicle to funnel money back to Defendant's buyers.  This discussion is highly probative of defendant's knowledge of and/or involvement in a scheme to defraud through the creation of a cash-back scheme.  Because the evidence has not been shown as substantially more prejudicial than probative, the objection will be overruled.

Finally, the Court notes that, at the hearing, defense counsel voiced his concern that the January 17, 2008 conversation between his client and Mr. Sena is "stilted," "truncated," and intended to "blind-side," Defendant, and, further, that, in counsel's opinion, "all . . . it's going to do is prejudice [the jurors] with incomplete information, innuendo, [and] misunderstanding. . . ." [Doc. 160 at 41].  Instead of playing the recording, suggests counsel, Mr. Sena (listed at number 5 on the *United States' Witness List* [Doc. 109 at 1]), "can come in and be much more fully examined on . . . direct examination . . . by" the government. [Doc 60 at 41].  To the contrary, however, as counsel for the government noted and case authority supports, it is permissible during trial to stop a tape or CD of a recorded conversation to ask the witness who was a participant therein to clarify what the witness meant by a particular remark, if clarification would assist the jury's understanding of facts in issue.  See, e.g.,

United States v. Giampa, 904 F.Supp. 235, 297-301 (D.N.J. 1995) (allowing government to stop audio- and videotapes at certain points to allow the witness, himself a participant to recorded conversations, to explain and interpret code words, phrases, and references used in "truncated sentences, abbreviated sentences, unfinished sentences and references to events and people that were clear only to the participants of the conversation").

Accordingly, for the reasons set forth herein and for reasons stated on the record of the December 7, 2010 hearing, Defendant's objections are overruled and his motion to suppress the transcript in its entirety is denied.

**C.**   ***Motion to Strike Surplusage and for an Order Requiring United States to Elect its Theory of Prosecution* [Doc. 91]**

In this motion, Defendant asks the Court to strike from the Second Superseding Indictment as surplusage (1) use of the term "cash back;" (2) paragraphs 2 through 5; and (3) paragraph 11(e). [Doc. 91 at 1]. He also, again, asks that the government be required "to elect and clearly to state its theory of fraud prosecution." [Id.]. As the Court understands the election-of-theory argument, he is concerned that the government's use of the term "cash back" confuses various theories of fraud prosecution and has the potential to cause the jury to convict him of honest-services fraud, or fraud through conflict of interest, neither of which has been charged.[2]

---

[2]  [See Doc. 91 at 5 ("The defense concern is that the United States' repeated reliance on the phrase "cash-back" scheme to describe Mr. Powers conduct is unnecessarily prejudicing jurors from the outset of the trial and, at the same time, conflating the operative terms of two, and possibly three, distinct theories of fraud prosecution: 1) money and property fraud; 2) honest services fraud, and 3) frauds committed by means of conduct which represents a conflict of interest which might be 'criminal.'")].

Rule 7 of the Federal Rules of Criminal Procedures provides that, "[u]pon the defendant's motion, the court may strike surplusage from the indictment. . . ." Fed.R.Crim.P. 7(d).  The purpose of this provision is to protect the defendant from immaterial or irrelevant indictment allegations that may be prejudicial.  See id. (advisory committee notes).  Our Tenth Circuit has explained that "'[a]cting in its discretion, a district court may strike as surplusage allegations not relevant to the charge at issue and inflammatory and prejudicial to the defendant.'" United States v. Schuler, 458 F.3d 1148, 1153 (10th Cir. 2006) (quoting United States v. Collins, 920 F.2d 619, 631 (10th Cir.1990)).  Notwithstanding, "language in the indictment . . . describing the essential elements of the crime alleged is not surplusage and cannot be stricken under Rule 7(d)." Collins, 920 F.2d at 631.

Moreover, allegations do not necessarily amount to surplusage simply because they relate information other than elements of the offense charged.  For example, in a recent wire-fraud prosecution in the Eastern District of Pennsylvania, the defendant moved to strike as surplusage descriptions of the losses sustained by the allegedly defrauded entities, arguing that  "because loss is not an element of the offense of wire fraud, [those descriptions were] not germane to the charges made or contain inflammatory and prejudicial matter, and therefore [were] surplusage [that] should be stricken." United States v. Georgiou, 2009 WL 4641719, at *6 (E.D.Pa. Dec. 7, 2009).  Granting in part and denying in part the defendant's motion, the court held that evidence of loss was relevant to show his specific intent to defraud (although the fact that the entities in question were dissolved as a result of losses

sustained went beyond what was reasonable to prove intent).  Id.  The court cited to a similar case in which the Third Circuit upheld the admission of victim-impact testimony on the topic of financial losses in a mail-fraud case.  Explaining the relevance of such testimony, the circuit first set forth the elements of the crime of mail fraud, noting that proof of actual loss is not among them.  United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994).  But, continued the circuit,

> that does not mean that evidence of loss was irrelevant. Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent.  Proof that someone was victimized by the fraud is thus treated as some evidence of the schemer's intent.   Also relevant is the defendant's failure to take any steps to ameliorate the loss.  The government submits that the evidence about the victim' losses and Copple's refusal to make good those losses was relevant to show Copple's specific intent to defraud. We agree, with the qualification that district judges should exercise their wise discretion in imposing limits on such testimony.

Id. at 545 (internal citations omitted).  The court in Georgiou relied on this precise reasoning in holding that descriptions of losses sustained, as set forth in the indictment, did not amount to surplusage.  Georgiou, 2009 WL 4641719, at *6.

Nor are allegations non-relevant surplusage if they detail facts that the government intends to prove.  See United States v. Laurienti, 611 F.3d 530, 546-547 (9th Cir. 2010) (in prosecution for securities fraud, use of word "unlawful" in relation to defendants' receipt of bonus commissions was not surplusage because government argued that (1) receipt of such commissions was part of overall scheme to defraud; and (2) government intended to show

at trial such circumstances as would make receipt of bonus commissions unlawful here).

In this case, while Defendant moves to strike "as prejudicial surplusage" paragraphs 2 through 5 of the Second Superseding Indictment, he does not explain how paragraphs 2 and 3 are in any way inflammatory, prejudicial, or superfluous.  See United States v. Zabawa, 39 F.3d 279, 285 (10th Cir. 1994) ("Use of Rule 7(d) is appropriate when the allegation is not relevant, or is inflammatory or prejudicial.").  Although he contends that "[p]aragraphs 2 through 5 provide substantial details about prototypical 'cash back' schemes and schemers, making a number of specific and prejudicial allegations," paragraphs 2 and 3 do not use the term "cash back" at all.  Those paragraphs do, however, describe and explain the purposes of the paperwork (URLAs and HUD-1s), that he is charged with falsifying or causing to be falsified as part of his overall scheme to defraud lenders.  Paragraphs 4 and 5 explain a "cash back" scheme, its risks, and its actors, but the term is used in the context of making allegations the government intends to prove at trial. Additionally, the term "cash back scheme" describes exactly what the government charges occurred in this case—Defendant devised a system whereby buyers who would not otherwise qualify for mortgages made material misrepresentations on loan applications and other documents so that lenders would make loans they otherwise would not make. Defendant would then provide to these buyers additional sums back at their closings that, for reasons explained in paragraph 4 of the Second Superseding Indictment, are not knowingly allowed.

Moreover, notwithstanding that the indictment should be a plain and concise statement of the facts, a "scheme or artifice to defraud . . . must be described with particularity. . . ."

Schuler, 458 F.3d at 1152.  Indeed, where the government is tasked with proving a scheme or artifice to defraud, "[i]t is necessary that 'the nature of the schemes or artifices is identified or described, including the particular pretenses, representations or promises claimed to have been false.'" Id. (*quoting* United States v. Curtis, 506 F.2d 985, 990 (10th Cir.1974)).  Rather than inflame and prejudice, paragraphs 2 through 5, and use of the term "cash back," (1) explain and shed light on the overall scheme Defendant is accused of devising; (2) provide a roadmap as to where the government expects to go at trial; and (3) help to supply the particularity our Tenth Circuit demands in situations where the government is required to prove the existence of a scheme or artifice to defraud.

Defendant also seeks to strike as prejudicial surplusage paragraph 11(e), which alleges that "K&E Construction did no repairs or renovation work for the buyers or sellers, and functioned only as an instrumentality to funnel cash to the buyers." [Doc. 91 at 4; see also Doc. 82 at 5-6].  He objects to this paragraph on the ground that it is not a plain and concise statement of the essential facts, and also maintains that K&E did, in fact, perform repairs and renovations for three buyers. [Doc. 91 at 4].

According to the government, it plans to show that the three buyers in question did not pay K&E to work on their properties.  It plans to show that K&E did not file tax returns, and did not operate in the normal course of business.  The government also plans to show that, although Defendant submitted to title companies invoices from K&E for alleged repair work, none of the  buyers contracted with K&E, and the invoices were for amounts paid to Defendant at closing, and then turned over by him to the buyers. [Doc. 99 at 4].  As such,

paragraph 11(e) is not surplusage but, instead, sets forth particular allegations that the government intends to demonstrate as the means by which Defendant executed the cash-back scheme, and should not be stricken from the indictment.  See Schuler,  458 F.3d at 1152.

Finally Defendant moves for an order directing the government to elect between its theories of fraud prosecution, his stated concern being that, by repeatedly using the term "cash back," the government "conflat[es] the operative terms of two, and possibly three, distinct theories of fraud prosecution: 1) money and property fraud; 2) honest services fraud, and 3) frauds committed by means of conduct which represents a conflict of interest which might be 'criminal.'" [Doc. 91 at 5].  He expresses concern that "cash back" sounds too much like "kickback," but that receiving a kickback is a form of "honest services" fraud, which has not been charged. [See id. at 4-7].[3]

Honest-services fraud was recently narrowed by the United States Supreme Court to fraud involving bribes and kickbacks.  See Skilling v. United States, 130 S.Ct. 2896, 2928 (2010); see also United States v. Riley, --- F.3d ----, 2010 WL 3584066, at *5 (3d Cir. 2010) ("In light of Skilling . . . the failure to limit honest services fraud to 'bribes and kickbacks' . . . now constitutes legal error.").  Additionally, the honest-services statute is set forth at 18 U.S.C. § 1346.  See Skilling, 130 S.Ct. 2908 n.1.  Nowhere in the Second Superseding

---

[3] Defendant's motion in this regard appears moot in light of the government's response that (1) Defendant has been charged with money or property fraud; (2) Defendant had not been charged with taking kickbacks or bribes; and (3) the government will not ask the Court to submit the charges to the jury under anything other than a money or property theory of fraud, as is charged in the indictment. [See Doc. 99 at 7-8, 9-10].  Nevertheless, for purposes of completeness, the Court addresses the issue.

Indictment is (1) 18 U.S.C. § 1346; (2) the term "bribery;" or (3) the term "kickback" used.

As for Defendant's concern with respect to conflict-of-interest fraud,

> [c]ounsel believes that the United States' allegations appear to include, as part of Mr. Powers' "scheme or artifice to defraud," allegations of conduct which could be described as "undisclosed self-dealing by a public official or private employee[," and therefore f]urther clarification of the theory of prosecution appears necessary to determine prior to trial whether violation of conflict of interest considerations is contemplated as part of the alleged scheme to defraud.

[Doc. 91 at 7].

To the extent that Defendant's dual roles as real estate agent and mortgage broker allowed for the facilitation of his scheme to defraud lenders, contends the government, any inference that he engaged in self-dealing or was operating under a conflict of interest is appropriate, "given the broad definition of fraud." [Doc. 99 at 9]. The government also maintains that although <u>Skilling</u> precludes it from charging Defendant "with crimes based on his conflicts of interest and self-dealing . . . this does not mean that these aspects of his conduct are irrelevant to the deceitful actions he took in this case as a scheme for money." [<u>Id.</u> at 5-6].

A similar issue was raised and addressed in a recent, post-<u>Skilling</u> case from the Eastern District of New York. In <u>United States v. Hatfield</u>, the defendant, on trial for offenses relating to insider trading, moved for a judgment of acquittal and mistrial on grounds including that (1) <u>Skilling</u> invalidated the honest-services fraud theory; (2) any evidence presented during his trial concerning alleged self-dealing related only to the defunct

honest-services theory; and (3) such honest-services fraud evidence infected the entire trial.
United States v. Hatfield, 724 F.Supp.2d 231, 329-30 (E.D.N.Y. 2010).  To the extent that
the defendant had been charged with honest-services fraud in violation of 18 U.S.C. § 1346,
the court agreed with his position and entered a judgment of acquittal as to the relevant
counts.  The court denied the motion for mistrial, however, specifically disagreeing with the
defendant's argument that "any evidence concerning 'self-dealing' related only to the now
defunct honest services charges." Id. at 330.  To the contrary, explained the court, evidence
that the defendant's alleged self-dealing "involved the mails and/or wires . . . remain[ed]
relevant to the mail and wire fraud counts . . . , under a money or property theory." Id.
Hatfield lends support to the government's argument that it need not actually charge Mr.
Powers with honest-services fraud or conflict-of-interest fraud in order to present evidence
of his alleged self-dealing, as any such action involved—or is relevant to—his use of the
wires to defraud the lenders in question.  Thus, to the extent that this motion has not been
rendered moot (in the sense that the government makes clear that it is pursuing only a
money/property theory of fraud prosecution), it will be denied.

**D.**   ***Motion to Require Government to Elect Between Offenses Alleged Within Duplicitous Wire Fraud Counts*** **[Doc. 94]**

In this motion, Defendant objects to the phrasing of the Second Superseding
Indictment, arguing that it is duplicitous because he has been charged under 18 U.S.C. §
1343 with having "knowingly and unlawfully devised and intended to devise a scheme and
artifice to defraud lenders . . . AND to obtain money, funds and other property from lenders.

. . ." [Doc. 94 at 6 (emphasis in original)].  He contends that, in charging him in the conjunctive, the government has "join[ed] . . . two or more offenses in one count, thus creating the possibility that the jury could convict without agreeing unanimously on guilt for the same offense." [Id. at 3 (internal quotation omitted)].  Moreover, he contends that "[t]hese two distinct offenses charged in the conjunctive cannot be adequately cured with a unanimity jury instruction. . . ." [Id.].  The requested remedy is that the government be required "to elect between duplicitous theories before trial." [Id.].

A duplicitous indictment is one that charges the defendant with two or more separate offenses in the same count.  United States v. Trammell, 133 F.3d 1343, 1354 (10th Cir. 1998).  However, in the context of the wire fraud statute, the Tenth Circuit has held that "when both a scheme to defraud and to obtain money are charged in one indictment or in a single count and are connected in the conjunctive, they are not duplicitous, and it will suffice to prove any one or more of the charges."  United States v. Lefebvre, 189 Fed.Appx. 767, 772 (10th Cir. 2006).  Lefebvre approvingly cited Troutman v. United States, in which the defendants were charged in count 14 of a 15-count indictment with using interstate commerce or the mails to employ a device, scheme, or artifice to defraud, and to obtain money by means of untrue statements of material fact, in violation of securities law.  See Troutman v. United States, 100 F.2d 628, 631 (10th Cir. 1938).  The defendants challenged their conviction, arguing that count 14 was duplicitous in that it charged "separate and distinct violations of the Securities Act."  Id.  Our Tenth Circuit disagreed, noting that, although the statute "embrace[d] in the disjunctive three separate and distinct acts as a

crime[, t]he indictment . . . charged in the conjunctive." Id.  The circuit concluded that, while an indictment charging a statutory offense must follow the statute creating it, "where the statute denounces several acts as a crime, they may be charged in one indictment or in a single count if they are connected in the conjunctive. An indictment drawn in that manner is not duplicitous, and it suffices to prove any one or more of the charges." Id.

In Lefebvre, the circuit concluded that even where duplicity *is* an issue (though that was not the case in either Lefebvre or Troutman),

> any perceived problem  in charging both a scheme to defraud and to obtain money by false pretenses may be cured by a jury instruction explaining unanimous agreement must be reached that the government proved, beyond a reasonable doubt, at least one or the other—*i.e.*, either a scheme to defraud or to obtain money by false pretenses.

Lefebvre, 189 Fed.Appx. at 772-773.  The circuit continued that even absent an instruction on unanimity[4] in the wire fraud context, if the jury returns a guilty verdict where the indictment has charged several acts in the conjunctive, the general verdict will stand if the

---

[4]  An example of a satisfactory unanimity instruction was set forth in Trammell:

> The government has alleged the defendant's actions constituted: (1) a scheme to defraud, and/or (2) a scheme whereby defendant attempted to obtain money by false pretenses. In order to find defendant guilty of this offense, you must find the government has proven beyond a reasonable doubt the defendant pursued either (1) a scheme to defraud, or (2) a scheme whereby defendant attempted to obtain money by false pretenses. Furthermore, should you so decide, *you must unanimously agree as to whether there was a scheme to defraud, or whether there was a scheme whereby defendant attempted to obtain money by false pretenses*.

Trammell, 133 F.3d at 1355 (emphasis in original).

evidence is sufficient with respect to any one of the acts charged.  Id. at 773.

Defendant argues that even an instruction on unanimity would be insufficient because (1) the jury might convict without unanimously agreeing on the same offense; (2) he might be prejudiced in a subsequent double jeopardy offense; and (3) the Court could have difficulty determining the admissibility of evidence. [Doc. 94 at 6].  These three concerns have been cited by the Tenth Circuit as valid dangers associated with a duplicitous indictment.  See United States v. Wiles, 102 F.3d 1043, 1061 (10th Cir. 1996) (rev'd on other grounds).  The circuit went on to explain, however, that it "draw[s] a distinction between an indictment that charges multiple offenses for distinct and separate criminal acts in the same count, and an indictment that charges *multiple means of carrying out one offense* associated with a continuing course of criminal conduct."  Id.  (emphasis added).  Wiles was a securities-fraud case where the defendants were charged in Count 2 of the indictment with "(1) employing a scheme to defraud, (2) making untrue statements of material facts and failing to state material facts, and (3) engaging in deceitful acts and practices, all of which defrauded [target corporation], its shareholders and investors."  Id. at 1053.  The circuit rejected the argument that Count 2 was duplicitous, concluding instead that this count charged a single offense of securities fraud, effected through "a multitude of ways and courses of action as a result of an ongoing scheme to defraud. . . ."  Id. at 1062.  In other words, while the defendants allegedly employed a number of *methods* to commit securities fraud as charged in Count 2, the unlawful act charged in Count 2 was one, single offense.

So too in Defendant's case.  To the extent that he is charged with devising and

intending to devise a scheme to defraud lenders, and obtaining, money, funds, and other property by means of material misrepresentations, he is charged with a single offense (*i.e.*, wire fraud), which he committed through a system of applying for mortgages for which he knew his clients would not qualify if truthful, so as to provide these people with cash back at closing, and making false statements and material misrepresentations in loan applications and other paperwork in order to effectuate his plan.  It is one offense, allegedly carried out through multiple means.  Our Tenth Circuit has been clear that a unanimity instruction "suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict." Wiles, 102 F.3d at 1062. For the foregoing reasons, the Court denies Defendant's motion to require the government to elect between offenses.

**E.**      ***Motion To Dismiss Counts 5, 6, 9, and 10 (Cameron Counts) Of The Second Superseding Indictment* [Doc. 92]**

Defendant asks the Court to dismiss counts 5, 6, 9, and 10 of the Second Superseding Indictment, all of which involve wire transmissions from RFC Cameron Financial Group, Inc. ("the Cameron counts").  In April of this year, the government informed Defendant that the loan records for the transactions described in the Cameron counts have been destroyed. As a result, he contends that (1) the destruction of these documents is a violation of Brady v. Maryland, 373 U.S. 83 (1963); (2) without the underwriting standards that he believes were among these destroyed documents, the government will not be able to meet its burden of proof on the element of materiality; and (3) without the underwriting standards, which he

would present as favorable evidence, Defendant is denied a fair trial. [Doc. 92 at 3-7].

The government responds that the loan documents in question were never in its possession but, instead, had been kept in a storage facility in California. When the government sought those documents, which it apparently did after Cameron had already declared bankruptcy and gone out of business, it learned that they had been destroyed. The government also maintains that the underwriting standards in question are voluminous, and so were not included in the destroyed files and documents. The government contends that it will be able to meet its burden of proof with respect to materiality and also questions how the underwriting standards would provide Defendant with exculpatory evidence. [See generally Doc. 98].

Under Brady, the government violates a defendant's due process rights by withholding evidence from him that is material to either guilt or punishment. Brady, 373 U.S. at 87; see also Giglio v. United States, 405 U.S. 150, 154 (1972) (applying Brady to impeachment evidence). But "[t]he government's obligations under Brady only extend to information in its possession, custody, or control[,]" United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006), and in this case, Defendant has not challenged the government's representation that the destroyed documents were never in its possession. [See Doc. 98 at 3; see generally Doc. 104]. For this reason, Defendant's Brady argument is unpersuasive.

Defendant also has not made clear how, exactly, Cameron's underwriting standards are material here, or how their absence denies him a fair trial. [See Doc. 92 at 6 ("[T]he absence of the Cameron underwriting standards will result in the denial of Defendant

Powers' right to a fair trial. The absence of the underwriting standards should prevent the United States from proving the essential element that any false or fraudulent pretenses, representations, or promises were used.")]. He appears to argue that before the government can prove that false statements were made on buyers' URLAs, the government "must first establish what was required to reported[,]" which, he argues, the government is unable to do without reference to Cameron's underwriting standards. [See id. at 5]. To be sure, he contends that "[t]he absence of the underwriting standards places the whole case in a different light by removing the basis for which the United States can assert the falsity of the [URLAs] submitted to the lenders and preventing Defendant Powers from asserting evidence to support the truthfulness of [them]." [Id. at 6-7]. In support, he cites United States v. Lake, 472 F.3d 1247 (10th Cir. 2007).

In Lake, the circuit set aside convictions on 40 counts of wire fraud, money laundering, circumvention of internal financial controls, conspiracy, and forfeiture, charged against two bank executives accused of concealing from the SEC their personal use of corporate aircraft. Lake, 472 F.3d at 1249-50. With respect to the wire fraud counts, the defendants were accused of having submitted required reports to the SEC in which they failed to disclose the value to them of their personal use of the aircraft. Id. at 1250. The government argued that all of the defendants' compensation—cash and noncash—was required to be disclosed, regardless of value, while the defendants insisted that disclosure was required by law only if the cost to the corporation of their personal use exceeded a certain threshold amount, which they maintained was not the case. Id. at 1250, 1253.

Setting out the elements of the offense of wire fraud, the circuit focused on element number three—purpose to use a wire communication to execute a scheme to defraud—as the central issue on appeal.  Lake, 472 F.3d at 1255.  It reached two important conclusions. First, the SEC reports, which comprised the wire submissions, were made because they were *required by law* to have been made, and *not* for the purpose of executing the alleged scheme to defraud.  In other words, "[a]s far as the trial evidence showed, even in the absence of a fraudulent scheme the . . . reports would have been filed and the contents would have been the same."  Id.  Second, the government did not demonstrate (nor had it offered any evidence tending to show) that the content of the reports was false, fraudulent, or even misleading, because it did not establish that "the actual additional cost incurred by the corporation" as a result of the defendants' personal use of the aircraft exceeded the threshold amount referred to above.  Id. at 1258-59.  It was in this context, *i.e.*, whether the SEC reports were required to disclose (1) the value to the defendants of their personal use of the aircraft, or (2) the additional cost to the corporation from that use, that the Circuit stated, "[w]hether the reports were false depends on what is required to be reported."  See id. at 1257.  Thus, whether the Lake defendants lied on the report depended on the scope of the reporting requirement.  In turn, Mr. Powers relies on this quoted passage in support of his argument that, given the alleged destruction and unavailability of Cameron's underwriting standards, the Cameron counts must be dismissed because in order to convict him on these counts, the government "must establish what RFC Cameron Financial Group, Inc. required to be reported; what has been termed 'the underwriting standards.'" [Doc. 92 at 6].  He argues that whether he

directed the buyers to lie on the loan applications depends on how the underwriting standards governed the lenders' processing of the applications.

Lake does not support Defendant's position.  In that case, the SEC reports alone were not evidence of a scheme to defraud because they were required to be filed and, therefore, "even in the absence of a fraudulent scheme the . . . reports would have been filed and the contents would have been the same."  Lake, 472 F.3d at 1255.  By contrast, in this case, the entire gist of the alleged scheme to defraud was the filing of falsified loan applications and other documents in an effort to obtain from lenders sums of money to which the applicants actually were not entitled.  Absent a scheme to defraud, there would be no reason to submit falsified loan applications.

Lake is further distinguishable on a more basic level.  In the present case, the government intends to show at trial that, with his assistance, Defendant's clients (1) falsely represented their assets and incomes; (2) concealed debts; (3) misrepresented sources of down payments; and (4) were untruthful with respect to their intent to occupy the properties in question, all of which the government asserts would otherwise have disqualified them from the mortgages they sought and received.  Whether the representations of the buyers were false does not depend on what information the lender required—the truthfulness of the representations can be assessed independently by the jury.  It is unlikely that the absent underwriting standards would have permitted loan applicants to be untruthful regarding these matters, but that is precisely what they would need to do in order to square the instant situation with that presented in Lake, where the falsity of the SEC reports depended on what

was required to be reported.  See Lake, 472 F.3d at 1257.  Defendant's assertion that "[t]he absence of the underwriting standards places the whole case in a different light by removing the basis for which the United States can assert the falsity of the [URLAs] submitted to the lenders and preventing Defendant from asserting evidence to support the truthfulness of the [URLAs]," [Doc. 92 at 6-7], lacks merit.

Apart from falsity, Defendant appears to argue that without the underwriting standards, the government cannot prove whether the alleged misrepresentations were material.  [Doc 104 at 5]  Whether a misrepresentation is material is a question of fact for the jury's determination.  See TENTH CIRCUIT CRIMINAL PATTERN JURY INSTRUCTION No. 2.57 (2006) (instructing the jury that "[a] false statement is 'material' if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.").  The government has maintained that it will demonstrate materiality by means of the testimony of the lenders.  The jury will determine whether this evidence is sufficient to establish whether any misrepresentations were material to a scheme to defraud.

## III. CONCLUSION

For the foregoing reasons, the motions addressed herein are denied.

**IT IS, THEREFORE, ORDERED** that Kevin Powers' *Motion to Dismiss Multiplicitous Wire Fraud Counts or, in the Alternative, Require Government to Elect Between the Multiplicitous Counts of Second Superseding Indictment* [Doc. 89] is **DENIED**;

**IT IS FURTHER ORDERED** that *Defendant's Motion to Suppress Redacted Transcript of January 17, 2008 Conversation Between Kevin Powers and Chris Sena* [Doc.

90] is **DENIED**;

     **IT IS FURTHER ORDERED** that Kevin Powers' *Motion to Strike Surplusage and for an Order Requiring United States to Elect its Theory of Prosecution* [Doc. 91] is **DENIED**;

     **IT IS FURTHER ORDERED** that Kevin Powers' *Motion to Require Government to Elect Between Offenses Alleged Within Duplicitous Wire Fraud Counts* [Doc. 94] is **DENIED**.

     **IT IS FURTHER ORDERED** that Kevin Powers' *Motion To Dismiss Counts 5, 6, 9, and 10 (Cameron Counts) Of The Second Superseding Indictment* [Doc. 92] is **DENIED**.

     **SO ORDERED** this 30th day of  March, 2011, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge