# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                Plaintiff,

      vs.                               CR 2009-3065 MCA

KEVIN POWERS,

                Defendant.

### DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE REPORT

**COMES NOW** Defendant KEVIN POWERS, by and through his attorney DANIEL J. TALLON, and files his formal objections to the pre-sentence report. The pre-sentence report was disclosed to defense counsel on or about July 12, 2011. The objections set forth herein concern portions of the pre-sentence report which the Defendant challenges. Defendant requests leave to file additional supplement objections as to loss calculations and restitution.

**GROSS RECEIPTS ENHANCEMENT**

1.        PSR page 31, paragraph 108 states that Mr. Powers derived more than $1 million in "gross receipts" from one or more financial institutions and for that reason, increases the base offense level by two levels. The basis for this proposed enhancement resides in USSG Section 2B1.1 (B)(14)(A).

2.        USSG Section 2B 1.1. Application Note 11. Gross Receipts Enhancement under subsection (b) (14) (A) states: "(A) In General. – – For purposes of subsection (b) (14) (A), the defendant shall be considered to have derived more than $1 million in gross receipts if the gross receipts to the defendant <u>individually</u>, rather than to all participants, exceeded $1 million."

1

3.      The PSR states that SunTrust Mortgage funded four properties and eight loans: 6600 Glenturret– $490,000; 10444 Oso Ridge NW – $320,000; 12514 Holly Drive – $1.3 million; and 11401 Eagle Rock – $760,000. This represents a total alleged <u>loss of $2.87 million</u>.

4.      PSR page 52, paragraph 205 states that <u>$1,152,800.50 is due as restitution</u> to SunTrust for with respect to the loans represented by Counts 1, 2, 12, 13, 14, 15, 16, and 17. PSR page 22, paragraph 70 states that Thomas Switzer was the reporting person for SunTrust's losses. The eight loans for which losses are claimed are charted on PSR page 23, paragraphs 71 through 74.

5.      Gross receipts is defined as:  "(B) Definition. – – "Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense. See 18 U. S. C. Section 982 (a) (4)."

6.      Counsel argues that the gross receipts obtained from SunTrust Mortgage were not "gross receipts to the defendant individually" and did not exceed $1 million. Even if it is argued that the K&E Construction money disbursed to Kevin Powers and immediately transferred to the homebuyer are "gross receipts to the defendant individually", the total of those amounts in the SunTrust Mortgage transactions was $717,000.00, an amount less than $1 million. Therefore, this two-level enhancement should not apply.

7.      This provision <u>double counts loss</u> and restitution amounts and duplicates the intent and impact of the pecuniary loss enhancement. The PSR claims an intended loss amount of approximately $5.5 million.  SunTrust's alleged loss, by itself, raises the offense level by or from +16 to +18.  At the top of Mr. Powers advisory guideline range,

this two-level enhancement raises his offense level from 29 to 31 and his sentencing

exposure by 21 to 27 months. See PSR page 32, paragraph 114 and PSR page 50,

paragraph 193. Again, this two-level enhancement should not apply.

**SOPHISTICATED MEANS ENHANCEMENT**

8.      PSR page 31, paragraph 107, the PSR writer argues that Mr. Powers

should be subject to a two-level sophisticated means enhancement and, in summary, cites

the following factors.  The PSR argues that Mr. Powers:

- *controlled the transactions by acting as realtor and mortgage broker*
- *located houses being sold for less than their appraised value*
- *approached the sellers with requests to purchase and build in cash back amounts*
- *applied for loans with larger amounts based on false information in loan applications*
- *provided title companies with necessary invoices to receive cash back*

9.      The Specific Offense Characteristics set forth in Section 2B1.1(b)(9)

states: "If (A) the defendant relocated, or participated in relocating, a fraudulent scheme

to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial

part of a fraudulent scheme was committed from outside the United States; or (C) the

offense otherwise involve sophisticated means, increase by two levels. If the resulting

offense level is less than level 12, increase to level 12."

10.      Subparagraphs A and B clearly do not apply based upon their references to

"relocated, or participated in relocating, a fraudulent scheme to another jurisdiction" and

requiring that a "substantial part of a fraudulent scheme was committed from outside the

United States."  Only subparagraph C could apply.

11.     Application Note 8 attempts to explain the sophisticated means enhancement under subsection (b)(9)(C).  It states: "For purposes of subsection (b)(9)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Thereafter, the Application Note discusses schemes committed in more than one jurisdiction and references "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

12.     Counsel argues that the overriding sense or purpose of the sophisticated means enhancement is contained in the phrases "especially complex or especially intricate offense conduct" and conduct such as hiding assets or transactions and the use of fictitious entities, corporate shells or offshore financial accounts.

13.     The focus on multijurisdictional and offshore criminal conduct seems to exclude the pedestrian nature of residential real estate sales and mortgage loan applications. The indicted transactions were not hidden but published; K&E Construction was neither a fictitious entity nor a corporate shell.

14.     There is no other example of an enumerated offense which "otherwise involved sophisticated means". There is no definition, rule of construction, special rule which adequately defines "sophisticated means" in any other specific context.

15.     The use of purchase agreements addenda to outline the purpose to obtain renovation monies, the alleged misstatement of the vague concept of stated income and the simple declaration of intent to occupy a property as a primary residence are at the core of the government's alleged scheme to defraud. These elements of conduct, either

alone or taken together, are arguably not "especially complex or especially intricate" and are not in line with the apparent intent of this enhancement to punish sophisticated multijurisdictional and/or multinational criminal conduct.  Case specific allegations and evaluative factors are examined below.

**A.     Mr. Powers allegedly controlled the transactions by acting as realtor and mortgage broker.**

16.     Michael Dreskin in his FD-302 and in trial testimony which was uncontroverted, explained that a person can act as a realtor and mortgage broker without conflict of interest. See PSR page 21, paragraph 64.

17.     PSR page 16, paragraph 49 states that Shauna Rampley bought the 6719 Glenturret property "on the advice of the <u>defendant **and** Gene Barnett,</u> her business partner (whose girlfriend is Joan Prouty)."

**B.     Mr. Powers located houses being sold for less than their appraised value.**

18.     PSR page 5, paragraph 7 acknowledges that the properties chosen by clients "<u>were **offered** for sale under market value.</u>"   It states that "only he" (Mr. Powers) could find properties which would appraise for more than the asking prices in order for the cash back amounts to be included.  This is not true.

19.     The PSR states that "In those roles" he was able to locate houses being sold for less than their appraised value. Every licensed real estate agent is able to locate houses being sold for less than their believed or projected appraised value. Any licensed real estate agent can provide a "market analysis". At the time they are provided, real estate agents are not acting as appraisers. Unless they have familiarity with the actual results of specific appraisals in the area, the realtors are only making educated guesses.

**C.      Mr. Powers approached the sellers with requests to purchase and build in cash back amounts.**

20.      PSR page 5, paragraph 7 and 8. Mr. Powers denies that he the only person "finding the properties". As stated in paragraph 7, Gene Barnett found the four Oakland Estates properties purchased by Joan Prouty and Shauna Rampley. Jodi Powers found the two properties she purchased. Ms. Tuschhoff brought Claude Sanchez to Mr. Powers; Mr. Sanchez requested that Mr. Powers sell his Holly Drive property.   The Holly property was not listed in the Multiple Listing Service.   Mr. Powers knew of the Rio Grande property because he had been involved in a prior transaction with the property with its current owner, Tim Lesley. Buyer Pauline Walker had already purchased several properties from Tim Lesley through Mr. Powers.  Tim Lesley directly contacted Ms. Walker regarding the proposed sale of 7909 Rio Grande.  That property was not listed in the Multiple Listing Service.  Mr. Powers found the Eagle Rock property.

PSR pages 5 – 6, paragraph 9. Defendant objects to paragraph 9 because it conflates the idea of an appraised value with asking price. The appraisals were not determined to be flawed. No trial evidence supports that contention. What Mr. Powers sought to do was find houses which had a fair market value in excess of their asking price in a strongly appreciating market. Any real estate buyers' agent would do the same.

21.      It appears that it was common practice in the real estate injury industry to build in cash back amounts or to withdraw expected equity from the appraised value of houses. In PSR page 14, paragraph 43, Thompson states: "when asked why the $210,000 came out of the sellers funds on the HUD – 1, he said that it that was the way it normally worked and he had done it before, just not for so much money." Regarding systemic industry practices, PSR page 5, paragraph 8 states that Sara Hites and Deb Brown were

told by "their qualifying broker …it would be okay so long as all was disclosed in the HUD–1 settlement statements."

**D.      Mr. Powers applied for loans with larger amounts based on false information in loan applications.**

22.      It is not a "sophisticated means" to apply for a mortgage loan. Many people with a high school education can process mortgage loan applications.  The activity did not require a license in New Mexico.  The United States alleges that the false information had to do with stated income and assertions as to owner occupancy. It does not require "sophistication" to either allegedly misstate stated income or to misstate one's intention to occupy property as a primary residence.

**E.      Mr. Powers provided title companies with necessary invoices to receive cash back.**

23.      Mr. Powers provided the title companies with the necessary invoices (invoice) in order to receive the cash back amounts. It is not sophisticated to have provided a single lump sum invoice as to each of the nine transactions which set forth, quite simply, the total amount of renovations planned with respect to each of the nine residences.

24.      The arguments set for in paragraph 16 to 23 contradict the guidelines' requirement that sophisticated means consist of means that are "especially complex" or represent "especially intricate offense conduct pertaining to the execution or concealment of the offense." Therefore, a two level increase is not warranted. At the top of Mr. Powers' advisory guideline range, this two-level enhancement raises his offense level from 29 to 31 and his sentencing exposure by 21 to 27 months. See PSR page 32, paragraph 114 and PSR page 50, paragraph 193. Again, a two level increase is not

warranted.

**OBSTRUCTION OF JUSTICE ENHANCEMENT**

25.     PSR page 32, paragraph 111 argues for the application of a two–level obstruction of justice enhancement.  The only basis for this enhancement is: "In the recorded conversation with Chris Sena, Powers repeatedly told Sena not to tell the FBI about cash back or that they would go to prison."

26.     USSG Section 3C 1.1, Obstructing or Impeding the Administration of Justice states: "If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by two levels."

27.     Mr. Powers' conduct must be <u>purposefully calculated</u> AND <u>likely to thwart</u>, the investigation or prosecution of the offense of conviction and the obstructive conduct is related to the offense of conviction.

28.     Mr. Powers' statements were NOT "likely to thwart the investigation" under the circumstances of the recording of the Sena conversation. At the time of that recording the FBI already knew that this cash back money had been supplied to Sena. The FBI knew this as a result of its contacts with and document disclosures from Ron Campbell and other confidential sources.

29.     Application Note 1 states: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the

investigation or prosecution of the offense of conviction." The FBI was aware of the Holly Drive transaction and possessed documents about it from several sources including Mr. Sena for up to nine months prior to January 2008. Application Note 1 would seem to defeat the proposed enhancement.

30.     Application Note 2, Limitations on applicability of adjustment states: "In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statement sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

31.     The defense argued at trial that Mr. Powers was confused by Mr. Sena's shifting agenda in the January 17, 2008 conversation.  That conversation was followed another January 2008 conversation which presented several inconsistencies with the first. Counsel also contends that, according to the PSR, Mr. Powers backed off his original statements, stating that the interpretation of his actions and the actions of Mr. Sena was a matter of definition and that he would not put words in Sena's mouth or tell him what to say.  These statements are contrary to the assertion that Mr. Powers obstructed justice. See PSR page 9, paragraph 23.  Application Note 2 does not support the proposed enhancement.

32.     Application Note 4 sets forth a non-exhaustive list of examples of covered conduct. One is: "(A) threatening, intimidating, or otherwise unlawfully influencing a codefendant, witness, or juror, directly or indirectly, or attempting to do so;" Mr. Sena did not possess any of the three enumerated statuses in January 2008.

33.     Another is: "(G) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;" Mr. Powers was not aware he was being recorded so his statements to Mr. Sena cannot be considered as being made to a law enforcement officer.

34.     Application Note 5. Examples of conduct ordinarily not covered, includes: "(B) making false statements, not under oath, two law enforcement officers, unless Application Note 4 (G) above applies."

**MISCELLANEOUS OBJECTIONS AND CORRECTIONS**

35.     Correction: Vaughan is misspelled (Vaughn) throughout the PSR.

36.     Page 1, facesheet – this indicates that Mr. Powers is entitled to 15 days pre-sentence confinement from November 4 to November 18, 2009. This is incorrect. Mr. Powers may be entitled to one or two days pre-sentence confinement.

37.     PSR page 4, paragraph 2. The date trial commenced was April 6, 2011 not April 18, 2011.

38.     PSR page 5, paragraphs 7 and 8. Mr. Powers denies that he the only person "finding the properties". As stated in paragraph 7, Gene Barnett found the four Oakland Estates properties purchased by Joan Prouty and Shauna Rampley. Jodi Powers found the two properties she purchased. Ms. Tuschhoff brought Claude Sanchez to Mr. Powers; Mr. Sanchez requested that Mr. Powers sell his Holly Drive property.  The Holly property was not listed in the Multiple Listing Service.   Mr. Powers knew of the Rio Grande property because he had been involved in a prior transaction with the property with its current owner, Tim Lesley. Buyer Pauline Walker had already purchased several

properties from Tim Lesley through Mr. Powers.  Tim Lesley directly contacted Ms. Walker regarding the proposed sale of 7909 Rio Grande.  That property was not listed in the Multiple Listing Service.  Mr. Powers found the Eagle Rock property.

39.     PSR pages 5 – 6, paragraph 9. Defendant objects to paragraph 9 because it conflates the idea of an appraised value with asking price. The appraisals were not determined to be flawed. No trial evidence supports that contention. What Mr. Powers sought to do was find houses which had a fair market value in excess of their asking price in a strongly appreciating market. Any real estate buyers' agent would do the same.

40.     PSR pages 5 – 6, paragraph 9 also states: "These loan products, no longer available, allowed buyers to state a means of earning a living and incomes, which the lenders were not allowed to investigate.… were not allowed to do more than evaluate the reasonableness of the income amounts by comparison with the stated kinds of employment." Several trial witnesses testified as to databases such as salary.com which were identified as lenders as the basis for stating income. Mr. Powers related those databases to the debt to income ratios set forth in lender guidelines. Mr. Powers objects to the statement that the buyers' incomes were inflated because those incomes were consistent with the databases identified by the lenders. Mr. Powers objects to paragraph 9 because it states that incomes were inflated "presumably" to meet qualifying debt to income ratios. The assertions in paragraph 9 are without support for the reason that lender guidelines have not been provided to support them.

41.     PSR page 6, paragraph 10. Mr. Powers did business as Powers Mortgage Group for two of the nine transactions as opposed to eight of the nine transactions as stated in this paragraph.

42.      PSR page 7, paragraph 13. Mr. Powers objects to the statement that "The buyers appear to have been largely naïve and unsophisticated about real estate matters." Mr. Powers states that all were experienced home buyers and/or investors at the time of the indicted counts.

43      PSR page 8, paragraph 19. Mr. Powers objects to any statement that suggests that Mr. Sena was naïve and unsophisticated. Christopher Sena was not naïve for the reason that he began investing in properties with Kevin Powers in 2003, five years before he was contacted by the FBI and three years before his purchase of the Holly Drive property.

44.      PSR page 8, paragraph 19. Ms. Powers denies that he told Mr. Sena to have his "girlfriend pretend to be a contractor who is not paid in the renovations to the property and put a lien on the property." Further, Mr. Powers denies that he knew Christopher Sena's true income as based on his tax information.

45.      PSR page 9, paragraph 22.  Mr. Powers objects to the statement: "Powers in essence threatened Sena by saying that Sena got the money, not Powers." Counsel contends that there is no support for this statement in any of the three recorded conversations with Christopher Sena.

46.      PSR page 9 paragraph 23.  Mr. Powers denies that he stated that he "had talked with someone at Vaughan Realty who said that so long as Sena had not identified Holly as owner – occupied, Sena could not get in trouble."

47.      PSR page 10, paragraph 26. Mr. Powers objects to and denies the following: He told the agents that Claude Sanchez, "may be dead" not that he was dead.

48.     PSR page 10, paragraph 27. Mr. Powers objects to the statement that he was given $6,000 of the $350,000 home equity loan. Mr. Powers denies that the amount of $350,000 for renovations was an estimate made by Chuck Hoggan, a project manager for K&E. Mr. Powers also states that the management agreement that he wrote "void" on, in fact was voided in October 2007, but he simply had not made a written indication of same until reviewing the file with Chris Sena on January 24, 2008.

49.     PSR Page 11, paragraph 30. Mr. Powers denies that after hiring an attorney he left a voicemail with the FBI telling him that he wished to talk to them even though he had been advised not to. There was no appointment set to talk with the FBI on January 28, 2008.

50.     PSR page 12, paragraph 34. Mr. Powers denies that the K&E money received in the purchase of the Copperwood property was paid to Mr. Powers for closing costs. Instead, those funds were paid for actual work performed by K&E on the Copperwood property.

51.     PSR page 13, paragraph 38.  Mr. Powers denies that any of the K&E monies for the Amherst, Palomas, Kielich, and Eagle Rock properties were to make mortgage payments, but instead were to make repairs and renovations. Mr. Powers also denies that the Eagle Rock home was "valued at $500,000, she bought it for $700,000, and Powers told her it appraised for $600,000." This is incorrect.

52.     PSR page 13, paragraph 39. Mr. Powers objects to the inclusion of this statement: "her friend, Joan Prouty, a physician's assistant at UNMH, told her to stop doing deals with Powers because they were illegal, but Ms. Tuschhoff said she did not know why Prouty said that." Although hearsay may be admissible in presentence reports,

the source of this assertion is so far removed as to be unreliable and states a legal conclusion that Ms. Prouty is not entitled to make nor to have included in the presentence report.

53.     PSR page 13 – 14, paragraph 40 states that on or about February 1, 2008, Powers informed Ms. Tuschhoff that he would turn her listings with him over to another agent. This was an appropriate decision given the fact that Ms. Tuschhoff was also cooperating with FBI agents and recording her conversations with Kevin Powers. The paragraph 17 reference suggests a lack of credibility or forthrightness on the part of Mr. Powers which is not appropriate.

54.     PSR page 13, paragraph 40. Mr. Powers denies asking Ms. Tuschhoff "not to betray him."

55.     PSR page 14, paragraph 42. Mr. Powers objects to inclusion of this statement by Mr. Moskowitz: "he provided two HUD – 1s for the Eagle Rock property, and said he did not know why there were two." It is clear from trial testimony that for every property with two mortgage loans there are two HUD -1 forms. Mr. Powers also objects to Mr. Moskowitz' statement "he said the usual commission for the loan originating fees is 1%, and that Powers fees were way high." Mr. Moskowitz is not a mortgage lender. In addition, New Mexico state law in 2006 and 2007 permitted mortgage loan origination fees of up to 5.99%. A fee of 1% – 2%, such as those charged on Eagle Rock property, was typical in the market and legal, and not "way high."

56.     PSR page 15, paragraph 44. Mr. Powers objects to the characterization of all his income coming from sole proprietorships as being somehow irregular. There is no requirement that K&E or Powers Mortgage Group file tax returns as corporations or

LLC's. This characterization suggests unfounded impropriety by Mr. Powers. The United

States did not call Charles Sanders as a witness and did not establish either that Mr.

Powers improperly filed tax returns or improperly characterized the entities by which he

earned income.  Therefore this paragraph should be stricken as both irrelevant and

inaccurate.

      57.     PSR page 15, paragraph 46. Mr. Powers denies that Ms. Walker gave him

all her income information including W – 2s, tax returns, bank statements, pay stubs.

Further, Ms. Walker did not receive "over $100,000" but in fact received $244,000.

      58.     PSR page 15, paragraph 46 states Walker bought the Rio Grande house for

$800,000 with monthly payments of $8000. These amounts are not correct. The

paragraph also states: "Powers **got** an appraisal for the loan amount." Mr. Powers objects

to this statement because it suggests wrong doing. The United States did not prove that

any appraisal was false forged or fraudulent.

      59.     PSR page 15, paragraph 46 confuses the Dawn Tushhoff /Eagle Rock

transaction with Ms. Walker. It states that "she got over $100,000, which she used to

make the mortgage payments and renovations. When the money ran out, she sold five

rental properties, and used that money to make mortgage payments. Eagle Rock is in

foreclosure."

      60.     PSR page 16, paragraph 46 presents an ongoing theme which Mr. Powers

objects to. This paragraph states as to Ms. Walker "when the money ran out she could not

pay the mortgage." Mr. Powers objects because the statement fails to address the

independent underlying acts of each cooperative witness to spend loan proceeds.

Examples of statements by each of the six cooperating witnesses about how their funds

were dissipated without cause are set forth in the following paragraphs: 1) Page 15, paragraph 46 (Walker); 2) Page 16, paragraph 49 (Rampley); 3) Page 17, paragraph 52 (Jodi Powers); 4)Page 19, paragraph 57 (Prouty). Mr. Powers objects because these statements fail to address the independent, underlying decisions of the six cooperating witnesses to spend loan proceeds. Mr. Powers argues that inclusion of these statements creates and maintains the proposition that Mr. Powers controlled or victimized the buyers, when in fact, those witnesses have not been assessed any responsibility for their defaults on the loans and the losses which resulted from them. These six witnesses have been immunized from prosecution and from responsibility for loss and restitution. Mr. Powers believes the record of the PSR is most accurate when it presents and accurately characterizes the participation of the six immunized witnesses.

61.     PSR page 16, paragraph 49. Mr. Powers objects to the statement that he "gave her (Ms. Rampley) most, but not all of this money." This refers to the $92,500 paid to K&E for renovations. Stipulated and admitted trial exhibits show that a check for $92,500 was picked up by Gene Barnett on behalf of Ms. Rampley within 24 hours of the closing date on this property.

62.     PSR page 16, paragraph 49 also states: "after the deal, she consulted another mortgage person, (this person is not identified) who said the deal was unethical." This information has no place in this report. Although hearsay may be admissible in presentence reports, the source of this assertion is so far removed as to be unreliable and states a legal conclusion that Ms. Rampley is not entitled to make nor to have included in the presentence report.

63.     PSR page 16, paragraph 50. Mr. Powers objects and states that Jodi Powers worked as a loan processor and real estate agent under his auspices from October 2005 to beyond March 2006, ending in November 2006, a total of 13 months.

64.     PSR page 17, paragraph 52. Mr. Powers objects to the statement that FBI agents "learned that most of the K&E money from the first transaction went to Kevin Powers, who made a down payment and covered closing costs." In fact, Paragraph 51 is more accurate: approximately $11,000 of the $59,000 were kept by Mr. Powers for closing and other costs, but (not including any down payment on this 100% LTV loan) associated with the two transactions. Ultimately, Jodi Powers received over $119,000 of the $131,000 designated as renovation monies from the Ridge Rock and Oso Ridge transactions.

65.     PSR page 21, paragraph 65. Mr. Powers denies that he ever physically abused Elizabeth Powers at any time.  Elizabeth Powers told the FBI she had been physically abused "in the past" without identification of its perpetrator. Mr. Powers denies that he inflicted any physical abuse on Elizabeth Powers. Mr. Powers requests that this information be stricken or amended.

66.     PSR page 33, paragraph 118. Mr. Powers states that this allegation of cruelty to animals alleged to have occurred on April 12, 1986, did not and the charge was dismissed.  Mr. Powers requests that this paragraph be stricken or amended.

67.     PSR pages 33 – 34, paragraphs 119, 120 and 121. Mr. Powers denies that any of these three events relate to him. His identity was used by his brother Kip Powers resulting in attribution of this conduct to Kevin Powers. Mr. Powers requests that this paragraph be stricken or amended.

68.     PSR page 38, paragraph 137. "Mr. Powers related that since this offense happened, he was called by God and needed to get away." Mr. Powers states this is inaccurate. Mr. Powers did not leave New Mexico because of the allegations which led to this indictment.  Rather, he left to deepen his existing commitment to his faith, to obtain a master's degree, a long held goal, from Liberty University, to allow his immediate and extended family to heal and to gain distance from the vindictiveness of his ex-wife in the aftermath of their divorce in July 2009.

69.     PSR page 39, paragraph 139. Mr. Powers states that there are "8 principles" and not "12 traditions" of the CR.

70.     PSR page 40, paragraph 143. "At first Mr. Powers didn't believe and denied he had a child as he was not ready to take any responsibility. Approximately 3 years later, Mr. Powers went to New Mexico looking for Ms. Martinez and located her parents where he left a note on the door of her parents' home."  Mr. Powers adds that Ms. Martinez was not receptive to his attempt to locate his son at that time, but later responded to him when he moved to New Mexico in 1989. PSR page 40, paragraph 143 also states: "The defendant and Ms. Martinez never had a relationship, but maintain civil contact with one another."  Mr. Powers adds that he and Ms. Martinez have maintained a cordial relationship at all times since 1989.

71.     PSR page 43, paragraph 158. Mr. Powers objects to inclusion of this paragraph in the draft presentence report. First, he requests to be provided with all test materials, their results and the interpretation of those results. He denies that he has "no real insight into the possibility of relapse" after 23 years of sobriety. In fact, Mr. Powers receives special training in the counseling of substance abusers through the Sagebrush

church. Mr. Powers states that on a regular basis he is reminded of the risk of relapse when he witnesses church, AA and NA program participants relapsing. Mr. Powers denies that he is not "cooperative with regard to treatment and does not appear genuinely motivated toward change." Mr. Powers is and has been a regular attendee at AA and NA meetings and regularly mentors and counsels both recovering and relapsing substance abuse addicts. He has regularly attended all counseling offered through Pretrial Services and is genuinely motivated to continuing and extending his current 23 years of sobriety. The presentence report itself shows so many ways Mr. Powers' motivation to change his life that the "results" or "scores" of the one multiple choice test reflected in paragraph 158 seems absurdly unrelated in his day to day life.

72.     PSR page 45, paragraph 174. Mr. Powers was not employed as an office manager and worked in sales at Yourson Construction and Restoration. His job title was Operations Manager and Marketing Director.

**WHEREFORE,** KEVIN POWERS respectfully requests that the Court:

A.     Grant the relief requested herein by ordering redaction and corrections of the draft pre-sentence report consistent with the objections set forth herein;

B.     Order the production of the following supporting information from the United States Probation Office:

1)     Mortgage Electronic Registration System (MERS) records as to each loan, including documentation which includes information as to offsets or credits against loss and an itemization of the elements of loss, so that the Court can be sure that appropriate credits against loss have been registered and that improper elements of loss have been eliminated from claimed loss and restitution calculations;

2)      All documentation which shows that any collateral sold at foreclosure was sold at a commercially reasonable foreclosure sale;

3)      Documentation of the current status of all unsold collateral;

4)      Current appraisals as to each property which support its fair market value is required;

5)      Documentation which verifies whether or not  there has been any payment of mortgage insurance as the result of default on any loan, whether or not the recipient of those proceeds claims to be a "victim" within the definition of the Mandatory Victim Restitution Act;

6)      Formal victim impact submission or claim form required by 18 USC Section 3664 (B) (5);

7)      Proofs of loss as to each loan to support restitution sought; and

8)      Any other "available records" (see USSG Section 2B1.1, Application Note 3 (c)), which are in any way relevant to the calculation of loss and restitution.

C.      Grant counsel leave to supplement the formal objections filed today with additional objections as to the issues of loss and restitution;

D.      Set a deadline pursuant to 18 U.S.C. Section 3663A, for the production of proof of actual loss and restitution claims, starting ten days prior to sentencing, which requires all statutory victims to submit their claims within 90 days of the September 13, 2011 sentencing hearing, or by December 11, 2011;

E.      Conduct a hearing so as to allow the Defendant to present evidence so as to determine facts and fairly resolve disputed objections; and

F.      Grant such other and further relief as may be just and appropriate.

Respectfully submitted,

*Daniel J. Tallon*

*Electronically Filed on August 17, 2011*
_____
DANIEL J. TALLON
Attorney for Kevin Powers
6 Placitas West Road
Placitas, NM 87043
505.867.1515; fax 867.9495

I hereby certify that a copy of the foregoing was electronically filed and thereby delivered by electronic means to all defense counsel of record and to Assistant U.S. Attorneys Mary Higgins and George Kraehe on the 17th day of August 2011.

    *Daniel J. Tallon*
_____
    DANIEL J. TALLON