# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                    Plaintiff,

      vs.                                  CR 2009-3065 MCA

KEVIN POWERS,

                    Defendant.

## SENTENCING MEMORANDUM
## AND MOTIONS FOR DOWNWARD DEPARTURE PURSUANT TO USSG SECTION 2B1.1 AND FOR A DOWNWARD VARIANCE UNDER 18 U. S. C. SECTION 3553(a)

KEVIN POWERS, by and through his attorney, DANIEL J. TALLON, files this sentencing memorandum in support of his motion for downward departure and motion for a downward variance so as to allow the Court to support a sentence below the advisory guideline range and a sentence consistent with the sentence requested by counsel in this sentencing memorandum.

In support of his motion for downward departure under the authority of USSG section 2B1.1, Application Note 19(c), Mr. Powers requests that the Court consider his Objections to the Presentence Report filed September 8, 2011 and August 17, 2011, and his arguments set forth in those Objections that the Court consider his "gain" as the appropriate measure of loss in determining his advisory guideline sentencing range or, in the alternative, that the Court make a finding that the actual and/or intended loss calculations as determined by the Court, substantially overstate the seriousness of the offense.

Mr. Powers respectfully requests that this Honorable Court exercise its discretion to grant a downward variance and to impose a sentence "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).

Counsel has attached to this memorandum 3 exhibits: Exhibit A, which consists of 22 letters written specifically in support of Mr. Powers' request for leniency; Exhibit B, which consists of 12 miscellaneous exhibits, including a letter from Donald Powers to his son and 2 news articles which illustrate important issues underlying the current financial crisis past and present; and Exhibit C, which consists of 7 additional letters attesting to the positive character traits possessed by Mr. Powers.

There is no need to incapacitate Mr. Powers to prevent him from committing further crimes given his extraordinarily low risk of recidivism as well as his voluntary withdrawal from the real estate sales and mortgage lending industries. Mr. Powers has already been subjected to punishment in excess of what is necessary to meet the sentencing goals of 18 U.S.C section 3553(a).

The advisory guideline range, 108 to 135 months, provides no useful advice as it was not developed based on empirical data or national experience, and fails to satisfy any purpose of sentencing. A sentence of 6-12 months detention, using a combination of local jail time, halfway house and home confinement followed by five years of supervision is a just result and just punishment and meets the sentencing goals of section 3553(a).

## I. <u>BACKGROUND</u>

It is fitting that the story of Kevin Powers begins in a recession or depression that preceded by many years the global and national recession that we experience today.

The story of Kevin Powers is not the story told at 11 days of trial in April 2011. It is not a story that the jurors in this trial were told by the United States.  But it is a story that this Court needs to know and to consider as it dedicates itself to the evaluation of the real human factors and needs to that must be addressed to when passing judgment.

Kevin is the second of three sons and the third of nine children in the Powers family. Kevin has been a source of strength, good example and stability in his family, although he is not without faults. His older brother Kip is not the brother that the family counts on. It is Kevin, because Kevin is the son and brother that his parents and siblings know lifted himself up from the depths of adversity and recovered from numerous setbacks in his early years. Kevin's recoveries are the source of his strength and, paradoxically, part of the reason that he finds himself before this Court today.

In his adolescence, Kevin showed great athletic ability both in football and wrestling. He was derailed from what might have been the athletic objectives of his high school years by injuries sustained in a motorcycle accident in the summer after his junior year. This event was the cause of Kevin's first exposure to drugs in a significant way.  At age 17 and 18, he experimented with them, increase his use, then committed property crimes because he needed money to buy drugs. As a result of these offenses, he was sentenced as a juvenile to the California Youth Authority when he was age 18 and 19. He learned then what it was like to fight and survive in the gladiator school of the CYA. This was not a life that he was made for; deep down Kevin knew that he had the

intelligence and the drive to accomplish more. Nevertheless, after his release from the California Youth Authority, he was unfocussed on what he could become.  Kevin recalls some significant events of his time in the California Youth Authority:

Due to his size, the authorities used him to help "balance" the already unbalanced racial numbers that existed in the CYA system.  Strong racial tensions already existed, but in their wisdom, the authorities thrust Kevin into the dorms in an effort to "increase" the white minority. The move backfired and a race riot erupted within only a couple of days. After a two week lockdown, the dorm population of approximately 50 individuals was transitioning from the dorms to the academic facilities. Kevin was stabbed in his side by what is referred to as a "suicide knife".  A suicide knife is a filed down spoon in the shape of an arrow head, it is inserted into a cardboard handle.  When thrust into the target, the object remains within the body while the handle is removed and the evidence thrown away. The "suicide" is the option of going to jail officials to report the incident in order to get the object removed, and then to become a "snitch" with a "jacket" forever placed on him. That jacket isolates an inmate from his peers and from protection and companionship. Option 2 is to leave the object inside the body to fester, become infected and lead to possible death. Kevin found a third option: he removed it himself and sewed up the incision with a needle and thread. He underwent great pain to avoid public ridicule and isolation.  At CYA, Kevin earned a welding certificate and credits towards a college education. He was released ahead of schedule, despite the adversity of and negativity of this environment.

Kevin knew that if he was released and returned to associates in California that he would likely return to the penal system. Instead he wisely chose release to join his father

in New Mexico. His parents had divorced while he was incarcerated. In 1980, his father was living in Santa Fe, New Mexico. In Santa Fe, Kevin successfully completed his 8 months probationary period for California.

Kevin learned to be self-sufficient and strong from his father. Donald Powers attended every day of his trial in April 2011. Donald Powers didn't make excuses for Kevin in his early years and he doesn't make excuses for Kevin now. Donald Powers demanded excellence, strength, integrity and responsibility, and more, from his son. He expected him to contribute to the benefit and support of his siblings and family. Kevin Powers carried those lessons and those purposes with him from young adulthood, and he does to this day. Donald Powers suggested that Kevin hire and train his sister Jodi in the businesses that brought him much success in the last decade. At that time, Jodi's business was failing and she was homeless. After Donald Powers' retired and his earnings decreased, it was Kevin who took on the role as provider for his siblings and safety net for their financial short comings.

In about 1982, Kevin joined a national traveling sales crew for a period of four years. He wasn't involved in crime nor did he abuse drugs or use alcohol during this time, but he had not excluded them from his life. He excelled at sales. He possessed the sheer physical energy, determination and will that was necessary to carry one through long days in strange cities in an attempt to make a living, flying by the seat of his pants.

Kevin discovered a natural ability to excel in sales in his years on the traveling sales crew. In a very short period the company promoted Kevin to be a sales leader and a trainer for new hires.  The traveling sales crew allowed Kevin to see and experience firsthand a large portion of the United States. His best memories are being able to visit

and work in the Empire State Building and in the World Trade Center. Kevin was able to successfully relate to various cultures and to excel in business, in different cities and with many different individuals from all across America. This gave Kevin the confidence and abilities needed to later succeed in the New Mexico real estate market.

Kevin's size and strength, desire, raw intelligence and street smarts made him a natural for jobs like the monster truck shows. He was involved in this employment upon his return from to California from the traveling sales crew in about 1986. While working crowd control at an event, a motorcycle stunt man made a jump over two trucks, Evel Knievel-style, and landed on Kevin. The injuries sustained were substantial: two fractured vertebrate C-1, C-2, three broken ribs, five broken or chipped teeth and numerous severe bruises.  This near death experience made Kevin realize the important things in life.  At the same time, this accident was the cause of the flowering of his drug and alcohol addiction which brought him to his knees more effectively than the airborne motorcycle which struck him.

Kevin used this crippling accident as a springboard to becoming the man he is today. Disabled for 18 to 24 months by the numerous serious injuries he suffered and incapacitated by pain medications, Kevin both struggled with drug addiction and with recovering from his injuries.   Shortly after the 1986 accident, Kevin became addicted to pain medicine and muscle relaxers. Perhaps more important and more difficult than the recovery from the physical injury was Kevin's struggle to recover from the abuse of controlled substances.  His efforts to conquer addiction motivated Kevin to recommit his life to Jesus Christ. He found a 12 step recovery program and worked the steps.

One of the steps in that program was to make direct amends to the people he has

harmed. Kevin had tried previously while on the sales crew to make contact with his

son's mother when the boy was about 3 years old, but Isaac's mother was not ready to be

contacted then.  He was not able to establish a connection with Isaac, but the desire was

there. Kevin had not yet learned that half measures do not succeed.  Unification with son

Isaac had been derailed for at least a couple of years by the tragic accident described

above.  So after achieving a stable twelve months of sobriety and with the blessing of his

mentors, Kevin went on a journey to locate his only son, Isaac, and relocated to

Albuquerque in August 1989, where he has remained ever since. Kevin has been sober

for 23 years, effective July 21, 2011.

Isaac was 8 years old when Kevin moved to New Mexico in August 1989. He

quickly established a viable relationship, not only being a Dad to a fatherless boy, but

also became his football coach. Isaac excelled in sports under the direction of his father.

Kevin continued to be the head coach for YAFL (Young Americans Football League).

Kevin then started assisting coaching football at Valley High School. It was at this point

that working with children became Kevin's desire. This motivated him to get a Bachelors

of Science Degree in Exercise Science with the hope to later coach Isaac at a high school

level. Kevin continued on into the master's degree program at the University of New

Mexico in Sports Administration. He obtained an intern position as an assistant Offensive

Line Coach with the UNM Lobos Football team. After one year Kevin met a lady who

had three children, from three different fathers.  None of those fathers was a part of his

child's life. Compassion for those children caused Kevin to end his pursuit of a master's

degree to marry and be a father to those two boys and one girl. He quit school and got a

job. His first job as a married man was originating second mortgages for Preferred Credit

Corp., a company based out of Florida. Unfortunately, the marriage didn't last, but the job did.

The intelligence, drive and determination that has allowed Kevin to maintain sobriety, and to share the gift of sobriety with others, is what makes him who he is. It has allowed him to accomplish great things for himself and his family and his children. Kevin is focused and driven; he cannot be another way.

The employments that Kevin used to be involved in, real estate sales and mortgage lending are no longer available to him, nor does Kevin want to become involved in them again.  He will never have the opportunity, and he does not want the opportunity to use those skills and his determination, energy and talent to achieve what some call "success" in those industries. Rather, he would like to teach others to lift themselves up from their personal struggles, using his commitment to God and to his religion, using his bedrock of sobriety and his will to teach others to lift themselves up for the sake of themselves, their marriages and their families.

Kevin has demonstrated extraordinary humility in the wake of the events of January, February and March 2008. As a result of the recording of staged conversations with Chris Sena and the execution of a search warrant at his business premises, Kevin lost everything. It was as if the house of his life, all its material possessions and the people who resided in it, burned down.  Imagine a fire that devastates your life or a hurricane, a tornado or a flood that wipes away and consumes everything that you "own". This is what happened to Kevin.   But some of what he lost, he looks back on with a great sense of relief; the stress, tension, and competitiveness required in the environment of real estate sales and mortgage lending were not a comfortable calling; he could master

those occupations, but only at a great cost to himself. He provided for all who depended upon him, but Kevin confesses that he was never at peace. He turned his abilities in a new direction, and welcomed the chance to re-engineer and reinvent his life.

Kevin lost his wife, and for a time, contact with his daughter Nicole. He went through bankruptcy and was disenfranchised from the jobs he once knew.  Instead of falling into despair, he looked to God and sought His guidance in the summer of 2008. As a result of prayer and the deep searching of one's soul that few of us can perform, Kevin moved across the country to attend Liberty University. With the help of God, and his colleagues and friends who were committed to God and worship, he was re-baptized into a more desirable life, a future with hope.

Kevin had been committed to Christianity in a strong way for many years before his fall in 2008, but his commitment was renewed and supports his determination to learn another way to live and another way to work.  This is what enabled him to succeed in school and in service of the Lord and His community in Lynchburg, Virginia. As a result of that time away, Kevin returned to New Mexico in February 2010, reinvigorated with hope, but burdened with the need to explain and defend himself in the face of the allegations made in the indictment tried before this Court.

Despite learning to walk and work again in a fresh way with his Lord, Kevin had already developed a humble path; the PSR shows that he worked as a volunteer and, to support himself, at two minimum-wage jobs throughout his time in Lynchburg. Kevin greatly missed his daughter Nicole, but knew then that his absence from her was only temporary, and perhaps necessary, because the emotions surrounding the breakup of his family were still raw and intense. Kevin knew he needed some time and space effectively

to work to improve himself. Also during that time, he lent assistance and counsel to a troubled young man, his stepson Jacob Langdon, who battles heroin addiction. Today, Jacob still leans on and is inspired to strive for sobriety by the example of his stepfather; at just 18, Jacob desperately needs Kevin's strength.

Kevin continues to exhibit extraordinary humility on a daily basis. He no longer sees "value" in investing in real estate, in driving a Mercedes or living in an upscale home. Kevin returned to Albuquerque with no money and no job and no home. He struggled to reconnect with his daughter, but he was impeded by the fact that his ex-wife was listed as a government witness. He was prevented from reconnecting with his family in a different way by the fact that his sister Jodi was a cooperating witness against him. His father Don was torn between his love for his son Kevin and his daughter Jodi, Don could not reconcile himself in his waning years to this great divide in his family. Kevin's other siblings stepped back, not knowing what to do, who they could or should support in this family crisis, a crisis which can be resolved by the conclusion of these proceedings.

Kevin returned to Albuquerque, this time to rebuild his life, not by *finding* his son but by *living* with his son. Isaac assisted Kevin by putting a roof over his head; Kevin assisted Isaac by providing ongoing fatherly counsel to him during a difficult time in his marriage and with his children. Kevin lived with Isaac for a year, from April 2010 until just after the trial ended in April 2011.

During the 20 months which have elapsed since Kevin was arraigned on this indictment in November 2010, he has never complained about what he has lost. Instead, he responded to being a nearly penniless, homeless, and divorced from his daughter and his father and his sister and more, by accepting any and all jobs; the most menial jobs.

Kevin Powers has an extraordinary work ethic and extraordinary humility. Throughout these 20 months he has attempted in every way possible to earn money to support himself and his daughter in the most menial of employments. He has swallowed his pride and humbled himself before this community, before his God and his family for the purpose of supporting his quest to rebuild his life even more strongly in God's eyes.

Kevin would like to be a strong and constant influence in the lives of Nicole and Jacob in the same way his father Donald was the foundation of his upbringing. See letter dated April 9, 1988 from Donald Powers to Kevin Powers attached as Exhibit B-1. Donald Powers attended virtually every hour of Kevin's trial in April 2011. Because of Kevin's sense of humiliation, the presence of his father to witness this public trial was extraordinarily painful. This is made more true by the fact that Kevin anticipated for the first eight days of the trial the appearance of his sister Jodi Powers to testify against him. Kevin knew that Donald Powers was there for both his son and his daughter.

After Jodi Powers gave her direct testimony, Kevin Powers directed counsel not to cross-examine her. He believed it was one of the few things he could do to lessen the pain of all of this on his father, his sister and his family. After Jodi Powers was excused from the courtroom, Kevin asked counsel if he could ask Donald Powers to leave the courtroom for the rest of the trial because of Kevin's great shame and emotional pain. Donald Powers responded to counsel saying that he would prefer not to leave "because he's still my son and I just want to go over there and gather him up in my arms."

Kevin Powers was a law-abiding citizen and had no adult criminal history before committing the charged acts of fraud. He was hardworking, deeply involved in his community, and a committed parent and stepparent.

Mr. Powers ask the Court to consider not just his trial convictions, but also his lack of adult criminal history, the severe collateral consequences of the events of the past three and half years and his genuine desire to make restitution to his victims.  A sentence within the advisory guideline sentencing range is far in excess of what is fair and just in this case.  A sentence of 6-12 months detention, using a combination of local jail time, halfway house and home confinement followed by five years of supervision is a just result and just punishment and meets the sentencing goals of section 3553(a).

### 1.    *Collateral Consequences Suffered by Client*

Since the execution of a search warrant at his business in March 2008, Mr. Powers has been subject to a very harsh collateral consequences.  His marriage disintegrated under the stress of these charges and Elizabeth Powers obtained a divorce. As his own family support system has deteriorated, Mr. Powers' human contact has become focused on his children, his church and associates in sobriety and recovery.

As a result of this offense, Mr. Powers has suffered the loss of his business, his professional reputation, and his ability to work in the real estate sales and mortgage lending industries.  He was extremely successful from 1999 to 2008, he has voluntarily surrendered his real estate license.  He will never again be able to engage in this profession. He would also agree never to participate in any activities related to loan origination.

### 2.    *Advisory Guidelines Range*

The United States Probation Office has calculated a guideline range of 108 to 135 months. This range is based on an adjusted offense level of 31 and

Criminal History Category I. This advisory range offers no useful advice and should not be heeded because it (1) is the product of a fraud guideline not based on empirical data or national experience, which has been severely criticized; (2) would result in unwarranted disparity as compared with sentences imposed on similarly situated defendants in other fraud cases; (3) fails to take proper account of Mr. Powers' especially low risk of recidivism, age, first offender status and collateral punishments and (4) is far greater than necessary to promote the goals of sentencing in this case.

## II.   **LAW AND ARGUMENT**

The advisory guideline range in this case is far greater than necessary to satisfy the goals of sentencing. The harsh sentencing recommendations of § 2B1.1 are not based on past practice or empirical data and have been increasingly rejected by sentencing courts in high-loss fraud cases. As the sample of cases highlighted below demonstrates, defendants in fraud cases involving less than $100 million in loss typically receive less than 10 years imprisonment, even when the Guidelines recommend a much higher sentence.

Counsel estimates that Kevin Powers' advisory guideline range is **three to four and one-half times** longer than the sentencing range he would have faced under the original guidelines adopted in 1987. Over the past twenty years, the Sentencing Commission has dramatically increased the severity of sentences for fraud offenders by raising the number of points imposed for the amount of loss *and* by approving a **five-fold** expansion in the number of specific offense characteristics. Because the Commission failed to cite empirical data when making these changes – and thus

failed to fulfill its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's sentencing recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "**short** but definite period[s] of confinement." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing* Reform, at 56 (Nov. 2004) [hereinafter *Fifteen Year Report*]. The Commission thus reduced the availability of probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in prison. To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).

But, as noted above, the Commission has abandoned its original goal of ensuring "short but definite" sentences, and has instead steadily increased the prison sentences for fraud.

The Commission has increased the sentencing range for a defendant guilty of Kevin Powers' crimes by approximately 700 percent in the twenty years since

the Guidelines were first adopted. The Commission has adopted this radical shift

in sentencing policy without the support of any empirical data demonstrating the

penological value of its substantial increases in sentence severity. *United States v.*

*Aldelson*, 4441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A.

Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998))

("[Be]cause of their arithmetic approach and also in an effort to appear

'objective,' [the Guidelines] tend to place great weight on putatively measurable

quantities, such . . . [the] amount of financial loss in fraud cases, without,

however, explaining why it is appropriate to accord such huge weight to such

factors.") Because the Commission failed to cite empirical data – and thus failed

to fulfill its institutional role – sentencing court have tremendous discretion to

disagree, on policy grounds, with § 2B1.1's recommendations. *See Spears v.*

*United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission

fails to fulfill its institutional role, a district court can vary from the guidelines

"based on *policy* disagreement with them, and not simply based on an

individualized determination that they yield an excessive sentence in a particular

case"). And indeed, "since *Booker*, virtually every judge faced with a top-level

corporate fraud defendant in a very large fraud has concluded that sentences

called for by the Guidelines were too high. This near unanimity suggests that the

judiciary sees a consistent disjunction between the sentences prescribed by the

Guidelines [in corporate fraud cases] and the fundamental requirement of Section

3553(a) that judges imposes sentences 'sufficient, but not greater than necessary'

to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss*

*Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

The chart below highlights a number of the fraud cases in which district court judges have imposed sentences below the advisory guideline range.

| Case | Conviction | Guideline Amount | Guideline Range | Sentence |
|------|-----------|------------------|-----------------|----------|
| **Christian Milton**, AIG, Vice President (D. Conn. 2009) | Convicted at trial of various counts of fraud. | | **LIFE imprisonment** | **48 months**[1] |
| **Ronald Ferguson**, CEO, General Reinsurance Corp. (D. Conn. 2008) | Convicted at trial of conspiracy, securities fraud, false statements to SEC, and mail fraud. | **$544 million** | **LIFE imprisonment** | **24 months**[2] |
| **Travis Correll**, (N.D. Ga. 2008) | Pled guilty to wire fraud (related to Ponzi scheme). | **$29 million** (ordered in restitution) | **188-235 months** | **108 months**[3] (Mr. Correll was initially sentenced to 144 months. He later received a further reduction, under Rule 35, based on his cooperation). |
| **Robert Cole**, Sales Rep., Diebold (N.D. Ohio 2008) | Pled guilty to securities fraud. | **$509,000** | **30-37 months** | **12 months and 1 day**[4] |
| **William Ledee**, Founder of fictitious insurance company (N.D. Ga. 2007) | Pled guilty to making false financial statements, engaging in business of insurance as a convicted felon, mail fraud, conspiracy to commit money laundering, etc. | **$21.6 million** (ordered in restitution) | The PSR indicated a total offense level of 51, and criminal history category II, resulting in a guideline range of **LIFE**.[5] | **70 months** (Judge varied below C agreement's sentence cap of 7.5 years)s |
| **John Whittier**, Manager, Wood River Partners (S.D.N.Y. 2007) | Pled guilty to securities fraud, failure to disclose ownership in excess of 5% of publicly traded security, and failure to disclose ownership in excess of 10% of publicly traded security. | **$88 million** (ordered in restitution) | **188-235 months** | **36 months**[6] |
| **Paul Humphreys**, CFO, Safety-Kleen (S.D.N.Y. 2007) | Pled guilty to securities fraud *and* conspiracy (to commit securities fraud, file false reports with SEC, falsify books and records, make false statements to auditors, and commit bank fraud). | **More than $80 million** | **70-87 months** | **70 months**[7] |

| | | | | |
|---|---|---|---|---|
| **Hector Orlansky**, President, E.S. Bankest (S.D. Fla. 2007) | Convicted at trial of conspiracy to commit bank fraud and wire fraud, bank fraud, making false statements, wire fraud, conspiracy to commit money laundering, and money laundering. | **$164.5 million** (ordered in restitution) | 262-327 months | **240 months**[8] |
| **Richard Adelson**, CEO & President, Impath (S.D.N.Y. 2006) | Convicted at trial of conspiracy, securities fraud, and filing false reports with SEC. | **$50 - $100 million** (court ordered restitution of $50 million) | Guidelines called for **life imprisonment**; however, statutory maximum was **85 years**. | **42 months**[9] |
| **Jamie Olis**, Tax Lawyer, Dynegy (S.D. Tex. 2006) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, (2) securities fraud, (3) mail fraud, and (4) wire fraud. | **$79 million** | 151-181      months | **72 months**[10] |
| **Walter A. Forbes**, Chairman, Cendant Corporation (D. Conn. 2007) | Convicted at trial of conspiracy and making false statements to the SEC. | **$3.275 billion** (ordered in restitution) | **151-181 months** (The advisory range was this low because the 1997 Guidelines were used. The 2006 Guidelines would have instead called for life imprisonment, limited only by a statutory cap of 300 months.) | **151 months**[11] |
| **E. Kirk Shelton**, Vice Chairman, Cendant Corporation (D. Conn. 2005) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, and false statements to SEC, (2) mail fraud, (3) wire fraud, (4) false statements to SEC, (5) securities fraud. | **$3.275 billion** (ordered in restitution) | **151-181 months** (See explanation above regarding use of 1997 Guidelines) | **120 months**[12] |
| **Bernard Ebbers**, CEO, WorldCom (S.D.N.Y. 2005) | Convicted at trial of conspiracy, securities fraud, making false filings with the SEC. | **Over $1 billion** | 360 months to life | **300 months**[13] |
| **Sanjay Kumar**, CEO, Computer Associates Int'l (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and false statements. | **$2.2 billion** (according to Government's Sentencing Memorandum) | **LIFE imprisonment** under 2005 Guidelines **188 to 235** under 1998 Guidelines (Unclear how District Court resolved dispute over which version should apply.) | **144 months**[14] |
| **Stephen Richards**, Sr. Vice President, Computer Associates (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and perjury. | **$2.2 billion** (according to Government's Sentencing Memorandum) | **LIFE imprisonment** under 2005 Guidelines **151 to 188** under 1998 Guidelines (Unclear how District Court resolved dispute over which version should apply.) | **84 months**[15] |

| | | | | |
|---|---|---|---|---|
| **Mehdi Gabayzadeh**, CEO, American Tissue (E.D.N.Y. 2006) | Convicted at trial of conspiracy to commit securities fraud, conspiracy to commit bank fraud, bank fraud, wire fraud, interstate transport of property obtained by fraud, bankruptcy fraud, conspiracy to commit perjury, and obstruction of justice. | PSR found total loss of **$193 million** (Court ordered $65 million in restitution.) | **LIFE imprisonment** | **180 months**[16] |
| **John Rigas**, Founder, Adelphia (S.D.N.Y. 2004) | Convicted at trial of securities fraud, bank fraud, and conspiracy to: (a) commit securities fraud, (b) commit bank fraud, and (c) make or cause to be made false statements in filings to SEC. | **$2.3 billion** | Guideline range was **LIFE imprisonment**; however, statutory maximum was 185 years. | **144 months**[17] |
| **Timothy Rigas**, CFO, Adelphia (S.D.N.Y. 2004) | Convicted at trial of securities fraud, bank fraud, and conspiracy to: (a) commit securities fraud, (b) commit bank fraud, and (c) make or cause to be made false statements in filings to SEC. | **$2.3 billion** | Guideline range was **LIFE imprisonment**; however, statutory maximum was 185 years. | **204 months**[18] |
| **Jacob Jacobowitz**, Executive VP, Allou Healthcare (E.D.N.Y. 2007) | Pled guilty to making false statements in reports to the SEC. | **$30 million** (ordered in restitution) | Guideline range was **168-210 months**; however, plea agreement was structured to impose statutory maximum of 120 months. | **84 months**[19] |
| **Herman Jacobowitz** CEO, Allou Healthcare (E.D.N.Y. 2007) | Pled guilty to conspiracy to commit bank, securities, and mail fraud *and* making false statements in reports to SEC. | **$176 million** (ordered in restitution) | Guideline range would have been **LIFE imprisonment**; however, plea agreement was structured to impose statutory maximum of 180 months. | **180 months**[20] |
| **Aaron Jacobowitz** Manager of various companies controlled by Jacobowitz family (E.D.N.Y. 2007) | Pled guilty to money laundering. | **$176 million** (ordered in restitution) | Guideline range was **LIFE imprisonment**; however, plea agreement was structured to impose statutory maximum of 120 months. | **120 months**[21] |
| Carole Argo CFO, SafeNet, Inc. (S.D.N.Y. 2008) | Pled guilty to securities fraud. | **$1 - 2.5 million** (stipulated loss amount) | 97 - 121 months | **6 months**[22] |
| Lennox Parris, Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | **Between $2.5 and $7 million** | **360 months to LIFE** | **60 months**[23] |
| Lester Parris, Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | **Between $2.5 and $4.9 million** | **360 months to LIFE** | **60 months**[24] |

| *Raquel Kohler*, Mutual Benefit Corp. (S.D. Fla. 2007) | Pled guilty to conspiracy to commit securities fraud. | **$471 million** (ordered in restitution) | Guideline range was **324- 405 months**, but statutory maximum limited sentence to **120 months**. | **60 months**[25] |
| *Marc Dreier*, Managing Partner, Dreier LLP (S.D.N.Y. 2009) | Pled guilty to securities fraud, wire fraud, and conspiracy to commit securities and wire fraud. | **$387 million** (ordered in restitution) | Guideline range was **LIFE**, but statutory maximum limited sentence to no more than **145 years**. | **240 months**[26] |

In the above-cited cases, courts have substantially varied from the guideline range based on: (1) policy disagreements with § 2B1.1's sentencing recommendations, (2) concerns about unwarranted disparities *vis-à-vis* the many courts who have declined to impose within-guidelines sentences in fraud cases, and/or (3) mitigating aspects of a particular defendant's history or the nature and circumstances of his/her offense. As discussed at greater length below, these very same factors weigh in favor of a statutory sentence below the advisory guideline range in Mr. Powers' case.

> **A.      The lengthy sentences, under § 2B1.1, for high-loss fraud defendants do not reflect sound policy.**

When the Sentencing Commission fails to fulfill "its characteristic institutional role" of developing a particular guideline, or its later amendments, based upon empirical data, national experience, or some rational policy basis, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007). Similarly, when the Commission acknowledges problems with a particular guideline but fails to make appropriate modifications, a sentencing court has

greater latitude to sentence outside the advisory range. *Id*. (upholding below-guidelines sentence based on policy disagreement with crack/powder disparity where Commission itself had reported that the disparity produced disproportionately harsh sanctions).

The Sentencing Commission has dramatically increased sentences for fraud over the past 20 years. These steady increases have been adopted without empirical support, without adequate consideration of the cumulative effect of overlapping enhancements, and despite research showing that shorter sentences provide adequate deterrence for white collar fraud offenders. Accordingly, the resulting guideline ranges should be given minimal weight in this Court's § 3553(a) analysis.

> **1.   The Commission has dramatically increased sentences for fraud despite consensus in the social science community that increases in sentence severity have little, if any, deterrent effect.**

In promulgating the original fraud guideline, the Sentencing Commission aimed to reduce the availability of probation and ensure "short but definite periods of confinement for a larger proportion of [ ] white collar cases." *Fifteen Year Report* at 56. The Commission's approach was consistent with research, available at the time, showing that the certainty, rather than the length, of a sentence has the greatest deterrent effect. In one widely-regarded study from the pre-guideline era, for example, researchers studied white collar offenders (presumably the most rational of potential offender) and found no difference in deterrence even between probation and imprisonment. *See* David Weisburd et al.,

*Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

In the twenty years since the Guidelines were first adopted, empirical research has continued to show that while certainty has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447,-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF.

The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the

severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Yet another study concluded: "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms." *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

In short, the Commission has dramatically increased sentence length for fraud offenders in the face of overwhelming social science research showing that such increases in severity have little, if any, deterrent value. In promulgating the various sentence increases for fraud offenses over the past twenty years, the Commission has offered no empirical data to rebut the virtual consensus in the social science community disputing the deterrent value of such increases. Offenders like Kevin Powers thus face sentences seven times greater than called for by the original guidelines even though they would be equally deterred by much shorter sentences.

**2.     The large number of specific offense characteristics under § 2B1.1 are cumulative and fail to accurately reflect the seriousness of the offense.**

When the Guidelines were first adopted in 1987, the fraud guideline, then § 2F1.1, provided just a small number of enhancements for specific offense characteristics. USSG § 2F1.1 (1987). Besides the amount of loss, the original § 2F1.1 imposed enhancements if the offense involved (1) more than minimal planning; (2) more than one victim; (3) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization or government agency, (4) the violation of a judicial or administrative order, or (5) the use of foreign bank accounts/transactions to conceal the nature or extent of the fraudulent conduct. In short, the original fraud guideline provided only six possible enhancements above the base offense level.

Twenty years later, § 2B1.1 – the current fraud guideline – includes nearly thirty different enhancements for specific offense characteristics. USSG § 2B1.1 (2008). And yet, "the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (quoting Kate Stith & José Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Furthermore, the Commission has failed to address the problem that many of these factors replicate or overlap with the loss concept, with one another, and with further upward adjustments in Chapter 3. In its *Fifteen Year Report*, the Commission acknowledged that "as more and more adjustments are added to the sentencing

rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness. "*Fifteen Year Report* at 137. But the Commission has done nothing more than identify the risk of what it labeled "factor creep"; it has not taken any action to evaluate which factors might be cumulative and whether its ever-expanding scheme of sentencing factors under § 2B1.1 produces sentences greater than necessary to achieve the goals identified in 18 U.S.C. § 3553(a).

Though the Commission itself has failed to remedy the problem of "factor creep," an increasing number of courts have declined to sentence within guideline ranges that are the product of overlapping specific offense characteristics. *See, e.g.*,*United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *Adelson*, 441 F. Supp. 2d at 506, 510; *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (complaining that guidelines in security fraud prosecutions "are patently absurd on their face" due to the "piling on of points" under § 2B1.1). In *Adelson*, for example, the district court found that the "calculations under the Sentencing Guidelines lead to a result [ *i.e.*, an effective life sentence] so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." 441 F. Supp. 2d at 506. The *Adelson* court criticized the Commission for failing to explain "the rationale underlying *any* of its identified specific offense characteristics" under the fraud guideline and characterized §

2B1.1's overlapping enhancements as an irrational "piling on of points." *Id*. at 510.

Furthermore, a growing chorus of legal scholars have offered their own criticism of the increasingly harsh sentences that result from the large number of specific offense characteristics inevitably present in every high-dollar corporate fraud case. Professor Frank Bowman, for example, explains that "[m]any factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so a the top of the sentencing table where sentencing ranges are wide." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *7 (Feb. 2008). As a result, Bowman adds, "[a]ny case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting." *Id.*

> **3.** **Counsel estimates that seven to eight of the eighteen levels imposed on Kevin Powers under the current loss table and proposed by the PSR writer and the United States were not based on any kind of empirical evidence or policy basis, and do not further any legitimate purpose of sentencing.**

Under the original Guidelines, adopted in 1987, 10 to 11 levels would have been added to Kevin Powers' offense level for the amount of loss caused by his fraudulent acts. USSG § 2F1.1 (1987). Twenty years later, under the 2010 Guidelines, 18 levels are being added for the same amount of loss. USSG § 2B1.1 (2010). Though this 7-8 levels increase subjects Mr. Powers to many years of

additional imprisonment, the Commission adopted its loss-table amendments without any empirical basis.

Two separate amendments – 154 and 617 – are responsible for the bulk of the increase to the loss table. For an amount of loss between $2.5 and $7 million – as in Mr. Powers' case – Amendment 154 added 3-4 additional levels, while Amendment 617 added 2-3 levels. In support of Amendment 154's substantial increase to the loss table, the Commission stated only that it sought to conform the fraud loss tables to the tax evasion tables and "increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." USSG, App. C, Amend. 154 (Nov. 1, 1989). And, in adopting the substantial increases in Amendment 617, the Commission claimed it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals involved in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." USSG, App. C, Amend. 617 (Nov. 1, 2001).

The explanations offered by the Commission for the two amendments are both deficient and faulty. In each instance, the Commission failed to provide any empirical data to support higher sentences for fraud offenders who typically have no criminal history and an exceptionally low recidivism rate. The Commission ignored the overwhelming social science research, discussed at length above, demonstrating that increases in sentence severity, as opposed to certainty, have virtually no deterrent value. Second, in adopting Amendment 154, the Commission sought to

conform the fraud loss table with the tax loss table without explaining why the tax loss table should itself be a model. Furthermore, though the Commission cited comments from the Justice Department and the Criminal Law Committee in support the higher sentences adopted through Amendment 617, it ignored clear feedback from the district courts. Though the Guidelines explicitly allow for *upward* departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," *see* USSG § 2F1.1 app. note 11 (2000) *and* USSG § 2B1.1 app. note 14 (2000), the sentencing courts granted upward variances in less than 1 percent of § 2B1.1 cases and only 1.2 percent of cases under § 2F1.1 in the year 2000. *See* U.S. Sentencing Commission, *2000 Sourcebook of Federal Sentencing Statistics,* tbl. 28 (2000). This feedback – from the institutional player best suited to make individualized sentencing determinations – completely contradicted the recommendations of entities like the Justice Department. Finally, in adopting Amendment 617, the Commission relied on the argument that the existing loss table resulted in sentences lower than the penalty levels for offenses of similar seriousness. The Commission failed to point out which offenses it deemed to be of comparable seriousness to high-loss fraud. The end result of its increases under § 2B1.1 have, however led to the absurd result that first-time, nonviolent fraud offenders are subject to sentences as high as, and sometimes even higher than, those imposed on the most violent offenders (*e.g.*, sentences for kidnapping, arson, high volume drug trafficking, and voluntary manslaughter). *Compare* USSG § 2B1.1 (2001) (offense level of 26 based only on base offense level and amount of loss over ) *with* USSG § 2A4.1 (2001) (offense level of 24 for kidnapping), USSG § 2K1.4 (2001) (offense level of

24 for arson creating substantial risk of death or serious bodily injury), USSG §
2D1.1 (2001) (offense level of 24 for trafficking in over 100 kg of marijuana) *and*
USSG § 2A1.3 (2001) (offense level of 25 for voluntary manslaughter).

Moreover, though the Commission has made the amount of loss the
determinative factor in the offense level calculation for fraud offenders, loss amount
is a highly imperfect measure of the seriousness of the offense. *See United States v.*
*Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate
emphasis that the Sentencing Guidelines place in fraud on the amount of actual or
intended financial loss" without any explanation of "why it is appropriate to accord
such huge weight to [this] factor[ ]"). The specific amount of loss is often "a kind of
accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the
need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28
(S.D.N.Y. 2004). Most defendants do not set out to defraud a specific amount of
money; rather, the amount of loss is dependent on the security procedures in place
and the point in time when the ongoing fraud happens to be detected. *Id.* As the
*Emmenegger* court explained: "Had [the defendant] been caught sooner, he would
have stolen less money; had he not been caught until later, he would surely have
stolen more." *Id.*

In short, the Commission failed to fulfill its institutional role of considering
empirical evidence when making the amount of loss central to its fraud guideline and
then repeatedly increasing the amount of points imposed for specific loss amounts.
The resulting fraud guideline is, therefore, entitled to no deference. This Court
should look to the all of the § 3553(a) factors, and the empirical data not considered

by the Commission, in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the various purposes of sentencing.

**B.    A variance is needed to avoid unwarranted sentencing disparities between Mr. Powers and similarly situated defendants who have received substantial variances from other courts.**

Both the Sentencing Commission and the sentencing courts are directed to avoid unwarranted sentencing disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct. *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007) (citing 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)). The Commission performs its function "at wholesale," while the district court performs its function "at retail." *Id.* Ideally, the two entities should have a symbiotic relationship, with the sentencing court taking the guidelines into account in its § 3553(a) analysis and the Commission considering feedback from the courts, in the form of departures and variances, when making its regular revisions to the guidelines. *See* 18 U.S.C. § 3553(a)(4) (requiring that sentencing court consider the guidelines' recommendation); *see also Rita*, 127 S. Ct. at 2464 (explaining that "[t]he statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and the courts of appeals" with the courts departing or varying in individual cases and the Commission "collect[ing] and examin[ing] the[se] results").

In making its own effort to avoid unwarranted sentencing disparities – as required by 18 U.S.C. § 3553(a)(6) – the sentencing court is expected to concern itself more with national disparities among similarly situated defendants than

with the narrower consideration of equity between defendants charged under the same indictment. *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007).

The sizeable chart inserted earlier in this sentencing memorandum is, therefore, of particular importance. The chart highlights a large sample of cases from districts across the country where defendants in high-loss fraud cases have received sentences substantially below their guideline ranges. None of the defendants included in this chart received any sentencing benefit based on cooperation. As corporate fraud defendants responsible for substantial losses, the defendants are of similar criminal background and have been convicted of similar criminal conduct. The national sentencing trend exemplified by this chart should, therefore, be taken into account by this Court. And, to avoid unwarranted – and unfair – sentencing disparities between Mr. Powers and the many defendants highlighted in the chart, this Court should grant a variance/departure of similar magnitude in Mr. Powers' case.

In its recent decision in *United States v. Parris*, the District Court for the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. 573 F. Supp. 2d 744 (E.D.N.Y. 2008). At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to

single-digit terms." *Id.* at 753. The court took this national pattern into account in arriving at a sentence of just 60 months for the two defendants who each faced an advisory guideline range of 360 months to life. *Id.* at 745.

Counsel realizes that all sentencing decisions are unique. In the District of New Mexico two recent sentencing in white-collar crime cases have attracted counsel's attention. In the case of *United States vs. Melot,* CR 2009-2258 MCA, Mr. Melot was sentenced on August 30, 2011 on his trial convictions for fifteen counts of tax evasion and related offenses. Mr. Melot was ordered to pay restitution in excess of $18 million and was sentenced to a prison term of five years to be followed by five years of supervised release. Counsel is unaware of Mr. Melot's prior criminal history and his offense level, but the amount of restitution certainly was relevant to the determination an advisory guideline sentencing range well in excess of sixty months.

On August 23, 2011 in the case of *United States vs. Frank Hayes a.k.a. William Baumann,* CR 2010-755 WJ, Mr. Hayes was required to pay restitution in the amount of $192,059.62.  Mr. Hayes was determined to be in criminal history category I offender. Mr. Hayes pled guilty to one of two counts of wire fraud committed in connection with obtaining residential mortgage loans.  His plea resulted in an offense level of 14 and a guideline sentencing range of 15-21 months. A downward departure/variance of two levels to level 12 was granted to Mr. Hayes reducing his guideline sentencing range to 10-16 months and making him eligible for a split sentence. The judgment entered against Mr. Hayes reflects that he will self-surrender to be incarcerated by the Bureau of Prisons for five months, to be followed by five months of home detention/location monitoring and five years of supervised release.

**C.      Several aspects of Mr. Powers' offense and his individual characteristics also support a variance.**

A sentencing court "may not presume that the Guidelines range is reasonable," *Gall*, 128 S. Ct. at 596-97, and cannot "require 'extraordinary circumstances to justify a sentence outside the Guidelines range." *United States v. Bolds*, 511 F.3d 568, 580-81 (6th Cir. 2007). The district judge 'must [instead] make an individualized assessment based on the facts presented' and upon a thorough consideration of all of the § 3553(a) factors." *Id.* at 580 (quoting *Gall*, 128 S. Ct. at 597). Although the Sentencing Commission "fills an important institutional role" in promulgating the Guidelines, the sentencing judge "has greater familiarity with the individual case and the individual defendant before him . . . [and] is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case." *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (internal quotations and citations omitted).

Though this Court has discretion to deviate from the Guidelines in even a mine-run fraud case, a variance is especially appropriate in Client's case because of the following mitigating aspects of his individual history and characteristics.

**1.      Powers' primary motivation was not greed.**

A defendant's motive for committing his crime is relevant at sentencing. *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). Under a court's mandatory analysis of the § 3553(a) factors, motive is part of the "nature and circumstances of the offense" and must be considered. *United States v. Mahan*, 2007 WL 1430288, at *3 (10th Cir. 2007) (unpublished) (finding sentence procedurally unreasonable where district court refused to consider defendant's stated motive for possessing

unloaded shotgun, *i.e.*, that he had just been violently beaten by three men and sought to defend his wife). Accordingly, a number of courts have granted departures or variances where a fraud defendant was motivated by something other than a desire for profit of personal financial gain. *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance below guidelines' recommendation where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (considering mitigating evidence that defendant in bank fraud case had "not act[ed] for personal gain or for improper personal gain of another").

　　　Mr. Powers' initial motive was not one of personal greed. Mr. Powers did not set out to permanently deprive the lenders of their funds.  He genuinely believed that the buyers in this case would repay all of the money he assisted them to borrow. In short, Powers' case is distinguishable from the run of the mill fraud case in which a defendant misappropriates large sums of money for the sole purpose of supporting a lavish lifestyle. Though the amounts of the K&E Construction renovation money became increasingly larger as the real estate boom, fueled by easy subprime mortgage loans progressed, his initial motive was to enable his customers to keep pace with that market and to invest for their future financial security.  Kevin Powers was not the proximate cause of the real estate market downturn in general and the irresponsibility of the six buyers to pay the obligations which they were capable of paying.   He believed, however, unrealistically, that the buyers would eventually be able to refinance, sell and repay the funds they had borrowed and, up to the end, as

he discussed with Mr. Sena, Mr. Powers was actively pursuing all means to do so. The Court should take this entire picture into account in fashioning an appropriate sentence.

> **2.     As a 51-year-old, first-time offender, Kevin Powers has an exceptionally low risk of recidivism.**

Both the age of an offender and his/her first offender status are powerful predictors of the likelihood of recidivism. Indeed, the Sentencing Commission has itself recognized that (1) recidivism rates decline dramatically with age, and (2) first-time offenders are even less likely to reoffend than defendants with a limited criminal history who also fall within Criminal History Category I. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13- 14 (May 2004) [hereinafter *First Offender Report*]. The Commission's research has, for example, demonstrated that a 20-year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, while a 51-year-old defendant with the same criminal history has only a 6.2% chance of recidivating. *Measuring Recidivism Report* at Ex. 9. With respect to first offenders, the Commission has found that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%. *First Offender Report* at 13- 14.

Despite these clear and compelling findings, the Commission has failed to revise the Guidelines to take either age or first-offender status into account. The

Commission clearly recognized the advisability of revising the Guidelines to take these factors into account. *See First Offender Report* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure); *Measuring Recidivism Report* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). But, in the five years since publishing its *Fifteen Year Report*, the Commission has taken no action toward implementing such revisions.

In response to the Commission's inaction, a growing number of courts have themselves taken both age and first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a). *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding sentence in child pornography case as reasonable where district court granted downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders); *Simon v. United States*, 361 F. Supp. 2d 35, 48

(E.D.N.Y. 2005) (explaining that sentence of 262 months – as opposed to Guidelines sentence of 324 to 405 months – constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (explaining that age of offender is relevant to § 3553(a) analysis, even if not ordinarily relevant under the Guidelines, and granting variance to 57-year-old defendant); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first – *i.e.*, the charged – act).

Kevin Powers is 51 years old and has no history of adult criminal behavior.  His juvenile history is 32 years old and predates Kevin's 23-year period of abstinence from alcohol and controlled substances.  The Sentencing Commission has recognized that an offender within his age range – and with his lack of any criminal record – is extremely unlikely to recidivate. Given Mr. Powers' extraordinarily low risk of recidivism, a within-guidelines sentence of 108 to 135 months is simply greater than necessary to protect the public from the small chance of his committing future crimes. Such a lengthy sentence would only serve to provide "just desserts" at a very high cost to the American taxpayer while hindering Mr. Powers' ability to make restitution to the lenders. Moreover, because it is the certainty, not the severity, of punishment that best serves as a general deterrent to the public at large, a sentence substantially below the

advisory range would more than adequately fulfill § 3553(a)(2)(B)'s goal of "afford[ing] adequate deterrence to criminal conduct."

### 3.   Mr. Powers' criminal conduct was aberrant in light of the many years of his adult life he lived as a law-abiding citizen.

In the Sentencing Reform Act, Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). In response, the Commission "redefin[ed] 'serious offense' in a way that was entirely inconsistent with prior practice, and not at all based on any real data or analysis," and thereby substantially increased the incarceration rate for non-violent first offenders above pre-guidelines rates. *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007).

The Commission acknowledged that the guidelines failed to address "single acts of aberrant behavior that still may justify probation at higher offense levels through departures." *See* USSG Ch.1, Pt. A, intro comment. § 4(d). Seizing on the Commission's statement, courts stepped in to fill in the gap, creating their own downward departure for offense conduct that constituted aberrant behavior. Though some circuits limited the availability of their aberrant conduct departure to defendants guilty of a "spontaneous, thoughtless, single act involving lack of planning," *see, e.g.*, *United States v. Marcello*, 13 F.3d 752 (3d Cir. 1994), other courts took a more expansive approach by looking at the totality of the circumstances and not automatically excluding defendants whose

uncharacteristic conduct was comprised of more than a single, unplanned criminal act. *See, e.g.*, *United States v. Grandmaison*, 77 F.3d 555 (1st Cir. 1996).

In 2000, the Commission finally adopted its own aberrant conduct departure. *See* USSG § 5K2.20. In doing so, however, the Commission failed to fulfill its institutional role of considering empirical data or the many policy questions relevant to how first-offenders should be sentenced. Instead, the Commission simply reviewed the approaches already being taken by the courts, considered general recommendations from the criminal justice community, and then elected to adopt a restrictive approach that limited eligibility to "single criminal occurrence[s] or single criminal transaction[s]." *Id*. The Commission "*did not* study the relationship between the varying court definitions or aberrant behavior and the statutory purposes of sentencing," "evaluate alternatives to incarceration for non-violent first offenders," or explain why it adopted various exclusions or definitions." *Germosen*, 473 F. Supp. 2d at 228-29. In a conclusory manner, the Commission merely "announced *what* it had done." *Id*. at 229.

Because the Commission failed to fulfill its institutional role, this Court has the authority to reject § 5K2.20's restrictions on the availability of the aberrant conduct departure. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). Mr. Powers lived a law-abiding life until he was in his mid-40s and engaged in the charged fraud. He was widely

regarded as a good person. He did not engage in the convicted conduct until he
was about 45 years old.

As a result of the temptation of boiling real estate, mortgage lending and
construction industries, Mr. Powers lost his moral compass and engaged in
reckless conduct. His crimes are, however, completely uncharacteristic when
viewed in the context of his entire productive adult life. This Court should,
therefore, grant a departure or variance based on the aberrant nature of his
conduct.

     **4.**     ***Due to the loss of his job and various professional licenses, Mr. Powers
will never be able to commit future fraud crimes.***

In fashioning a sentence that adequately deters the defendant from future
criminal conduct, it is highly relevant to consider whether the defendant will
even be able to commit future crimes like the one for which he is being
prosecuted. In *United States v. Olis*, for example, the district court considered that
the defendant was substantially incapacitated from committing future crimes of
fraud by the loss of his corporate job and professional licenses. 2006 WL
2716048, at *13 (S.D. Tex. Sept. 22, 2006) (unpublished). In granting a
substantial variance below the advisory range, the *Olis* court explained: "Once
[the defendant] returns to his family, the chastening effect of years in prison, the
attendant negative publicity, the loss of his job and accounting and law licenses,
and the need to provide support for his family will provide adequate deterrence
against any potential future criminal conduct." *Id.* Like the defendant in *Olis*,
Kevin Powers will be unable to commit future crimes of fraud.  He has
voluntarily surrendered his real estate sales license and will never again engage

in the sale of real estate or mortgage origination. Because a long sentence is not necessary to incapacitate Mr. Powers, the advisory guideline range of 108 to 135 months is simply *much* greater than necessary.

> **5.      Kevin Powers will be better able to make restitution to his victims if he is sentenced to a short term or no term of imprisonment and long term of supervised release or probation.**

In considering the length of a prison sentence, a sentencing court may consider how its sentence will affect the defendant's ability to make financial restitution. *See* 18 U.S.C. §3553(a)(7) (cataloging "the need to provide restitution to any victims of the offense" as one factor to consider in formulating sentence); *see*, *e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probation sentence as the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by non-incarcerated and employed defendant"). In *United States v. Peterson*, for example, the district court's central justification for varying from the guidelines was to facilitate the defendant's payment of restitution. 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005). The defendant had stolen checks from his employer, forged signatures on the checks, and deposited them into his sister's bank account. *Id.* at 1061. He pled guilty to bank fraud in the amount of $81,000. *Id*. The district court elected to grant a variance from the advisory guidelines range of 12 to 18 months imprisonment and instead sentenced the defendant to "one day in prison, followed by a substantial period of community confinement as a condition of five years of supervised release." *Id*. In explaining its variance from the guidelines, the district judge said:

If I had sentenced defendant consistent with the guidelines, he would have lost his job. This would have impaired his ability to repay the money he stole. I do not suggest that a defendant should receive a break just because he owes restitution. But in the present case, where defendant had a reasonably well-paying job and the restitution amount was manageable, § 3553(a)(7) weighed in favor of a sentence that would allow him to remain in the community and working. *Id.* at 1062.

Kevin Powers is an intelligent, college-educated, hardworking man and a particularly talented salesperson who is in the midst of what he believes is a natural transition into the filed of counseling and human services. Due to his work ethic and high energy level, and other qualities he was extremely successful when he sold real estate and originated loans for over a decade. There is every reason to believe that, even with a criminal conviction, he will be able to get a reasonably well-paying job and make substantial restitution to the lenders. If, however, Mr. Powers is sentenced within the advisory guideline range, he will not get out of prison until he is between 59 and 61 years of age, assuming good time awards of from 16 to 20 months.  He will be nearly at retirement age. At that point, his age, likely health issues, and life expectancy will make it nearly impossible for him to make meaningful restitution.

Counsel is not aware of any lender who has called for a long or any prison sentence.  Restitution is likely a more important consideration. Mr. Powers is remorseful and wants to devote the remainder of his working life to making amends to the victims. In fashioning an appropriate sentence, this Court should seek to maximize, rather than eliminate, Kevin Powers' ability to make the restitution the victims deserve.

**6.      Kevin Powers has already been punished collaterally through the loss of his profession and reputation.**

When a defendant suffers consequences for his criminal conduct – apart from the sentence imposed through the criminal court process – the sentencing court can take this collateral punishment into account in fashioning an appropriate sentence. *See e.g. United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as result of EPA-related charges); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant in public corruption case was already collaterally punished by loss of his position, loss of his reputation, widespread media coverage of his case, and the emotional toll of two lengthy, public trials). In *United States v. Samaras*, for example, the district court granted a variance from the Guidelines in part because the defendant had lost a good public sector job as a result of his conviction. 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005). Variances or departures on this basis have been justified because the collateral punishment itself satisfies the specific and general deterrence objectives of 3553(a), without the need for the full range of punishment called for by the Guidelines. *Gaind*, 829 F. Supp. at 671.

Mr. Powers has already suffered tremendously in the wake of his arrest and this collateral punishment must be taken into account at sentencing. He has lost his business, his professional reputation, and his ability to work in the real estate sales and mortgage lending industries.

All of these collateral consequences have caused Mr. Powers intense emotional anguish.  In short, Mr. Powers has suffered as much as other defendants, who received variances based on collateral punishment. In fashioning an appropriate

sentence, this Court should consider not only Kevin Powers' professional and reputational loss but also the incredible emotional suffering he has already endured as a result of his separation from his daughter and his family of origin as a result of the protected witness status of Jodi Powers and Elizabeth Zimmer, the mother of his beloved daughter Nicole.

This Court should consider the fact that Mr. Powers undertook his actions while the real estate market was booming. When the downturn began in late 2007, he essentially did not know another way out other than to keep working with his clients to save their sinking investments. However, once the market began to crash, he, as evidenced by his conversation with Mr. Sena, simply dug his hole deeper and deeper. Mr. Powers was hopeful that the market was going to become reverse itself and become profitable again so as to allow the buyers to sell or refinance and repay the borrowed funds, but that did not happen before the time he was charged in this case. And it has not happened to his date because the United States and all the world are suffering as a result of gross miscalculations and reckless conduct of many successful and learned people in high financial circle and political positions. Mr. Powers made extremely poor judgments in his mortgage lending activities. These misjudgments must, however, be seen in light of the high times in which we were living and the depths and duration of the financial ills our nation finds itself in today.   A sentence within the advisory guideline range is far in excess of what is fair and just in this case and would not take into account the insignificant stature of Mr. Powers' in reference to national financial events.  A departure or variance is, therefore, needed to avoid such an unjust result.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Mr. Powers respectfully submits that a sentence far below the advisory guideline range is a sentence that is sufficient, but not greater than necessary.

<div style="margin-left:40%">

Respectfully submitted,

*Daniel J. Tallon*

*Electronically Filed on September 8, 2011*
_____
DANIEL J. TALLON
Attorney for Kevin Powers
6 Placitas West Road
Placitas, NM 87043
505.867.1515; fax 867.9495

</div>

I hereby certify that a copy of the foregoing was electronically filed and thereby delivered by electronic means to all defense counsel of record and to Assistant U.S. Attorneys Mary Higgins and George Kraehe on the 8th day of September 2011.

*Daniel J. Tallon*
_____
DANIEL J. TALLON

# ENDNOTES

1. *United States v. Milton*, Case No. 3:06-cr-00137, Docket Entry 1216 (D. Conn. Jan. 30, 2009) (Judgment); *United States v. Milton*, No. 3:06-cr-00137, Docket Entry 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution).

2. *United States v. Ferguson*, Case No. 3:06-cr-00137, Docket Entry 1199 (D. Conn. Dec. 31, 2008) (Judgment); *United States v. Ferguson*, No. 3:06-cr-00137 , Docket Entry 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution).

3. *United States v. Correll*, Case No. 1:07-cr-00365, Docket Entry 36 (N.D. Ga. June 9, 2009) (Order Granting Motion for Reduction of Sentence).

4. *United States v. Cole*, 2008 WL 5204441, at *2-3, 9 (N.D. Ohio, Dec. 11, 2008).

5. Neither the Defendant's nor the Government's sentencing memorandum indicated what the Probation Office had found the advisory guideline range to be. Undersigned counsel contacted Marcia Shein, counsel for Mr. Ledee. Ms Shein reported that the PSR had indicated a total offense level of 51, criminal history category II, and an advisory range of life imprisonment. Ms. Shein also reported that the sentencing court disagreed with some of the PSR's calculation and found a lower guideline range of approximately 20 years. The parties had, however, entered a C agreement, which capped the sentence at 7.5 years. Although this cap was substantially lower than the advisory guideline range, the sentencing court nevertheless varied even further to impose a sentence of just 70 months. *See United States v. Ledee*, Case Nos. 1:04-cr-0623-BBM and 1:05-cr-0015-BBM, Docket Entry 154 (N.D. Ga. May 8, 2007) (Judgment and Commitment).

6. *United States v. Whittier*, Case No. 1:07-cr-0087, Docket Entry 12 (S.D.N.Y. Oct. 18, 2007) (Judgment). *See also*, *United States v. Whittier*, 1:07-cr-0087, Docket Entry 14 (S.D.N.Y. Nov. 6, 2007) (Transcript of Sentencing Hearing).

7. *United States v. Humphreys*, Case No. 1:02-cr-01559, Docket Entry 17 (S.D.N.Y. Nov. 14, 2007) (Judgment). *See also United States v. Humphreys*, Case No. 1:02-cr-01559, Docket Entry 19 (S.D.N.Y. Dec. 3, 2007) (Government's Sentencing Memorandum).

8. *United States v. Orlansky*, Case No. 1:03-cr-20951, Docket Entry 1196 (S.D. Fla. Nov. 16, 2007) (Judgment). *See also*, *United States v. Orlansky*, Case no. 1:03-cr-20951, Docket Entry 1054 (S.D. Fla. July 17, 2007) (Defendant's Sentencing Memorandum).

9. *United States v. Adelson*, 441 F. Supp.2d 506, 514 (S.D.N.Y. 2006), *aff'd* 2008 WL 5155341 (2d Cir. Dec. 9, 2008). *See also United States v. Adelson*, Case No. 1:05-cr-00325, Docket Entry 86 (S.D.N.Y. June 6, 2006) (Judgment).

10.     The district court initially imposed a sentence of 292 months (a sentence within the then-mandatory guideline range) after finding an actual loss amount of $105 million. *United States v. Olis*, 429 F.3d 540, 542 (5th Cir. 2005). On appeal, the Fifth Circuit vacated the sentence, finding that the district court's "loss calculation did not take into account the impact of extrinsic factors on Dynegy's stock price decline." *Id*. at 548-49. On remand, the district court concluded that the actual loss to shareholders could not be reasonably calculated. *United States v. Olis*, 2006 WL 2716048, at * 10 (S.D. Tex. Sept. 22, 2006). The court, therefore, relied on the intended loss figure of $79 million. *Id*. The new loss amount changed the guidelines range to 151-181 months. *Id.* The court then went on to grant a variance below this advisory range to arrive at a final sentence of just 72 months. *Id.* at 11-13.

11.   *United States v. Forbes*, Case No. 3:02-cr-00264, Docket Entry 2634 (D. Conn. Jan. 15, 2007) (Government's Sentencing Memorandum). *See also United States v. Forbes*, Case No. 3:02-cr-00264, Docket Entry 2641 (D. Conn. Jan. 23, 2007) (Judgment).

12.  *United States v. Shelton*, Case No. 3:02-cr-00264, Docket Entry 1604 (D. Conn. July 13, 2005) (Government's Sentencing Memorandum). *See also United States v. Shelton*, Case No. 3:02-cr-00264, Docket Entry 1635 (D. Conn. Aug. 4, 2005) (Judgment).

13. *See United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006). Ebbers' sentence has been widely viewed as "one of the most severe given to a first-time offender for a crime that did not involve violence or trafficking in illegal narcotics." *See* Peter J. Henning, *White Collar Crime Sentences After Booker: Was the Sentencing of Bernie Ebbers Too Harsh I*, 37 MCGEORGE L. REV. 757 (2006).

14.  In its Sentencing Memorandum, the Government argued for a loss calculation of $2.2 billion and set forth the two possible Guideline calculations. *United States v. Kumar*, Case No. 1:04-cr-00846, Docket Entry 223 (E.D.N.Y. Nov. 2, 2006). *See also United States v. Kumar*, Case No. 1:04-cr-00846, Docket Entry 284 (E.D.N.Y. Nov. 27, 2006) (Amended Judgment).

15.  In its Sentencing Memorandum, the Government argued for a loss calculation of $2.2 billion and set forth the two possible Guideline calculations. *United States v. Richards*, Case No. 1:04-cr-00846, Docket Entry 223 (E.D.N.Y. Nov. 2, 2006). *See also United States v. Richards*, Case No. 1:04-cr-00846, Docket Entry 283 (E.D.N.Y. Nov. 22, 2006) (Judgment).

16.  In his Sentencing Letter, Mr. Gabayzadeh conceded a total offense level of 48 (an offense level that results in an advisory sentence of life imprisonment regardless of criminal history score). *See United States v. Gabayzadeh*, Case No. 2:03-cr-00162, Docket Entry 180 (E.D.N.Y. Aug. 17, 2006). *See also United States v. Gabayzadeh*, Case No. 2:03-cr-00162, Docket Entry 190 (E.D.N.Y. Nov. 23, 2006) (Judgment).

17. Following their conviction and sentencing, John and Timothy Rigas succeeded in obtaining limited relief on appeal. Specifically, the Second Circuit reversed their convictions on one of the counts, and remanded for an entry of acquittal on that count

and for resentencing. *United States v. Rigas*, 490 F.3d 208, 239 (2d Cir. 2007). On remand, the District Court concluded that
the elimination of one count of conviction did not change the guideline range (life imprisonment), but did change the aggregate statutory maximum sentence from 215 months to 185 months. *United States v. Rigas*, Case No. 1:02-cr-01236, Docket Entry 428 (S.D.N.Y. June 24, 2008) (Memorandum and Opinion). Though each defendant had already received a substantial variance below the advisory range at the original sentencing, the district court reduced each of the defendants sentences by another three years. *Id*. Accordingly, John Rigas' sentence was reduced from 180 months to 144 months and Timothy Rigas' sentence was reduced from 240 months to 204 months. *Id*.

18. *See* Endnote 17.

19. *United States v. Jacob Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 141 (E.D.N.Y. July 23, 2007) (Government's Sentencing Memorandum). *See also United States v. Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 164 (E.D.N.Y. Aug. 8, 2007) (Judgment).

20. *United States v. Herman Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 141 (E.D.N.Y. July 23, 2007) (Government's Sentencing Memorandum). *See also United States v. Herman Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 158 (E.D.N.Y. Aug. 7, 2007) (Judgment).

21.*United States v. Aaron Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 141 (E.D.N.Y. July 23, 2007) (Government's Sentencing Memorandum). *See also United States v. Aaron Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 161 (E.D.N.Y. Aug. 8, 2007) (Judgment).

22. *United States v. Argo*, Case No. 1:07-cr-00683, Docket Entry 14 (S.D.N.Y. Jan. 23, 2008) (Government's Sentencing Memorandum). *See also United States v. Argo*, Case No. 1:07-cr-00683, Docket Entry 16 (S.D.N.Y. Jan. 29, 2008) (Judgment).

23. *See United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).

24. *Id*.

25. *United States v. Kohler*, Case No. 1:07-cr-20446, Docket Entry 65 (S.D. Fla. Sept. 17, 2007) (Defendant's Objections to Presentence Investigation Report). *See also United States v. Kohler*, Case No. 1:07-cr-20446, Docket Entry 84 (S.D. Fla. Oct. 10, 2007) (Amended Judgment).

26. *United States v. Dreier*, Case No. 1:09-cr-085, Docket Entry 84 (S.D.N.Y. July 17, 2009) (Judgment). *See also United States v. Dreier*, Case No. 1:09-cr-085, Docket Entry 76 (S.D.N.Y. July 8, 2009) (Government's Sentencing Memorandum).