# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                          CR 2009-3065 MCA

KEVIN POWERS,

        Defendant.

## DEFENDANT'S SUPPLEMENTAL OBJECTIONS
## TO THE PRE-SENTENCE REPORT REGARDING LOSS CALCULATIONS

**COMES NOW** Defendant KEVIN POWERS, by and through his attorney DANIEL J. TALLON, and supplemental objections to the pre-sentence report. The pre-sentence report was disclosed to defense counsel on or about July 12, 2011. The objections set forth herein concern portions of the pre-sentence report which the Defendant challenges and which relate to issues of pecuniary loss and restitution.

       1.      Counsel filed Objections to the draft PSR on August 17, 2011.  In those objections, counsel made specific requests for supporting documents as to loss.   Counsel was provided with additional supporting documents regarding actual loss and restitution: 1) on August 29, 2011 (104 pages from the United States Attorney; 2) on September 1, 2011 (255 pages from the United States Probation Office); 3) on September 6, 2011 (104 pages from the United States Attorney; and 4) September 8, 2011 (14 pages from the United States Probation Office).

**INTENDED LOSS**

2.     PSR page 30 – 32, paragraphs 104 to 114 concern offense level computations. The base offense level is 7. This is increased by the amount of loss by +18 to offense level 25.  This is based upon an alleged face amount of loss, all of it regarded as "intended" loss in the amount of $5,548,874.75.

3.     Defendant argues that he intended no loss, and that the intended loss amount which is the basis for 18 additional offense levels should not be the measure of loss for guideline sentencing calculations. Intended loss should be zero.  Therefore, actual loss must be greater than intended loss. The Court should focus its next inquiry on the evaluation of actual loss, which ordinarily is equal to restitution, provided the restitution figures provided are procedurally and substantively sufficient under the MVRA and supported by a preponderance of evidence. See United States v. Galloway, 509 F.3d 1246 (10th Cir. 2007).

4.     In general, "loss is the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n. 3(A). The PSR calculated what it termed the "actual loss" in this case as $3,002,745.85.  Because this loss was between $2,500,000 and $7,000,000, the offense level increased by 18. *See* U.S.S.G. § 2B1.1(b)(1)(I).

5.     Mr. Powers argues that intended loss requires knowledge that the loss is virtually certain to occur rather than that it is merely a probable consequence. The fact patterns in **United States v. Baum** and **United States v. Powers** are very similar.  In this case, the price of the home shown on the purchase agreement allegedly was inflated above an earlier list price for the house, generally by an amount roughly equivalent to an amount referred to as the "K&E money or renovation money".  The purchase agreements

included addenda (allegedly not disclosed to the lenders) requiring that the renovation money be paid by the seller to a contractor of the buyer's choice.  In each of nine transactions, it was paid to K&E Construction, one of Mr. Powers' business interests, for renovations to each home.   Mr. Powers transferred the entire amounts, (with slight reductions in three of the nine transactions), to each buyer within 24-48 hours after closing. The total of the "K&E money" was about $1,267, 500.00. PSR pages 28 – 29, paragraph 91.  The amount by which the K&E money was reduced of the reductions referenced above was about $25,000.00. This $25,000.00 is included in the $1,267,500.

6. "The guidelines do not define intent,…a loss is intended if it is expected." See **United States v. McCoy**, 508 F.3d 74, at 79 (1st Cir. 2007).  As to what it means to *intend* a loss, the Supreme Court has stated: "The element of intent in the criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more general one of knowledge or awareness." In other words, a defendant may be said to have intended a loss if he had the requisite knowledge or awareness, even if he had no desire for the loss. **United States v. United States Gypsum Co.,** 438 U.S. 422.445 (1978).

7. There is substantial authority that mere knowledge of a *probable* result does not suffice for intent: "a person... intends a result of his act ... when he knows that the result is *practically certain* to follow from his conduct, whatever his desire may be as to that result." *Id.* at 445 (quoting W. LaFave & A. Scott, Criminal Law 196 (1972) (emphasis added)); *see* Wayne R. LaFave, 1 Substantive Criminal Law § 5.2(a), at 341 (2d ed.2003). at 1135

8. Intent instructions in the Tenth Circuit use the "practically certain"

language.   See **United States v. Platte**, 401 F.3d 1176, 1181 (10th Cir. 2005).  **Baum**
stated that the guidelines definition of actual loss was "the reasonably foreseeable
pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n. 3(A)(i), might
suggest that reasonable foreseeability could not also be the test for intended loss. Id., at
1135.

9.      The quality of the knowledge required to be found to have intended loss is
at issue in the determination of intended versus actual loss. "…there is some authority
that a defendant is said to intend a consequence if he knows that the consequence is
*probable.* Other authority, in contrast, suggests that intent requires knowledge that the
consequence is *practically certain.* **Id**., at 1133. One could reasonably contend that the
evidence in this case does not support a finding that intended loss exceeded either actual
loss, to be determined, or $2.5 million, and was "practically certain." **Id**., at 1133.

10.     **Baum** examined the question of what quality of knowledge is required for
intent under the loss guidelines. Some authority suggests that it is enough that the
defendant know that the loss is probable.  **United States Gypsum** "conclude[d] that
action undertaken with knowledge of its probable consequences and having the requisite
anticompetitive effects can be a sufficient predicate for a finding of criminal liability
under the antitrust laws." 438 U.S. at 444.

11.     "The First Circuit, when interpreting U.S.S.G. § 2B1.1 in a context very
similar to the one before us (fraudulently obtained loans for homes with inflated purchase
prices), equated "intended loss" with "expected" loss.  See **United States v. McCoy**, 508
F.3d 74, at 79 (1st Cir. 2007).  ("The guideline makes clear that intended loss—`expected'

would be a better term—is to be used where it is higher than actual loss, that expectation being a measure for the defendant's culpability."). **Id**., at 79.

12.     PSR page 31, paragraph 106. The second paragraph in paragraph 106 states that it was reasonably foreseeable that the six buyers would <u>not</u> make mortgage payments with the cash back.  This argument conflicts with the allegation that Mr. Powers told the six buyers to use that money to make mortgage payments.

13.     Other cases discuss the issue of intended versus expected loss. The defendant's motive is an important sentencing factor. **Wisconsin v. Mitchell**, 508 U.S. 476, 485 (1993).  See also **United States v. Ranum**, 353 F.Supp 2d 984 (E.D. Wisc. 2005).  A defendant's actual or subjective intent determines loss.  **United States v. Goss**, 549 F.3d 1013, 1018-1019 (5th Cir. 2008).

14.     **United States v. Innarelli**, states that intended loss is a "term of art" and that "expected loss" is the true definition of intended loss. 524 F.3d 286, 290 (1st Cir. 2008).  In this case, whether Mr. Powers could foresee or expect loss is grounded in the historical reality of the real estate market which created a reasonable expectation for Mr. Powers, and almost everyone in his and related industries, that real property would continue to appreciate. Mr. Powers had a reasonable expectation that the value of the collateral would remain the same or increase and that the stream of mortgage money being made freely available to borrow would continue beyond the two-year window within which he expected his buyers would either refinance or resell their property, without damage to either the buyers' or the lenders' financial interests. See also **United States v. Cutter,** 313 F.3d 1, 6-7 (1st Cir. 2002).

15.     **United States v. Confredo, 528 F.3d 143, 152** (2nd Cir. 2008) held that

the defendant can rebut a presumption that "loss" means intended loss. **Confredo** held that intended loss is to be determined by the defendant's subjective expectation. In that case, the defendant did not intend to pocket the face value of the loans. The Second Circuit remanded **Confredo** for the purpose of determining defendant's subjective intent as to loss.

16.     Counsel argues that the presumption of intended loss is rebutted by trial testimony which supports the intent of Mr. Powers and the six buyers to succeed. By showing that loss was not expected, not subjectively intended, and that there was a gross disparity between his either intended gains and/or expected loss.  Counsel argues that the buyers' misrepresentations as to owner occupancy were a matter of <u>only limited materiality</u> in this 2006 mortgage loan market.  Further, there is support in trial evidence that the acts of the cooperating witnesses are what precipitated their defaults, events which were unexpected and unintended by Mr. Dowers. Therefore, the face amount of the loans in this case should not be regarded as the amount of intended loss.  The totality of the testimony and evidence in this case do not show that Mr. Powers either intended or expected the lenders' losses and are sufficient basis to find that Mr. Powers  has rebutted the presumption of intended loss by showing that loss was not expected. The loss in this case greatly overstates the seriousness of Mr. Powers' conduct and his reasonable expectations at the time the transactions were consummated.

17.     **United States v. Parish**, 565 F.3d 528, 535 (8th Cir. 2009) held that the test is whether market factors were foreseeable under the circumstances of that case. The defendant built 195 houses and financed those houses with 24 lenders.  In Parish, the court regarded the losses were foreseeable, but for distinguishable reasons: it found that

the number of houses built and amount of loan proceeds ($85 million) and the estimated

loss ($40 million) had a foreseeable impact on the local market.

18.     In **United States v. Forchette,** 220 F.Supp. 2d 914, 924-931 (E.D. Wisc.

2002) the amount of loss properly was determined to be the product of several sources.

That court found that it was unfair to sentence based on inflated loss figures, such as

those produced by the real estate downturn, for the reason that unforeseeable events could

be and well in this case a factor which produced a "gross disparity" between the nature of

defendant's conduct and the amount of loss.  The court held that intended loss in that case

had no relationship to reality. **Forchette** also discussed a "multiple causation" scenario

stating that in such cases, "it would be unfair to sentence the defendant based on the loss

amount inflated by factors, **such as an economic downturn, market collapse, or**

**negligence by the victims, which are beyond his control."** (emphasis mine).

19.     Mr. Powers acted upon the history of appreciation in the real estate

market.  This history was a reality. The downturn was not expected by and had no

relationship to reality for Mr. Powers or for any lender or investor in the real estate and

mortgage lending industries. See also **United States v. Ranum**, 353 F.Supp. 2d 984

(E.D. Wisc. 2005).

20.     Mr. Powers' intent was different in the sense that the representations made

by the six buyers as to owner occupancy had only limited materiality; they slightly

increased the interest rate on the loan. Mr. Powers' intent also was different because he

realized little gain from his conduct.  He never intended to obtain the benefit of the full

amount of the loans. The cooperating witnesses' actions, coupled with market downturn,

are factors which more directly determined the amount of loss; Mr. Powers obtained only

a minimal "share" of the proceeds of the loans.

21.     Mr. Powers/K&E were named as a recipient of a portion of the face amount of the loans, but was not an actual beneficiary of those monies.  As discussed in paragraph 29 below, 98% of those monies were immediately paid to and controlled by the buyers.

**GAIN SHOULD BE THE MEASURE OF LOSS, AS THE ALTERNATIVE TO ACTUAL LOSS, FOR LOSS CALCULATION PURPOSES**

22.     Mr. Powers' gain, as measured by the net benefit he received from the real estate sales and mortgage origination commissions set forth in the chart at PSR pages 27-28 paragraph 90, is the most reliable and just measure of loss and calculation of offense level based upon that loss.

23.     Mr. Powers' gain is not represented by the total of K&E money. It is more accurately described by the chart which sets forth the mortgage origination and real estate commissions he earned in connection with these nine transactions. Mr. Powers' gain, as assessed in that fashion, is approximately **$92,000 to $108,000**.  Mr. Powers "profited no more than in his legitimate business dealings" (see **United States v. Samaras**, 390 F.Supp. 2d 805, 809 (E.D. Wisc. 2005) when he sold these properties and brokered these loans, and in most or all cases, charged a real estate commission which reflected on the HUD-1 the fact that the commission was charged on the non-K&E Construction portion of the loans.

**Real Estate Commissions**

24.     The chart at PSR pages 27-28, paragraph 90 reflects loan origination commissions and real estate commissions received by Mr. Powers in connection with the 9 transactions and 17 loans. The following reductions of these amounts should apply.

The maximum amount attributable to Mr. Powers for both loan origination commissions and real estate commissions is $249,048.87.  The Vaughan Company received $127,842.28 in gross real estate commissions. Kevin Powers typically would have received between 55 – 65% of that amount.  See PSR page 10, paragraph 22.  A reasonable estimate of the actual amount paid to Kevin Powers is approximately 55-65% of $128,000 or $70,000 to $85,000.

25.     In addition, real estate commission amounts should be reduced from $127,842.28 for the following reasons. Jodi Powers received 1.5% real estate commissions on the four Oakland Estates properties. Her share of commissions on these four sales was approximately 1.5% of $1,600,000 or $24,000.00. Mr. Powers received, in addition to Ms. Powers, no more than 30 to 50% of the commissions she earned or $7,200.00 to $12,000.00.   Jodi Powers' share of commissions on the purchases of the two properties she purchased for herself was approximately 1.5% of $521,000 or $7,800.00. Mr. Powers received, in addition to Ms. Powers, no more than 30 to 50% of the commissions she earned or $ 2,500.00 to $4,000.00.  Therefore, the amount of real estate commissions earned by Mr. Powers should be further reduced by the $32,000.00 paid to Jodi Powers, resulting in a "gain" or income to Mr. Powers of from **$38,000.00 to $53,000.00.** ($70,000 to $85,000 less $32,000)

**Mortgage Loan Origination Commissions**

26.     With respect to AAA Worldwide Financial, mortgage loan origination commissions of $69,106.59 should be reduced by approximately $1,300.00 per transaction or $11,700 for nine transactions. This is because a $745.00 fee was paid from these gross amounts to AAA Worldwide, a $495.00 processing fee was paid to a

processor and credit reports in the amount of approximately $60.00 were always charged. Thus reduced to approximately $57,500.00, the adjusted gross amount of commissions should be further reduced by an overhead factor of 50% producing approximate net proceeds of **$28,750** paid to Mr. Powers.

27.      With respect to mortgage loan origination commissions received by Powers Mortgage Group the amount of $52,100 should be reduced by an overhead factor of approximately 50% producing approximate net proceeds of **$26,050**. Thus, net loan origination commissions to Mr. Powers totaled approximately **$54,550** for the 9 transactions, not the $121,206.59 set forth in the chart at paragraph 90.

28.      Therefore Mr. Powers earned the sum of approximately **$92,000 to $108,000** (37- 44% of the $249,048.87 commissions set forth in this chart. This lack of financial interest or gain by Mr. Powers supports his motion for downward departure on the ground that the claimed loss amounts substantially overstate the severity of his conduct.

**K&E CONSTRUCTION MONEY AS A MEASURE OF GAIN AS AN ALTERNATIVE TO LOSS**

29.      The nine payments to K&E Construction which total $1,267,500 are not an accurate measure of gain to Mr. Powers.  The chart at PSR pages 28 – 29, paragraph 91 sets forth the 9 K&E Construction payments which total $1,267,500. From that amount, $6,000 was deducted from Christopher Sena's proceeds; approximately $11,500 was deducted from Jodi Powers' proceeds and approximately $7,500 was deducted from Pauline Walker's proceeds. The total of these deductions is approximately **$25,000** which represents .0197 or 2% of the K&E proceeds. Therefore, 98% of those K&E proceeds were at the disposal of and expended at the exclusive discretion of the six purchasers of

nine properties, but not by Mr. Powers. $25,000 might be regarded as "gain" to Mr. Powers.

30.     Mr. Powers asks the Court to use gain as the measure of loss because, as argued below, the United States has not, with the assistance of the lenders, adequately supported the lenders' entitlement to restitution as "victims" as defined under the Mandatory Victim Restitution Act.

31.     The United States and the lenders have not provided the Court with information sufficiently clear to allow the Court to determine whether or not the lenders and the United States Probation Office have ensured that the asserted restitution amounts do not contain "losses" which are properly excluded under USSG section 2B1.1(D)(i).

32.     The United States and the lenders have not provided the Court with information sufficiently clear to allow the court to determine whether Mr. Powers actual loss/restitution figure has been properly credited with the proceeds of sales of collateral, sales which were conducted in a commercially reasonable manner and undiminished by improper exclusions.

33.     In addition, until September 6, 2011, counsel had not been provided with any information which addressed the issue of whether or not a lender obtained mortgage insurance proceeds to compensate them for losses related to the eight second loans in this case. On September 6, 2011, SunTrust provided information as to why their claim for mortgage insurance proceeds as to the second loan on 6600 Glenturret NE was denied. The reason for that denial is completely unrelated to Mr. Powers' conduct. The aggregate amounts of the second loans in this case are approximately $1.3 million. The United States seeks to impose an offense level enhancement based in part upon that alleged

incremental loss.

34.     Counsel contends that due to the inadequacy of "available information" 4 1/2 years after this investigation began, the process of determining restitution remains unreasonably burdensome and determining the "complex issues of fact related to the cause or amount of the victims losses…" has and will "complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  Business records, if properly and reliably maintained, should be readily accessible and available to support these loss claims, promptly.  In every case where the lender makes no response or no further information was located, there should be no loss attributable attributed to client.

35.     18 USC Section 3663A (3) states: "this section shall not apply in the case of an offense described in paragraph (1) (A) (ii) if the court finds, from facts on the record, that – –… (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."   "The District Court may opt out of imposing restitution if it determines "complex issues of fact related to the cause or amount of [HUD's] loss would complicate or prolong the sentencing process to a degree that the need to provide restitution to [HUD] is outweighed by the burden on the sentencing process." 18 U. S. C. Section 3663A (c) (3) (B); see also **United States v.  Serawop,** 505 F. 3d 1112, at 1118-19 (10th Cir. 2007)

36.     The lenders estimates or claims of loss are flawed because MERS records are inaccurate in that they failed to identify a legally recognizable victim who is entitled

to restitution and they failed to accurately present that information necessary to the courts determination of their asserted restitution claims.

37.     The lenders or servicers should not be permitted to unreasonably burden or delay the sentencing process, expending defense attorney and judicial time to determine reasonably accurate loss and restitution figures and thereby imposing unwarranted litigation costs on this process.  See 18 USC Section 3663A (3).

38.     Actual loss cannot be determined reliably and with reasonable effort. Therefore, counsel argues that Mr. Powers' gain is the more proper measure of loss.  See USSG Section 2B1.1, Application Note 3(B).    USSG section 2B 1.1, Application Note 3 (B) Gain. – "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."

39.     Counsel argues that because actual loss is greater than intended loss ("zero"), and actual loss/restitution cannot be reliably determined, then the Court should use Mr. Powers' gain which is equal to approximately **$92,000 to $108,000.**

40.     The increase from the base offense level of 7, as it relates to loss, should be +8 and not + 18, and no more than +10.  See USSG 2B1.1(b)(1)(E) ($70,000 to $120,000 loss) or USSG 2B1.1(b)(1)(F) ($120,000 to $200,000 loss).

**ACTUAL LOSS - RESTITUTION**

41.     PSR pages 52 and 53; paragraphs 204 to 215 concern the issue of restitution. Paragraph 205 states that the amounts of restitution "were determined through available lender records and reflect balances due after short sale/foreclosures of the lien holder as reflected in MERS."

42.     PSR (page 30, paragraph 106) states that from the "intended" loss of

$5,548,875.74.  The lenders recouped $2,546,128.90 (45.90%).  PSR page 30, paragraph 102   The PSR contains no information as to how this figure was determined.

43.     The PSR states that actual loss is $3,002,745.85. Intended or actual loss is calculated "by subtracting money recouped by the lenders from the total original loans." The PSR does not explain how and why the actual loss and restitution amounts differ. The difference could be critical to the Court's estimate of loss, as a reduction of $502,000.00, based upon the asserted inadequacy of supporting information, would reduce the loss-based sentencing enhancement by two offense levels, which results in a reduced guideline sentencing range of from 21 to 27 months at Offense Level 31.

44.     PSR page 24, paragraph 75. Section 2B 1.1, Application Note 3 (E) entitled Credits Against Loss correctly recites that "Loss shall be reduced by the following: (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

**AS TO MOST OF THE LOANS, IT CANNOT BE RELIABLY ESTABLISHED WHO THE "VICTIM" IS, SO AS TO JUSTIFY AN LOSS-BASED OFFENSE LEVEL INCREASE AND AN AWARD OF RESTITUTION**

45.     18 USC Section 3663A states in pertinent part:

(c) (1) this section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense – –

(A) that is – –

… (ii) an offense against property under this title, (title 18),…, including any offense committed by fraud or deceit;…

and

(B) in which an <u>identifiable victim</u> or victims has suffered a
physical injury or <u>pecuniary loss.</u>

46.     Before proceeding, it is important to determine what persons or entities in
this case are victims within the meaning of USSG Section 2B 1.1, Application Note 1.
Definitions.  Application Note 1 states: "for purposes of this guideline… "Victim" means
(A) any person who sustained any part of the <u>actual loss</u> determined under subsection (b)
(1);… "Person" includes individuals, corporations, companies, associations, firms,
partnerships, societies, and joint stock companies."

47.     Whether someone is a victim depends on whether there is an adequate
causal relationship between the asserted loss and criminal conduct and whether the
"victim" demonstrably relied upon a representation made by the defendant. See **United
States v. Cutter,** 313 F.3d 1, 6-7 (1st Cir. 2002).  The First Circuit Court of Appeals
"emphasized the necessity for an adequate causal link between the criminal
offense in the loss in **United States v. Vaknin**, 112 F.3d 579 (1st Cir. 1997).
**Vaknin** announced two "bedrock principles" regarding restitution orders. "First,
restitution should not be ordered at the loss would have occurred regardless of the
defendant's misconduct underlying offense of conviction. Second, restitution is
inappropriate if the conduct underlying the conviction is too far removed, either factually
or temporally, from the loss. … This means, in effect, that the government must show not
only that a particular loss would not have occurred but for the conduct underlying the
offense of conviction, but also that the causal connection between the conduct in the loss
is not too attenuated (either factually or temporally). A sentencing court should undertake

an individualized inquiry: what constitutes sufficient causation can only be determined case-by-case, in fact – specific probe." 112 F.3d 579, at 589 – 90.   "This standard reflects the Supreme Court's pronouncement that restitution awards are limited to "loss caused by the specific conduct that is the basis of the offense of conviction."  **Hughey v. United States**, 495 U. S. 411, 413 (1990) (interpreting the language "direct and proximate cause" in the VWPA); see also **United States v. Mancillas**, 172 F.3d 341, at 342 (5th Cir. 1999), (finding **Hughey** applicable to the identical language in the MVRA.) See **Cutter**, 313 F.3d at 7.

48.    Counsel contends that subsequent purchasers or loan servicers are not "victims" if they purchased the debt 1) after the default had occurred; or 2) or after foreclosure sale had been initiated; or 3) if that debt was purchased at a discount price, for example, because it was a poor asset with little likelihood of return.

49.    The dates and circumstances surrounding the purchase or transfer of each loan, are material to a determination as to whether the purchaser is a victim, whether they suffered a loss, and whether they are entitled to restitution.  The information provided is not sufficient to make that determination.

**STATUTORY AUTHORITY - RESTITUTION PROCEDURE**

50.    18 USC Section 3664 discusses the procedure for issuance in enforcement of an order of restitution. The Court has the power to order the presentence probation officer to obtain "information sufficient for the court to exercise its discretion in fashioning a restitution order." The PSR "shall include, to the extent practicable, a complete accounting of the losses to each victim…" If the identity of the alleged victims "cannot be reasonably ascertained," the probation officer shall so inform the court. See 18

USC Section 3664 (a).  Subparagraph (b) requires that the defendant be provided with all

portions of the PSR pertaining "pertaining to the matters described in subsection (a)."

51.     The United States was required to provide information supporting

restitution claims to the PSR writer not later than 60 days prior to the initial sentencing

date, August 5, 2011 or by June 6, 2011. Subparagraph (d) (1).   July 15, 2011 is the

"deadline" 60 days prior to the September 13, 2011 sentencing date.

52.     After filing Objections on August 17, 2011 and making specific requests

for supporting documents as to loss, counsel was provided with additional supporting

documents regarding actual loss and restitution: 1) on August 29, 2011 (104 pages from

the United States Attorney; 2) on September 1, 2011 (255 pages from the United States

Probation Office); 3) on September 6, 2011 (104 pages from the United States Attorney;

and 4) September 8, 2011 (14 pages from the United States Probation Office). The

investigation of these matters by SunTrust and by the FBI began in April 2007, four and

one-half years ago.

53.     Subparagraph (2) requires the PSR writer to give each victim "the

opportunity" to file a "separate affidavit" relating to the amount of its losses subject to

restitution and to provide the victim with an "affidavit form" to submit pursuant to

subparagraph (A) (vi).   Restitution should be paid directly to statutory victims who have

provided victim impact statements which accurately substantiate direct losses

54.     In light of the convoluted relationships among original lenders, existing

and defunct, and the array of servicers, trustees, purchasers and foreclosure and short

sellers left in their wake, counsel requests that the Court require each alleged victim to

provide a separate affidavit detailing its actual loss/restitution claim so as to provide the

Court with "available information" sufficient to fashion a restitution order in this case.

55.     Only one loan arguably is supported in this manner; the second loan on 7909 Rio Grande by the Declaration of Howard Handville.  **See paragraph below.**

56.     If there is no "available information" other than the bald assertion that face amount of the loan is "actual loss", there should neither restitution due nor loss, actual, expected or intended, attributed to Mr. Powers.

57.     Counsel contends where a restitution or loss claim is not supported by the lender or alleged victim, and/or there is no effort to mitigate damages (for example, as shown by a restitution claim for 100% or nearly 100% of the face amount of the loan), then that claimed amount should be deducted from the restitution amount.

**THE SUNTRUST COUNTS OF CONVICTION**

58.     PSR page 22, paragraph 70; page 29, paragraphs 92 - 93; page 52, paragraphs 205 – 206 discuss loss and restitution with respect to the eight SunTrust loans, Counts 1, 2, and 12-17.

59.     SunTrust alleges that the losses were sustained at foreclosures or short sales and are supported by "available MERS records".  All four properties related to these eight loans appear to have been sold or foreclosed.  The stated recoveries, range between 39.6% and 66.1% of the original face amounts of the two loans made in each transaction. Counsel argues that the alleged recoveries do not reflect commercially reasonable sales or mitigative conduct by Suntrust.   Suntrust's restitution claims are not adequately and/or consistently supported by the records provided to the Court and counsel.  In overview, determination of an accurate restitution amount for both the SunTrust and non-SunTrust loans is impracticable and places an undue burden on the sentencing process.

60.     The lender's "estimates" or claims of loss are flawed because MERS records are inaccurate in the sense that they fail to identify a legally recognizable victim who is entitled to restitution.   To the extent that the Mortgage Electronic Registration System (MERS) does not incorporate information as to offsets or credits against loss nor does it include an itemization of the elements of loss, the Court cannot be sure that appropriate credits against loss have been registered or that improper elements of loss have not been eliminated from claimed loss calculations.  MERS records fail to accurately present that information necessary to the Court's determination of the lenders' entitlement to restitution.

**THE PERVASIVE RELIANCE ON MERS AND THE UNRELIABILITY OF MERS RECORDKEEPING**

61.     MERS, which is only a computer system, does no diligence and therefore its "records" consist of entries made by its members and are wholly unreliable and thus, so are any assignments done in MERS name by its members straw officers. MERS has stated that it is "not responsible for the accuracy of any information provided by a member vendor or any information entered into the MERS system by or on behalf of the member." **"Delaware, Massachusetts Investigate Mortgage Clearinghouse MERS". The Washington Post. July 27, 2011.  By Hayley Tsukayama**.

62.     The MERS records provided to counsel by the United States on August 29, 2011 include as to each property and each count this recitation by MERS: "MERS makes no representations or warranties regarding the accuracy or reliability of the information provided. MERS disclaims responsibility or liability for errors, omissions, and the accuracy of any information provided. MERS does not input any of the information found on the MERS System, but rather, the MERS members have that

19

responsibility regarding mortgage loans in which they hold an interest. Users of this information have the responsibility to verify the accuracy, currency and completeness of the information.   The information does not constitute the official legal record and is for informational purposes only. The servicer listed should be contacted for further information."

63.      MERS is described as a privately run electronic database which allows financial firms to trade mortgages. **Id.**

64.      MERS was founded in 1995 by Fannie Mae, Freddie Mac and big banks like Bank of America and JP Morgan Chase. It was designed to increase speed and profits. MERS cut out the county clerks and became the owner of record, no matter how many times loans were transferred. MERS appears to sell loans to MERS *ad infinitum*. **"Oregon Judge Denies Foreclosure, Challenges MERS".  The Wall Street Journal – May 26, 2011. WSJ.com. No byline.**

65.      MERS is based in Reston, Virginia. "MERS, which was created by the mortgage industry in the 1990s, has saved financial firms millions of dollars by allowing them to reassign loans without the time and expense of filing mortgage documents and paying local fees each time a loan changes hands." **"Massachusetts to Probe Mortgage Registry." The Washington Post, July 25, 2011. By Brady Dennis**

66.      MERS is a private corporation with a full-time staff of fewer than 50 employees. It is a private mortgage registry that has all but replaced the nation's public land ownership records. **"MERS? It May Have Swallowed Your Loan". The New York Times, March 5, 2011.  By Michael Powell and Gretchen Morgenson.**  (Ms. Morgenson is the author of the recently released book entitled *Reckless Endangerment*:

How Outsized Ambition, Greed, and Corruption Led to Economic Armageddon.)

67.     When MERS was established no one conducted a state-by-state study of real estate laws**. "Oregon Judge Denies Foreclosure, Challenges MERS", supra.**

68.     "How can MERS claim title to those mortgages, and forecloses on homeowners, when it has not invested a dollar in a single loan? And, more fundamentally: given the evidence that many banks have cut corners and made colossal foreclosure mistakes, does anyone know who owns what or owes what to whom anymore?"  **"MERS? It May Have Swallowed Your Loan". supra.**

69.     "At times, some MERS members have failed to follow those procedures and/or establish state foreclosure rules," or to properly explain MERS and document MERS relationships in legal pleadings," wrote MERS spokeswoman Karmela Lejarde in an e-mail to the New York Times. **"The Banks Still Want a Waiver." The New York Times, July 23, 2011. By Gretchen Morgenson.**

70.     "MERS officials have filed questionable documents with courts attesting to ownership of the notes and other significant matters.**" Id.**

71.     Janis Smith, spokeswoman for Fannie Mae, an investor in MERS, told the New York Times "We would never rely on it (MERS) to find ownership," noting that it (Fannie Mae) has its own records."  **"MERS? It May Have Swallowed Your Loan". supra.**

72.     Alan Grayson, Congressman for Florida's Eighth Congressional District in the foreclosure ravaged Orlando, Florida area stated "in many foreclosures, the MERS paperwork was squirrelly….with no real legal authority Fannie and the banks eliminated the old system and replaced it with a privatized one that was unreliable. **Id.**

73.     In 2010, Valparaiso University law professor Alan M. White, matched MERS and ownership records against those in the public domain. "Fewer than 30% of the mortgages had an accurate record in MERS," Mr. White says. "I kind of assumed that MERS at least an accurate list of current ownership. They don't. MERS is going to make solving the foreclosure problem vastly more expensive." **Id.**

74.     "MERS has begun to clean up its practices and paperwork. Officials are furiously assigning mortgages out of MERS's name in each of the banks' names." "… the issues surrounding MERS seem mind – numbing." **"The Banks Still Want a Waiver." supra.**

75.     "Officials at MERS appear to recognize that they are swimming in dangerous waters. Several federal agencies are investigating MERS, and, in response, the company recently sent a note laying out a raft of reforms. It advised members not to foreclose in MERS's name. It also told them to record mortgage transfers and county records, even if state law does not require. **"MERS? It May Have Swallowed Your Loan".  supra.**

**STATE INVESTIGATIONS AND JUDICIAL ACTION TAKEN AGAINST MERS**

76.     Non-judicial foreclosure also known as foreclosure by advertisement and sale, necessarily relies on the foreclosing party to accurately review and assess its own authority to foreclose. A nonjudicial foreclosure is a procedure which relies on a bank or trustee to self – assess its own authority to foreclose.

77.     United States District Court Judge Owen M. Panner found this process deeply troubling and wrote:  "The MERS system creates confusion as to who has the authority to do what with the trustee. The MERS system raises serious concerns

regarding the appropriateness and validity of foreclosure by advertisement and sale outside of any judicial proceeding." **"Oregon Judge Denies Foreclosure, Challenges MERS".  supra.**

78.    "Federal bankruptcy courts and state courts have found that MERS and its member banks often confused and misrepresented who owned mortgage notes. In thousands of cases, they apparently lost or mistakenly destroyed loan documents." **"MERS? It May Have Swallowed Your Loan".  supra.**

79.    In February 2011, Federal Bankruptcy Judge Robert E. Grossman in New York ruled that MERS could no longer act as an "agent" for the owners of mortgage notes. He acknowledged that his decision could erode the foundation of the mortgage business. Judge Grossman wrote: "This court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this court to turn a blind eye to the fact that this process does not comply with the law." **Id.**

80.    Massachusetts Atty. Gen. Martha Coakley will soon seek documents filed by Mortgage Electronic Registration Systems as part of an ongoing investigation into unlawful foreclosure practices, she wrote in a letter to state registers of deeds Monday…..Coakley's inquiry comes as a 50 – state coalition of attorneys general continues to negotiate a multi-billion dollar settlement with the nation's largest banks over shoddy foreclosure practices." **"Massachusetts to Probe Mortgage Registry." The Washington Post, July 25, 2011. By Brady Dennis.**

81.    "Federal and state officials are seeking penalties of $20 billion to $25 billion from Bank of America Corp., J.P. Morgan Chase & Co. and other financial firms

under investigation since last fall." **"Foreclosure Talks Snagged on Liability.  The Wall Street Journal, August 22, 2011. By Ruth Simon, Vanessa O'Connell and Nick Timiraos.**

82.     "The legal protection sought by the banks included loan origination; securitization and servicing practices; fair – lending procedures; and their use of the Mortgage Electronic Registration Systems, an industry – owned loan registry that often acts as an agent for owners of mortgage loans,…." **Id.**

83.     Speaking with reference to these ongoing negotiations, Illinois Atty. Gen. Lisa Madigan told the Wall Street Journal "those of us at the table… have maintained this investigation is about robo – signing and loss – mitigation problems." **Id.**

84.     She contends that any release "should be narrowly drafted to cover those issues." **Id.**

85.     "Minnesota legislators passed a law stating that MERS explicitly has the right to undertake foreclosures." **"Delaware, Massachusetts Investigate Mortgage Clearinghouse MERS".  supra.**

86.     States and courts which have ruled unfavorably in cases involving MERS and/or are investigating MERS foreclosure practices include the United States Bankruptcy Court in the Eastern District of New York, Oregon, Arkansas, New York, Michigan, Illinois, Massachusetts, Delaware, Maine, Kansas, Utah and California. **"Foreclosure Talks Snagged on Liability.  supra.**

**SUNTRUST'S CLAIM FOR MORTGAGE INSURANCE PROCEEDS WAS DENIED DUE TO ITS MALFEASANCE. THERE IS NO INFORMATION PROVIDED TO ALLOW THE COURT TO DETERMINE WHETHER ANY LENDER RECEIVED MORTGAGE INSURANCE PROCEEDS WITH RESPECT TO THE SEVEN REMAINING SECOND LOANS**

87.    The September 6, 2011 disclosure includes discussion of the disposition of the second loan. On November 25, 2009, the amount of $97,174.66 was "charged off". There were good reasons for Suntrust's decision to charge off the loan. The September 6, 2011 disclosure includes a document entitled "second mortgage claim for loss" which references SunTrust's mortgage insurer, AIG United Guaranty Credit Insurance Company. This document recites that the reason for Ms. Prouty's default was "overextended." Another SunTrust document entitled "Assignment of Promissory Note" assigns "all rights, title and interest to United Guarantee Residential Insurance Company of North Carolina for note referenced below" referencing the note amount of $98,000. This assignment is executed on February 19, 2008. The document bears UG Cert #10473313.

88.    Of greatest interest, is an April 30, 2008 letter from Beverly Lentz, Claims Manager for AIG United Guaranty which denies SunTrust's claim for loss under United Guaranty certificate#10473313. Ms. Lentz writes:

> "We have concluded that the documentation information used to qualify the insured loan and which United Guaranty relied on when agreeing to issue the aforementioned certificate, contained representations that were materially incorrect or incomplete. Interest only first mortgage – the first mortgage had an interest – only period and the loan did not go through the Desktop Underwriter approval process. According to the agreed-upon guidelines, Desktop Underwriter approval was required for all first mortgage interest – only loans in front of the insured second mortgage…. While there may be other issues, coverage on

> this loan is being rescinded because of the issue (s) cited
> above.…

This letter strongly suggests to counsel that SunTrust violated its own guidelines, its own

approval processes and deceived United Guaranty by granting a "first mortgage interest –

only loan in front of the insured second mortgage."

89.     Counsel argues that but for SunTrust's violation of its own guidelines in

the most fundamental way, it would have been paid the face amount of the $98,000.00

note by the mortgage insurance it secured from United Guaranty. This underwriting

decision by SunTrust and the denial of this mortgage insurance claim by United Guaranty

are matters not within the control of Kevin Powers and which substantially contributed to

the actual loss/restitution claimed as to this second loan. Significantly, counsel has not

been provided with any information by any lender as to the seven other second loans

under consideration by the Court in its actual loss/restitution analysis which shows

whether or not that lender recovered monies premised on mortgage insurance.

90.     The September 6, 2011 disclosure also contains a series of 13 pages of

what appears to be computer print screens, printed effective October 30, 2008. Review of

these 13 pages suggests that as to the second mortgage, that mortgage insurance recovery

was "denied UGIC 2nd" after "2nd UGIC claim filed 1460." It recites a "BPO value of

$370,000" as of April 1, 2008; that this was a no income verification loan; that the risk

was reasonable; that the first loan was an interest – only loan; and that the processor was

Bertha Kelly.

91.     Under the screen entitled "mortgage insurance" it appears that SunTrust

paid mortgage insurance for the second loan under "pool PMI" at a rate of .0035% on a

property valued at $490,000 with a loan-to-value ratio of either 19.8% or 20%.   The

investor is "F75". It is unclear who the "victim" entitled to restitution is: SunTrust

mortgage; International Plaza II; Fannie Mae or another entity. These printouts state that

the judicial foreclosure start date was January 15, 2008 and it was started in the name of

"MERS".

92.     Loan documents and price sheets in this case revealed that mortgage

lenders charged exorbitant interest rates on second loans.  They did so, in part, for the

purpose of paying the mortgage insurance required to insure 100% loan-to-value

mortgage loans. These interest rates took the place of private mortgage insurance (PMI)

which buyers traditionally paid if their down payment was less than 20%. In the brave

new world of subprime mortgage lending, lenders freely granted 100% loan-to-value

loans and purchased private mortgage insurance through a pool. This contention is

supported by documents provided by SunTrust on August 30, 2011 and to counsel on

September 6, 2011.

93.     When it is known that collateral has been pledged to secure a loan, the

PSR cannot presume nor should the Court find that collateral had no value, has no value,

and that there is a 100% or nearly 100% loss.  If the Court permits charge-off of a loan, it

places the determination of the advisory guideline range in the hands of the lender which

has not shown that it has made a reasonable effort to offset or mitigate loss.

94.     Mr. Powers is entitled to know, not guess, what "charged it off" means in

this context.  It is a unilateral determination, not necessary a reasonable one, which

results in no credit or offset. The Court should know the basis for that decision, because it

has the effect of precluding any credit or offset to loss.  This decision should be made

with reference to an appraisal of fair market value to allow the Court to have any sense as

to whether the lenders' decision was a reasonable one in relation to the computation of loss for sentencing purposes.

95.     If there is a charge off without explanation, there should no restitution due nor actual loss attributed to Mr. Powers because, on its face, this shows that the lender made no effort to mitigate loss.   A sworn proof of claim should be required to state whether mortgage insurance proceeds were paid.

**THE UNITED STATES CONCEDES THAT IT CANNOT PROVE, BUT CLAIMS THAT IT DOES NOT HAVE TO PROVE THAT THE FORECLOSURE AND SHORT SALES OF PROPERTIES WERE CONDUCTED IN A COMMERCIALLY REASONABLE MANNER**

96.     In its Response (Doc. 278) to Defendant's Objections (Doc. 270), the United States concedes that it cannot prove that the foreclosure sales were conducted in a commercially reasonable manner.  The United States contention that "it does not have to prove" the foreclosure and other sales were conducted in a commercially reasonable manner, even if true, does not render that issue irrelevant; its resolution is fundamental to fairness in the sentencing process, even where the burden of proof is a preponderance of the evidence.  Mr. Powers is entitled to have actual loss, which could be the driver of his offense level, determined with reference to the amount of credits he would reasonably expect to have been derived from the sale of the collateral and/or from the proceeds of mortgage insurance.

97.     This Court has the power to make findings of fact which counsel submits are necessary to avoid an injustice as a result of the abysmal recordkeeping of the lenders involved in this case.

98.     As stated above "Loss shall be reduced by the following: (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the

victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." USSG Section 2B1.1, Application Note 3(E), Credits Against Loss.

99.     Whether a foreclosure or short sale was commercially reasonable cannot be determined without some reliable evidence of the fair market value of each property at a time temporally relevant to its sale.  This could be accomplished by supplying evidence of appraisals of each property, or a less persuasive source, a broker price opinion ("BPO") as the value of the property.  Although records supplied to counsel for the first time on September 1, 2011, make repeated allusions to the existence of appraisals and "BPOs", few are provided to the United States Probation Office or to counsel.  This failure by the lenders is one of the factors which have made counsel's efforts to assess and argue issues of actual loss (and whether it is the standard to be employed to establish Mr. Powers' offense level).  The lenders' recordkeeping deficiencies are material to this sentencing determination and threaten to create an untoward risk that Mr. Powers could be sent to prison for an extended period and obliged to pay an amount of restitution which is neither reliable, adequately supported, nor fair.  The lenders' actions, or simply the chaotic nature of their "recordkeeping", is unduly burdensome and should not be allowed to impair the grave goals of the sentencing process, at the expense of one man.

100.     The lenders should not be allowed to increase actual loss and restitution amounts by improperly imposing interest and other charges as offsets to the proceeds of foreclosure and short sales. USSG Section 2B1.1, Application Note 3(D), Exclusions from Loss.  "Loss shall not include the following: (i) "interest of any kind, finance

charges, late fees, penalties, amounts based on an agreed – upon return or rate of return, or other similar costs."

101.    The Court should recall trial testimony and the statement in PSR at page 5, paragraph 9, that the appraisal amounts, as determined in 2006 and 2007 and effective at the time of closing of each property, have not been challenged by the United States. Counsel argues that the unreasonably low amounts recovered are a reflection of at least two major forces.  One was the unanticipated (read "unexpected") downturn in the real estate market.  Second, these recoveries are unreasonably low, even with reference to the market downturn.  Because appraisals and details of the foreclosure sales are not forthcoming, perhaps the cause is the lenders' failure to mitigate damages by their failure to conduct a "commercially reasonable foreclosure sale."

102.    Counsel requests the opportunity to present evidence of the original appraised values of all property at the time of closing or requests that the United States stipulate as to the appraisal amounts which it did not challenge at trial and does not challenge in this presentence report. See PSR page 5, paragraph 9.

103.    In **United States v. Washington**, 634 F.3d 1180 (10th Cir. 2011), the defendant challenged the foreclosure process, one in which the lenders, original or assigned, at the sheriff's sale, "bid in" the property for the amount owed on the outstanding loan so they could complete the foreclosure process and sell the properties. The final sale price following foreclosure was used to determine the value of the collateral, i.e., Loss = (amount owed to original lender) – – (amount received from downstream purchaser on open market following foreclosure).

104.    Mr. Washington challenged this calculation on the grounds that it included

losses not attributable to him as well as the losses of assignees to the original loans, which, he argues, was contrary to the holding in **United States v. James**, 592 F. 3d 1109 (10th Cir. 2010).

105.    The foreclosure process should be legally conducted and review of its details should be open to the Court so as to permit it to assess actual loss and restitution. "… The states have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the needs of lenders and borrowers. All states permit judicial foreclosure, conducted under direct judicial oversight; about half the states also permit foreclosure by exercising a private power of sale provided in the mortgage documents." (Citations omitted.) Foreclosure laws typically require notice to the defaulting borrower, substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures. Many states require that the auction be conducted by a government official, and some forbid the property to be sold for less than a specified fraction of the mandatory presale fair-market-value appraisal." **BFP v. Resolution Trust Corporation**, 511 U.S. 531, at 541-542 (1994)

106.    It is a fundamental contractual and equitable principle that a creditor is obliged to mitigate its damages.  The issue in **United States v. Willis**, 593 F.2d 247 (6th Cir. 1979) was "whether and, if so, to what extent a secured party can collect a deficiency from guarantors after being charged with having needlessly dissipated the collateral which might have substantially reduced, if not completely extinguished, the indebtedness secured by the guarantee." **Id**., at 254 – 255. "Carried to its logical extreme, the

government's view would permit it to collect the indebtedness from the guarantor even in

a case where it had simply given the collateral way, or worse, destroyed." **Id.,** at 255.

**Willis** held "that even the contractual obligations of unconditional guarantors are

protected from unnecessary expense by the doctrine of commercial good faith. See

**United States v. Anderson**, 366 F.2d 569 (10th Cir. 1966).

107.    In this case, Mr. Powers objects to the commercially unreasonable amount

of recovery from the pledged collateral. He asks the Court to assure that actual

loss/restitution amounts are calculated with adherence to principles of good faith and

reasonableness.  The Court should not permit the alleged victims to allege that Mr.

Powers "inflated" appraisals at the time of closing and, at the same time use, those

"inflated" amounts so as to create greater paper losses either by not assessing the fair

market value of the collateral or by failing to obtain as a credit or offset, the reasonably

equivalent value of the collateral it sold, at the time it was sold. The lenders are duty

bound to make sure that any foreclosure sale or short sale was conducted in accordance

with applicable state law and in a commercially reasonable manner.

**SUNTRUST'S AND OTHER LENDERS ACCOUNTING PRACTICES
OBFUSCATE THE DETERMINATION OF ACTUAL LOSS AND
RESTITUTION**

108.    A lender may be entitled to keep its books as it chooses, but the unique

accounting practices of Suntrust and possible other lenders make it difficult to determine

how and how much "loss" each lender sustained. A review of the 6600 Glenturret and

10444 Oso Ridge loans provide examples.  The September 6, 2011 disclosure by the

United States reveals or suggests that the amount of SunTrust's actual loss/restitution

depends on and is determined by the unique accounting practices of the originating lender

and/or its assigns and servicers.

109.    SunTrust's "Foreclosure Bid Worksheet" under the category "bid strategy" recites that the "STM NPV/bid amount" is $824,734.67. The "bid amount" is $262,187.18 and "potential charge-off" is $335,560.01.   It is unclear to counsel what SunTrust's strategy is and was with respect to this property.  A Core Logic Enhanced BPO Exterior Report for the second loan is provided. It recites that the "neighborhood price range" is from $278,000-$344,000 and states further that "homes in this market area or are declining at a rate of 1% per month or 12% per year. This report is dated November 3, 2008.

110.    This BPO states a "final value" for this property as $305,000, $40,000 more than the $265,000 purchase price received as to this property.  There is an "EFV" of $316,000.

111.    The 10444 Oso Ridge materials provided by the United States on September 6, 2011, show that the "STM basis" in the first loan for this property was $254,812.29. It states that the "Requested book or basis amount" is $225,250. It notes that "(book amount is the lower of STM basis in loan or 85% of the value)". These basis or book amounts do not appear to bear any relationship to the appraised value of the property.  On its "Bid Strategy Form" SunTrust arbitrarily reduces the original appraised value of $320,000 effective September 29, 2006 by 15% to $272,000, and then reduces the "current BPO" value of $265,000 effective October 18, 2007 by $39,750.00 or 15% to $225,250.00.  The "recommendations of bid" are "Debt plus costs. No final value listed – total debt okay! AMG 10/24/07."  There is no information regarding a subsequent sale of this property, its purchase price nor a temporally relevant appraisal.

## ANALYSIS OF "AVAILABLE" INFORMATION SUPPORTING EACH LOAN – SUNTRUST COUNTS

### 6600 Glenturret Way NE

112.     Counts 1 and 2 concern the 6600 Glenturret NE property. The PSR suggests that SunTrust sustained a loss of 54% ($206,210.06) on the first loan and 99% ($97,174.66) of the second loan. The combined loss amount is ($303,405.06) and represents 62% of the original amount financed/appraised value.

113.     In the MERS records provided to counsel on August 29, 2011, the 6600 Glenturret first and subordinate liens are listed as "foreclosure complete".  The servicer is identified as SunTrust mortgage, Inc. and the investor is Fannie Mae.

114.     A SunTrust "Mortgage Marketing Loss Statement" was provided to counsel on August 29, 2011.  The purchase price is $265,000. The net sales price or "net sales proceeds" is $243,208.45. Contrary to USSG section 2B1.1 Application Note 3(D)(i), SunTrust appears to reduce the purchase price by amounts of delinquent interest $36,096.61 on the first lien of $392,000.00 and $12,063.04 on the second lien of $97,174.66.  Under the category "investor expenses" the following improper line items are used to reduce the sales proceeds by the amount of $23,585.16: lost/imputed interest: $10,144.72; attorneys fees and costs: $3,260.22; taxes: $6,334.47; property preservation: $1,420.00; other disposition costs 392.00 utilities: $255.75; and insurance: $1778.00.

115.     It appears that a foreclosure sale was conducted on February 5, 2005. Under the category entitled "interest calculation" 493 days of interest at $80.55 per day result in a total of $39,710.14 and are used improperly to reduce Mr. Powers' credit against loss

116.     A printout from SunTrust's "Quality Assurance System" includes a HUD

– 1 settlement statement.  This document indicates that the 6600 Glenturret property was sold by "The Home Store Realtors, Inc."  The closing date is June 15, 2009. Total settlement charges of $21,791.55 include broker commission fees: $14,575; taxes $3994.73; buyer closing costs: $3000.00; and HOA dues: $221.75. These amounts are used improperly to reduce Mr. Powers' credit against loss.

117.    Another Quality Assurance System Loss Reimbursement Statement provided consists of six pages.  It also concerns Fannie Mae loan number 170-121-1665, the first lien on 6600 Glenturret, Count 1.  This document indicates the loan was last paid by Joan Prouty on October 1, 2007.  It states that the loan was first acquired on February 5, 2009, then sold on June 15, 2009.  Counsel guesses that this sale must refer to its acquisition by Fannie Mae from SunTrust. Which entity is the victim entitled to restitution is unclear.  This document claims delinquent interest: $36,096.61; imputed interest: $10,144.72; foreclosure costs consisting of attorneys fees, taxes and other liquidation expenses of $900.00, $6334.47, and $5813.97, respectively, and other disposition costs of $392.00. These amounts are used improperly to reduce Mr. Powers credit against loss.  Ultimately the claimed loss is: $206,310.40.

118.    Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011. Counsel does not believe that assessment records or the equivalent of an appraisal by a licensed appraiser. But the assessment records are part of the other information available to the Court. Review of the assessment records for all counts shows that they are logically inconsistent and therefore unreliable.

119.    These tax records set forth the total full value assessment for 6600 Glenturret Way NE for the years 2006 to 2011.  The highest assessed amount for all but

one of the nine properties at issue occurs in the year 2008.  The total full value assessment in 2008 was $323,420.00 when Joan Prouty owned the property.

120.    Lexis.com records show that Fannie Mae sold the property to the current owner Mr. Issa.  The sale to Mr. Issa took place on or about June 12, 2009.  There was a prior recording date of April 17, 2009.  Counsel guesses this was a recording date of transfer of title to Fannie Mae following a foreclosure sale.  It is unknown how much and to whom Fannie Mae made payment for the loan it purchased. This fact is relevant as to which entity is the statutory victim and to how much restitution is due.

121.    An August 24, 2011 e-mail from Mr. Switzer to Ms. Higgins states that SunTrust losses were $206,310.40 for the first loan and $97,174.66 the second, now claiming a total loss of $303,485.06.

122.    The September 6, 2011 disclosure reveals that SunTrust sold the first loan on 6600 to FNMA and later repurchased it. SunTrust bid $444,543.74 at a foreclosure sale conducted February 5, 2009, thereby establishing a value for this property just $45,000 less than its appraised value and purchase price in March 2006, 35 months earlier. This suggests that SunTrust's "loss" on this property is no more than $46,000, even in light of the decline in property values which occurred during this three-year period.

123.    Suntrust's "Upset Bid Sheet" provided for the foreclosure sale includes $39,522.19 in accrued interest and other charges which are not recoverable. It makes a reference to "pro rata MIP" which counsel interprets as "mortgage insurance proceeds." The grantee is identified as Fannie Mae.

124.    Previous information indicated that this property sold to a private buyer

for the purchase price of $265,000. SunTrust claims a loss of $206,310.40 on the first loan. This claim includes both delinquent interest and imputed interest. Neither are recoverable under USSG section 2B1.1 Application Note 3(D)(i).

125.    The appraisal performed by Bart Gilbert is an "REO appraisal" provided for the first time in addition to a residential broker price opinion (BPO) dated April 18, 2009.

126.    The BPO describes general market conditions and states that the market price of this property has decreased 5% in the past four months or at the rate of 15% per year. The BPO opines that the reason the property has not yet sold is because of these factors: "Overpriced. Surplus of short sales and bank REO for sale at current time." Under the comments section BPO author Marty Morales writes: "subject property is located in a gated community of less than 100 homes. This subdivision has been hit hard with short sales and bank REO's. Prices have depreciate [sic] in the area." It references the 6719 Glenturret property which is currently listed at $305,000.

127.    Mr. Gilbert's uniform residential appraisal report (Fannie Mae Form 1004) indicates the value of 6600 Glenturret is $290,000 effective February 17, 2009 as determined by the sales comparison approach. This is an "REO appraisal" which counsel assumes is a limitation or condition with respect to how it is written and the premises of its opinions. (His "lender/client" is identified as Fannie Mae National Property Disposition Center. The lender is also identified as "International Plaza II". This may be relevant to who is the "victim" in this transaction.)

128.    Mr. Gilbert states that the "price of prior sale/transfer" on March 20, 2006 according to Multiple Listing Service records was $404,900. This suggests that the

concession represented by the K&E Construction/renovation monies <u>was disclosed</u> and is and was reflected in MLS records. This information was available to Mr. Gilbert.

129.    There are several comments worth noting in the section entitled "Additional Field Text". These notes indicate that the indicated range of value is from $273,900-$354,300. In the "Text Addendum" Mr. Gilbert writes that during the 12 months from February 19, 2008 to February 18, 2009 there have been 27 sales of homes comparable to the subject property. "The low selling price was $271,000, the average selling price was $469,599, the median selling price was $455,000 and the high selling price was $730,000."

130.    Also during that 12 month period the average selling price of all homes, including those homes not comparable to the subject property was $348,338. These figures suggest <u>that the purchase price ($265,000) of the 6600 Glenturret property was almost $210,000 less than the average price of 27 comparable homes</u> and that it was $6,000 less than the lowest selling price of those comparable homes. In addition<u>, the average selling price of all homes in the area was $73,000 greater than the amount recovered by SunTrust.</u> Counsel argues that this was a commercially unreasonable sale.

131.    The average selling price for all homes in the subject neighborhood for the February 19, 2007 to February 18, 2008 period was $392,007.25.  During the next 12 months the average selling price in this neighborhood was $349,338. Those average selling prices range from $84,000-$127,000 more than the purchase price obtained by SunTrust. Counsel calculates that the average selling price for the 2008/2009 period was 11% less than the average selling price in the 2007/2008 period.

**10444 Oso Ridge NW**

132.    Counts 12 and 13 concern the 10444 Oso Ridge NW property.  The PSR states at page 23, paragraph 72 that SunTrust sustained a loss of 37% ($94,997.57) on the first loan and 100% ($63,927.66) on the second loan. The combined loss amount is $158,925.23 and represents only 49.7% of the original amount financed.

133.    In the MERS records provided to counsel on August 29, 2011, the first and subordinate liens on 10444 Oso Ridge NW are listed as "foreclosure complete."  The same page contains this information as to the first lien: "reinstated or modified (option 1), not assigned back to MERS"

134.    Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011. The highest total full value assessment occurs in 2008, $225,158, when the owner was Jodi Powers.

135.    An August 24, 2011 e-mail from Mr. Switzer to Ms. Higgins claims the SunTrust loss amounts as $94,997.57 on the first loan and $63,927.66 on the second, for a total of $158,925.23.  The SunTrust mortgage marketing loss statement indicates that there are "sales proceeds" in the amount of $179,254.30. There is a charge for lender expenses in the amount of $6816.55. The "total amount due lender" is $95,477.37. There is about $500.00 discrepancy here.  The total amount due lender for the first and second mortgages $165,053.87, $158,925.23.

136.    An October 26, 2007 invoice from attorney Susan Little suggests that there was a judicial sale date of October 25, 2007.  It appears that this property was re-sold on August 14, 2008 for the amount of $179,254.30.  There is a HUD-1 settlement statement prepared for the seller SunTrust Mortgage and lender Wells Fargo Bank.   The

contract sales price was $199,000. The full amount of the purchase price should be a credit against loss. Counsel argues that this was a commercially unreasonable sale.

137.    Core Logic Appraisal Services performed and "enhanced BPO/Appraisal" on or about October 18 or 19th 2007.  Nationwide Appraisal Services Corporation performed a full appraisal or "REO Full Single family – FNMA & REO addendum" on January 23, 2008. On June 19, 2008, Wayne Machol of Integrated Asset Services, LLC performed BPO, "REO expenses –BPO fee."  The Court and counsel have not been provided with the results of the appraisal and the two other evaluations.  Therefore, the bona fides of the foreclosure sale and any subsequent sale cannot be evaluated.

138.    It should be noted that the BPO evaluations are not true appraisals but broker price opinions. Broker price opinion is equivalent to what the United States has criticized and charged Mr. Powers with doing, which is locating properties which are listed for price lower than they were expected to appraise for.  See PSR page 5, paragraphs 6 and 7.  This is part of the United States' argument in favor of the "sophisticated means" enhancement is seeks.

**12514 Holly Drive NE**

139.    Counts 14 and 15 concern the 12514 Holly NE property. The PSR states at page 23, paragraph 73 that SunTrust sustained a loss of 19.3% ($188,135.56) on the first loan and claims a loss of 100% ($326,175.00) on the second loan.  The PSR states as to the second loan: "It appears SunTrust lost the whole amount. Thomas L. Switzer, advised he could not find any information relating to the second loan for Holly." The absence of any information is a patently insufficient basis to award restitution. The combined loss amount is $514,310.56 and represents only 49.7% of the original amount financed.

140.     In the MERS records provided to counsel on August 29, 2011, the Holly Drive first lien is listed as "paid in full'.  The servicer for the first lien is SunTrust mortgage and the investor is Goldman Sachs Mortgage Company.  An "ALS Purge History Card" is a 3-page document which concerns the Holly Drive property and Christopher Sena.  It indicates that the last payment date for 12514 Holly was July 10, 2008; 7 days after Mr. Sena met with Ron Campbell and Mr. Campbell's daughter.

141.     The principal remaining on the Sena HELOC/second loan was a constant $325,000.00. The transaction detail indicates a "waiver" effective April 10, 2008. It also indicates a "charge off" on April 10, 2008.  It is unclear if Mr. Sena "earned" the forgiveness of the home equity loan for his substantial assistance to the FBI and to SunTrust in the months prior to this charge off, which occurs three months before the $890,000 sale of Holly Drive to Mr. Thu.

142.     The Holly Drive HELOC/second loan (Count 15) is addressed in an e-mail initiated by SunTrust's Cheri Daniels to Thomas Switzer on August 24, 2011 provides information on the Sena home equity loan. She writes: "Be aware, this is of [sic] internal purposes. Errors have been found in HELOC histories in the past. The charge-off amount was 325K."  In an August 24, 2011 e-mail forwarded by Mr. Switzer to Ms. Higgins, forwarded to counsel on August 29, 2011, Mr. Switzer again states a claimed loss of $188,135.56 and reiterates: "I was unable to locate any information regarding this file" with respect to the home equity loan." On September 7, 2011, without providing any additional supporting documentation, Mr. Switzer reverses direction and claims a loss of $325,000.  (See under Exhibit B.  As the subprime mortage spiraled down in the summer of 2008, a New York Times article dated August 15, 2008 examined the origin and

aggressive marketing of home equity loans by Citicorp and other major lenders.)

143.     Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011.The highest total full value occurs in 2009 ($787,100.00) when Mr. Sena owns the property.  Interestingly, that figure is approximately $235,000.00 higher than the 2007 assessment of $541,900.00, suggesting that the substantially increased assessment may have resulted from Mr. Sena's investment of money and time in the "renovation" of the Holly Drive property.

144.     In 2006, $92,500.00 was the total full value assessment of the land only. The owners were Claude and Chong Sanchez. Claude Sanchez testified at trial that his purchase price of the land alone at 12514 Holly Northeast was $200,000.00 for .89 acres. Trial Transcript, April 14, 2011, page 44, lines 9-25 and page 45, lines 1-7.

145.     The SunTrust mortgage marketing loss statement for the Holly Drive first loan shows sale proceeds in the amount of $836,997.05.  $30,000 of these proceeds were applied to the home equity loan. Lender expenses in the amount of $2299.78 are charged. Delinquent interest in the amounts of $52,993.92, plus $21,556.85 for a total of over $74,000.00 are apparently deducted from the gross sales proceeds. These amounts should be excluded from this loss calculation.

146.     The second page of the marketing loss statement indicates that the property was sold and closed on June 26, 2008 for a purchase price of $890,000.  This was a short sale and foreclosure did not occur as to this property.   A real estate commission of 5% on the $890,000 purchase price or $47,559.38 was paid to RE/MAX signature mortgage.  Real estate sales commissions ought not to be an authorized reduction in the credit against loss or purchase price under USSG section 2B1.1,

Application Note 3(D)(i).

147.    Counsel argues that the purchase price of $890.00.00 should be subtracted

from the first lien amount of $975,000.00 to produce a loss figure of $85,000.00. This

should be the total amount of actual loss/restitution. F There is no supporting

documentation as the resolution of the $325,000 home equity loan.   In fact it appears that

that loan was written off by payment of $30,000 of the sales proceeds from the

$890,000.00 sale.

148.    Until September 7, 2011, it was unknown if mortgage insurance (MI)

proceeds were paid as to any of the eight second loans.  Whether mortgage insurance

(MI) proceeds were paid is a critical factor in loss calculation and the determination of

the advisory guideline sentencing range. It is so important that it should be addressed in

an affidavit in support of actual loss/restitution.

149.    Core Logic Appraisal Services, provided an "enhanced BPO/appraisal"

between June 25 and June 27, 2008.  The Holly sale closed on June 26, 2008. The results

of "enhanced BPO/appraisal" are not provided so as to allow an assessment of whether

the sale was conducted in a commercially reasonable manner and whether the lender

mitigated damages.

150.    The September 6, 2011 disclosure contains seven additional pages of

material as to the Holly Drive loans. It indicates that the first mortgage had a "short

payoff." It states that the second mortgage loan, the HELOC, "appear [sic] to have been

charged off." The disclosure contains a letter dated July 1, 2008 from SunTrust to

Christopher Sena. It is an agreement to a short sale for $890,000.00.

151.    A recommendation for the short sale recites: "I would recommend

approval of the short sale….<u>The borrower stated the turn of the market has affected his ability to make his mortgage payments.</u> He has a HELOC with SunTrust and I have included a $1000.00 in the closing cost."

152.    A document entitled "Presale/Pre-Qual calculator – 1st Mortgage" identifies the investor for this first loan as Goldman Sachs. It states that Holly Drive had a current property value of $850,000.00. The REO value is $722,500.00. There is a notation "(consider 85%?)". Again, restitution appears largely to be a function of lender – specific accounting practices.

### 11801 Eagle Rock NE

153.    Counts 16 and 17 concern the Eagle Rock NE property.  PSR page 23, paragraph 74 states that SunTrust sustained a loss of 59% ($355,977.65) on the first loan and claims a loss of 97% ($146,277.00) on the second loan. The combined loss amount is $502,254.65 and represents 66.1% of the original amount financed.

154.    In the MERS records provided to counsel on August 29, 2011, the Eagle Rock first and subordinate liens are listed as "foreclosure complete".  There are no details given concerning the foreclosure sale. There is invoice from attorney Susan Little dated November 3, 2008. There does not appear to be any publication for a foreclosure sale of Eagle Rock.

155.    Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011.The total full value assessment in 2011 was $289,233.00. In his trial testimony, United States witness Mark Thompson said the Eagle Rock land by itself was worth $300,000.00 in 2007.  See Trial Transcript, April 14, 2011, page 188, lines 16-20.  In 2008 the total full value assessment for the house, purchased for

$760,000.00, was $722,000.00.  At this time the owner was Dawn Tuschhoff.

156.    In an August 24, 2011 e-mail from Mr. Switzer to Ms. Higgins, Mr. Switzer states the SunTrust loss as $355,977.65 on the first loan and 146,277.00 on the second loan for a total of over $502,000.00.

157.    The SunTrust mortgage marketing loss statement sets forth sales proceeds totaling $257,022.35. The unpaid principal balance on the first loan is $608,000.00 and on the second loan $151,277.21.

158.    The Eagle Rock home was sold on October 29, 2008. The purchase price was $274,500.00. Based upon the testimony of government witness Mark Thompson referenced above, Counsel argues that this was a commercially unreasonable short sale. In addition, a HUD – 1 settlement statement shows that there were actual settlement of charges totaling $15,936.19.

159.    Core Logic Appraisal Services performed a full appraisal or "enhanced BPO/appraisal and interior repairs/appraisal" on a date between July 2 and July 7, 2008. No appraisal documentation or amount has been provided.  On July 24, 2008 three months prior to the short sale closing Old Republic Diversified Services, Inc. – BPO of Orange, California performed a "valuation costs – interior BPO".  No documentation is provided.

160.    Approximately $65,000 which was seized from the bank account of Dawn Tuschhoff in February 2008. Mr. Powers is entitled to a credit against restitution for that amount.

161.    The September 6, 2011 disclosure contains only five pages of additional information provided as to the Eagle Rock property. The disclosure indicates that the first

mortgage on that property had a "short payoff". The disclosure states that $5,000 was applied towards the second mortgage loan in the amount of $152,000 and "the remaining balance charged off."

162.     The "loan summary" for the first loan of $608,000 states that the current value of this property is $305,000 or 40.13% of the original value on July 7, 2008, just 14 months after the original appraisal date of April 25, 2007.

163.     Neither the lender nor the United States has challenged or proven that this or any appraisal related to the original sales transactions was flawed or fraudulent.  It must be remembered, that each lender, through the processes of independent field appraisals, Hanson reviews, and review of local property value databases such as those provided by Core Logic, agreed with and accepted all of the appraisal values produced coincident with the original closed sales of these nine properties.

## ANALYSIS OF "AVAILABLE" INFORMATION SUPPORTING EACH LOAN – THE NON-SUNTRUST COUNTS OF CONVICTION

164.     As to the amounts claimed as losses in the nine non-Suntrust Mortgage counts (Counts 3-11), each subsequent purchaser had either no relationship or an insufficient relationship with Mr. Powers or with the application process and therefore could not have been deceived or defrauded by him. In such a case, the subsequent purchaser would be making a business decision possibly with knowledge of the pre-existing failure of the loan. i.e. "One" or First West Bank.

### 6805 Glenturret Way NE

165.     Counts 3 and 4 concern the 6805 Glenturret NE property. The PSR discusses them at page 24, paragraphs 75 – 76; page 29, paragraph 94 and page 52, paragraph 207. Accredited Home Lenders is bankrupt; the PSR writer states that that his

phone messages left with subsequent purchasers/servicers have not been returned. It is stated that the loss sustained was 99.2% ($367,500.00) on the first loan.

166.     In the MERS records provided to counsel on August 29, 2011, the 6805 Glenturret Way first and subordinate liens are listed as "foreclosure complete". The subordinate lien on 6805 also is listed as "active (registered)" for the amount of $122,500. The servicer and investor are HSBC Mortgage Services.

167.     Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011. The total full value assessments for this home which sold for an uncontested appraised value of $490,000.00 in March 2006 is $453,250.00 in both 2008 and 2009.

168.     Lexis.com records indicate that the buyer (post foreclosure?) was the MLM Trust Series 2006 – AHL. Seller information identifies the seller as "Special Master Bernalillo County."  The contract date was August 14, 2008; the recording date was September 26, 2008.   There is no HUD – 1 settlement statement, no appraisal and no BPO provided. The victim entity is not and cannot be reliably identified.

169.     Count 4 is discussed at PSR page 24, paragraphs 75 and 77; page 29, paragraph 95; and page 53, paragraph 208.  The PSR states the loss is based on "available records" in the amount of $120,823.08. This is exactly 100% of the face amount of the second loan. Counsel objects and contends that these losses are not adequately supported and that the actual loss and restitution amounts claimed should be reduced by the amount of $488,323.08, due to the absence of any documents to support the loss. Counsel argues that this was a commercially unreasonable sale.

**6701 Glenlochy Way NE**

170.     Counts 5 and 6 concern the 6701 Glenlochy NE property. The PSR discusses them at page 24, paragraph 78; page 25, paragraphs 79-80; page 29, paragraphs 96-97; and page 53, paragraphs 209-210. The PSR states that Cameron Financial, now defunct, sustained a loss of $392,000 or 99.5% of the first loan and $96,964.58, 99.5% of the second loan.

171.     Counsel objects to an award of restitution as to Count 5 for the reason that paragraph 78 states that part of the debt was purchased, without disclosing the amount of the purchase price or the date and circumstances of its acquisition.  The PSR states that the debt related to Count 6 was "charged off."  Beyond that, the PSR goes on to state that no additional information was provided by FDIC, the loan servicer, as to Count 5.

172.     As to Count 6, the loan servicer is Specialized Loan Servicing. Without explanation, SLS charges off the amount of $96,964.58 on the second loan and without providing "any further information." See PSR paragraph 78.  SLS does not provide any information to suggest that there was a foreclosure sale, short sale, receipt of mortgage insurance proceeds or some other form of mitigative conduct, yet it claims 100% of the loss as restitution.  The PSR writer's "subsequent request…has not been answered" by SLS.

173.     In the MERS records provided to counsel on August 29, 2011, the 6701 Glenlochy Way first and subordinate liens are listed as "foreclosure complete".  The servicer is identified as "FDIC as Receiver for Indy Mac Federal Bank, FSB."  The investor is Fannie Mae.  The MERS records also state that the subordinate lien was "deactivated" on September 21, 2010. The servicer now is identified as Specialized Loan

Servicing, LLC and the investor as The Bank of New York Mellon, N. A.  In the absence of any further information, counsel argues that this was a commercially unreasonable sale.

174.    As to the 6701 Glenlochy property and Count 5, Fannie Mae responded to request for information from US Probation Office in Las Cruces, New Mexico on July 18, 2011.  The Fannie Mae data form claims accrued interest: $27,425.76; legal fees: $900.00; taxes $12,071.42; other liquidation expenses $5257.01; and other disbursements $836.00.  These amounts should be excluded from this loss calculation. Fannie Mae claims total disbursements: $438,286.02; net sales proceeds $239,140.58; other receipts: $150,931.79; total receipts: $390,072.37 and concludes that it has an "economic (gain)/loss: $48,213.65".

175.    Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011.The total full value assessment in 2009 was $453,250.00 (the owner is Indy Mac Bank).  In 2008 and 2007 the assessment was $453,250.00 when the owner was Joan Prouty.

176.    The Fannie Mae document dated July 18, 2011, states that the unpaid principal balance at acquisition by Indy Mac was $391,796.00. This document states that the property was "sold or loan repurchased."  There is an "Explanation for Other Receipts" and that explanation is: "Lender Make Whole."

177.    On August 29, 2011 counsel was supplied with an e-mail from a Barbara Brunson USPO to Neil Stern dated July 29, 2011. She writes: "The investor on this loan was Fannie Mae, but it was service released by One West Bank, so you will need to contact One West Bank directly to determine the subsequent servicer (or servicers) to

obtain the loan file." One West Bank has supplied no information. The victim entity and the amount of actual loss/restitution cannot be reliably determined.

178.     There is a separate one-page document provided with no identification as to its source. It states that the unpaid principal balance at acquisition was $391,796.00. It adds accrued interest, legal fees, taxes, other liquidation expenses and other disbursements to reach "total disbursements" in the amount of $438,286.02. Total receipts are stated as $390,072.37. Those total receipts are comprised of "net sales proceeds" in the amount of $239,140.58. It has a category entitled "other receipts" which sets forth the amount of $150,931.79. There is a category entitled "MI proceeds". This category is left blank.

179.     The connection between the term "other receipts" and the explanation for them is "lender make whole".  The "bottom line", possibly, is a claimed economic loss in the amount of $48,213.65.

180.     The correct calculation of actual loss/restitution for this property should be computed based upon the current unpaid principal balance of $391,795.83 and not the unpaid principal balance at acquisition. From that amount, total receipts in the amount of $390,072.37 should be subtracted. In addition, there should be an examination of how the figure for "net sales proceeds" was determined. Counsel argues that purchase price which would be set forth on the HUD – 1 settlement statement for the sale to Mr. Shakir, should be the amount deducted from the "current unpaid principal balance figure" set forth above.  No HUD-1 settlement statement is provided.

181.     It appears that based upon the "total receipts", the lender has been made whole with respect to the current unpaid principal balance of the first loan. It remains to

be seen whether or not mortgage insurance proceeds were applied to offset the amount of the second or whether or not that second loan was otherwise charged off or otherwise resolved.

### 6719 Glenturret Way NE

182.    Counts 7 and 8, concern the 6719 Glenturret NE property. The PSR discusses them at page 25, paragraph 81; page 25, paragraphs 82 – 83; page 29, paragraph 98; page 30, paragraph 99; and page 53, paragraphs 211 – 212. As to Count 7, the PSR writer relates that a judgment in the amount of $420,095.42 was obtained by the trustee of a mortgage-backed security at a foreclosure sale. Thereafter, Gene Barnett, paramour of Joan Prouty and business partner of Shanna Rampley, the title owner of 6719 Glenturret, purchased this property. 6719 Glenturret was originally valued and appraised at $490,000.00. Mr. Barnett redeemed the property for an unknown sum, and resold the property for $213,114.16 (likely net sale proceeds), thereby resulting in a loss of $206,981.26 or 52% of the first loan and 62% ($303,826.31) of the two combined loans.

183.    In the MERS records provided to counsel on August 29, 2011, there is no information listed as to the 6719 Glenturret property.  There were 70 pages of MERS reports provided by FBI agent John Howard to AUSA Higgins, and thereafter to counsel on August 29, 2011.  Agent Howard wrote that Ms. Rampley's 6719 Glenturret Way NE transaction is not in MERS anymore.

184.    Bernalillo County real property tax records were supplied by the USPO to counsel on September 1, 2011.  The total full value assessment of 6719 Glenturret Way NE was highest in 2008: $312,708.00.   Ms. Rampley owned the property.

185.     There is no indication of how or when the sale of 6719 Glenturret Way NE occurred. This is the property that was redeemed by Gene Barnett. There is no reference to bankruptcy, foreclosure or short sale.  The purchase price paid by the current owners Xia Fujie & Sumali Hartono, d/b/a Hosh LLC, is unknown.

186.     Paragraph 81 states that information as to loss or restitution with reference to Count 8 (a second loan for the amount of $96,845.05) is either "unknown" or "pending". The issue of mortgage insurance proceeds, which may have been paid as to this loan and eliminated actual loss/restitution are not addressed.

187.     Counsel also contends that the question remains as to whether or not he sale of redemption rights by cooperating witness Rampley to Gene Barnett, followed by his redemption of the property, was an arm's length transaction.  Mr. Barnett purchased an "indicted" property for less than 44% of its original appraised value. Therefore, counsel objects to this restitution claim and requests either a subtraction of or an adjustment to the total restitution amount.

**7909 Rio Grande Boulevard NW**

188.     Counts 9 and 10, concern the 7909 Rio Grande NW property.  The PSR discusses them at page 26, paragraphs 84, 85, 87 and 88; page 30, paragraphs 100 – 101; and page 53, paragraphs 213 – 214. Accredited Home Lenders extended the first loan, represented by Count 9. The servicer of that loan, American Servicing Company or ASC, states that "no direct loss" was sustained. Therefore, counsel argues that ASC does not meet the definition of "victim" for the reason that there is not a causal link or a relationship between Mr. Powers' conduct and its alleged restitution claim.

189.     Paragraph 85 claims a loss of $301,917.14 or 46% of the amount of the

first loan. Paragraph 86 claims a loss in the amount of exactly 100% ($232,571.89) of the second loan. There is no information provided to support whether or not a commercially reasonable foreclosure sale was conducted. In this case, the recovery amounted to 60.7% ($534,489.03) of the combined loan amounts. At a restitution hearing, counsel would present evidence that Cameron Financial Group conducted an independent appraisal of the 7909 Rio Grande property, prior to closing in April 2007, and valued that property at no less than $875,000.00.

190.    In the MERS records provided to counsel on August 29, 2011, the first lien on 7909 Rio Grande is "reinstated or modified (option 1), not assigned back to MERS. The subordinate lien for 7909 Rio Grande is listed as "active (registered)."  The servicer is America's Servicing Company and the investor is identified as Nomura Credit Capital Inc.  According to MERS, there was an assignment of the mortgage for foreclosure to assignee Wells Fargo Home Mortgage on January 15, 2008.  The assignor was MERS; the loan is characterized as "seasoned loan registered out of compliance."  Mortgage Electronic Registration Systems, Inc., with a Flint, MI not a Reston, VA address, is also identified as "mortgage/beneficiary."  The servicer for the first loan is Ocwen Loan Servicing, LLC and the investor is HSBC Bank USA, National Association. The identity of the victim entity remains unclear.

191.    On August 29, 2011, counsel was provided with a "declaration" made by Howard Handville, loan analyst and employee of Ocwen Loan Servicing, LLC. Mr. Handville states the total loss amount of this loan is $245,640.60.  He writes: "This amount consists of $234,283.44 in unpaid principal balance, $135.21 in corporate grants, $21,653.90 in interest, and $10,131.95 in stock advance.  The declaration is signed

August 25, 2011 at West Palm Beach Florida. This declaration sets forth amounts which
should be excluded from this loss calculation.

192.    Also provided on August 29, 2011 regarding the 7909 Rio Grande second
loan (Count 10) were copies of e-mails between USPO Neil Stern and René Chrun, a
paralegal at Houser & Allison, attorneys in Long Beach, California, who represent
HSBC. Ms. Chrun writes concerning updated loss information for Ocwen:  "Can we send
our own declaration? This form seems to apply more to an individual rather than a
Corporation and I think Ocwen would hesitate in signing this form due to the language."
Mr. Stern asks if they will fill out affidavit probation Form 72 which he has sent to them.
It appears that the Handville declaration was in response to Mr. Stern's request.  Ms.
Chrun states restitution should be ordered to "HSBC, as trustee for the registered holders
of Nomura Asset Acceptance Corporation Alternative Loan Trust, Series 2007 – S 1.

193.    Bernalillo County real property tax records were supplied by the USPO to
counsel on September 1, 2011.  The total full value assessment for 7909 Rio Grande is
highest in 2007 to 2009: $517,600.00.  Its owner was until about April 30, 2008, Pauline
Walker.

194.    As to the first loan, there is in April 28, 2011 letter from Deborah Conn of
ASC which attaches loss information previously sent to AUSA Higgins on October 7,
2010. It states: "Wells Fargo/ASC loss is zero. The investor losses were $420,607.92.
The investor is identified "Nomura PMSR" on a form called Calculation of Realized
Loss. This Calculation of Realized Loss information is dated September 22, 2010 and is
likely information that was sent by Ms. Conn to AUSA Higgins on October 7, 2010.
Counsel objects and argues that Nomura PMSR does not meet the definition of "victim"

for the reason that there is not a causal link or a relationship between Mr. Powers'
conduct and its alleged restitution claim.

195.    Counsel argues that the full purchase price for this house should be a
credit to the actual unpaid principal balance of the mortgage loan which is set forth as
$650,000.00. The sum of $118,690.78, which consists of the following impermissible
elements of expense or restitution: gross interest, attorney's fees, taxes, property
inspection; property maintenance; insurance; utilities; appraisals/BPO; attorneys' costs, is
added to the unpaid principal balance, but should not be recognized by the Court.

196.    Counsel notes that a "appraisals/BPO" was performed but not provided.
There is no date or amount or supporting documentation for an appraised value of the
property prior to its sale.

197.    Count 11 concerns the 5305 Ridge Rock NW property which the PSR
discusses at page 26, paragraphs 84 and 86. Accredited Home Lenders, through ASC,
asserts a restitution claim in the amount of $131,187.40 or approximately 40% of the
original loan value.   Counsel objects to the Court accepting the claimed restitution
amount as either actual loss or restitution claim for the reason that it has not been shown
that the foreclosure/short sale was conducted in a commercially reasonable manner.

198.    In the MERS records provided to counsel on August 29, 2011, the first
(and only) lien for 5305 Ridge Rock is listed as "deactivated" on June 6, 2007
approximately 8 months after it was activated by the purchase by Jodi Powers. The
servicer is identified as America's Servicing Company and the investor is Citigroup
Global Markets Realty Corp.

199.    Bernalillo County real property tax records were supplied by the USPO to

counsel on September 1, 2011.  The total full value assessment is highest in 2007 and 2008: $307,100.  In 2008, the owner is US Bank National Association Trustee and in 2007 the owner is Jodi Powers.

200.    There is an April 28, 2011 letter from ASC's Deborah Conn to AUSA Mary Higgins which states "Wells Fargo/ASC loss is zero. The investor loss is $193,483.35." The investor is "Citigroup PMSR".  ASC provides a form entitled "Calculation of Realized Loss".  The actual unpaid principal balance of the mortgage loan is $331,723.51. Expenses add almost $53,000 to that total, but should be excluded from actual loss/restitution.  The purchase price is never disclosed. There is a credit for "proceeds from sale of acquired property" in the amount of $199,387.24.  The "total realized loss (or amount of gain): is $193,483.35. This figure is arrived at by subtracting total credits from total expenses. Counsel objects and argues that Citigroup PMSR does not meet the definition of "victim" for the reason that there is not a causal link or a relationship between Mr. Powers' conduct and its alleged restitution claim.

201.    The total restitution amount per the PSR is $3,002,745.85   Based upon the objections stated above, counsel requests that the Court either deny the restitution claim and not recognize that claim as establishing actual loss.  In the alternative, the Court should require additional information to support the commercial reasonableness of the foreclosure/short sales; and that it otherwise adjust and reduce the actual loss/restitution amounts as to all counts.

202.    On behalf of Mr. Powers, counsel requests the opportunity, after additional documentation which may be forthcoming, to have testimony heard on the issue of actual loss/restitution (see 18 USC Section 3663 or 3664 subparagraph (4)) and,

if necessary, to have referred to a magistrate judge "any issue arising in connection with a proposed order of restitution… for proposed findings of fact and recommendations as to disposition, subject to a *de novo* determination of the issue by the court." See subparagraph (6).

## THE CONTRIBUTIONS TO LOSS BY COOPERATING WITNESSES

203.    18 USC Section 3664 (h) states: "If the court finds that more than 1 defendant has contributed to the loss of the victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and the economic circumstances of each defendant."

204.    Assistant United States Attorney has not appeared concerned as to the six cooperating witnesses' failure to pay the mortgages and defaults. See PSR page 22, paragraph 66 regarding the non-prosecution agreement extended to the buyers.

205.    The United States' posture at trial and at sentencing is to suggest to the jury and to the Court that its six cooperating witnesses were somehow victims, emotionally and financially, of the conduct of Mr. Powers. Defense counsel contends that this picture is inaccurate.

206.    Although the six witnesses did not test the United States proof of their criminal intentions and criminal acts in a trial, they did not have to.  The United States' public position is to absolve them of all responsibility and to place it only on the shoulders of Mr. Powers. None of the six witnesses has ever accepted responsibility for their role in these offenses.

207.    If the cooperating witnesses were sentenced on the basis of the face

amounts of the loans they received and defaulted on, then Joan Prouty (six loans charged) and Christopher Sena would be assigned an offense level of 20 (base of 7 + 16 less 3 for acceptance of responsibility).

208.    The remaining four cooperating witnesses would be assigned an offense level of 18 (base of 7 + 14 less 3 for acceptance of responsibility).  Assuming that each of the six are, like Kevin Powers, in Criminal History Category I, Ms. Prouty and Mr. Sena would face advisory guideline sentencing ranges of 33 to 41 months and Ms. Walker, Ms. Tuschhoff, Ms. Rampley and Jodi Powers would be assigned advisory guideline sentencing ranges of 27 to 33 months.

209.    Of course, each witness would be entitled to credit against the loss attributed to them. Assuming a 50% credit and reduction of loss across the board, their adjusted offense levels would likely decrease: Joan Prouty, Christopher Sena and Pauline Walker would be assigned an offense level of 18 (base of 7 + 14 less 3 for acceptance of responsibility). The three remaining cooperating witnesses would be assigned an offense level of 16 (base of 7 + 12 less 3 for acceptance of responsibility).  Assuming that each of the six are, like Kevin Powers, in Criminal History Category I, Ms. Prouty and Mr. Sena would face advisory guideline sentencing ranges of 27 to 33 months; Ms. Walker would be assigned an advisory guideline sentencing range of 21 to 27 months.

210.    None of the six immunized witnesses will face any incarceration nor will they be obliged to pay restitution, for their role as the proximate causes of default and the ensuing losses to the lenders.

**WHEREFORE,** KEVIN POWERS respectfully requests that the Court:

A.      Grant the relief requested herein by correcting and reducing the loss amounts and offense level calculations of the draft pre-sentence report consistent with the objections set forth herein;

B.      Grant counsel leave to supplement the formal objections filed today with additional objections as to the issues of loss and restitution;

C.      Set a deadline pursuant to 18 U.S.C. Section 3663A, for the production of proof of actual loss and restitution claims, starting ten days prior to sentencing, which requires all statutory victims to submit their claims within 90 days of the September 13, 2011 sentencing hearing, or by December 11, 2011;

D.      Conduct a hearing so as to allow the Defendant to present evidence so as to determine facts and fairly resolve disputed objections; and

E.      Grant such other and further relief as may be just and appropriate.

Respectfully submitted,

*Daniel J. Tallon*

*Electronically Filed on September 8, 2011*

_____

DANIEL J. TALLON
Attorney for Kevin Powers
6 Placitas West Road
Placitas, NM 87043
505.867.1515; fax 867.9495

I hereby certify that a copy of the foregoing was electronically filed and thereby delivered by electronic means to all defense counsel of record and to Assistant U.S. Attorneys Mary Higgins and George Kraehe on the 8th day of September 2011.

*Daniel J. Tallon*

_____

DANIEL J. TALLON

59