Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW MEXICO
2

3

4

5    UNITED STATES OF AMERICA,

6                        Plaintiff,

7      -vs-                NO:  CR 09-3065

8    KEVIN POWERS,

9                        Defendant.

10

11

12

13

14                   VOLUME 7

15            TRANSCRIPT OF PROCEEDINGS

16                 TRIAL BY JURY

17               April 15, 2011

18

19

20

21

22   BEFORE:  HONORABLE E. RICHARD WEBBER
                SITTING BY DESIGNATION FROM
23              THE EASTERN DISTRICT OF MISSOURI

24   Proceedings reported by stenotype.
     Transcript produced by computer-aided transcription.
25

3783008a-8798-417a-ac0e-724123da26d0

```
1                         APPEARANCES

2    For the Plaintiff:

3         US ATTORNEY'S OFFICE
          PO Box 607
4         Albuquerque, NM  87103-0607
          505-346-7274
5         BY:  GEORGE C. KRAEHE, ESQ.
               george.kraehe@usdoj.gov
6              MARY L. HIGGINS, ESQ.
               mary.higgins@usdoj.gov
7
     For the Defendant:
8
          DANIEL J. TALLON, ESQ.
9         6 Placitas West Road
          Placitas, NM  87043
10        505-867-1515
               dtallonlaw@gmail.com
11
     For Witnesss Joan Prouty and Shaunna Rampley:
12
          FREEDMAN BOYD HOLLANDER GOLDBERG IVES
13           & DUNCAN, PA
          PO Box 25326
14        Albuquerque, NM  87125-5326
          505-842-9960
15        BY:  DAVID A. FREEDMAN, ESQ.
               daf@fbdlaw.com
16

17

18

19

20

21

22

23

24

25
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 3

1           (In open court at 8:29 a.m.)

2           THE COURT:  Just doing a check.  The jury

3    is ready.  But I see you all are talking, and I

4    don't want to bring them in until you're ready.

5    Just let me know.

6           MR. TALLON:  I would like to approach in a

7    couple minutes, Your Honor, if we could confer.

8           THE COURT:  Okay, come on up.

9           (At the bench:)

10          MR. TALLON:  Your Honor, I apologize for

11   getting here at 8:15.  I know we had talked about

12   the possibility of doing stipulations but I'm sure

13   it would take more time than we did it before this

14   moment I'm sure we could defer that until a later

15   time.  A couple of things I don't want to have slip

16   my mind.  I don't know why I seize on this but I

17   know Mr. Kraehe reminded me that it was either 150

18   or 152 that we were discussing, I was discussing and

19   although there is a group that was stipulated to I

20   don't think I offered it into evidence I want to

21   cleanup that small tidbit I think it was the

22   cross-examination of Mr. Sanchez.

23          THE COURT:  What number was it?

24          MR. TALLON:  150.

25          MS. HIGGINS:  I have 150 listed as the

3783008a-8798-417a-ac0e-724123da26d0

Page 4

1   appraisal it's also part of Exhibit it's also part

2   of Exhibit .

3          MR. TALLON:  Exhibit 150 was the appraisal

4   that I showed Mr. Sanchez yesterday it was a

5   $1.3 million appraisal I believe it was stipulated

6   to.

7          THE COURT:  1.3 million.

8          MR. TALLON:  An appraisal by Richard sin

9   no witnesses.  And I believe it's stipulated to, but

10  I have not offered it into evidence Mr. Kraehe

11  reminded me I omitted to do that I'd like to do that

12  at this time.

13         MR. KRAEHE:  I did cross-referenced your

14  list, Your Honor, and it wasn't actually received.

15         THE COURT:  Okay it's now received.

16         MS. HIGGINS:  That specific exhibit was

17  not received but it's part of Exhibits 46 and 47

18  which had been received those are the main Suntrust

19  loan files.

20         MR. TALLON:  All right just to be assured.

21         THE COURT:  It's in.

22         MR. TALLON:  All right.  And then as

23  another matter I think this is a little late but

24  still timely, the Court is aware that I was not

25  aware that I was not aware that Mr. Powers was not

3783008a-8798-417a-ac0e-724123da26d0

Page 5

1    going to cross-examine Jodi powers.  And we

2    addressed that when that issue came up yesterday

3    immediately following her direct examination.  One

4    of the exhibits used in Ms. Powers direct

5    examination was Exhibit 43 it was an e-mail.

6            THE COURT:  Yes.

7            MR. TALLON:  A portion of it was

8    highlighted and it's a three or fourth page e-mail

9    and the balance was left for the jury to read.  And

10   correct me if I'm wrong Ms. Higgins I don't have the

11   dates correct I just wasn't to put on the record

12   that initially I objected to Exhibit 43 in whole and

13   I believe it was at our hearing on February 9th,

14   2011, that Judge Armijo made a ruling and in part, I

15   think her ruling was based on the United States

16   reconsidering and withdrawing its intention to offer

17   the entire Exhibit and in fact offering to redact

18   most of it.  I think on February 9th the United

19   States said we're going to offer a paragraph or

20   several sentences Ms. Higgins can clarify that for

21   me if she likes and Judge Armijo's ruling was that

22   based on the United States' representation she would

23   rule that only that portion that the United States

24   was offering would be admitted.

25            THE COURT:  All right.

Page 6

1          MS. HIGGINS:  That would have been the

2   highlighted paragraph, Your Honor.

3          THE COURT:  Well that's interesting

4   because there was a paragraph that only part of it

5   was highlight bud she read the whole paragraph.

6          MS. HIGGINS:  Yes.

7          THE COURT:  So are you suggesting redact

8   everything in 43 but that paragraph?  Is that what

9   you're asking?

10          MR. TALLON:  No, that's not it.

11          MS. HIGGINS:  Yes, there were sentences in

12   that paragraph I think we wanted more than just that

13   one highlighted sentence.

14          MR. KRAEHE:  We wanted the whole

15   paragraph.

16          THE COURT:  She read the whole paragraph.

17          MR. TALLON:  Okay.  Is that what you were

18   offering on February 9th?

19          MS. HIGGINS:  I can't remember I think we

20   might not have had that for sentence but we may have

21   been offering the whole paragraph.

22          MR. TALLON:  Okay the record of

23   February 9th would make that clear the purpose of my

24   bringing this up, Your Honor, is that the record was

25   never, was never made of that in court well it was

3783008a-8798-417a-ac0e-724123da26d0

1   never made of what I'm about to tell you which was

2   subsequent to February 9th, Mr. Powers instructed me

3   to withdraw his objection to the entire exhibit and

4   what he wished me to convey to Ms. Higgins was that

5   she could introduce the government could introduce

6   the entire Exhibit 43 and that that's what he wished

7   to do so I wanted to bring that up now because that

8   was a specific directive from him also in context I

9   think and this is a matter that is of record some

10  time in the near future today or Monday we're going

11  to here from a witness Christopher Sena and one of

12  the essential exhibits to the government's case, I

13  think is the transcript of his conversation with

14  Mr. Powers on January 17, 2008.

15          MR. KRAEHE:  What exhibit number is that?

16          MS. HIGGINS:  On the original exhibit list

17  it's the CD the tape recording is Exhibit 61, and

18  the transcript is listed as 61A.

19          THE COURT:  Okay.

20          MR. TALLON:  Those two exhibits are

21  involved in what I a am speaking to the Court about

22  now I moved to suppress the audio and the transcript

23  in its entirety on December 8, I believe of 2010

24  Judge Armijo made a ruling in part, agreeing with

25  and most, denying my motion to suppress the entire

3783008a-8798-417a-ac0e-724123da26d0

Page 8

1    transcript but permitting or requiring that the

2    government redact some small portions of it.  The

3    government also wished to redact probably about half

4    the pages of the transcript that was its own desire,

5    I was when I was aware of that of what sort of the

6    final intentions of the government was and after the

7    February 9 hearing there's another hearing

8    Mr. Powers again directed me to withdrawal his

9    objection to virtually the entire transcript and to

10   maintain objections only to some very selective

11   portions.  So Ms. Higgins and I between well I would

12   say late February and even early, early April,

13   eventually hammered out a an agreed and in part was

14   based on judge Armijo's ruling an agreed version of

15   a redacted transcript which included substantially

16   more material than would have been admitted in

17   response to my initial objection and in response to

18   any ruling of Judge Armijo the request to have more

19   information included was again at the direction of

20   Mr. Powers I just want to make that clear for the

21   record since we're discussing matters in which my

22   client has exercised some control over.  And some

23   cases went against my judgment.

24             THE COURT:  Okay, very well.

25             MR. TALLON:  I don't know if that's

3783008a-8798-417a-ac0e-724123da26d0

Page 9

1   appropriate, Your Honor.  But that's about all I can

2   say at this time.

3           THE COURT:  No you are on the record and

4   anything that's appropriate you think is in evidence

5   so.

6           MR. TALLON:  I think there's one other

7   matter that I will bring up at this time witness

8   Natalie Martinez is on the government's exhibit list

9   she is not on the defense witness list and in my

10  defense witness list I have a cash all provision I

11  say in addition to these witnesses I'll reserve the

12  right to call any witness identified by the

13  government I did not request process for or subpoena

14  for Natalie Martinez but I would semisay that after

15  yesterdays proceedings had concluded a decision was

16  made to call Ms. Martinez at about 5:00 this morning

17  I filed an ex parte motion requesting free process

18  be issued for Natalie Martinez I don't know how that

19  might be brought to your attention it was filed

20  through Judge Armijo's it was filed in her case and

21  a proposed order was sent to her mailbox so I would

22  I don't know how the mechanics would work and the

23  reason I bring it up is in part because of the

24  mechanics and the timing was short in the Court

25  grants that motion and I'll have process issued I

Page 10

1    will be attempting to serve Ms. Martinez over the

2    weekend so that she may be at least on deck and

3    available for Monday or Tuesday depending on how

4    timing goes.

5            THE COURT:  Natalie please check with

6    Katie and see there should be an ex parte order for

7    the issuance of a subpoena for Natalie Martinez and

8    I'll intend to grant that and would you have her

9    check it as soon as possible so that process can be

10   issued.

11           MR. TALLON:  I don't know if I'm

12   forgetting anything, Your Honor, but I know about

13   the Court's concern for time and moving matters

14   along not allowing any gaps I'm in deferring in

15   every way I can to make sure that no gap appears and

16   I would I wish the Court to know that if

17   cross-examination lags or something that occurs I'm

18   not doing it for the purpose of delay and I'm

19   attempting to do the best I can to assimilate the

20   information that I think is necessary for effective

21   cross.

22           THE COURT:  I have not for a moment to

23   assume that in this case.

24           MR. TALLON:  Thank you, Your Honor.

25           (In open court:)

3783008a-8798-417a-ac0e-724123da26d0

1            (Whereupon the jury entered the

2    courtroom.)

3            THE COURT:  Please be seated.

4            In this case, the attorneys have been very

5    helpful in taking up matters in recesses and so

6    forth.  This morning we had a couple of legal

7    matters that we had to take up.  That's the reason

8    for the 15-minute delay.  And usually, these matters

9    actually speed the trial along at some time later.

10   So please understand that there was some work going

11   on while you were waiting.  Thank you.

12           Whenever you're ready, you may present

13   your next witness.

14           MS. HIGGINS:  Your Honor, the United

15   States calls Joan Prouty.

16           THE COURT:  Good morning.  Please state

17   and spell your first name and your last name.

18           THE WITNESS:  My name is Joan, J-O-A-N,

19   P-R-O-U-T-Y.

20                   JOAN PROUTY,

21   having been first duly sworn, testified as follows:

22                DIRECT EXAMINATION

23   BY MS. HIGGINS:

24       Q.   And since you have kind of a low voice,

25   make sure the microphone is closer to you.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 12

1              Where do you live?

2        A.    In Albuquerque.

3        Q.    What do you do for a living?

4        A.    I'm a physician's assistant.

5        Q.    How long have you been doing that?

6        A.    Since 1998.

7        Q.    So in March 2006, you were a physician's

8   assistant?

9        A.    That's right.

10        Q.    Do you recall approximately what your

11   income as a PA was in March of 2006?

12        A.    Roughly $75,000 a year.

13        Q.    And how did that work out to a monthly

14   income?

15        A.    Roughly $3,500 a month --

16        Q.    Okay.

17        A.    -- take home.

18        Q.    Now in March of 2006, did you buy any

19   houses for investment purpose?

20        A.    Yes.

21        Q.    How many?

22        A.    Three.

23        Q.    Where were the houses located in

24   Albuquerque?

25        A.    They were located in the Northeast Heights

3783008a-8798-417a-ac0e-724123da26d0

Page 13

1    in a subdivision known as Oakland Estates.

2         Q.    Do you recall the addresses of those three

3    houses?

4         A.    Yes, I do.

5         Q.    What were they?

6         A.    6600 Glenturret, 6805 Glenturret and 6701

7    Glenlochy.

8         Q.    Did you have a real estate agent for these

9    purchases?

10        A.    Yes, I did.

11        Q.    And who was that?

12        A.    Kevin Powers.

13        Q.    Do you see Mr. Powers in the courtroom

14   today?

15        A.    Yes, I do.

16        Q.    Is he seated at counsel table behind me?

17        A.    Yes.

18        Q.    Now, did you have to finance these

19   purchases?

20        A.    Yes.

21        Q.    Who found financing for you?

22        A.    Mr. Powers.

23        Q.    How did you come to know Mr. Powers?

24        A.    Through my boyfriend, Gene Barnett.

25        Q.    And how did that happen?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 14

```
 1      A.    He was involved in working with a
 2   colleague of his to purchase properties.
 3      Q.    And when you say, "he," you're talking
 4   about?
 5      A.    Gene Barnett.
 6      Q.    All right.  Before the three transactions
 7   we're going to talk about, had you done any other
 8   real estate transactions with Mr. Powers?
 9      A.    Yes.
10      Q.    What was that about?
11      A.    He had assisted in refinancing my property
12   that I lived in earlier in December of the prior
13   year, '05.
14      Q.    Is that where you lived?
15      A.    Yes.
16      Q.    What was that address?
17      A.    8405 Racheleigh.
18      Q.    So you refinanced that property?
19      A.    Yes.
20      Q.    Thereafter, did you meet with Mr. Powers
21   to talk about the possibility of buying homes for
22   investment purposes?
23      A.    Yes.
24      Q.    Where did you meet him?
25      A.    At his office.
```

Page 15

1        Q.    Okay.  And was there any discussion

2    between you and Mr. Powers about doing that, about

3    buying houses for investment purpose?

4        A.    Yes.

5        Q.    Okay.  Was there any discussion about

6    buying more than one house?  How was it decided --

7    you told us that you bought three homes.  How was

8    that decided?  And it might not have been decided at

9    the first conversation.

10        A.    I don't know that it was decided at the

11    first conversation.

12        Q.    All right.  Was there any discussion --

13    did Mr. Powers tell you how it might be possible for

14    you to invest in buying homes in Albuquerque?

15            Did you have any money to invest?

16        A.    No.

17        Q.    So how could you invest in real estate if

18    you had no money to invest?

19        A.    I could apply for, with his assistance

20    from the mortgage end of things, for loans that were

21    100 percent financed loans.

22        Q.    All right.  And then how were you going to

23    be able to make mortgage payments?

24        A.    The loans that were taken out on the

25    properties included some additional moneys, and that

3783008a-8798-417a-ac0e-724123da26d0

1    money was to be used to pay the mortgages until they

2    could be resold.

3        Q.    How were you to get that money?

4        A.    That was to come at closing, and it would

5    come as money back -- as a lump sum of money back.

6        Q.    To you?  The money would come back to you?

7        A.    Ultimately to me, yes.

8        Q.    Okay.  Did Mr. Powers -- now when you talk

9    about investment, did you have in mind making any

10   kind of profit?

11       A.    I hoped to, yes.

12       Q.    Okay.  And how was that going to happen?

13       A.    As I understood it, I would purchase the

14   properties.  And money would come to me at the

15   closing.  And I would use that money to pay for the

16   mortgages until we were able to sell the properties.

17   And the goal was that there would be -- the

18   properties would sell and there would be money left

19   over.  And that would be the profit.

20       Q.    Would it be accurate to say that you were

21   going to make your profit up front then?

22       A.    Yes.

23       Q.    And that profit up front would be the

24   money coming back to you after closing?

25       A.    Correct, yes.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 17

1      Q.    Now, was there any discussion with

2    Mr. Powers about how you could ensure that there

3    would be money coming back to you?  That is to say,

4    was there any difference between the original

5    listing price of the houses and the ultimate

6    purchase price?

7      A.    Yes, there was.

8      Q.    How did that work?  That is to say, how

9    was that going to happen?

10     A.    As I understand it, in the discussions

11   with the seller's Realtor, there would be an

12   agreement that the actual sales price was much

13   higher than the asking price and that the difference

14   between those two would be the money that would come

15   back to me at closing.

16     Q.    All right.  And who was going to negotiate

17   that part of the contract?

18     A.    Mr. Powers was.

19     Q.    Who found the houses?

20     A.    Mr. Powers.

21     Q.    Did you ever sit with him while he was

22   looking for houses for you to look at for investment

23   purposes?

24     A.    Yes.

25     Q.    What did he do to do that?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 18

1      A.    The properties are listed in the computer

2   under the Multiple Listing Service, MLS.  And

3   looking at the properties that were available and

4   then surrounding properties, as to what they had

5   sold for in the past, and finding properties that

6   were less than what had sold in the surrounding

7   community.

8      Q.    Okay.  So are you saying that you were

9   looking for properties that in a particular

10   community seemed to be priced lower than what other

11   properties had been sold for in that community?

12      A.    Yes.

13      Q.    And was it those properties, those kinds

14   of properties, that you would look at?

15      A.    Yes.

16      Q.    In the three cases we're going to talk

17   about, did you happen to know the listing prices of

18   the houses you bought before the increase in the

19   sales price?  You may or may not.

20      A.    I don't remember exactly.  I knew they

21   were less but I don't remember the exact amount

22   right now.

23      Q.    Okay.  I'm going to direct your attention

24   to some government exhibits.  If you'll look to your

25   left, there are lots of binders, and we're going to

3783008a-8798-417a-ac0e-724123da26d0

Page 19

1   be working first with Exhibits 4 and 5.  So if you

2   will pull those two binders out, we'll look at

3   Government Exhibit 4 first.

4        The page numbers can be on the bottom of

5   the page.  Now, they are tabbed, so it starts

6   with 1.  And if you look through the tabs, perhaps

7   you will find a tab for 4.

8   A.   I see.

9   Q.   And we want to look at page 292.  Now,

10  that would be the last three digits of what look

11  like page numbers on these.  They may be

12  highlighted.

13  A.   Is that the number at the top?  And what

14  was the number again?

15  Q.   292, and you're looking for the last three

16  digits.

17       MS. HIGGINS:  Your Honor, may I approach

18  the witness?

19       THE COURT:  Yes.

20  Q.   (By Ms. Higgins)  Now, you have said that

21  Mr. Powers found the houses, and you've given us the

22  addresses.  These are all in Oakland Estates, you

23  said W.ere offers made on each of these three

24  houses?

25  A.   Yes.

Page 20

1      Q.    All right.  And page 292 of Exhibit 4,

2  what is that?

3      A.    It's a purchase agreement.

4      Q.    All right.  And who is the buyer?

5      A.    That would be me.

6      Q.    Does it show who the seller is?

7      A.    It says Heights.

8      Q.    Okay.  And what is the contract purchase

9  price?

10     A.    490,000.

11     Q.    All right.  And now if you'll go to -- I

12  think it's page 300.  That would be some pages back.

13           THE COURT:  What is the address on this

14  one?

15           MS. HIGGINS:  I'm sorry.

16     Q.    (By Ms. Higgins)  What is the address,

17  please?

18     A.    6600 Glenturret Way.

19     Q.    Okay.

20     A.    You said 300?

21     Q.    I think so.  We're looking for a signature

22  page.  Is that the signature page for this purchase

23  agreement?

24     A.    Yes.

25     Q.    All right.  Did you sign?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1     A.     Yes, I did.

2     Q.     All right.  Is there a date by your

3  signature?

4     A.     Yes, there is, 2/10/06.

5     Q.     Who negotiated this offer?

6     A.     Mr. Powers.

7     Q.     Were you involved in the negotiations?

8     A.     Not directly, no.

9     Q.     Okay.  But you were aware of what the

10  terms were?

11    A.     Yes.

12    Q.     And you did sign and date this?

13    A.     Yes.

14    Q.     Now, thereafter was this offer accepted?

15    A.     Yes.

16    Q.     And did you apply for a mortgage loan?

17    A.     Yes, I did.

18    Q.     Who was your mortgage broker?

19    A.     Mr. Powers.

20    Q.     Was Mr. Powers involved in any way in

21  filling out loan applications for you?

22    A.     His office was, yes.

23    Q.     Okay.  How did you inform them about

24  things like your income and other things that needed

25  to go on the loan application?  How did you tell him

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 22

1    about that?

2        A.    I brought them documents, whatever they

3    asked for.  And they had prior documents from

4    December, when I had refinanced my primary property.

5        Q.    Okay.  And as your mortgage broker, did

6    Mr. Powers and his office submit loan applications

7    on your behalf?

8        A.    Yes.

9        Q.    Looking again at Government Exhibit 4,

10   page 72.

11       A.    It's here.

12       Q.    Okay.  And what is that?

13       A.    This is a loan application.

14       Q.    Are you able to read, for which property?

15       A.    It's kind of distorted there, but it says

16   Glenturret.

17       Q.    All right.  Sometimes it's helpful to look

18   at the computer screen, but maybe not.

19       A.    I don't know that that helps a lot.

20       Q.    But it does say Glenturret?

21       A.    Yes, it does.

22       Q.    Okay.  Can you tell the amount, and can

23   you tell an interest rate?

24       A.    The amount on here is $392,000 at an

25   interest rate of 7.5 percent.

Page 23

1      Q.    All right.  And does that sound like a

2    first mortgage for a property?

3      A.    Yes.

4      Q.    Okay.  Can you see the box where you mark

5    the purpose for which you're buying the house?  And

6    it's on the right-hand side.

7      A.    The purpose is purchase.

8      Q.    Move down just a little bit to where you

9    have three choices:  Primary residence, secondary

10   residence or investment.  And it will be on the top

11   right, to the middle.

12     A.    I see.  Thank you.  Primary residence.

13     Q.    All right.  And I believe you said your

14   average monthly income at that time take-home was

15   what?

16     A.    About $3,500 a month.

17     Q.    Okay.  Looking at the second page of this

18   loan document -- not the second page, but turn over

19   until you see some information on income.  What page

20   is that?

21     A.    The top says 73.

22     Q.    Okay.  And looking at that, what was

23   submitted for you as base income?

24     A.    It appears that it's $11,163.

25     Q.    Was that correct?

3783008a-8798-417a-ac0e-724123da26d0

Page 24

```
 1        A.    No.
 2        Q.    Do you know anything about how -- well,
 3   that simply was not your income?
 4        A.    That's right.
 5        Q.    Okay.  At this point, were you still
 6   living at the Racheleigh address?
 7        A.    That's right.
 8        Q.    And you intended to continue living there?
 9        A.    Yes.
10        Q.    And were you buying 6600 Glenturret as a
11   primary residence?
12        A.    No, I was not.
13        Q.    And now looking at the signature page
14   where you signed your name on this loan application,
15   you'll be paging towards the back.  It might be
16   three or four pages.
17        A.    Yes.
18        Q.    What page is that?
19        A.    This page I'm looking at is 76.
20        Q.    Okay.  Do you see your signature on that
21   page?
22        A.    Yes, I do.
23        Q.    And do you see a date?
24        A.    3/20/06.
25        Q.    And down in the bottom right-hand corner,
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 25

1    what mortgage brokerage company submitted this loan

2    application on your behalf?

3        A.    Worldwide Mortgage.

4        Q.    What was your understanding of who was

5    Worldwide Mortgage?

6        A.    That was the company Kevin Powers had.

7        Q.    Okay.  These loan applications were

8    submitted, and did you get a loan?

9        A.    Yes, I did.

10       Q.    Okay.  What was the plan for paying the

11   mortgage on this house?  You may have mentioned it

12   before.

13       A.    The plan was that at closing, I would get

14   money back.  And that money would be used to pay the

15   mortgage.

16       Q.    All right.  Did you know at this point how

17   much money you would be getting back?  And by, "at

18   this point," I mean at the time that the loan

19   applications were submitted and approved, did you

20   know how much?

21       A.    It would be the difference between what

22   the original selling price was and the actual price

23   that we paid for the house.

24       Q.    Okay.  So at this point in the process,

25   you didn't know exactly how much?

3783008a-8798-417a-ac0e-724123da26d0

Page 26

1      A.     I'd have to look again at what the
2  original price was and see.  I'm sure that I did.
3      Q.     Okay.  Who decided how much you were going
4  to get back?
5      A.     That was agreed upon between the two
6  Realtors.  And the 490 price was a price that Kevin
7  had come up with, Mr. Powers had come up with.
8      Q.     Okay.  Would you have been able to pay the
9  mortgage on this house while owning Racheleigh as
10 well, without the money you were going to get back
11 at closing?
12     A.     No.
13     Q.     Did you know what the mechanism was that
14 was going to get money back to you?  Did you know
15 how that was going to happen?
16     A.     At one time.
17     Q.     Okay.  Did you go to closing on this
18 property, 6600 Glenturret?
19     A.     Yes, I did.
20     Q.     Did Mr. Powers come with you?
21     A.     Yes.
22     Q.     You might not remember, but do you recall
23 which title company?
24     A.     It was US Title.
25     Q.     Okay.  In Exhibit 4 -- well, let me stop

1    for just a minute.  Let's look at Exhibit 5 for just

2    a minute.  And that will not be in that binder I

3    think it's in the next binder.  So you can leave

4    that one there and try and find space.

5              And in Exhibit 5, page 432?

6    A.    Yes.

7    Q.    What is that?

8    A.    This is another loan application.

9    Q.    For what property?

10   A.    Glenturret.  And again, it's pretty

11   obscured and I cannot see the exact address.

12   Q.    Okay.  For how much?

13   A.    $98,400 -- well, 98,000.

14   Q.    And does this look like a loan application

15   for a second loan?

16   A.    Yes, it does.

17   Q.    Now looking at page 435?

18   A.    Yes.

19   Q.    Is that a signature page?

20   A.    Yes.

21   Q.    Now, that is your signature on that page?

22   A.    Yes.

23   Q.    What is the date on that?

24   A.    3/20/06.

25   Q.    So for both of the loans we'ave been

3783008a-8798-417a-ac0e-724123da26d0

Page 28

1    talking about, even though it's hard to read the

2    address, they were both signed on March 20th of '06?

3        A.   Yes.

4        Q.   Since you have Exhibit 5 out, would you

5    look, please, at 421?

6        A.   Yes.

7        Q.   When you went to closing, did you sign any

8    notes?

9        A.   When you say "notes," you mean --

10       Q.   Promissory notes.

11       A.   Yes.

12       Q.   Okay.  So in Exhibit 5 at page 421, what

13   is that?

14       A.   This is a promissory note for the second

15   mortgage.

16       Q.   For how much?

17       A.   $98,000.

18       Q.   At what interest rate?

19       A.   9.625 percent.

20       Q.   And what property?

21       A.   6600 Glenturret Way.

22       Q.   I'm now having you go back to Exhibit 4,

23   page 52.

24       A.   Yes.

25       Q.   What is that?

3783008a-8798-417a-ac0e-724123da26d0

Page 29

```
 1      A.    This is another promissory note.

 2      Q.    Okay.  In what amount?

 3      A.    392,000.

 4      Q.    At what interest rate?

 5      A.    7.5 percent.

 6      Q.    And for what property?

 7      A.    6600 Glenturret Way.

 8      Q.    Okay.  And on each of these notes, did you

 9   sign these?

10      A.    Yes, I did.

11      Q.    Is it Exhibit 4 you have in front of you?

12      A.    Yes.

13      Q.    All right.  Could you please look at

14   page 196?

15      A.    (Witness complies.)

16      Q.    And what is that?

17      A.    This appears to be the HUD.

18      Q.    Okay.  And does this show for what

19   property?

20      A.    6600 Glenturret Way.

21      Q.    Who is the buyer?

22      A.    Well, me.

23      Q.    Okay.  And and who is the seller?

24      A.    Sarah@ Heights.

25      Q.    And does it show a total contract price?
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    It's usually at the top left somewhere or mid-left.

2        A.    Yes, 490,000.

3        Q.    Okay.  And in the top right, there are

4    some dates.  Does it show a closing date?

5        A.    3/20/06.

6        Q.    In Government Exhibit 4, page 258 -- I'm

7    sorry.  Let's go back to that HUD for just a moment.

8    I'm ahead of myself.

9              Does it show who the lender is on

10   Government Exhibit 4?

11       A.    Yes.

12       Q.    Who was the lender?

13       A.    Suntrust Mortgage, Inc.

14       Q.    And did you get two loans from Suntrust?

15       A.    Yes, I did.

16       Q.    On the second page of the HUD -- this is

17   Exhibit 4, I believe it would be page 197.

18       A.    Right.

19       Q.    -- down at the bottom of the page, and

20   it's usually around Line 1306, is there an item

21   having to do with K&E Construction?

22       A.    1307 there is a line, yes.

23       Q.    And how much to be paid to K&E

24   Construction?

25       A.    $85,000.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1      Q.    Was this the amount you were expecting to

2   get back after closing?

3      A.    Yes.

4      Q.    Were you intending to use K&E Construction

5   to do construction, renovation, repairs,

6   landscaping, anything like that for you?

7      A.    No.

8      Q.    Do you happen to remember how much you

9   actually spent on this property after closing?

10      A.    I spent $350 on a garage door opener.  I

11   put window coverings in.  And that was about $700,

12   but I don't know the exact amount.  And I had

13   landscaping done in the backyard.

14      Q.    Okay.  Can you give us an approximate

15   total?

16      A.    It probably was about $5,000 total.

17      Q.    Okay.  Now, looking at page 258 in

18   Exhibit 4 --

19      A.    258, you said?

20      Q.    258.

21      A.    Yes.

22      Q.    What is that?

23      A.    It says it's an occupancy affidavit.

24      Q.    Is this one of the documents that you

25   signed at closing?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 32

```
 1      A.    Yes.

 2      Q.    Did you read this document before you

 3  signed it at closing?

 4      A.    No, I did not.

 5      Q.    Okay.  Now after closing, did you actually

 6  receive $85,000?

 7      A.    I did.

 8      Q.    From whom?

 9      A.    From Kevin Powers.

10      Q.    And in what form?

11      A.    He gave me a cashier's check.

12      Q.    All right.  Just to mix things up, I'm

13  going to ask you to find Government Exhibit 156.

14      A.    In 4?

15      Q.    No.  It's another exhibit, and it's

16  another binder.  So 156.

17      A.    Oh, I see what you're saying.

18      Q.    And if you'ill look in Government 156 on

19  page 27, and those are always the last digits.

20            MS. HIGGINS:  Your Honor, this has not yet

21  been moved into evidence, but it's been stipulated

22  to.  Government Exhibit 156 are bank records.

23            THE COURT:  Received.

24            (Government Exhibit 156 admitted.)

25      Q.    (By Ms. Higgins)  And actually Ms. Prouty,
```

3783008a-8798-417a-ac0e-724123da26d0

Page 33

1     whose bank records are these?

2          A.    These appear, as I looked quickly, to be

3     mine.

4          Q.    Now on page 27 of Government Exhibit 156,

5     what is that?

6          A.    This is the cashier's check that I

7     received from Kevin Powers.

8          Q.    All right.  And did you deposit it into

9     this account after you received it?

10         A.    Yes, I did.

11         Q.    Okay.  You can put that down for just a

12    minute.

13         A.    Will I be coming back to this?

14         Q.    You will be coming back to it, so you can

15    leave it open on the floor.

16               Now, we're going to look at another

17    property.  And for this, we're going to need

18    Exhibits 96 and 95, and they may be in the same

19    binder.  So if you will first open to Government 96,

20    and that would be page 534.

21         A.    You said 534.

22         Q.    Yes.  What is that?

23         A.    This is another purchase agreement.

24         Q.    All right.  For what address?

25         A.    6805.

Page 34

1      Q.    Is this another house that you bought?

2    You mentioned three.  Is this -- we'll call it the

3    second one?

4      A.    Yes, this is.

5      Q.    Okay.  And does the purchase agreement

6    show who the seller was?

7      A.    Yes, it does.

8      Q.    And who is that?

9      A.    I'm probably butchering the name.  I

10   apologize, but Mazzarella.

11     Q.    Okay.  And what is the offer?

12     A.    $490,000.

13     Q.    And to your understanding, did this offer

14   include the amount that you were going to get back

15   after closing?

16     A.    Yes.

17     Q.    And looking at page 543 -- it's down a

18   bit.

19     A.    Yes.

20     Q.    -- is that the signature page?

21     A.    Yes, it is.

22     Q.    Did you sign that purchase agreement?

23     A.    Yes, I did.

24     Q.    And does it show who represented you?

25     A.    Yes, it does.  Wait a minute.

3783008a-8798-417a-ac0e-724123da26d0

Page 35

1       Q.    Sometimes the real estate terms are

2    confusing.  Who represented you in negotiating this

3    purchase contract?

4       A.    Kevin Powers did.

5       Q.    Okay.  And do you also see

6    Mr. Mazzarella's name as the seller?

7       A.    Yes.

8       Q.    Do you see anybody who represented him?

9    You might not.

10      A.    Looking at this, it would appear the

11   selling broker was Kevin Powers, even though he was

12   the buyer's broker in reality.

13      Q.    Okay.  And when you say "the buyer's

14   broker," are you sure he represented you?

15      A.    Yes.

16      Q.    Okay.  So even if the real estate terms

17   don't entirely make sense to you, you know who

18   represented you in this deal?

19      A.    Yes, I do.

20      Q.    And who negotiated this purchase contract?

21      A.    Mr. Powers did.

22      Q.    Now having made this offer, did you then

23   submit loan applications?

24      A.    Yes.

25      Q.    Okay.  And I'm going to ask you to look at

3783008a-8798-417a-ac0e-724123da26d0

Page 36

1    Exhibit 96.

2        A.    Exhibit 96?

3        Q.    Page 491.

4        A.    Okay.

5        Q.    And what does this seem to be?

6        A.    It's part of the loan application.

7        Q.    For what address?

8        A.    6805 Glenturret Way.

9        Q.    And the loan application is for how much?

10       A.    $367,500.

11       Q.    At what interest rate?

12       A.    6.910 percent.

13       Q.    Now going on to the next page, does that

14   have -- well, let's stay on the first page for just

15   a minute, since it's up.

16           Which of the boxes did you mark showing

17   the purpose for which you were buying the house?

18       A.    Primary residence.

19       Q.    Did you mean for this to be your primary

20   residence?

21       A.    No, I did not.

22       Q.    Now, looking at the second page -- there

23   might not be a second page.  Oh, there it is.  What

24   we're looking for is income information.  And I

25   believe that's at the top of the second page, which

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 37

1    would be page 492.

2         A.    Yes.

3         Q.    What was submitted as your income?

4         A.    On this, it says $12,000.

5         Q.    And again, is that accurate?

6         A.    No.

7         Q.    Did this loan application list any income

8    from -- any rental income?

9         A.    Apparently it does, yes.

10        Q.    And what is the rental property?

11        A.    I didn't have any rental property at this

12   time.

13        Q.    Okay.  Does it give an address of a

14   possible rental property?

15        A.    I don't see any.

16        Q.    Okay.  But you see something in the income

17   section that speaks about rental income?

18        A.    Yes, I do.

19        Q.    How much was that?

20        A.    It says on here $1,200.

21        Q.    But at that time, you were not renting out

22   any property?

23        A.    No, I was not.

24        Q.    So you had no rental income?

25        A.    That's right.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1      Q.    And let's go to the signature page of this

2   loan application.  What page is that?

3      A.    I have 493.

4      Q.    Okay.  And did you sign this loan

5   application?

6      A.    Yes, I did.

7      Q.    What is the date?

8      A.    3/23/06.

9      Q.    So this sounds like it's about three days

10   later than the first property?

11      A.    That's right.

12      Q.    Okay.  Looking at now Exhibit 95 --

13      A.    Is that still this one?

14      Q.    I hope so.

15      A.    Yes.

16      Q.    So if you'ill look for the tab, going

17   back, since you're in 96, look for the tab 95, and

18   let's look at page 323.

19      A.    Yes.

20      Q.    And what is that?

21      A.    This appeared to be a loan application.

22      Q.    Okay.  And for what property?

23      A.    For the 6805 Glenturret Way.

24      Q.    And the amount?

25      A.    $122,500.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 39

1    Q.    Would this be for the second loan?

2    A.    Yes.

3    Q.    At what interest rate?

4    A.    9.499 percent.

5    Q.    And going over to the signature page of

6  this --

7    A.    Yes.

8    Q.    -- what page is that?

9    A.    325.

10    Q.    Did you sign that loan application?

11    A.    Yes, I did.

12    Q.    And what is the date on it?

13    A.    3/23/06.

14    Q.    And what mortgage brokerage company

15  submitted this loan on your behalf?

16    A.    Worldwide Mortgage.

17    Q.    Now since you have Exhibit 95 out, let me

18  ask you:  The offer was made, the loan applications

19  were submitted, and did you get financing?

20    A.    Yes, I did.

21    Q.    All right.  Looking at -- you've got

22  Exhibit 96 out right now?  I think you're at 96.  If

23  you're at 95, that's fine.

24          If it's 95, would you please look at

25  page 257?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 40

```
 1      A.    Ninety-five, 257?

 2      Q.    Yes.

 3      A.    Here it is.

 4      Q.    Now, you went to closing on 6805

 5   Glenturret Way?

 6      A.    Yes, I did.

 7      Q.    Do you recall which title company?

 8      A.    US Title.

 9      Q.    And was Mr. Powers with you at closing?

10      A.    Yes.

11      Q.    In Exhibit 95, page 257, what is that?

12      A.    That's a promissory note.

13      Q.    Okay.  For how much?

14      A.    $122,500.

15      Q.    And does it give an interest rate?

16      A.    Yes, it does.  9.499 percent.

17      Q.    And do you see a signature page?  That's

18   usually on the second or third page.

19      A.    Yes, I do.

20      Q.    And you signed that?

21      A.    Yes, I did.

22      Q.    These promissory notes, what exactly are

23   you agreeing to in a promissory note?

24      A.    To pay the amount of money that they're

25   loaning me.
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 41

1      Q.    All right.  And in Exhibit 95, could you

2  please look at page 294?

3      A.    Yes.

4      Q.    What is that?

5      A.    This is an occupancy agreement.

6      Q.    All right.  Does your signature show on

7  that document on that particular page?

8      A.    Yes, it does.

9      Q.    Okay.  Did you read, review this at

10  closing?

11     A.    No, I did not.

12     Q.    Was it your intention to live in 6805

13  Glenturret Way as your primary residence?

14     A.    No.

15     Q.    And in Exhibit 95, could you go to

16  page 274?

17     A.    Yes.

18     Q.    We'll wait for them to get caught up with

19  us.  What is that?

20     A.    It's the HUD.

21     Q.    Okay.  Does it show you as the buyer?

22     A.    Yes, it does.

23     Q.    Who does it show as the seller?

24     A.    I'm sorry.  Seller just says Glenlochy,

25  LLC.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 42

1      Q.    All right.  And for what address?

2      A.    6805 Glenturret Way.

3      Q.    And in the far right-hand corner is the

4   date.  Does it have a closing date?

5      A.    Yes, 3/23/06.

6      Q.    Can you tell who the lender was from this

7   document?

8      A.    Accredited Home Lenders, Inc.

9      Q.    And again, you got two loans from

10   Accredited that you've talked about with the notes?

11      A.    (No audible response.)

12      Q.    You got two loans from Accredited?

13      A.    Yes.

14      Q.    On the second page of this document, it

15   will be 273, is there a line item down at the bottom

16   for K&E Construction?

17      A.    Yes, there is.

18      Q.    What line is that?

19      A.    1308.

20      Q.    And the amount?

21      A.    On this copy, there is not an amount.

22      Q.    Okay.  You did receive money back at the

23   time?

24      A.    Yes, I did.

25      Q.    When you went to closing, were you there

3783008a-8798-417a-ac0e-724123da26d0

Page 43

1    with the seller?  Were you both --

2        A.    I wasn't in the same room with the seller,

3    no.  They obviously had to close, but they weren't

4    there with me.

5        Q.    That didn't happen, okay.  We'll come back

6    to that.

7              On page 276 of Exhibit No. 95, is that a

8    signature page where you signed for the HUD?

9        A.    Yes, it is.

10       Q.    All right.  Looking now at Exhibit 96,

11   page 374.

12       A.    Yes.

13       Q.    And what is that?

14       A.    This is a promissory note.

15       Q.    For how much?

16       A.    $367,500.

17       Q.    So would that have been for the first

18   mortgage?

19       A.    Yes.

20       Q.    At what interest rate?

21       A.    6.990 percent.

22       Q.    And did you sign that note?

23       A.    Yes, I did.

24       Q.    Okay.  And also in Exhibit 96, on

25   page 430 --

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    A.    Yes.

2    Q.    -- is that an occupancy affidavit form?

3    A.    Yes, it is.

4    Q.    Does it show your signature?

5    A.    Yes, it does.

6    Q.    Okay.  And again, did you review this or

7  read it before signing it?

8    A.    No, I didn't.

9    Q.    Okay, this is like the other one.  Did you

10  sign one for each of the loans?

11   A.    Yes, I did.

12   Q.    Now you did get money back after closing

13  in this case; is that correct?

14   A.    Yes, I did.

15   Q.    Drawing your attention to Exhibit 156 that

16  we left out, now we're going to look at page 35.

17   A.    Which page again?

18   Q.    Thirty-five.

19   A.    Yes.

20   Q.    What is that?

21   A.    That's a cashier's check I received from

22  Mr. Powers.

23   Q.    For how much?

24   A.    $75,000.

25   Q.    And you received that -- how exactly did

Page 45

1    you get those?

2         A.    I went to his office and picked them up.

3         Q.    You picked up the cashier's check that was

4    made out to you?

5         A.    Uh-huh.

6         Q.    Did you ever go with Mr. Powers to his

7    bank?

8         A.    No, I didn't.

9         Q.    All right.  Looking now at the third

10   property you bought, so we can put No. 156 down for

11   just a moment.  And we're going to need Exhibit 136

12   to start with, page 61.

13        A.    Yes.

14        Q.    And what is that?  Is that the purchase

15   agreement?

16        A.    It is a counteroffer to the purchase

17   agreement, yes.

18        Q.    Okay.  So it could be that these pages are

19   a little bit out of order.  Can you find the

20   beginning of -- I think if you go forward, and it's

21   possible that we might go backwards, too -- we're

22   looking for the first page of the purchase

23   agreement.  Page 63.

24        A.    I see that now.

25        Q.    Okay.  And this is a purchase agreement

Page 46

1   for what property?

2        A.    6701 Glenlochy Way.

3        Q.    And is this the third of the three

4   properties you told us about?

5        A.    Yes, it is.

6        Q.    Okay.  Are you listed as the buyer?

7        A.    Yes, I am.

8        Q.    Who is listed as the seller?

9        A.    On this page, there is not a seller.

10       Q.    But you did in fact buy it from someone?

11       A.    Yes.

12       Q.    Okay.  Does it show a contract price?

13       A.    490,000, yes.

14       Q.    Okay.  Take a look at page 71.

15       A.    Yes.

16       Q.    Is that a signature page?

17       A.    Yes, it is.

18       Q.    Does it show you as the buyer?

19       A.    Yes, it does.

20       Q.    Is there anything on there showing a

21   seller?

22       A.    Yes.

23       Q.    And who is the seller?

24       A.    Kevin.  And I don't know this person's

25   last name, I'm sorry.

3783008a-8798-417a-ac0e-724123da26d0

Page 47

```
 1      Q.    Does it start with a B?

 2      A.    Yes.

 3      Q.    Okay.  Could it be Beszelek@?

 4      A.    That would make sense.

 5      Q.    Who represented you in this transaction?

 6      A.    Mr. Powers did.

 7      Q.    And who represented Mr. Beszelek?

 8      A.    Premiere Realty, and that was Sarah

 9  Heights.

10      Q.    You had already dealt with her on another

11  one of these three transactions?

12      A.    That's right.

13      Q.    I think you said you didn't know the

14  original listing price.  But this amount, 490,000,

15  did that include the amount that you were going to

16  get back after closing?

17      A.    Yes, it did.

18      Q.    All right.  And who negotiated this offer

19  for you?

20      A.    Mr. Powers.

21      Q.    Thereafter, did you fill out loan

22  applications to get financing for this house?

23      A.    Yes, I did.

24      Q.    Okay.  Now, you're in Exhibit 136?

25      A.    Yes.
```

1        Q.     Take a look at page 133.

2        A.     Yes.

3        Q.     And what is that?

4        A.     This is another loan application.

5        Q.     For what address?

6        A.     The 6701 Glenlochy property.

7        Q.     And this loan application is for how much?

8        A.     $392,000.

9        Q.     At what interest rate?

10       A.     7.750 percent.

11       Q.     Is there a second page to this loan

12   application that shows income?

13       A.     Yes, thand ere is.

14       Q.     Okay.  What income is listed for you?

15       A.     $11,000.

16       Q.     All right, I'm going back to the first

17   page.  Are any of those boxes checked showing the

18   purpose for which you were buying the house?

19       A.     Yes, primary residence.

20       Q.     All right.  Were you buying this house to

21   live in?

22       A.     No, I was not.

23       Q.     And looking again at the second page

24   having to do with income, other than the 11,000, is

25   that the base monthly income?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 49

1       A.    Yes.

2       Q.    All right.  Is there any other income

3   listed there?

4       A.    Rental.

5       Q.    For how much?

6       A.    $147.

7       Q.    And for what rental property?

8       A.    I don't know.

9       Q.    Okay.  You see no addresses on there that

10   that might go to?

11       A.    No.  No, I don't.

12       Q.    But at that point, you were not renting

13   out anything; is that right?

14       A.    That's correct.

15       Q.    Okay.  I'm going to have you -- now, this

16   is throwing you a bit of a curve -- pull out

17   Exhibit 210.

18       A.    Yes.

19       Q.    And I believe this is going to be on

20   pages 1 to 5, so at least it's up front.

21       A.    Which pages?

22       Q.    We'll start with page 1, and we'll wait

23   for them to catch up.

24             What is that?

25       A.    This is a loan application.

3783008a-8798-417a-ac0e-724123da26d0

Page 50

1    Q.    For how much?

2    A.    $98,000.

3    Q.    At what interest rate?

4    A.    12.125 percent.

5    Q.    And would this be the second loan on

6    Glenlochy?

7    A.    Yes.

8    Q.    And it is for Glenlochy; I'm correct about

9    that?

10   A.    That's right.

11   Q.    And it shows you as the buyer?

12   A.    Correct.

13   Q.    And again moving down the page just a

14   little bit, this shows the purpose is?

15   A.    Purchase for primary residence.

16   Q.    All right.  And looking at the second

17   page, does this give similar income information as

18   the first loan agreement we were just looking at?

19   A.    Yes.

20   Q.    Now on page 5 of this exhibit,

21   Exhibit 210, do you see -- well, it might be page 4.

22         Do you see a signature page?

23   A.    Yes, I do.

24   Q.    And did you sign that?

25   A.    Yes, I did.

3783008a-8798-417a-ac0e-724123da26d0

Page 51

```
 1      Q.    And what is the date?

 2      A.    3/27/06.

 3      Q.    So in terms of timing, this looks like the

 4   third property, at least in terms of timing for

 5   closings?

 6      A.    That's right.

 7      Q.    And was the income information on these

 8   loan applications correct?

 9      A.    No.

10      Q.    Now you've got 210 in front of you?

11      A.    Yes.

12      Q.    All right, let's work with that.  Page 140

13   of 210, you did get the loans?  They were

14   authorized?

15      A.    Yes.

16      Q.    Okay.  And what is that?

17      A.    This is a note, a promissory note.

18      Q.    Okay.  And this relates to 6701 Glenlochy?

19      A.    Yes, that's right.

20      Q.    For how much?

21      A.    $392,000.

22      Q.    And the interest rate?

23      A.    7.50 percent.

24      Q.    And did you sign that note?

25      A.    Yes, I did.
```

3783008a-8798-417a-ac0e-724123da26d0

Page 52

1       Q.    All right.  Does this note show who the
2   lender is?

3       A.    I'm sure it does.

4       Q.    Perhaps on the first page?

5       A.    Cameron Financial Group d/b/a First Choice
6   Mortgage.

7       Q.    All right.  And since we're in
8   Exhibit 210, please look at page 122.

9       A.    Yes.

10      Q.    What is this?

11      A.    This is the HUD.

12      Q.    The settlement statement.  For what
13  property?

14      A.    6701 Glenlochy.

15      Q.    It shows you as the buyer?

16      A.    That's right.

17      Q.    And who does it show as the seller?

18      A.    Kevin Mark -- did you say Beszelek?

19      Q.    As best we know.

20            And what does it show as the closing date?

21      A.    3/27/06.

22      Q.    And the full purchase price?

23      A.    $490,000.

24      Q.    Is there a second page on this exhibit?

25      A.    Yes, there is.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 53

1        Q.    And down at the bottom of that page, so
2   that would be page 122, does that show any payment
3   to K&E?

4        A.    That's actually my page 123.

5        Q.    123?  Sorry.

6        A.    And it does on Line 1307.

7              THE COURT:  Are you still at 210?

8              MS. HIGGINS:  Yes.  Exhibit 210, page 123.

9              THE COURT:  Okay, go ahead.

10       Q.   (By Ms. Higgins)  And you're at Line 1307?

11       A.    That's right.

12       Q.    And what does that show?

13       A.    $80,000 to K&E Construction.

14       Q.    All right.  I'm not sure if I asked you on
15   the second property.  But both for the second and
16   the third property there have been amounts going to
17   K&E and amounts coming back to you.

18             For this property, how much of this 80,000
19   did you spend on repairs and renovations?

20       A.    Roughly the same on each one, because they
21   were identical.  So roughly $5,000.

22       Q.    All right.  And for any of the work that
23   you had done on these properties, did you hire K&E
24   Construction?

25       A.    No, I didn't.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 54

1       Q.    Okay.  Let go back to Exhibit 136 and look

2   at page 167.

3       A.    What page?  I'm sorry.

4       Q.    167.

5       A.    Thank you.

6       Q.    And is that the second promissory note you

7   signed?

8       A.    Yes, it is.

9       Q.    And so that was for how much?

10      A.    $98,000.

11      Q.    At what interest rate?

12      A.    12.125 percent.

13      Q.    Okay.  And did you sign that note?

14      A.    Yes, I did.

15      Q.    Okay.  Looking at this same Exhibit 136 on

16  page 129, what is that?

17      A.    This is an occupancy agreement.  They

18  title it Occupancy and Financial Status Affidavit.

19      Q.    All right.  And it indicates that you're

20  buying the house for what?

21      A.    Principal residence.

22      Q.    All right.  Did you read, review this

23  before signing it?

24      A.    No, unfortunately I didn't.

25      Q.    Do you see your signature either on that

3783008a-8798-417a-ac0e-724123da26d0

Page 55

1    page or the following page?

2        A.    The following page, yes.

3        Q.    And then also on page 178, is that the

4    other occupancy affidavit that would relate to the

5    second loan?

6        A.    Yes.

7        Q.    Okay.  And again, it indicates you're

8    buying that as your primary residence?

9        A.    Principal residence, yes.

10       Q.    Okay.  But you're not?

11       A.    Correct.

12       Q.    And then looking at Exhibit 156, page 34.

13       A.    Would you repeat the page number again,

14   please?

15       Q.    Yes, 34.

16       A.    Thank you.

17       Q.    And we're back in your bank documents?

18       A.    Thank you.

19       Q.    What is on that page?

20       A.    That's the cashier's check I received from

21   Mr. Powers.

22       Q.    In the amount of?

23       A.    $80,000.

24       Q.    Okay.  Now to your understanding, what was

25   K&E Construction Company?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 56

1      A.    Well, Mr. Powers told me that it was

2   something he had in the past, that he had done

3   roofing or something like that and used that

4   company.

5      Q.    Okay.

6      A.    So I don't know anything about K&E

7   Construction, really.

8      Q.    All right.  And to your knowledge, the

9   funds that were paid to K&E after closing in each of

10   these three transactions, did those funds come back

11   to you on those cashier's checks we've looked at?

12      A.    Yes.

13      Q.    Do you know whose idea it was to list K&E

14   on the HUD as an entity that was going to be paid

15   after closing?

16      A.    No, I certainly don't.

17      Q.    Was it your idea?

18      A.    No, it wasn't my idea.

19      Q.    And the payments to K&E, how were they

20   connected to you getting money back after closing,

21   to your understanding?

22      A.    The title company would cut a check to K&E

23   Construction.  And then that money would be turned

24   around into a cashier's check to be given to me.

25      Q.    Who turned it around?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 57

```
 1      A.    Mr. Powers.

 2      Q.    In looking at the dates of closing on

 3   these three properties, they were close in time,

 4   weren't they?

 5      A.    Very close.

 6      Q.    Why did you close on them close in time?

 7      A.    It was my understanding that they needed

 8   to be closed very close in time so that --

 9            MR. TALLON:  Object to what her

10   understanding was.

11            THE COURT:  Sustained.  Could you develop

12   that?

13            MS. HIGGINS:  Yes, Your Honor.  I'm sorry.

14      Q.   (By Ms. Higgins)  First of all, why three

15   properties?  Why did you buy three at once?  Whose

16   idea was that?

17      A.    Mr. Powers'.

18      Q.    Why?

19      A.    We needed to have three properties, in

20   anticipation of selling them at a later date, so we

21   had comparable values on properties in the area that

22   we could submit or the appraiser could submit for

23   any future sale.

24      Q.    Okay.  And so each of these three

25   properties, the purchase price shown on the purchase
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1   agreements and the total amount of the loans was how

2   much again for --

3        A.    490,000.

4        Q.    For each of them?

5        A.    Yes.

6        Q.    And so say that again.  By buying them for

7   that much and buying three at once, how was that

8   going to affect things in the future?

9        A.    When you're attempting to establish the

10  price of a house, they look at surrounding areas or

11  surrounding properties in the area for what they

12  have sold for, so they have a comparative value and

13  can say that the loan is a reasonable amount.

14            And so in anticipation of when we were

15  selling these houses, we would have established that

16  price as being a reasonable comparative value.

17       Q.    So in essence, you and Mr. Powers, in

18  these transactions, were setting these three houses

19  as comps for others?

20            MR. TALLON:  Objection.  Beyond this

21  witness' expertise.

22            THE COURT:  Overruled on that basis.

23       Q.    (By Ms. Higgins)  In understanding what

24  Mr. Powers was telling you, were you understanding

25  him to say that you were setting comps for other

3783008a-8798-417a-ac0e-724123da26d0

Page 59

1    houses in Oakland Estates as well?

2            MR. TALLON:  Objection to the form of the

3    question.  Object because it's compound, and object

4    because it lacks foundation.

5            THE COURT:  It's leading.  Sustained.

6        Q.   (By Ms. Higgins)  Okay.  So we've talked

7    about why you got three properties.  Now, why did

8    you close on them so close in time?

9        A.    So that each of the loan companies

10   wouldn't know about the prior loans or the other

11   loans that were being gotten.

12       Q.    And you had three different lenders; did

13   you not?

14       A.    That's right.

15       Q.    How would a lender find out whether you

16   had bought other houses?  Where does that

17   information show up?

18       A.    In the credit report that they would pull.

19       Q.    Okay.  But by doing it within this short

20   time frame, there wasn't enough time for that

21   information to get into the credit report?

22       A.    That's right.

23       Q.    On any of these three transactions, did

24   you put any of your own money down?  Were these all

25   100 percent financing?

Page 60

1      A.    They were 100 percent financing.

2      Q.    And you received three amounts of money

3  within a short period of time.  I believe you said

4  85,000, 75,000 and 80,000.  If my math is correct, I

5  believe that's $240,000.

6            What did you do with those funds?

7      A.    Each of these checks was then taken to the

8  credit union and deposited and set up an account for

9  each one of the properties.

10     Q.    All right.  And did you make mortgage

11  payments with those as well?

12     A.    Yes, I did.

13     Q.    Did you do anything else with that money?

14     A.    Yes, I did.

15     Q.    Tell us.

16     A.    Well, the first thing I did was pay back

17  my dad.

18     Q.    Can you explain that, please?

19     A.    In order to have money to bring to

20  closing, just for the closing costs, I needed to

21  have some money.  And so I borrowed money from my

22  father.  I borrowed $30,000 from my father.

23     Q.    Okay.  Did you put that money in your bank

24  account?

25     A.    Yes, I did.

Page 61

1      Q.    So that if any of the lenders asked for

2    verification of money you had in your bank accounts,

3    would that have shown?

4      A.    Yes.

5      Q.    Do you recall writing any kind of a letter

6    to be shown to a lender, if necessary, about that

7    30,000 deposit into your bank account?

8      A.    I did not write a letter, no.

9      Q.    Okay.  Do you recall seeing any letter

10   having to do with that?

11     A.    Yes, I do.

12     Q.    Did you sign that letter?

13     A.    I did not.

14     Q.    What was the gist of that letter?

15     A.    I believe the letter you're talking about

16   is a letter that was obtained from my father, saying

17   that he had given me this money as a gift.

18     Q.    Was it a gift?

19     A.    No, it was a loan.

20     Q.    So did your father write that letter?

21     A.    I can't answer that question.

22     Q.    But there was such a letter?

23     A.    That's right.

24     Q.    And that would have been available to

25   lenders if they questioned that deposit into your

3783008a-8798-417a-ac0e-724123da26d0

Page 62

1    bank account?

2        A.    Apparently.

3        Q.    But it was not a gift?

4        A.    No, it was not a gift.

5        Q.    And you knew when you received it that it

6    was not a gift?

7        A.    No.

8        Q.    And when you received the cash back funds,

9    you repaid your father?

10       A.    Yes, I did.

11       Q.    What else did you do with that money?

12       A.    I bought window coverings for the houses.

13       Q.    The approximately 5,000 you spent on each

14   of the houses?

15       A.    And put in garage door openers, because

16   they didn't have them, and had landscaping done to

17   the backyards.

18       Q.    Did you make any loans to anyone?

19       A.    I did.

20       Q.    To whom?

21       A.    I loaned Shaunna Ramply some money.

22       Q.    How much, if you remember?

23       A.    I don't remember off the top of my head.

24   I'm sure it's in here.  But I don't remember exactly

25   how much I loaned her, to be truthful.

3783008a-8798-417a-ac0e-724123da26d0

Page 63

1    Q.    And when you say "here," you mean probably

2    in your bank documents?

3    A.    Yes.

4    Q.    Did she repay the money?

5    A.    Yes.

6    Q.    And did she repay it quickly?

7    A.    Yes, she did.

8    Q.    Did you buy any other real estate using

9    any of that money?

10   A.    Yes, I did.

11   Q.    What did you buy?

12   A.    I bought a condo and I bought another

13   house.

14   Q.    Did that leave any money to make mortgage

15   payments on these three places?

16   A.    Yes, it did.

17   Q.    What was your plan, in terms of how long

18   you were going to hold on to these three properties?

19   A.    Originally, I was to hold on to them for a

20   year or less.

21   Q.    In that period of time, were you planning

22   on renting these houses out?

23   A.    Initially, no.

24   Q.    Did there come a time when you decided to

25   try to rent them out?

Page 64

```
 1       A.    Yes.

 2       Q.    Were you able to?

 3       A.    Yes.

 4       Q.    And so there was some rental income?

 5       A.    Yes.

 6       Q.    For all three houses?

 7       A.    Yes.

 8       Q.    How much were you renting them for?

 9       A.    I believe the amount was $1,650 a month.

10       Q.    Sitting here today, would you be able to

11  average for each house how much rental income you

12  derived from each house?

13       A.    When you say "average" --

14       Q.    Did you have any expenses that you needed

15  to meet out of the rental income?

16       A.    Well, I had to pay the mortgage,

17  certainly, the utilities.  I had to pay for the

18  trash, you know, the City water/trash collection.

19       Q.    So you had some expenses.  Do you recall

20  what the mortgage payments on those houses were?

21       A.    Not immediately off the top of my head,

22  because they were all a little different.  But they

23  were like $4,000, roughly, a month.

24       Q.    For each?

25       A.    For each.
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 65

1      Q.    And did any rental income you got cover

2  the mortgage payments?

3      A.    No.  It paid for a little bit of them.

4      Q.    Were you able to sell the houses within a

5  year?

6      A.    No, I was not.

7      Q.    Now, you bought in March of 2006.  Did

8  there come a time when you stopped making mortgage

9  payments?

10     A.    That's right, there was.  November of '07.

11     Q.    November of '07?

12           At the time you were making mortgage

13  payments on these houses, were you also making

14  mortgage payments on your primary residence which

15  was at Racheleigh?

16     A.    Yes, I was.

17     Q.    And I think you've now told us that you

18  bought some other real estate as a result of getting

19  some of this money back.  Were you having to make

20  payments on -- is that one or more property?

21     A.    More than one property.

22     Q.    More than one.  Were you having to make

23  payments on those properties as well?

24     A.    Yes.

25     Q.    Were those properties rented out?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 66

1       A.    No.

2       Q.    What finally happened to the three Oakland

3   Estates houses?

4       A.    They went into foreclosure.

5       Q.    Did you ever ask Mr. Powers about this

6   money back at closing, whether it was legal or not?

7       A.    Yes.

8       Q.    What was his response?

9       A.    That it was legal, that he had had it

10   cleared through his attorneys.

11      Q.    Okay.  Did Mr. Powers ever ask you to use

12   any of the funds you got back at closing to make

13   loans to others?

14      A.    At one point, yes.

15      Q.    Was this another customer of his?

16      A.    Yes.

17      Q.    Did you do so?

18      A.    No.

19      Q.    Did you ever see any K&E invoices, K&E

20   Construction Company invoices?

21      A.    No.

22      Q.    Now at some point after all of this -- and

23   by "all of this," I mean after you bought the

24   houses, after you stopped making mortgage payments,

25   were you approached by FBI agents?

3783008a-8798-417a-ac0e-724123da26d0

Page 67

```
 1        A.    No, I never was.

 2        Q.    There were no phone calls?

 3        A.    I don't recall any phone calls to me, no.

 4        Q.    Were you ever asked to talk with the FBI

 5   or with the United States Attorney's office?

 6        A.    Yes, I was.

 7        Q.    And do you have any idea when that might

 8   have been?  Some time after what we'ave been talking

 9   about?

10        A.    Yes, it was after we what were talking

11   about.

12        Q.    All right.  And did you meet with the US

13   Attorney's Office?

14        A.    Yes, I did.

15        Q.    Did you bring an attorney?

16        A.    Yes, I did.

17        Q.    Okay.  And at that point, was there also

18   an FBI agent or agents present?

19        A.    Yes.

20        Q.    And did they ask you questions, and did

21   you tell them about these transactions?

22        A.    Yes, I did.

23        Q.    And did you thereafter -- and this could

24   be some months, perhaps a year later -- did you sign

25   an agreement with the US Attorney's Office?
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 68

1      A.    Yes, I did.

2      Q.    And what was your understanding of that

3   agreement?

4      A.    That I would agree to testify and provide

5   evidence.  And in exchange, I would be offered

6   immunity for what I provided as far as testimony was

7   concerned.

8      Q.    All right.  And was there any kind of a

9   qualification put on your cooperation?  That is to

10  say, were you asked to talk truthfully?

11     A.    Absolutely, yes.  I thought that was a

12  given.

13     Q.    Okay.  At the time you were doing these

14  transactions, did you think you were doing anything

15  wrong?

16     A.    Not at the time, no.

17     Q.    Why did you think you were not?

18     A.    It was represented to me that these were

19  all legal things to do.

20     Q.    That you could buy three residences within

21  a couple of weeks and call each of them a primary

22  residence?

23     A.    Yes.

24     Q.    And that you could buy all three with

25  false income information?

3783008a-8798-417a-ac0e-724123da26d0

Page 69

1    A.    Yes.

2    Q.    Who told you that?

3    A.    Mr. Powers.

4    Q.    Did you have anyone else advising you on

5    these deals?

6    A.    No.

7    Q.    Did you think, at the time, that

8    Mr. Powers had your best interest at heart?

9    A.    At the time I did, yes.

10   Q.    And did you trust him to represent your

11   best interest and to provide you the benefit of his

12   expertise and experience?

13   A.    Yes, I did.

14   Q.    As both a real estate agent and a mortgage

15   broker?

16   A.    Yes, both.

17   Q.    In retrospect, do you think he had your

18   best interest at heart?

19   A.    I'd have to think about it at this point.

20         MS. HIGGINS:  Your Honor, may I have a

21   moment, please?

22         THE COURT:  Sure.

23         MS. HIGGINS:  That's all the questions I

24   have at this time.

25         THE COURT:  All right, thank you.

1           This is going to be a 20-minute break.

2   Usually, we take 15, but there's another matter that

3   needs to be covered.

4           Do not discuss the case among yourselves.

5   If anyone should try to talk to you about the case,

6   advise me.  And do not read, watch or listen to any

7   radio or television which reports on the trial.

8   Don't do any research on your own.  Keep an open

9   mind until all the evidence has been received and

10  you've heard all the evidence.

11          This Court is recess for 20 minutes.

12          (Court in recess from 9:57 to 10:21.)

13          (Whereupon the jury entered the

14  courtroom.)

15          THE COURT:  Please be seated.

16          MR. TALLON:  Your Honor, could we approach

17  briefly?

18          THE COURT:  Yes, sir.

19          (At the bench:)

20          MR. TALLON:  Your Honor, it's 10:22.  I

21  did not know what allowance or what restrictions, if

22  any, you were going to place on my

23  cross-examination.  I have two requests for you,

24  Your Honor.

25          I would like to ask if you would give me a

1    break at some point during my cross-examination so I

2    have an opportunity to regroup, be organized about

3    my exhibits, consult with my client and move on.

4              This is a very important cooperating

5    witness.  She is involved in three transactions I

6    think the heart of the government's case is that

7    this woman was engaged in three  transactions in

8    about a week.  There's an awful lot of information

9    on my table, and there's a awful lot of new

10   information which arrived to me today.

11             I think I really do need a break to be

12   effective.  And in that regard, I don't know what

13   Your Honor would consider reasonable, but it would

14   certainly be helpful for me to have some time after

15   the lunch hour to conclude my cross-examination.

16             THE COURT:  Okay.  Well, at this time I

17   was thinking if you could make a good showing after

18   lunch that you need some more time, I will certainly

19   consider it.

20             MR. TALLON:  All right.

21             THE COURT:  Okay.

22             MR. TALLON:  Thank you.

23             (In open court:)

24

25

Page 72

```
 1                    CROSS-EXAMINATION

 2   BY MR. TALLON:

 3        Q.    Good morning, Ms. Prouty.  My name is Dan

 4   Tallon, and I'm assigned to represent Kevin Powers.

 5   We have met once before; isn't that correct?

 6        A.    That's correct.

 7        Q.    And you're represented by Mr. Freedman,

 8   David Freedman?

 9        A.    I have been, yes.

10        Q.    And Ms. Shaunna Ramply, a friend of yours,

11   is also rented by Mr. Freedman?

12        A.    Shaunna is represented by Ms. Freedman.

13        Q.    Would you describe her as a friend?

14        A.    Not necessarily.

15        Q.    Is she a business partner of your

16   boyfriend, Gene Barnett?

17        A.    Yes.

18        Q.    She has been?

19        A.    Yes.

20        Q.    Is she currently?

21        A.    No, I don't think so.

22        Q.    You don't think so?

23        A.    I think that Strongbow has been dissolved,

24   but I'm not sure.

25        Q.    All right.  Well, as a legal entity,
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 73

1    Strongbow may have been dissolved.  I don't know.

2    But regardless of whether it was dissolved, was she

3    a in a business relationship with Gene Barnett?

4        A.    At this time, no.

5        Q.    Now, are you aware from any source that

6    Ms. Ramply testified in this case a couple days ago?

7        A.    I imagine she has, yes.

8        Q.    When you say "imagine," why do you imagine

9    that?

10       A.    She bought properties before me.  And I

11   would assume in these proceedings things go in a

12   time-wise fashion.

13       Q.    Why would you assume she's already

14   testified?

15       A.    I don't know.  I'm just assuming that.

16       Q.    Is it possible she would be testifying

17   next week?  What's the source of your information?

18       A.    There is no information.

19       Q.    Did you talk with Shaunna Ramply about

20   your testimony or about her testimony in this case?

21       A.    No.

22       Q.    Did you talk with Gene Barnett about

23   Shaunna Ramply's testimony in this case?

24       A.    No.

25       Q.    Did you talk with Gene Barnett about this

3783008a-8798-417a-ac0e-724123da26d0

Page 74

1    case at all?

2        A.    It's come up in conversation over the

3    years, yes.

4        Q.    Now when you say "over the years," would

5    it be accurate to say that you have lived with

6    Mr. Barnett -- and I'm casting no aspersions --

7    lived with Mr. Barnett since about May of 2005?

8        A.    Roughly.

9        Q.    Roughly?  And when you say it's come up in

10   conversation with Mr. Barnett over the years, what

11   is the it's that's come up in conversation with

12   Mr. Barnett?

13       A.    These proceedings.

14       Q.    Could you be a little more specific?  In

15   other words, tell me more about what'as come up in

16   conversation over the years with Gene Barnett in

17   these proceedings.  I'd like to know more about what

18   you mean when you say "these proceedings."

19       A.    Well --

20            MS. HIGGINS:  Your Honor, objection if

21   it's going to elicit hearsay.

22            THE COURT:  You are not permitted to say

23   what Mr. Barnett told you.  But the question goes to

24   generally the subject matter.  And as to that, you

25   could speak to that.

Page 75

1          Overruled as to hearsay at this time.

2     Q.   (By Mr. Tallon)  What have you discussed?

3     Maybe you could take it in terms of subject areas.

4     A.    In general conversation, obviously this is

5     something very stressful for both of us with the

6     conversations going towards -- I guess I don't

7     understand your question well enough to really

8     answer directly to you.

9     Q.    All right.  Gene Barnett is a licensed

10    real estate agent?

11    A.    Yes, he is.

12    Q.    Gene Barnett has been licensed as a real

13    estate agent since December of 2005; is that

14    correct?

15    A.    I'd have to look at the records.  But it's

16    something like that, yes.

17    Q.    Gene Barnett is a good friend of Tim

18    Lesley, a real estate investor?

19    A.    They're friends, yes.

20    Q.    Gene Barnett engaged in something called a

21    Mastermind Group, which is an investing group, a

22    real estate investing group, as I understand it, in

23    which Tim Lesley was a member?

24    A.    That's the first time I've heard of

25    Mastermind.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 76

1      Q.    You never heard of the Mastermind Group?

2      A.    No, I haven't.

3      Q.    Mr. Barnett would go out at night and come

4   back and tell you that he went to a meeting of the

5   Mastermind Group?

6      A.    No.

7      Q.    In your general conversations with Gene

8   Barnett, have you ever discussed mortgage lending?

9      A.    Yes.

10      Q.    Have you discussed real estate investing?

11      A.    Somewhat, yes.

12      Q.    Have you discussed signing notes for

13   mortgage loans?

14      A.    Signing notes for mortgage loans?

15      Q.    Yes.

16      A.    No.

17      Q.    Have you discussed with Mr. Barnett

18   purchase agreements?

19      A.    No.

20      Q.    Have you discussed --

21      A.    Well, purchase agreements, that's sort of

22   a broad term.  Yes.

23      Q.    Real estate purchase agreements?

24      A.    Yes.

25      Q.    Have you discussed with Mr. Barnett owner

3783008a-8798-417a-ac0e-724123da26d0

Page 77

1    occupancy affidavits?

2        A.    No.

3        Q.    Have you ever sought Mr. Barnett's advice

4    as to the significance of owner -- excuse me,

5    occupancy affidavits, if I could use that phrase?

6        A.    His advice?  No.

7        Q.    You never sought his advice?

8        A.    No.

9        Q.    Either before or after he became a real

10   estate agent?

11           MS. HIGGINS:  Your Honor, it's not exactly

12   an objection.  But Mr. Tallon was asking about

13   advice with respect to occupancy affidavits.  He may

14   have broadened it now.  I'm not sure --

15           THE COURT:  He may have what?

16           MS. HIGGINS:  Broadened it to other areas.

17           THE COURT:  Okay.  As I understand the

18   last question, it pertains to anything, not only

19   owner occupancy matters or any kind of real estate

20   advice whatsoever.  Am I incorrect about that?

21           MR. TALLON:  I was being specific in this

22   question as to owner occupancy affidavits.

23           THE COURT:  All right.

24           MR. TALLON:  So I'll rephrase it and make

25   it as clear as I can.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 78

1              THE WITNESS:  Thank you.

2         Q.   (By Mr. Tallon)  Have you ever, in your

3    general conversations with Gene Barnett, ever sought

4    his advice as to owner occupancy affidavits, either

5    before or after he became a licensed real estate

6    agent?

7         A.   I never sought his advice on those things,

8    no.

9         Q.   Did you ever discuss with Gene Barnett

10   your intention with respect to occupying houses as

11   primary residences?

12        A.   Yes.

13        Q.   When?

14        A.   In March of '06.

15        Q.   And did you discuss that with him before

16   you made the decision to purchase any of these three

17   houses that you're discussing today?

18        A.   I can tell you that I told him, "I have no

19   intention of living in these houses."  It wasn't to

20   seek his advice.  But I told him what I was going to

21   do, and that was not live in these houses.

22        Q.   You told Gene you had no intention of

23   living in these houses?

24        A.   That's right.

25        Q.   Did you ever discuss stated income loans

3783008a-8798-417a-ac0e-724123da26d0

1   with Gene Barnett?

2       A.    I think we've had general discussions

3   about that, yes.

4       Q.    How general?

5       A.    This was a long time ago.  This was in

6   '06.  So we talked about them generally, and it was

7   a long time ago.

8       Q.    But not too long that you couldn't

9   remember the conversation, is it?

10      A.    I don't remember specific conversations.

11      Q.    Did you discuss renovations with Mr. Gene

12  Barnett?

13      A.    Uh-huh.  Yes, I did.

14      Q.    And it's your testimony that you know

15  nothing about K&E Construction, and you have never

16  seen a K&E invoice?

17      A.    I have not seen a K&E invoice.

18      Q.    But it is your testimony that you received

19  three checks for renovations for three houses,

20  totaling $240,000?

21      A.    I received those cashier's checks, yes.

22      Q.    Now, before you testified here today, did

23  you have any conversations with Tim Lesley?

24      A.    I've talked to Tim a few times over the

25  years.

3783008a-8798-417a-ac0e-724123da26d0

Page 80

1     Q.    Before you testified here today, did you

2   have any conversations with Tim Lesley about these

3   proceedings?

4     A.    No.

5     Q.    When was the last time you spoke with Tim

6   Lesley?

7     A.    A long time ago.

8     Q.    How long?

9     A.    I don't recall exactly, but a long time

10   ago.  Months, months, maybe a year.

11     Q.    Help me out.  How many months?

12     A.    I don't know, I really don't.

13     Q.    Did you talk with Tim Lesley before or

14   after you talked to me in October of 2010?

15     A.    I've not talked to Tim after that.

16     Q.    Did you talk to your father, Dean Perry,

17   about these proceedings?

18     A.    No.

19     Q.    You've never talked to your father about

20   your contacts with the FBI or anything in connection

21   with this case?

22     A.    I had one conversation with him, and it

23   bothered him.  And so I've made a very distinct

24   effort not bother him with that.  It's disturbing

25   for a parent.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 81

```
1      Q.    Your father lives in Santa Fe?

2      A.    No.

3      Q.    Where does he live now?

4      A.    In Albuquerque.

5      Q.    He did live in Santa Fe?

6      A.    Yes, he did.

7      Q.    And was he a real estate investor?

8      A.    No.

9      Q.    And he loaned, but did not give, you

10   $30,000?

11     A.    That's right.

12     Q.    And you told Ms. Higgins that you couldn't

13   or wouldn't answer the question as to whether or not

14   your father wrote the letter you were referring to

15   in your testimony?

16     A.    What is it you're asking, exactly?

17     Q.    Do you remember the letter that you say

18   that you didn't write --

19     A.    Right.

20     Q.    -- and you didn't see and you didn't sign?

21   Do you remember that letter?

22     A.    I did not --

23     Q.    Do you remember that letter?

24     A.    Yes, I do.

25     Q.    Okay.  The next question was, did Dean
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 82

1    Perry write that letter?

2        A.    I don't know.

3        Q.    Is it possible that Dean Perry wrote that

4    letter?

5        A.    It's highly improbable that he would ever

6    have written that letter.

7        Q.    I asked is it possible that Dean Perry

8    wrote that letter.  Is Dean Perry the person who

9    gave you the $30,000?

10       A.    Yes.

11       Q.    Now, how did you come to select

12   Mr. Freedman as your attorney?

13            MS. HIGGINS:  Objection, Your Honor.

14   Relevance.

15            MR. TALLON:  I have two cooperating

16   witnesses that are both represented by Mr. Freedman

17   as their attorney.

18            THE COURT:  Well, we're getting into very

19   priveleged areas in terms of attorney/client

20   privilege.

21            MR. TALLON:  I'm just asking about

22   selection, Your Honor.

23            THE COURT:  All right, I'll allow it.

24            And the question was, "How was it that you

25   selected Mr. Freedman as your counsel," as I recall.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 83

```
 1              MR. TALLON:  Yes.
 2              THE COURT:  All right.
 3      A.    He was referred to me.
 4      Q.   (By Mr. Tallon)  And who referred you to
 5 Mr. Freedman?
 6      A.    A fellow by the name of Dave Stevens.
 7      Q.    Is he a real estate investor?
 8      A.    No, not that I know of.
 9      Q.    Did Dave Stevens also refer Shaunna Ramply
10 to Mr. Freedman?
11      A.    I don't know how Shaunna came to be
12 represented by Freedman.  I assume it was because I
13 was.
14      Q.    And you were represented by Mr. Freedman
15 before you first spoke with the FBI?
16      A.    That's right.
17      Q.    And before you spoke to the FBI, did
18 Mr. Freedman and yourself prepare for that event,
19 that interview?
20      A.    Yes.
21      Q.    And how many times did you meet with
22 Mr. Freedman before that occurred?
23      A.    I think I met with him twice before that
24 interview.
25      Q.    And when did that first interview occur?
```

3783008a-8798-417a-ac0e-724123da26d0

Page 84

1       A.    I don't recall the exact date.  It was --

2  time is going by -- in '09, I guess, but I don't

3  remember the exact date.

4       Q.    And how many times have you met with the

5  FBI in connection with your preparation for this

6  case?

7       A.    I think it's been three times.

8       Q.    Okay.  When was the last meeting?

9       A.    I think in December, December of this last

10  year.

11       Q.    Okay.  Remember, the answers are only in

12  your head.  They're not over at that table.  Do you

13  understand that?

14       A.    I know.  I was just wondering if there was

15  a piece of paper that I could refer to with dates.

16       Q.    Now, in addition to the three properties

17  you've been discussing here today, you bought a

18  condo and you bought another residence?

19       A.    That's right.

20       Q.    And the condo is located on what street?

21       A.    Vista del Rey.

22       Q.    And the residence?

23       A.    On Sprenger.

24       Q.    That's S-P-R-E-N-G-E-R?

25       A.    That's right.

3783008a-8798-417a-ac0e-724123da26d0

Page 85

```
 1      Q.    Sprenger, Northeast?

 2      A.    That's right.

 3      Q.    Did you buy any other properties besides

 4   those two?

 5      A.    No.

 6      Q.    You mentioned a place called Racheleigh?

 7      A.    Yes.

 8      Q.    That's that was your residence in December

 9   of 2005?

10      A.    That's right.

11      Q.    Okay.  And do you still own those three

12   properties?

13      A.    No, I don't own the Vista del Rey property

14   any longer.

15      Q.    When was that sold?

16      A.    I think it was October -- sorry.  This is

17   all very intimidating.  I had these things in my

18   head, and I can't remember them now.  It was sold, I

19   think, in October of '09.

20      Q.    Okay.  Was that before or after you filed

21   for bankruptcy?

22      A.    After.

23      Q.    And would it be accurate that you filed

24   for bankruptcy about October of '08?

25      A.    November of '08.
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1    Q.    So you held Vista del Rey for about a year

2    after you filed for bankruptcy?

3    A.    We were trying to sell it and held it,

4    yes.

5    Q.    You held it.  But you did bankrupt out of

6    the debts that you incurred for the three properties

7    that you're talking about today?

8    A.    That's right.

9    Q.    You made a decision to bankrupt out of

10   these three properties, but to hang on to three

11   other properties; isn't that correct?

12   A.    Yes.

13   Q.    And that was a considered decision on your

14   part, wasn't it?

15   A.    My goal was to try to hold on to the

16   Sprenger property and Racheleigh property, yes.  I

17   wasn't going to make any money off of the Vista del

18   Rey property, so I didn't care one way or the other

19   there.

20   Q.    Okay.  But my question to you is you --

21   and how old are you?

22   A.    Fifty-five.

23   Q.    -- Joan Prouty, 55 years old, when you

24   filed for bankruptcy, you made a decision, an

25   election, to keep three properties and the debts

3783008a-8798-417a-ac0e-724123da26d0

1    that went along with them, the condo, Sprenger and

2    Racheleigh; and to basically escape responsibility

3    for the debt that you incurred on three other

4    properties?  You made that decision, right?

5         MS. HIGGINS:  Your Honor, objection.  I

6    think this might be calling for a legal conclusion.

7    I don't know what the bankruptcy pleadings say, and

8    so I'm not quite sure why decisions were made in the

9    bankruptcy.

10         MR. TALLON:  Well, Your Honor --

11         THE COURT:  Overruled.

12    A.    Well, I didn't have control.  Certainly my

13    goal was to hang on to these properties, but the

14    master or judge or whatever they call that in

15    bankruptcy is the one who decides.

16    Q.   (By Mr. Tallon)  Well, you didn't have any

17    input in that decision?

18    A.    Not in the final decision, certainly.

19    That's decided by the judge.

20    Q.    But you said your goal was to hang on to

21    those three properties?  You didn't say it was the

22    bankruptcy trustee's goal.  You said it was your

23    goal?

24    A.    Sure.

25    Q.    Okay.  So your goal was to hang on to the

Page 88

1   condo, Sprenger and Racheleigh; isn't that correct?

2       A.    Sure.

3       Q.    And you made a considered decision,

4   evaluating your circumstances.  And as a 55 year old

5   physician's assistant, you decided, I'm going to

6   ditch these three, and I'm going to keep these

7   three, correct?

8       A.    Well, I wouldn't know that "ditch" would

9   be right word.  I could no longer pay for them.

10  They were in foreclosure.  They were out of my

11  control.

12      Q.    Those three properties that you ditched --

13  let me just use what I like -- the three that you

14  ditched were earning rental income; isn't that

15  right?

16      A.    At that time, I don't know that they were.

17      Q.    Between 2006 and 2008, if that's when you

18  filed the bankruptcy, I think November of 2008, the

19  three properties that you ditched were earning

20  rental income; isn't that correct?

21      A.    During that time, but not after that.

22      Q.    Not after the bankruptcy?

23      A.    Right.

24      Q.    Yes.  Because you didn't own them anymore,

25  correct?

Page 89

1      A.      Right.   They were in foreclosure.

2      Q.      But listen to my question.   Between 2006,

3   March 2006, and November 2008, the three properties

4   that you ditched were earning rental income; isn't

5   that correct?

6      A.      During that time frame before, yes.

7      Q.      How many thousand dollars?

8      A.      Each one of them, when they were rented,

9   were receiving $1,650 a month.

10      Q.      Okay.   How much rental income did you

11   receive from 6600 during that three-year period?

12      A.      I don't know the exact amount.   But each

13   month, until they went into foreclosure, I

14   received -- not from March, but from later in the

15   year, when they were rented, $1,650 a month.

16      Q.      Did you at any time have all three rented?

17      A.      There were periods of time when all three

18   were rented, yes.

19      Q.      And they were all rented for how much?

20      A.      $1,650.   A month.

21      Q.      So from March of 2006 until you defaulted

22   in -- excuse me, you were discharged in bankruptcy

23   in November of 2008, you were actively renting or

24   attempting to rent all of those three properties?

25      A.      That's right.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    Q.    And do you have the numbers for the rental

2  income you received from those three properties

3  during that two-and-a-half-year period?

4    A.    Not on me, no.

5    Q.    Who was the property manager for those

6  three properties?

7    A.    Initially I sought help from Jesse

8  Barnett.  And then when he no longer wanted to do

9  that, I took that back over.

10   Q.    So Jesse Barnett was your property

11  manager?

12   A.    For a period of time, yes.

13   Q.    How long?

14   A.    It was a matter of a few months.

15   Q.    What year was that?

16   A.    That would have been '06.

17   Q.    And then after Jesse Barnett -- is this

18  the same Jesse Barnett that worked for Worldwide

19  Mortgage?

20   A.    Yes.

21   Q.    The same Jesse Barnett who was a loan

22  officer for Worldwide Mortgage?

23   A.    I don't know what his title was.

24   Q.    And after Jesse Barnett -- is he Gene

25  Barnett's nephew that?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 91

1      A.     That's right.

2      Q.     And after Jesse Barnett no longer wanted

3   to be property manager for the three properties you

4   ditched, who took over?

5      A.     I did.

6      Q.     In your busy life as a physician's

7   assistant, were you able to keep up with managing

8   those three rental properties?

9      A.     Gene helped me.

10     Q.     How much did Gene help you?

11     A.     As much as I needed help with.

12     Q.     So Gene, the real estate agent, helped you

13   be the property manager for the three ditched

14   properties starting maybe in about 2007 and

15   extending until the time they went into bankruptcy;

16   isn't that correct?

17     A.     He helped me with lots of different

18   things, yes.

19     Q.     With lots of different things.  Did you

20   help him with anything?

21     A.     I would like to think that in a supportive

22   relationship, yes, I would help him.

23     Q.     Now, who performed the maintenance on the

24   six properties you owned during the time you owned

25   all six?

3783008a-8798-417a-ac0e-724123da26d0

Page 92

1       A.    I did some, Gene helped me with some,

2    Kathy helped.  We all made an effort.

3       Q.    So maintenance was performed by you, Gene,

4    Kathy.  Who else?

5       A.    My dad's wife helped me paint at one

6    point.

7       Q.    What's her name?

8       A.    Peggy.

9       Q.    Peggy Perry?

10      A.    Yes.

11      Q.    Who else helped?

12      A.    That's all I can think of off the top of

13   my head right now.

14      Q.    What about Carl Barnett?

15      A.    Probably Carl did help, because he

16   painted.  That's true, he helped paint.

17      Q.    It's also true that Carl owned a company

18   called All Real Estate Maintenance, true?

19      A.    I guess, yeah.  I don't recall the name of

20   his company.  But if you say so, yes.

21      Q.    Okay, you're guessing at the name.  But

22   what you're not guessing at is that Carl Barnett did

23   in fact own and operate a real estate maintenance

24   company, yes?

25      A.    Okay, yes.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 93

1       Q.      Don't say okay.  Is that true?

2       A.      Yes.

3       Q.      And how much work did his company do in

4   connection with the maintenance of these properties?

5       A.      I think he helped paint at one point and

6   clean up after people moved in or moved out.  And he

7   helped with some painting and repair work at

8   Vista del Rey.

9       Q.      Okay.  So painting, cleanup, repair work

10   at Vista del Rey.  Who did the landscaping that you

11   talked about doing?

12      A.      Some guy.  I think it was called Busy Bee

13   Landscape or Busy Bee something or other.  I don't

14   remember the guy's name.

15      Q.      And you just didn't put a lot of

16   landscaping into those properties, did you?

17      A.      No, I did not.

18      Q.      That was your decision, wasn't it?

19      A.      That's right.

20      Q.      You decided not to have a water feature,

21   right?

22      A.      I don't know that I ever thought about a

23   water feature.

24      Q.      But you're the one who decided how much

25   money or how much of your money you wanted to spend

Page 94

1    on landscaping; is that right?

2        A.    That's right.

3        Q.    You're the one who went to the store and

4    picked out the drapes, window coverings, if you want

5    to call them that, right?

6        A.    Right.

7        Q.    Who picked out the garage door opener?

8        A.    I did.

9        Q.    Now, you mentioned Vista del Rey.  That's

10   a property you owned with Kathy?

11       A.    Right.

12       Q.    Okay.  Do you know what a locum or locums

13   is?

14       A.    In the medical profession, yes.

15       Q.    And what is that?

16       A.    A locums tenen is like a substitute

17   doctor.

18       Q.    Did you say a locums tennant?

19       A.    T-E-N-E-N, tenen.

20       Q.    Okay, T-E-N-E-N.  Locums tenen; is that

21   right?

22       A.    That's right.

23       Q.    So that's Latin, correct?

24       A.    I guess, yes.

25       Q.    And it's a substitute doctor, usually

1    somebody who travels from city to city does ER work

2    could fill in anywhere really, right?

3         A.    Depending upon their specialty, yes.

4         Q.    Depending upon their specialty.  In fact,

5    that phenomenon is throughout the medical industry?

6    Nurses do it, MRI techs do it, X-ray techs do it,

7    right?

8         A.    Yes.

9         Q.    I could probably name any occupation in

10   the medical field, A.nd in that occupation, you will

11   find locums tenen, people who are travelers, yes?

12        A.    That's probably true, yes.

13        Q.    And Kathy Winston was a friend of yours?

14        A.    Yes.

15        Q.    And Kathy Winston was a partner in the

16   Vista del Rey property?

17        A.    Yes.

18        Q.    And Kathy Winston is a doctor?

19        A.    She's a doctor, yes.

20        Q.    And a co-investor with you on Vista del

21   Rey, correct?

22        A.    That's right.

23        Q.    Now we were talking a moment ago about how

24   you might have helped Gene.  Gene Barnett was

25   discharged in bankruptcy about 2003 or '5?

3783008a-8798-417a-ac0e-724123da26d0

```
 1      A.    It was before I met him.  I don't know
 2   when exactly.
 3      Q.    But before May of 2005, yes?
 4      A.    Yes.
 5            MS. HIGGINS:  Your Honor, I'm going to
 6   object to the relevance of this line of questioning.
 7            MR. TALLON:  The relevance will become
 8   apparent.
 9            THE COURT:  Overruled temporarily.
10      Q.   (By Mr. Tallon)  Did Mr. Barnett have a
11   sufficiently good credit history and credit score so
12   that he could take out mortgage loans on his own?
13      A.    I don't know Gene's scores.
14      Q.    Were you aware in 2005 that Mr. Barnett
15   had filed for bankruptcy?
16      A.    He told me he had.
17      Q.    Without knowing his scores, did you know,
18   in the course of general discussions from time to
19   time that took place at the Racheleigh house, did
20   you know that his credit was poor?
21      A.    I had to assume that.  I did not know
22   that, but I assumed that.
23      Q.    So you simply assumed, but did not confirm
24   with Gene that his credit was poor?
25      A.    No, I didn't confirm with Gene that his
```

1    credit was poor.

2        Q.    All right.  Now, I think you told me once,

3    maybe it was in October, that you did this, made

4    these investing decisions that you made to attempt

5    to assure your financial future?

6        A.    My goal was to try to get a good

7    retirement package put together.

8        Q.    To retire early, yes?

9        A.    Not necessarily, early, no.

10       Q.    But have a nice package?

11       A.    Right.

12       Q.    And in 2005, when Gene was studying to be

13   a real estate agent and your relationship was

14   flourshing, were you and Gene ever -- did you and

15   Gene ever talk about investing in real estate so you

16   could put together a nice retirement package?

17       A.    So that I could, yes.

18       Q.    And is it your intention, as you sit here

19   today, to live -- or excuse me to continue your

20   relationship with Mr. Barnett indefinitely?

21           MS. HIGGINS:  Objection, Your Honor.

22   Relevance.

23           THE COURT:  Sustained.

24       Q.    (By Mr. Tallon)  Could the course of your

25   relationship change?

Page 98

1      A.    Every day brings something new.  It's

2    possible.

3      Q.    Every day brings something new.

4            In the course of whatever discussions you

5    had about Mr. Barnett's credit, were you aware that

6    he had a very substantial and still has a very

7    substantial federal tax lien in his credit history?

8      A.    No, I'm not aware of that.

9      Q.    If I told you that he had a tax lien of

10   about 70- or $80,000, would that surprise you?

11           MS. HIGGINS:  Objection, Your Honor.

12   Relevance.

13           THE COURT:  Sustained.

14     Q.   (By Mr. Tallon)  Does he have any

15   substantial debts that you know of?

16     A.    He has his car loan, and that's really the

17   only debt that I know of.

18     Q.    And maybe he doesn't have more than the

19   car loan because he can't get loans; isn't that

20   right?

21     A.    I don't know that he's tried to get loans.

22     Q.    You don't know that he's tried to get

23   loans?  Is that a no?

24     A.    That's a no.

25     Q.    And that would be because you applied for

1    all of the loans; isn't that true?

2        A.    He wasn't asking me to apply for loans for

3    these properties, so no.

4        Q.    But that is the reason why -- Gene's poor

5    credit is the reason why you applied for these

6    loans; isn't that correct?

7        A.    No, that's not correct.  I didn't intend

8    for him to be involved in these.  So no, I didn't

9    expect him to apply for these loans.

10       Q.    Okay.

11       A.    No.

12       Q.    Back in 2006, in March 2006, would it be

13   accurate to say that you, Joan Prouty, did not

14   intend for Gene Barnett to be involved in these

15   loans?

16       A.    That's right.

17       Q.    That changed?

18       A.    What changed?

19       Q.    Let me ask you a different question.

20             In March of 2006, did you intend to have

21   Gene Barnett involved with the management and

22   maintenance and repair of these three properties?

23       A.    I expected, as my life partner, that he

24   would be involved, yes.

25       Q.    Life partner suggests to me that you

3783008a-8798-417a-ac0e-724123da26d0

1    intend to be together forever?

2        A.    That would certainly be my goal.

3        Q.    But every day brings something new?

4        A.    There you go.

5        Q.    Did you intend in March of 2006 to have

6    the assistance of Gene Barnett with these

7    properties?

8            MS. HIGGINS:  Your Honor, objection.

9    Asked and answered, I think.

10           THE COURT:  Well, come up please.

11           (At the bench:)

12           THE COURT:  I don't want to be construed,

13   what I said a while ago, that I was simply giving

14   you time.  You've spent over 20 minutes talking

15   about Gene Barnett, and you haven't even touched on

16   any of what I would say are the core issues.

17           MR. TALLON:  That's one of the key issues,

18   Your Honor.  This woman was an intimate relationship

19   with Gene Barnett.  He was a real estate agent.  He

20   was involved in the maintenance of these properties.

21   He was a licensed real estate agent before they were

22   purchased.  He was involved in a investment real

23   estate investment group.

24           THE COURT:  His name has come up.  But

25   what I'm saying is I'm not going to let you go all

1    day with her on this.

2          MR. TALLON:  My focus is not going to be

3    on the government's documents.  I'm not going to go

4    back through --

5          THE COURT:  Well, I don't want you to be

6    surprised on the time.

7          MR. TALLON:  Your Honor, as I said to you

8    the first thing this morning, I have no intent to

9    delay the Court.  I'm trying to be organized and

10   effective in my cross-examination.

11          And I realize that at times, it may not be

12   apparent to the Court where I'm going.  But I would

13   ask the Court to give me a little time and a little

14   latitude to connect some things up.

15          THE COURT:  I appreciate that.  I'm just

16   saying as much stuff that was covered, the

17   government used an hour and 14 minutes.  So I would

18   guess you need something in the nature of close to

19   twice that amount of time.  That's kind of my goal

20   on this, but don't expect to go all afternoon with

21   her.  Go ahead.

22          MR. TALLON:  I understand, Judge.

23          (In open court:)

24       Q.   (By Mr. Tallon) Was it part of your plan

25   and your goal to use your properties -- or excuse

3783008a-8798-417a-ac0e-724123da26d0

1    me, to rent your properties to persons in the

2    medical profession?

3         A.    The one at Vista del Rey, yes.

4         Q.    So you did not intend to rent any of the

5    other five properties you owned to persons in the

6    medical profession, just one of them?

7         A.    It wasn't a specific intent, no.

8         Q.    Now after you bought these properties,

9    these three properties, you made an independent

10   decision to buy three more?  Isn't that correct, or

11   two more?

12        A.    Two more.

13        Q.    Two more.  And why did you do that?

14        A.    The goal with Vista del Rey was to have a

15   property that was income generating and, as you

16   point out, rent them to folks in the medical

17   profession.

18             And the Sprenger property was to move

19   into, live in and ultimately sell for an investment.

20   but more of a long-term, plus living-in, type of

21   investment.

22        Q.    Okay.  So you were going to move from

23   Racheleigh to Sprenger; is that right?

24        A.    That's right.

25        Q.    And establish your choice?  In fact, you

1  brought Sprenger after you bought all these three

2  properties; isn't that right?

3      A.    That was the last property purchased.

4      Q.    Okay.  So after you bought these three

5  properties and after you bought Vista del Rey, you

6  decided to buy Sprenger.  And then you also decided

7  that you would make Sprenger your primary residence;

8  is that correct?

9      A.    Yes.

10     Q.    Mr. Powers had no hand in that

11 decision-making, did he?

12     A.    No, he didn't.

13     Q.    So instead of making 6600 Glenturret your

14 primary residence; 6805 your primary residence,

15 Glenturret; 6701 Glenlochy your primary residence;

16 Vista del Rey your primary residence; you skipped

17 over all of those transactions.  And you decided,

18 along with your life partner, to make Sprenger your

19 primary residence?

20     A.    I made that decision to make Sprenger my

21 residence, yes.

22     Q.    But anywhere in that chain of properties,

23 you could have made a different decision and decided

24 to take any one of the previous four as your primary

25 residence?

3783008a-8798-417a-ac0e-724123da26d0

Page 104

1      A.    That's true.

2      Q.    And isn't it true that you knew that there

3    was a distinct difference between a full document

4    refinance on Racheleigh and the stated income loans

5    that you got on every one of the other five

6    properties you owned?  You know there's a

7    difference, don't you?

8      A.    I understand there's a difference now,

9    yes.

10      Q.    And you talked about take-home pay with

11    Ms. Higgins?

12      A.    That's right.

13      Q.    In addition to the gross income or the

14    gross salary that you earn at whatever medical

15    facility you work, do you have overtime at times?

16      A.    Occasionally, yes.

17      Q.    Do you have shift differentials?

18      A.    No, I don't.

19      Q.    Do you have bonuses?

20      A.    Now I do.  I didn't at the time.

21      Q.    Do you have incentives?

22      A.    No.

23      Q.    Do you have quotas that relate to the

24    numbers of patients you handle?

25      A.    No.

Page 105

1        Q.    Does your salary vary, based on factors

2    other than your simple base income, your hourly

3    rate?

4        A.    Only if I work overtime.

5        Q.    But you have worked in, I think, three

6    different employments since 2006, three different

7    medical --

8        A.    I picked up extra work.  And I switched in

9    '07 from Lovelace to Pres.

10       Q.    Okay.  So you worked at Lovelace in '06?

11       A.    Yes.

12       Q.    And they pay better than Pres, don't they?

13       A.    A little bit.

14       Q.    And when you moved to Pres in '07, you had

15   less income from medical work?

16       A.    I had less income per hour, but more in

17   the long run.

18       Q.    More in the long run how?

19       A.    As I was working overtime.

20       Q.    Okay.  So less per hour at Pres, but

21   overtime helped bring that number up?

22       A.    That's right.

23       Q.    And you said you picked up something --

24   you said you picked up extra work.  Do you mean this

25   overtime?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 106

1       A.    For a very short period of time, but that

2   was just last year.

3       Q.    And what was that extra work?

4       A.    I was working at the prison.

5       Q.    Which one?

6       A.    Los Lunas.

7       Q.    Okay.  So Central New Mexico --

8       A.    Correctional Facility.

9       Q.    -- Correctional Facility?

10            How do you like being in prison?

11            MS. HIGGINS:  Objection, Your Honor.

12            THE COURT:  Sustained.

13            MR. TALLON:  Excuse me.

14      Q.   (By Mr. Tallon)  How do you like working at

15   the prison?

16      A.    It's a great job.

17      Q.    You get to leave, though?

18      A.    I do.

19      Q.    In addition to your medical earnings,, you

20   also had some pretty substantial rental income

21   during 2006, 2007, 2008; isn't that right?

22      A.    Yes.

23      Q.    And according to your testimony, you

24   started in March 2006 with $240,000 that you told

25   Kevin Powers you were going to use for renovations,

3783008a-8798-417a-ac0e-724123da26d0

1   including landscaping.  All right?

2          Tell me what you did with the remainder of

3   that $240,000.

4      A.   I used part of it to do the renovations.

5   I used part of it to -- well, first of all, pay my

6   father back.  I used part of it to pay the

7   mortgages.  I used part of it to buy Vista del Rey

8   and Sprenger.

9      Q.   What else did you do with it?

10     A.   There 's things to do with the property.

11  I loaned Shaunna Ramply money, and then she paid

12  that back.

13     Q.   Did you pay Jesse Barnett any compensation

14  for the work he did?

15     A.   Yes, I did.

16     Q.   Did you pay Carl Barnett any compensation

17  for the work he did?

18     A.   Yes, I did.

19     Q.   Did you ever pay any money to Tim Lesley

20  for any reason?

21     A.   No.

22     Q.   Did you ever pay any money to Kathy

23  Winston, your doctor friend?

24     A.   I paid the mortgage on the Vista del Rey

25  property.  I didn't pay Kathy any money, no.

1     Q.    Did you ever loan her any money?

2     A.    Not that I recall, no.

3     Q.    Not that you recall?

4     A.    I may have loaned her lunch money or

5  something like that, but not substantial money.

6     Q.    So could you think a little harder?  Is

7  there anything else you used to do with that

8  $240,000?  Let's say any expenditure over $1,000.

9     A.    Not that I can think of.

10    Q.    Did you buy a car?

11    A.    I did not use that money to buy the car,

12 no.

13    Q.    When you say "that money," was --

14    A.    I didn't use the money for the properties.

15 I did buy a car in February of '06, I think it was.

16    Q.    Did you ever buy a boat?

17    A.    No.

18    Q.    What other assets do you have now?

19    A.    I have my car that I bought then.  I have

20 currently the Sprenger property, the Racheleigh

21 property.  Assets, assets -- I have my 401(k), my

22 403(b).  Pretty much everything got dwindled down to

23 nothing, truly nothing, in the bankruptcy.

24    Q.    Okay.  So dwindled down to nothing in the

25 bankruptcy means that after the bankruptcy, you

3783008a-8798-417a-ac0e-724123da26d0

1    retained Vista del Rey, which you bought in part

2    with the $240,000.  After the bankruptcy, you

3    dwindled down to owning Vista.  You bought that with

4    some of the $240,000.  And you sold it after the

5    bankruptcy, correct?

6        A.    Yes.

7        Q.    And after the bankruptcy dwindled you

8    down, you retained the Sprenger property.  You had

9    used some of the $240,000 to buy the Sprenger

10   property.  And you and Gene Barnett live in it

11   today?

12       A.    We do, yes.

13       Q.    And the Racheleigh property, which you

14   owned before you met Kevin Powers, you refinanced it

15   and took money out of it?  You did a full document

16   loan for that one.  And you used the money from

17   Racheleigh to buy the car that you still own; is

18   that right?

19       A.    That's right.

20       Q.    Your dad, who may or may not have written

21   the letter about the $30,000, he's been paid back?

22       A.    That's right.

23       Q.    And you chose to do renovations.  But you

24   only chose to do what sounds to me like no more than

25   $15,000 in renovations on three properties?

1      A.     Yes.  They were brand new properties.

2      Q.     But you did intend to do renovations at

3    the time you closed on these loans, correct?

4      A.     Yes.

5      Q.     And you told Ms. Higgins that you used

6    some of that $240,000 to pay the mortgages, yes?

7      A.     Yes.

8      Q.     And even though you dwindled down to some

9    impoverished state after the bankruptcy, before the

10   bankruptcy, you paid some of that money to Jesse

11   Barnett, a loan officer and property manager, yes?

12     A.     Yes.

13     Q.     You paid some of that money to Carl

14   Barnett, who owned a real estate maintenance

15   company, correct?

16     A.     Yes.

17     Q.     And you took some of that money and bought

18   the property -- you co-owned the property with Kathy

19   Winston at Vista del Rey?

20     A.     That's right.

21     Q.     And in the bankruptcy that dwindled you

22   down, you kept your 401(k) because in bankruptcy,

23   you can keep that, yes?

24     A.     I guess that's how that works, yes.

25     Q.     And the 403(b), another retirement

1    account?

2        A.    Yes.

3        Q.    You can keep that in bankruptcy because

4    the law allows you to keep that?

5        A.    That's right.

6        Q.    And what money did you use to pay the

7    mortgages on Vista del Rey and on Sprenger and on

8    Racheleigh after the bankruptcy was concluded?

9    Where did that money come from?

10       A.    The money I earn monthly.

11       Q.    Did any of it come from the $240,000

12   you're talking about today?

13       A.    After bankruptcy, there'as no money.

14       Q.    Before the bankruptcy you've told us where

15   some of the money went, right?

16       A.    Right.

17       Q.    And on each and every one of those

18   decisions to spend, Kevin Powers was not involved in

19   any of those decisions, was he?

20       A.    The ones you described, no.

21       Q.    When you testified talking with

22   Ms. Higgins, you said you didn't read the owner

23   occupancy affidavits?

24       A.    No, I didn't.

25       Q.    Did you read your bankruptcy pleadings?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1       A.     No, I didn't.

2       Q.     Did you read any appraisals in this case?

3       A.     I looked them over, yes.

4       Q.     And isn't it true, Ms. Prouty, that every

5    one of the appraisals in this case came back for the

6    price that you paid for those houses; isn't that

7    correct?

8       A.     I believe they did, yes.  I'd have to look

9    at the exact figures.

10      Q.     Well, let me see if this refreshes your

11   recollection.  Do you remember that one of the three

12   houses actually came back with an appraised value

13   $5,000 more than the $490,000 you paid for it?  Do

14   you remember that?

15      A.     I don't recall that, no.  But I'm sure

16   it's somewhere in here.

17      Q.     Probably a lot of the answers are in

18   there.  Do you know if the appraisals are in there?

19      A.     I don't know.

20      Q.     Did you ever discuss the amounts of the

21   appraisals with the FBI or the US Attorney?

22      A.     The appraisals, no.

23      Q.     You didn't review those in preparation for

24   your testimony, did you?

25      A.     No.

1      Q.    Do you remember the person that did those

2  appraisals?

3      A.    Yes, I do.  Heidi Chavez.

4      Q.    Heidi Chavez.  She did all of them, yes?

5      A.    If I recall, yes.

6      Q.    And the Oakland Estates subdivision was in

7  a part of Albuquerque which, in 2006, was rapidly

8  appreciating; isn't that correct?

9      A.    That's right.

10     Q.    And Gene Barnett knew that, didn't he?

11     A.    I think most people in Albuquerque knew

12 that.

13     Q.    I didn't ask about most people.  Gene

14 Barnett knew that?

15     A.    Yes.

16     Q.    Tim Lesley knew that?

17     A.    I'd have to assume, yeah.

18     Q.    Would you assume that Tim Lesley knew that

19 Oakland Estates was rapidly appreciating, very

20 rapidly appreciating, because Mr. Tim Lesley bought

21 a house in Oakland Estates on March 30, 2006?

22          MS. HIGGINS:  Objection, Your Honor.

23 Relevance.

24          THE COURT:  Well, there's a promise that

25 it will be connected.  Overruled.  It does seem so,

3783008a-8798-417a-ac0e-724123da26d0

Page 114

1    but overruled.

2       A.    I assume that Tim knew they were

3    appreciating, yes.

4       Q.    (By Mr. Tallon)  All right.  Well, you've

5    just spoken with Ms. Higgins about three closings

6    that you went to in March of 2006?

7       A.    Right.

8       Q.    Gene Barnett, your intimate friend, life

9    partner, is a very good friend of Tim Lesley, yes?

10      A.    Yes.

11      Q.    They have the same interest, real estate

12   investing, correct?

13      A.    They have a similar interest in real

14   estate investing, yes.

15      Q.    And Mr. Leslie a very successful and

16   prudent and wise and responsible real estate

17   investor, isn't he?

18      A.    Apparently, yes.

19      Q.    And my question to you -- and don't

20   speculate if you don't want to -- is:  Didn't you

21   know in March 2006 that Tim Lesley bought a house in

22   Oakland Estates that closed on March 30, 2006?

23      A.    I didn't know when he closed.  I knew he

24   was buying a house in Oakland Estates.  I don't know

25   date that he closed.

Page 115

1      Q.    Well, he bought a house on the same street

2   as one of your houses?

3      A.    Right.

4      Q.    Now, that wasn't too difficult, was it?

5      A.    Difficult in what way?  I'm sorry.

6      Q.    One of the reasons the Oakland Estates

7   property subdivision was appreciating so well is

8   because there was an auto salvage yard just south of

9   it that was being eliminated; isn't that correct?

10     A.    It was still there, and I understand it

11  was going to be eliminated.

12     Q.    Uh-huh.  So people in the know, like your

13  friend Gene Barnett and his friend Tim Lesley, knew

14  that that property was going to get this big ugly

15  out of there, and Oakland Estates was going to

16  skyrocket?  And that's why all of you bought there;

17  isn't that correct?

18     A.    I don't know that it was determined that

19  it was actually going to be going away rapidly.

20     Q.    Are you telling me, Ms. Prouty --

21           MS. HIGGINS:  Objection, Your Honor.  I

22  think he ought to let the witness finish her answer.

23           THE COURT:  Yes, sustained.

24     Q.    (By Mr. Tallon)  Are you telling me,

25  Ms. Prouty, that the knowledge that you're

1    describing that you had, the knowledge that Gene

2    Barnett had, the knowledge that Tim Lesley had was

3    not a factor, if not a huge factor, in the fact that

4    you, just you, bought three houses in Oakland

5    Estates?

6        A.    It was a factor.

7        Q.    And isn't it also a factor that the reason

8    you applied for three loans in Oakland Estates is

9    because your life partner didn't have the

10   creditworthiness to apply for a loan?

11       A.    No, that's not why I got the loans.  I

12   wanted to do this myself.

13       Q.    Yes, you wanted to do it yourself.

14            And isn't it true that to maximize the

15   benefits of the appreciation in Oakland Estates so

16   that life partners and business partners, like

17   Shaunna Ramply and Gene Barnett, to maximize that

18   benefit and in recognition of the fact that

19   Mr. Barnett had poor credit, his business partner is

20   the person who put her name on that loan

21   application?

22       A.    I'm not sure I understand the question

23   you're asking.  I'm sorry.

24       Q.    All right.  Gene Barnett was a partner of

25   Shaunna Ramply; yes or no?

3783008a-8798-417a-ac0e-724123da26d0

1      A.    Yes.

2      Q.    And Gene Barnett had poor credit; yes or

3   no?

4      A.    Yes.

5      Q.    Shaunna Ramply is a partner of Gene

6   Barnett in Strongbow Investments; yes or no?

7      A.    Yes.

8      Q.    Strongbow Investments is a full service

9   real estate investment company; yes or no?

10      A.    Yes.  I mean I don't know everything

11   about --

12      Q.    Shaunna Ramply --

13            MS. HIGGINS:  Objection --

14            THE COURT:  Wait, wait.  Yes, yes, yes,

15   yes.  Sustained.  Don't interrupt witness, please.

16            Do you want to finish that?

17      A.    I don't know everything Strongbow does.

18   But I know they were making real estate investments,

19   yes.

20      Q.    (By Mr. Tallon)  Was the 6719 Glenturret

21   house purchased by Shaunna Ramply a real estate

22   investment?

23      A.    As I understand it, yes, if that's the

24   address.  I don't remember the address that's on

25   hers.

1     Q.    Did Shaunna Ramply actually occupy 6719

2   Glenturret?

3     A.    She ultimately did.  I don't know when she

4   moved in and out exactly.  But she did, yes, at one

5   point.

6     Q.    Now, you described sitting down with

7   Mr. Powers.  Now I realize you just told us you made

8   your own decisions here.  But you do remember

9   telling Ms. Higgins that you sat down with

10  Mr. Powers, and together you looked for properties

11  that were selling for less money than the

12  surrounding properties.

13          Do you remember telling Ms. Higgins that?

14    A.    Yes.

15    Q.    And did Mr. Barnett ever go to a sort of

16  specialized real estate investing classes that were

17  put on by a guy name Russ Whitney?

18    A.    I guess that's what the guy's name was.

19  Whitney was all I knew.

20    Q.    Okay, so Whitney classes.  And you do know

21  that they related to real estate investment, yes?

22    A.    That is what I understood, yes.

23    Q.    And did Eugene ever tell you how much

24  money he and Shaunna Ramply spent on tuition for

25  those classes?

```
 1      A.    No.

 2      Q.    Was it a lot of money?

 3      A.    I don't know.

 4      Q.    Do you know how he paid for those classes?

 5      A.    I don't know.

 6      Q.    You don't know?  And this took place

 7   before you met Gene Barnett, yes?

 8      A.    I think that it started before and

 9   continued during the time we knew each other.

10      Q.    Okay.  So Mr. Barnett, Gene Barnett, had

11   begun to take the Whitney classes on real estate

12   investing before you met him.  And he continued to

13   take them after you met him; is that correct?

14      A.    As I understand it, yes.

15      Q.    And did you ever discuss with your life

16   partner, Gene Barnett, anything about what he

17   learned in those real estate investing classes?

18      A.    Little things, yes.

19      Q.    Little things.  Was one of those little

20   things one of the same little things that Mr. Powers

21   told you, which is if you look for properties that

22   are underpriced in relation to the homes surrounding

23   them, that might be a good buy?

24            MS. HIGGINS:  Objection, Your Honor,

25   hearsay.  I believe the question was, did
```

1    Mr. Barnett tell her that?

2            THE COURT:  Overruled.

3            THE WITNESS:  Now, what was the question?

4    I'm sorry.

5            THE COURT:  Little things, the same little

6    things that Mr. Powers told you.  Which is if you

7    look for properties that are underpriced in relation

8    to the homes surrounding them, that may be a good

9    deal.

10      A.    Yes.

11      Q.    (By Mr. Tallon)  Okay.  And that's

12   something you knew before you met Mr. Powers; isn't

13   that correct?

14      A.    Yes.

15            THE COURT:  Well, you said that Mr. Powers

16   told you.

17      Q.    (By Mr. Tallon)  Yes, but all right.

18   Mr. Powers told you that, yes?

19      A.    Yes.

20      Q.    But didn't you know that before you met

21   Mr. Powers?

22      A.    I heard that, know it.  It's sort of a

23   bigger term.  But yes, I know that, yes.

24      Q.    You knew that before -- you knew about

25   this --

3783008a-8798-417a-ac0e-724123da26d0

1      A.    Concept.

2      Q.    -- concept before you met Mr. Powers, yes?

3      A.    Correct.

4      Q.    And you knew about it because there aren't

5   too many real estate agents who work in hospitals.

6   But you did live with a real estate agent, yes?

7      A.    Yes.

8      Q.    I'm glad you're laughing.

9            Now, did you tell Ms. Higgins that you

10  were not aware of the terms -- I think that was the

11  phrase, you were not aware of the terms -- of any of

12  these three purchases?

13     A.    When you say "terms," I don't remember

14  saying that exactly to Ms. Higgins.  But what are

15  you saying when you say" "terms," so I make sure I

16  answer your question.

17     Q.    I'll rephrase it.  Were you aware of the

18  terms of the purchase agreement for 6600 Glenturret?

19     A.    The terms being the amount and the

20  interest rate?

21     Q.    You weren't aware of all the terms?

22     A.    That's where I want to know what "terms"

23  means for you.  Because it may mean something very

24  different for me, and I want to make sure I'm clear.

25     Q.    Okay.  Were you aware, in the 6600

3783008a-8798-417a-ac0e-724123da26d0

1    Glenturret transaction, that you would be paid, to

2    be used for renovations, a sum of around $80,000?

3        A.    Yes.

4        Q.    Were you aware, in reference to the 6805

5    Glenturret transaction, that you would be paid the

6    sum of about $80,000 for renovations?

7        A.    Yes.

8        Q.    And were you aware that with respect to

9    6701 Glenlochy, you would be paid the sum of about

10   $80,000 for renovations?

11       A.    Yes.  So those terms, okay.  I just wasn't

12   sure what you were asking.  I'm sorry.

13       Q.    Thank you for helping me.  You said that

14   when you applied for these three loans, that

15   Mr. Powers' office was involved; is that right?

16       A.    Right.

17       Q.    And would it be accurate to say that his

18   office contained a number of different employees?

19       A.    There were two other employees; two or

20   three other employees, yeah.

21       Q.    And at the time you visited, you saw two

22   or three other employees?

23       A.    There was Jodi Powers, his sister, and

24   then Natalie Martinez.

25       Q.    And who was the third?

1      A.    Jesse Barnett.

2      Q.    Jesse Barnett?

3      A.    That was afterwards, yes.

4      Q.    All right.  Did you ever meet Michael

5    Delgado?

6      A.    I never met him.

7      Q.    And Jesse Barnett is someone who worked

8    there as well?

9      A.    Yes.

10      Q.    When you made your choices or choice --

11    well, let me rephrase.

12            As you were going through the notes with

13    Ms. Higgins, three different properties, two loans

14    for each property, isn't it true that each pair of

15    loans two, two, two, they all were different,

16    different interests rates, different splits in

17    amounts?

18      A.    Yes.

19      Q.    But isn't it also true that all three

20    pairs of loans were 100 percent loan to value; you

21    knew that?

22      A.    That's right.

23      Q.    You also knew that all three all three

24    pairs of loans were stated income loans?

25      A.    Right.

1      Q.    You knew that?

2            When Mr. Powers sat down with you the

3   first time to discuss your application for a loan,

4   he advised you that you had quite a few product

5   choices -- excuse me, products to chose from; isn't

6   that true?

7      A.    No.

8      Q.    So you weren't aware that there was any

9   other product to buy, other than the product you

10  bought for 6600 Glenturret?

11     A.    I don't know that we ever had a discussion

12  about products.

13     Q.    Well --

14     A.    About types of loans, I knew that, you

15  know, there was this regular type of loan one would

16  get.  And then in order to buy these more expensive

17  properties, we needed to do what was called a stated

18  income loan.

19     Q.    Uh-huh.  And you were advised that there

20  was more than one thing to chose from when you chose

21  your product; isn't that right?

22     A.    I knew about those two, yeah.

23     Q.    You discussed what the payments would be,

24  yes?

25     A.    Yeah, yes.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1      Q.    You discussed what the amount and the

2   interest rate was on the first loan, and you

3   discussed what the amount and the interest rate was

4   on the second loan, yes?

5      A.    I don't know that we spent much time

6   talking about interest rates.  I don't recall much

7   about that at all, no.  But about the amounts, yes,

8   the total amounts.

9      Q.    So are you saying that the interest rate

10  wasn't a material factor for you?

11     A.    No, it wasn't a material factor.

12     Q.    You didn't care?

13     A.    Well, no.

14     Q.    Okay.  And is that your answer with

15  respect to all three properties?

16     A.    Right.

17     Q.    And I assume you didn't care about the

18  interest rate for the other two you bought later on?

19     A.    About Sprenger, I did.  And about

20  Vista del Rey, no.  I don't recall.  But I would

21  assume, looking back, I wouldn't have.

22     Q.    Okay.  So Sprenger is the only property

23  where you cared about the interest rate?  The other

24  four, you didn't care?

25     A.    Because I was going to be holding on to

3783008a-8798-417a-ac0e-724123da26d0

1    that longer.

2        Q.    One of the conditions to getting each and

3    every pair of loans that you got was that you had to

4    indicate on those Form 10-03s that Ms. Higgins

5    showed you that you intended to occupy that as a

6    primary residence?

7        A.    That's right.

8        Q.    Have you ever looked at the Form 10-03

9    where the purpose for the loan is stated?

10       A.    After all of this came about, I looked at

11   that to see that it was there, yes.

12       Q.    Okay.  So you're saying that you didn't

13   look at the Form 10-03, the first page, when you

14   signed it?

15       A.    No.

16       Q.    Okay.  Do you remember that the purpose on

17   your Form 10-03 that you checked was purchase?

18       A.    Well, I didn't check them.  They were

19   already prechecked, and I just signed them.

20       Q.    You never looked at what the purpose was?

21       A.    No.

22       Q.    If you looked at the purpose now, would it

23   be primary residence, or would it be purchase?

24       A.    Well, there were two separate places.  One

25   over here on right side said "Primary Residence,"

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 127

1    and then on this column it had "Purchase" or

2    "Purchase Primary Residence."

3         Q.    All right.  Well, just so that you don't

4    get any more lost than you seem to be right now --

5              MS. HIGGINS:  Objection, Your Honor.

6              THE COURT:  Absolutely, absolutely.

7    Sustained.

8         Q.    (By Mr. Tallon)  All right.  I'm looking

9    for -- how about Exhibit 96, page 492?  And could we

10   focus in on, say, the top half of that page?

11        A.    492?

12        Q.    492, yes, in Exhibit 96.  Okay.

13             And could you look for page 1 of that

14   document?  Perhaps 491 I'm looking for.  Yes, it is.

15   I'm sorry.  So do you see page 491 up there --

16        A.    Uh-huh.

17        Q.    -- if you could look closely at the top

18   half of the page?

19             And if you go to, say, the left side of

20   the page, is the left side of the page visible to

21   you?

22        A.    Uh-huh.

23        Q.    Do you see the word, "purpose"?

24        A.    "Purpose of loan"?

25        Q.    Yes.  And what is the purpose of this

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 128

1    loan?

2        A.    Purchase.

3        Q.    Purchase, all right.

4              And can you go over to where it says

5    "primary residence"?

6        A.    Uh-huh.

7        Q.    And what does it say there?

8        A.    "Primary residence" is marked.

9        Q.    Okay.  But what is the language that

10   precedes it?

11       A.    "Property will be."

12       Q.    "Property will be primary residence," is

13   that what it says?  That's what you checked?

14       A.    I didn't check these.  They were prepared.

15       Q.    Do you consider yourself to have completed

16   this loan application,, or do you consider the

17   completion of the loan application somebody else's

18   responsibility?

19       A.    Completing it, filling it in, at the time

20   I thought it was someone else's responsibility.

21       Q.    At the time?

22       A.    Yes.

23       Q.    And that's why you think you weren't doing

24   anything wrong?

25       A.    Wrong in what way?  I mean completing it,

3783008a-8798-417a-ac0e-724123da26d0

Page 129

1    it was already completed.  And all I had to do was

2    sign it.

3         Q.    Did you also have the obligation and the

4    responsibility to review it?

5         A.    I suppose I did.

6         Q.    And as an example, as an analogy, as a

7    physician's assistant, you can prescribe

8    medications?

9         A.    Yes, I can.

10        Q.    Probably with as much freedom as a doctor

11   could; is that right?

12        A.    Not quite, but yes.

13        Q.    Almost as much; is that right?

14        A.    Yes.

15        Q.    And you have to be aware of what the

16   contraindications of medication could be for your

17   patient; isn't that right?

18        A.    Yes.

19        Q.    And when I've seen the prescriptions that

20   I get, they usually have the product information on

21   a piece of paper you wrap up inside the box or

22   whatever the container might be, very, very very

23   small print.

24              Do you ever read that to make sure that

25   you, as a physician's assistant, understand what

3783008a-8798-417a-ac0e-724123da26d0

Page 130

1    you're giving to your patient and whether or not it

2    may not be a good thing for that patient?

3        A.    Yes.

4        Q.    You do that, don't you?

5        A.    Yes.

6        Q.    You did that yesterday probably, if you

7    worked yesterday?

8        A.    I didn't work yesterday.  I was hoping to

9    be here yesterday.

10       Q.    But the last day you worked, that

11   responsibility, a grave responsibility, crossed your

12   mind at least, and perhaps you read that kind of

13   information?

14       A.    Every prescription.

15       Q.    When Mr. Powers sat down with you, isn't

16   true that he gave you -- explained to you that you

17   had choices, you had product choices?

18             Are you saying no or yes to that?

19       A.    I'm not saying anything.  It was never

20   really discussed, as to choices.

21       Q.    Would it be accurate to say that as to

22   each of these three applications, Mr. Powers or a

23   member of the team in his office explained the same

24   thing about each of the three applications each

25   time?

3783008a-8798-417a-ac0e-724123da26d0

1      A.    Each time we filled out an application,

2   they were prepared, and I was just asked to sign

3   them.  We didn't talk about the applications,, per

4   se.

5      Q.    You said you never considered interest

6   rate?

7      A.    No.

8      Q.    But you were aware, when you applied for

9   each of these three loans, that there were those

10   three little check boxes there that say "primary

11   residence"?  They say -- what's the next -- I can't

12   read it from here, the second one.

13      A.    It says "secondary residence" and

14   investment,".

15      Q.    Secondary residence and investment.  You

16   were aware of those three choices; isn't that right?

17      A.    Actually, no.

18      Q.    So your testimony is you weren't aware of

19   the three choices?

20      A.    No.

21      Q.    All right.  So you're saying, for example,

22   that Mr. Powers didn't explain to you that you

23   needed to live in the residence to get a certain

24   loan product?

25      A.    He told me that I should -- that they were

1    going to be defined as a primary residence, and I

2    should at least have the perception of living in

3    them.

4        Q.   Didn't he tell you that you have to move

5    in there at least for a while?

6        A.   He said, "At least overnight."

7        Q.   And he told you you had to move in to each

8    of those places; isn't that correct?

9        A.   Yes.

10       Q.   He said that you had to move into each of

11   those places to satisfy one of the conditions of the

12   loans, the three loans that you were applying for;

13   isn't that correct?

14       A.   He said I should at least move in

15   overnight, yes.

16       Q.   And did he also explain to you or did you

17   ever discuss with Mr. Barnett -- now I'm changing to

18   Mr. Barnett.  Did you ever discuss the significance

19   or the meaning of those choices?

20       A.   No.

21       Q.   And it's your testimony that you never

22   told Mr. Powers what your choice was as to those

23   three options?

24       A.   We never really discussed, no, not in that

25   fashion.

3783008a-8798-417a-ac0e-724123da26d0

1       Q.     In what fashion was it discussed?

2       A.     It was not a choice I made.  This was just

3   what was going to be put on there.  It wasn't really

4   a choice, it was just how the form was completed.

5       Q.     Do you ever talk with Mr. Barnett simply

6   about his real estate business?

7       A.     Sure.

8       Q.     And do you ever discuss with him the

9   obligations he has as a real estate agent or broker?

10      A.     Well, I don't know all of his obligations,

11  so I can't really speak to that with him.

12      Q.     Does he ever talk to you about the need

13  for correctness in the contracts that he becomes

14  involved with?

15      A.     Yes.

16      Q.     And in that regard, have you ever thought

17  it was important to read the things that you signed?

18      A.     Certainly after this episode, things have

19  become more more -- we've become more aware of all

20  of that.

21      Q.     But Mr. Barnett was a licensed real estate

22  agent before you made the decisions that you made to

23  buy these properties?

24      A.     He was licensed, not practicing.  But yes.

25      Q.     And Mr. Barnett is a gentleman who's about

3783008a-8798-417a-ac0e-724123da26d0

Page 134

1    your age, possibly a little bit older?

2       A.    Yes.

3       Q.    And he has some life experience; isn't

4    that right?

5       A.    Yes.

6       Q.    He's run businesses; isn't that right?

7       A.    That's right.

8       Q.    He's engaged in contracts before; isn't

9    that right?

10      A.    Yes.

11      Q.    Isn't it true -- well, you could take a

12   look at -- we're on the same exhibit here, 96.  And

13   if you could go to page 511 of 96.

14      A.    (Witness complies.)

15      Q.    Do you recognize what's portrayed on that

16   page and 512 and 513?

17            MR. TALLON:  Okay.  Starting with

18   page 511, if you could bring that up.  Thank you,

19   Agent.

20      Q.    (By Mr. Tallon)  What do you recognize that

21   to be?

22      A.    It says it's a lease.

23      Q.    And what is the date on the lease?

24      A.    It says March 10th of '06.

25      Q.    And whose handwriting is on that first

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    page?

2         A.    Kevin Powers'.

3         Q.    And who is the person who's going to rent

4    8405 Racheleigh, Northeast?

5         A.    Gene Barnett, spelled wrong.

6         Q.    And if I move over to the next page,

7    512 --

8              MR. TALLON:  And Your Honor, if I could

9    just step forward so I could read it a little better

10   myself.

11             THE COURT:  Okay.

12        Q.   (By Mr. Tallon)  I just wanted to make sure

13   that what was on my copy is what you're seeing.

14             Gene Barnett, by this lease, intended to

15   begin occupying Racheleigh, Northeast on April 1,

16   2006; is that correct?

17        A.    According to this, yes.

18        Q.    And he said -- or he signed -- excuse me.

19   The lease was for a period of a year, yes?

20        A.    That's what it says.

21        Q.    $1,600 a month, yes?

22        A.    Yes.

23        Q.    And by this lease Gene Barnett or Gene

24   Barnett and yourself agreed that Mr. Barnett should

25   send his rent payment to 6805 Glenturret Way,

3783008a-8798-417a-ac0e-724123da26d0

Page 136

1   Northeast?

2      A.    That's what it says, yes.

3      Q.    And on the next page, 513, the person that

4   signed as landlord, not life partner, was Joan

5   Prouty?

6      A.    That's what it says, yes.

7      Q.    That's your signature?

8      A.    Yes.

9      Q.    And the resident is Gene Barnett?  He

10  signed there, correct?

11     A.    Right.

12     Q.    On March 10, 2006, he was a licensed real

13  estate agent, and a gentleman probably in his

14  mid-fifties or so.  Did he understand what he was

15  doing when he signed this lease?

16     A.    You'd have to ask him.

17     Q.    Did you understand what you were doing

18  when you signed this lease?

19     A.    No.

20     Q.    And did you understand, because Mr. Powers

21  had told you, that when you bought any property as a

22  primary residence, all right, a loan that was

23  intended -- a loan product that was intended for a

24  property to be used as a primary residence, isn't it

25  true take Mr. Powers told you that not only you had

1   to move into that residence, but you needed to

2   support your move, your intention, in some reliable

3   and credible way?

4           And you signed this lease with your life

5   partner so as to support your intent, as you stated

6   it to Mr. Powers?  Because you wanted that loan

7   product, you stated that you were going to occupy

8   6805 Glenturret as a primary residence; isn't that

9   right?

10      A.   I don't think that was the intent of this

11  paper, no.

12      Q.   Okay.  Well, what I'm trying to get to is

13  you told this jury that you didn't discuss the three

14  options with Mr. Powers?  That he never discussed it

15  with you, and you just signed it?

16      A.   Right.

17      Q.   Isn't that what you told the jury?

18      A.   Right.

19      Q.   And doesn't this piece of paper seem to

20  show, seem to suggest to you that you and

21  Mr. Barnett were both very aware that something had

22  to be done to support and to qualify for the loan

23  product that his creditworthy life partner was

24  applying for?

25      A.   This was so that we could have

Page 138

1    documentation, in case the company, the loan

2    company, wanted to see some lease agreement.

3           It didn't have anything to do with me

4    moving into the properties, so I'm not sure I

5    understand the question.

6       Q.    Let me rephrase it.

7       A.    Thank you.

8       Q.    Isn't it true that you had to execute a

9    lease as a condition of getting your loan for 6805

10   Glenturret, Northeast?

11          That's a question.

12      A.    I don't know that.  I don't know that.  I

13   don't know that at all.  I know that we had a lease

14   wrong.  But we had this lease agreement so that it

15   could be made available if the loan companies needed

16   to see a lease agreement.

17      Q.    Okay.

18      A.    I just want to make sure I'm answering the

19   right question.

20      Q.    I think your answer was you don't know,

21   basically?

22      A.    Probably.

23      Q.    All right.  Ms. Prouty, is it for

24   Mr. Powers, is it for anybody employed by Worldwide

25   Mortgage, is it their business to tell you and your

3783008a-8798-417a-ac0e-724123da26d0

1   life partner what loan to apply for or where you and

2   your life partner should live or whether you and

3   your life partner are going to simply be landlord

4   and tenant?

5        A.    Well, there are three questions --

6        Q.    Is it the business of any employee of

7   Worldwide Mortgage to make that decision for you?

8        A.    There are three questions that you

9   asked --

10       Q.    Please --

11       A.    Well, there are three --

12             MS. HIGGINS:  Objection, Your Honor.  The

13   question is compound.

14             THE COURT:  Well, it is compound.  I mean

15   there are several questions.  Sustained, compound.

16       Q.  (By Mr. Tallon)  Is it for any employee of

17   Worldwide Mortgage to tell you and your life partner

18   where they should live?

19       A.    No.

20       Q.    Chosing a loan product was not a decision

21   for any employee at Worldwide Mortgage?  It was your

22   decision, wasn't it?

23       A.    No.

24       Q.    Would you agree, Ms. Prouty, that this

25   lease suggests that Mr. Powers did in fact tell you

Page 140

1    that as to every loan you applied for as a primary

2    resident, that you needed to move into the property

3    to qualify for an owner occupied loan?

4        A.    I don't know if the lease agreement

5    implied that.  But he did tell me I needed to move

6    in to the properties, yes.

7        Q.    And if he told you some other things that

8    you needed to do to qualify for the loan, maybe

9    you're just forgetting them?  Are you forgetting

10   anything else he told you?

11       A.    Possibly.  Who knows?  I mean, I give him

12   the information that he needed.  Every time he asked

13   for information, I brought it to the office.  I gave

14   him as much as I could every time he asked.

15       Q.    But in the end, you made the decision?

16       A.    That's right.

17       Q.    Would it be accurate to say that Gene

18   Barnett was a silent partner in your three real

19   estate deals you're discussing?

20       A.    A silent partner?  He was certainly

21   helpful in everything that I needed help with.

22       Q.    Have you heard the phrase, "silent

23   partner"?

24       A.    I've heard the phrase.  I don't know what

25   it's true definition is.  I have heard that phrase.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 141

1    But I think it would probably be applied

2    differently, you know, by everybody.

3            I'm sure there's some specific legal term.

4    But you know, that's sort of a generic phrase.

5    Q.   Let me ask you this:  Except for the fact

6    that Mr. Barnett name's was not on the loan

7    application, was he a silent partner in these three

8    transactions?

9    A.   He certainly was helpful.  So a silent

10   partner in that way, yes.

11   Q.   And you're aware that he did a transaction

12   with Shaunna Ramply; is that right?

13   A.   Yes.

14   Q.   Would it be accurate to say that

15   Mr. Barnett was a silent partner in the purchase

16   made by Shaunna Ramply?

17   A.   I think it would be perceived that way.

18           MS. HIGGINS:  Objection, Your Honor.  I

19   don't know that this witness knows the answer to

20   that question.

21           THE COURT:  Well, what's the legal

22   objection?

23           MS. HIGGINS:  Irrelevant, immaterial.

24   I'll go with that.

25           THE COURT:  Okay, overruled.

3783008a-8798-417a-ac0e-724123da26d0

Page 142

1      Q.   (By Mr. Tallon)  Would it be accurate to

2   say that Gene Barnett, except for the fact that his

3   name wasn't on the loan application, that Gene

4   Barnett was a silent partner in the purchase of 6719

5   Glenturret, the property purchased by Shaunna

6   Ramply?

7      A.   From what I know, yes.

8      Q.   The property was purchased in the name of

9   Shaunna Ramply, but it was owned by Strongbow

10  Investments; isn't that correct?

11     A.   As I understand it, yes.

12     Q.   And in addition to being a silent partner

13  in your purchases, was he also your advisor?

14     A.   Advisor as to what?  I mean, he helped me

15  do a lot of different things because he knew people

16  in town that could get things done, like the garage

17  door opener and things like that.  So yes, he was my

18  advisor in that way.

19     Q.   Mr. Barnett --

20     A.   But I didn't seek any kind of real estate

21  advice from him, no.  I didn't think he had that

22  much experience.

23     Q.   You said that Mr. Barnett knew a lot of

24  people in town that could get things done; isn't

25  that right?

3783008a-8798-417a-ac0e-724123da26d0

Page 143

1      A.    Uh-huh, yes.

2      Q.    And isn't it true that he knew a lot of

3    people in the construction industry?

4      A.    Yes.

5      Q.    And isn't it true that he ran companies

6    that primarily did metal work?

7      A.    That's what his company had been.

8      Q.    Welding?

9      A.    Yes.

10     Q.    But based upon those contacts, those

11   numerous contacts that he had, he had the ability to

12   find the people who could do any renovations and

13   maintenance that were necessary on those three

14   houses; isn't that correct?

15     A.    Right.

16     Q.    And for that reason, you and Mr. Barnett

17   did not choose to use K&E Construction and the

18   contacts that Mr. Powers had, who could have done

19   that work for you?

20     A.    I had no intention of using K&E

21   Construction for anything.  The first I heard of it

22   was with the HUD, when it was down on that line.

23     Q.    But Mr. Barnett knew what K&E Construction

24   was, didn't he?

25     A.    I don't know.  I don't know.

Page 144

1      Q.   Did you know that Mr. Barnett had, with

2    Shaunna Ramply, in the year 2005, when you were with

3    Mr. Barnett, that Mr. Barnett and Ms. Ramply had

4    bought two properties to renovate, and they had used

5    Mr. Powers as their broker?

6      A.   They used him as a broker, right.

7      Q.   You knew that?

8      A.   Right.

9      Q.   And you knew that money had been taken out

10   from the loan to do renovations on those two

11   properties purchased in 2005?

12     A.   That's what I heard, yes.

13     Q.   You knew that?

14          And the money in 2005 was taken out, in a

15   sense, in the name of K&E Construction, wasn't it?

16          MS. HIGGINS:  Objection, Your Honor.  In a

17   sense?  This witness does not know what was actually

18   on those forms or to whom the money was being paid.

19          THE COURT:  What's the legal objection?

20          MS. HIGGINS:  Mischaracterizing the facts.

21          THE COURT:  Well, overruled.  It does call

22   for speculation.  Sustained.

23     Q.  (By Mr. Tallon)  And in March 2006 -- let

24   me rephrase.

25          By the time you and Mr. Barnett arrived

Page 145

1    at, say, March 10, 2006, isn't it true that

2    Mr. Barnett and you and Mr. Barnett's contacts were

3    in a position to perform any renovation or other

4    work that was necessary concerning any property you

5    purchased?

6        A.    Right.

7            MR. TALLON:  Your Honor, could I have a

8    moment over here?

9            THE COURT:  Yes.

10           MR. TALLON:  Could we take a look at

11   letter H8?  I believe this exhibit has been

12   stipulated to.

13           THE COURT:  What's the number, please?

14           MR. TALLON:  Letter H, No. 8.

15           THE COURT:  All right.

16       Q.   (By Mr. Tallon)  Okay.  Are we on page 1 of

17   36?

18           THE COURT:  Are you offering it now?

19           MR. TALLON:  Yes.

20           THE COURT:  Received.

21           (Defendant's Exhibit H8 admitted.)

22           MR. TALLON:  And I'll just make a note

23   that what you see highlighted in yellow there is

24   something that I have added to the document.

25   Sometimes it might be helpful for some emphasis but

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    not always helpful.

2        Q.    Do you recognize what that first page is,

3    Ms. Prouty?

4        A.    Yes, I do.

5        Q.    And what is it?

6        A.    It's my bankruptcy paperwork.

7        Q.    All right, and that's page 1.  If we could

8    go from page 1 of 36 and move ahead a few pages to

9    page 3 of 36.  And looking at the top of the page

10   right there, do you see the date it was filed?

11       A.    On this, I don't see the date.

12       Q.    Left side.  Left side, at the top half of

13   the page, towards the left side.  It's in yellow.

14       A.    10/10/08.

15       Q.    All right, and let's see --

16       A.    It was heard on 11/4/08.

17       Q.    Date of filing was 10/10.  Heard on

18   11/4/08, okay.

19             And if we move to page 6 of 36, we see

20   what's called a Summary of Schedules.  And you see

21   under Line A, Schedule for Real Property?

22       A.    Uh-huh.

23       Q.    Do you see that?

24       A.    Uh-huh, yes.

25       Q.    Okay.  And if we could turn to page 7 of

3783008a-8798-417a-ac0e-724123da26d0

Page 147

1   36, and if we could take a look at the -- let's see,

2   there's six boxes there that are highlighted.  And

3   direct your attention to the three that are 6600

4   Glenturret, 6701 Glenlochy, 6805 Glenturret, do you

5   see those three?

6        A.    Yes, I do.

7        Q.    And it indicates, if you move to the

8   right, that the stated current value of each of

9   those properties was $325,000?

10       A.    Okay.

11       Q.    Do you see that?

12       A.    I'd have to see what the top -- the title

13  was.

14       Q.    Okay.  If you could drop it down a little

15  bit so that you so see --

16       A.    Current value, okay.

17       Q.    Current value of debtor's interest in the

18  property, without deducting any secured claim or

19  exemption.  And in that column, the current value

20  for your three properties you discussed today was

21  $325,000; is that correct?

22       A.    Okay, yes.

23       Q.    And isn't it true that prior to filing

24  this bankruptcy petition, that Gene Barnett was the

25  real estate agent with whom you listed these

Page 148

1    properties for sale?

2        A.    Yes.

3        Q.    So if Mr. Barnett was successful in

4    selling these three properties during the crash of

5    2008, he would have received real estate commissions

6    on each sale; isn't that correct?

7              MS. HIGGINS:  Your Honor, objection.

8    Relevance.

9              THE COURT:  Overruled on relevance.

10       Q.   (By Mr. Tallon)  And isn't it true that to

11   sell these three properties, Mr. Barnett had to

12   engage in a relationship with the lender on each of

13   these properties because each of these properties

14   were in default?

15       A.    Yes.

16       Q.    So when Mr. Barnett engaged in a

17   relationship with each of the three lenders and

18   said, "I would like to list and sell these

19   properties," do you know whether Mr. Barnett told

20   each lender that he was living with you?

21       A.    I don't know whether he told them.  And

22   that's not a question I've thought about.

23       Q.    Okay.  If you could turn to page 8 of 36?

24       A.    (Witness complies.)

25       Q.    This is personal property, Line 8.  You're

1    a scuba diver?

2        A.    Yes.

3        Q.    Do you and Mr. Barnett own a boat?

4        A.    No.

5        Q.    Okay, moving to page 18 of 36.  Are we

6    there?

7        A.    Eighteen, you said?

8        Q.    Eighteen of 36.  I'm just directing your

9    attention to the bottom of the page.  There's a

10   credit card, Chase; is that right?

11       A.    That's right.

12       Q.    And I just use that as an example.  Did

13   you eliminate all your credit card debt when you

14   filed this bankruptcy?

15       A.    Yes.

16       Q.    And when you got the $240,000 in March of

17   2006, did you also pay off some substantial credit

18   card debt with that money?

19       A.    Yes.

20       Q.    Okay.  And then if we could look at

21   page 23 of 36.

22       A.    (Witness complies.)

23       Q.    Okay.  This page gives -- it's entitled

24   Current Income of Individual Debtor or Debtors; is

25   that right?

3783008a-8798-417a-ac0e-724123da26d0

Page 150

1      A.    Right.

2      Q.    Okay.  And it basically gives some figures

3  here.  I won't go through all the figures.  But this

4  was your representation as to what your income was

5  in October of 2008; isn't that right?

6      A.    Right.  That's from my paycheck stub.

7      Q.    Okay.  And this does not include any

8  fringe benefits, retirement plans, anything that

9  your employer gives you in addition to your base

10 salary, does it?

11     A.    Right.

12     Q.    Did you ever hear of salary.com?

13     A.    No.

14     Q.    Okay.  You don't have a spouse, so

15 obviously the Spouse column is blank.  But given the

16 fact that Mr. Barnett was your silent partner and

17 only a silent partner in these transactions, he did

18 not have to list his income here, did he?

19     A.    No.

20     Q.    Now, if you could turn to page 27 of 36?

21     A.    (Witness complies.)

22     Q.    And if we could look at paragraph 1 on

23 page 27 of 36, that's entitled Statement of

24 Financial Affairs.

25           Paragraph 1 has a title, Income From

3783008a-8798-417a-ac0e-724123da26d0

1    Employment or Operation of Business.  Do you see

2    that?

3        A.    Yes.

4        Q.    And do you see in the yellow, it says,

5    "Gross amount of income""?

6        A.    Right.

7        Q.    And you represented in the fiscal year of

8    2006 that you made $81,000 and change?

9        A.    Yes.

10       Q.    And then in 2007, you actually made almost

11   $96,000 from your employment; is that correct?

12       A.    That's right.

13       Q.    All right.  Now all this employment income

14   that you started earning in 2006 and 2007 and 2008,

15   that income would be in addition to the $240,000 you

16   borrowed; isn't that right?

17       A.    Yes.

18       Q.    All right.  And if we go to No. 2 on that

19   page, Income Other than From Employment or Operation

20   of Business, it shows that you earned $30,000 and

21   change in 2006 rental income?

22       A.    Okay.

23       Q.    36,000 and change in the year 2007 from

24   rental income?

25       A.    Okay.

1       Q.    And then year to date in 2008, it looks

2  like maybe nine months of 2008, it looks like your

3  rental income was declining, and it was only about

4  $15,000 for the nine months?

5       A.    Okay.

6       Q.    All of that money is money you received in

7  addition to the $240,000 you borrowed on these three

8  houses?  And it was in addition to the income you

9  earned as a physician's assistant; isn't that right?

10      A.    That's right.

11      Q.    Now, if you could turn to page 30 of 36 of

12 this petition?

13      A.    (Witness complies.)

14      Q.    And I direct your attention to paragraph 6

15 on this page, do you see the words "assignments" and

16 "receiverships"?

17      A.    Yes.

18      Q.    Now, you don't know Mark Harmon, do you?

19      A.    I've met him a couple times.

20      Q.    And how have you met him?

21      A.    He was an investor that got a hold of me.

22 And I don't understand all this stuff real well.

23 But he would buy the redemption rights, so that when

24 things went into foreclosure, as I understand it,

25 when things went into foreclosure he had a certain

3783008a-8798-417a-ac0e-724123da26d0

Page 153

1    period of time where he could try to sell the

2    property because he had those rights.

3        Q.    Isn't it true he had a period of time in

4    which he would have the first right to buy that

5    property?

6        A.    Right.

7        Q.    Yes.  And he could buy it from Gene

8    Barnett, couldn't he?

9        A.    He could buy it from the bank.

10       Q.    Okay.  But who made the decision to give

11   those redemption rights to Mark Harmon, of all

12   people?

13       A.    I did.

14       Q.    And because you don't understand

15   redemption rights, were you advised on that decision

16   by Gene Barnett?

17       A.    I suppose he told me about it, yes.  So if

18   that's considered advice, yes.

19       Q.    All right.  You would not have known Mark

20   Harmon, the real estate investor, if you didn't live

21   with a real estate agent; isn't that right?

22       A.    Actually, Mark Harmon was friends with the

23   tenant in 6600 Glenturret.  So that's how I came to

24   know Mark.  The tenant referred him.

25       Q.    All right.  And your tenant at 6600 knew

3783008a-8798-417a-ac0e-724123da26d0

Page 154

1    you were in distress?

2        A.    Yes.

3        Q.    Knew the property was in default?

4        A.    Right.

5        Q.    Do you know anyone who lives in these

6    three properties we'ave been talking about, do you

7    know who's living there today?

8        A.    No, I don't.

9              THE COURT:  Is this a good place to take a

10   break?

11             MR. TALLON:  Yes.

12             THE COURT:  Court will be in recess until

13   1:00.  Do not discuss the case among yourselves or

14   with others or in anyone's presence.  If anyone

15   should try to discuss the case with you, advise me

16   immediately.  Do not read, watch or listen to radio

17   or television or news reports of the trial.  Keep an

18   open mind until all the evidence has been received

19   and you've heard the closing arguments and

20   instructions.

21             Court is in recess until 1:00.

22             (Court in recess from 12:00 to 1:09.)

23             (Whereupon the jury entered the

24   courtroom.)

25             THE COURT:  Please be seated.  You may

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    continue your interrogation.

2        Q.    (By Mr. Tallon)  Ms. Prouty, I'd like to

3    talk to you a little bit more about your bankruptcy

4    petition.  And shortly before the lunch hour began,

5    we were talking about redemption rights.  Do you

6    remember that?

7        A.    Yes.

8        Q.    And I'm not sure if we had a chance to

9    discuss them as I would like.  The redemption rights

10   were sold to a Mark Harmon?

11       A.    Yes.

12       Q.    And did you sell the redemption rights to

13   all three of the properties that you are discussed

14   today to Mark Harmon?

15       A.    I didn't sell anything.  I gave them to

16   him.  I didn't know I could sell them until later

17   on.

18       Q.    Okay.  So you assigned them for no

19   compensation?

20       A.    Right.

21       Q.    And do you know he what he did with those?

22       A.    I believe he sold the house at 6805

23   Glenturret.  But as I recall, he didn't have the

24   redemption rights on the others.  I don't remember,

25   but I don't think he did.

1       Q.    Okay, so only on 6805?  I assume before he

2   sold 6805, he redeemed 6805; is that right?

3       A.    I don't understand the process.  So if

4   that's how it works, I would assume, yes.

5       Q.    All right.  But when he actually did the

6   sale part to whoever bought it, who represented him

7   on that sale?

8       A.    I don't know.  Probably -- I don't know.

9   I don't know.

10      Q.    All right.  Can you exclude Gene Barnett

11  from the possible people who represented him on the

12  sale?

13      A.    No, I can't exclude Gene.  I don't know,

14  though.

15          MR. TALLON:  Could we now move to another

16  exhibit?  And this would be Exhibit J24.  And before

17  I show it, I believe it's stipulated to.

18          Let me make sure that the government is

19  satisfied that they have stipulated to this.

20          MS. HIGGINS:  J24 has been stipulated to.

21          THE COURT:  Received.

22      Q.   (By Mr. Tallon)  Okay.  Do you see that

23  first page that says at the top, "separator sheet"?

24      A.    Yes.

25      Q.    Okay.  Could we turn to the next page of

Page 157

1    that exhibit?

2        A.    (Witness complies.)

3        Q.    And do you see a letter there?

4        A.    Yes.

5        Q.    A letter dated March 19, 2008?

6        A.    Yes.

7        Q.    And I'm just directing your attention to

8    the signature line on that letter.  It says Joan

9    Prouty.  Is that your signature above it?

10       A.    Yes, it is.

11       Q.    And do you see the writing at the top, the

12   handwriting that says, it looks like, "Attention

13   Nicole Stoner"?

14       A.    Yes.

15       Q.    Do you recognize that handwriting?

16       A.    Yes.

17       Q.    And whose is it?

18       A.    Gene's.

19             MR. TALLON:  Now if you could scroll down

20   and just show the bottom half of the page.  A little

21   bit further, please; a little more.  Okay.

22       Q.    (By Mr. Tallon)  Do you see that bottom

23   line in yellow?  The writing is, I think, upside

24   down to you and I, but what does that say on there?

25       A.    It says, "April 1st, '06, 10:01, Gene and

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    Joan, (505)898-9692."

2        Q.    Now is that Gene and Joan the Gene and

3    Joan that we've been talking about today?

4        A.    That's how I set up the fax machine.

5        Q.    All right.  No last names are indicated

6    there.  Is that your fax number?

7        A.    No, that's the home number.

8        Q.    Okay, that's the home number.

9              Now, is that the home number at Sprenger?

10       A.    Yes.

11       Q.    And does Gene Barnett operate a business

12   or a company out of Sprenger that is supposed to be

13   doing real estate investment?

14       A.    No.  He's a Realtor, and he uses a home

15   office.

16       Q.    Okay.  But from that home office, does he

17   have a company that goes by three letters, you know,

18   like ABC?  I don't have it in my mind right now, so

19   I'm asking you if you remember which one, it is.

20       A.    No.

21       Q.    All right, I'll get back to that later.

22             If we could move to the next page.  And at

23   the top, you see Nicole Stoner, that name, Gene

24   Barnett.  Does that appear to be Gene's handwriting?

25       A.    It does.

Page 159

1    Q.    A fax transmittal from April 8, 2008?

2    A.    April 10, 2008.

3    Q.    I'm sorry, April 10th.  I misspoke.  All

4  of that writing there is Gene's writing, yes?

5    A.    That's right.

6    Q.    And this appears to be a fax transmittal

7  to Suntrust Mortgage?

8    A.    That's what it appears to be, yes.

9    Q.    All right.  If we could skip -- let's see,

10 three pages after the one we're looking at, and it

11 appears to be another fax transmittal.

12   A.    (Witness complies.)

13   Q.    Okay.  Let's go to Exhibit J25, which I

14 believe is also stipulated to.

15         Do you see on that page what appears to be

16 a fax transmittal?

17   A.    That's right, yes.

18   Q.    All right.  And again, Gene Barnett and

19 Nicole Stoner are involved in this transmission?

20   A.    Yes.

21   Q.    It appears that Ms. Stoner works for

22 Suntrust Mortgage?

23   A.    I guess, yes.

24   Q.    The transmittal seems to relate to a short

25 sale purchase agreement?

3783008a-8798-417a-ac0e-724123da26d0

1      A.    Yes.

2      Q.    Is this a transaction that Mr. Barnett was

3    conducting as a Realtor?

4      A.    Yes.

5      Q.    And he would be paid commissions if this

6    transaction was completed, the sale was completed?

7      A.    Yes.

8      Q.    And would he have been paid commissions by

9    Suntrust Mortgage?

10     A.    I guess, yes.

11     Q.    And if we could go to the next page and

12   sort of focus in on the bottom of that page.  And in

13   the yellow there, do you see in that yellow box,

14   "Gene Barnett, All Star Realty"?

15     A.    Yes.

16     Q.    And that is the company he was working for

17   at that time?

18     A.    What was the date?  I don't remember the

19   date that he changed to Keller Williams.  He had

20   worked for All Star and then moved to Keller

21   Williams.  I don't know for sure.

22     Q.    Yes, I agree.  Because if we go back to

23   the first fax transmittal form and the second, they

24   both have Keller Williams Realty on top; is that

25   right?

3783008a-8798-417a-ac0e-724123da26d0

Page 161

1     A.     Right.

2     Q.     And then on this line on the page you're

3   looking at right now, he indicates his affiliation

4   at All Star Realty?

5     A.     What does that say?  I can't read through

6   the yellow.  What is the name and --

7     Q.     I think it reads, "What is the Realtor's

8   name and phone number?"

9     A.     Okay.

10    Q.     Does that seem accurate to you?

11    A.     I guess that's what it says.  I can't

12  really make it out.

13    Q.     Do you know if your relationship with Gene

14  Barnett was ever disclosed to Suntrust Mortgage, the

15  company whose loan you defaulted on?

16    A.     I don't know one way or the other.

17    Q.     Did Suntrust Mortgage know that Gene

18  Barnett was in fact your silent partner?

19    A.     I don't know.

20    Q.     Do you know if a sale was completed with

21  respect to this property by Gene Barnett?

22    A.     I don't know.

23    Q.     Okay.  If we could go now to Exhibit J11.

24    A.     (Witness complies.)

25    Q.     Okay, Ms. Prouty.  Does that appear to be

3783008a-8798-417a-ac0e-724123da26d0

Page 162

1    a Web page to you?

2        A.    I guess.

3            MS. HIGGINS:  Objection, Your Honor.  It

4    calls for speculation, and the witness is

5    speculating.

6            THE COURT:  Well, just ask her if it

7    appears to be.  Overruled.

8        Q.   (By Mr. Tallon)  Does it appear to be a Web

9    page to you?

10       A.    I guess, yes.

11       Q.    And everything is a .com these days?

12       A.    Right.

13       Q.    Do you see in the upper left portion of

14   that page, in yellow, "salary.com"?

15       A.    Right.

16       Q.    And if can you go sort of to the middle

17   top of the page, do you see those words in a box,

18   "salary wizard"?

19       A.    Yes.

20       Q.    And do you see underneath that box, it's

21   highlighted, the words to the effect the median

22   expected salary for a typical physician

23   assistant-medical in Albuquerque, New Mexico, 87122

24   Zip code, is $101,164.  Do you see that?

25       A.    I see that.  I want that job.

Page 163

1        Q.    Okay.   Somebody has got it, it appears.

2   Do you see this little pie-shaped chart down below

3   that?

4        A.    I do.

5        Q.    And do you see to the left of the

6   pie-shaped chart, they talk about -- you know,

7   there's a list of check boxes -- base salary,

8   bonuses, Social Security, 401(k), and there's about

9   four others?

10        A.    I see that.

11        Q.    Okay.   And then beneath what we've just

12   been reading do you see a box that contains the bold

13   face words "basic salary report"?

14        A.    I do.

15        Q.    And I won't ask you to read it, but

16   there's some further description of maybe what a

17   basic salary report consists of?

18        A.    Okay, yes.

19        Q.    Okay.   Now if we could turn to the next

20   page, which is Exhibit J12 -- and I believe this is

21   stipulated to as well -- do you see a letter dated

22   March 10, 2006?

23        A.    Yes.

24        Q.    Is that your signature on that letter?

25        A.    Yes.

3783008a-8798-417a-ac0e-724123da26d0

1      Q.     And could you read it to the jury?

2      A.     "To whom it may concern:  The nature of

3   the business I am in is in the medical field.  I

4   have been in the same line of work for over seven

5   years and receive bonuses and promotions frequently.

6   I also don't mind working overtime, and I get paid

7   well by doing so.  I earn over $11,000 per month and

8   intend to be earning even more."

9      Q.     Okay.  Could we turn to the next page?

10  And I think it's also part of Exhibit J2.  It's the

11  second page of Exhibit J12.

12         Do you recognize your signature on that

13  letter?

14     A.     Yes, that's mine.

15     Q.     Okay.  Can you read it to the jury?

16     A.     "To the Lender:  Please accept this letter

17  as an explanation on how I'm planning on making my

18  new mortgage payment.  I make sufficient money.  I

19  have plenty of reserves in my accounts.  My income

20  and job is very stable, and I will not have any

21  problems making payments of $3,500 a month.  If you

22  have any further questions, please feel free to

23  call."

24     Q.     "Thank you, Joan Prouty"?

25     A.     Yes.

3783008a-8798-417a-ac0e-724123da26d0

Page 165

1        Q.    Now, that letter is addressed to the

2    lender.  But if we back up a page and look at the

3    letter we first looked at, that's addressed To Whom

4    It May Concern, isn't it true that the To Whom It

5    May Concern letter was a letter to the lender?

6        A.    I guess, yes.

7        Q.    And if we could go one page further, now

8    we're on Exhibit J13 --

9             THE COURT:  Is this agreed?

10             MR. TALLON:  I believe this is stipulated

11    to as well.

12             THE COURT:  Received.

13        Q.    (By Mr. Tallon)  It's a little hard to

14    read.  It's just the copy I have.  But it says "Gift

15    Letter" at the top, doesn't it?

16        A.    Uh-huh.  Yes, it does.

17        Q.    And it appears to be something of a form

18    letter, but it does have a signature line and place

19    for someone to print below it.  Does the letter

20    appear to be signed by your father, Dean Perry?

21        A.    Yes, it does.

22        Q.    And he does describe the $30,000 that he

23    gave to you as a gift, and not a loan?

24        A.    That's how it's described, yes.

25        Q.    And would you have had to transmit this

Page 166

1    letter to your father to get his signature on it

2    when he lived at 109 Verano Loop, Santa Fe; isn't

3    that correct?

4        A.    Well, there are a couple things.  I didn't

5    transmit it to him.  And he was using that as a

6    mailing address at the time because he was traveling

7    in his RV.

8        Q.    Okay.  Now if we could look at

9    Exhibit J19 --

10            THE COURT:  Also stipulated?

11            MR. TALLON:  I believe it is stipulated as

12   well.  Yes, it is.

13            THE COURT:  Received.

14            MR. TALLON:  Actually, we're at J19.  Stay

15   right there, please.

16       Q.    (By Mr. Tallon)  All right.  J19 consists

17   of three forms.  And do you see the title of that

18   form?

19       A.    Yes, I see the Tax Information

20   Authorization.

21       Q.    And is that called a Form 8821?

22       A.    That's what it says, yes.

23       Q.    All right.  And if we could, still within

24   the same Exhibit 19, turn about three pages, we're

25   looking for a Form 4506.

3783008a-8798-417a-ac0e-724123da26d0

1           All right.  Could we go down to the bottom

2    of that page?

3        A.    (Witness complies.)

4        Q.    Is that your signature on Form 4506?

5        A.    Yes.

6        Q.    And if we move to the top and look at the

7    title of this form, what is that title?

8        A.    Form 4506, Request for Copy of Tax Return.

9        Q.    So you gave permission to disclose some

10   very private information to any lender that might

11   want to consider approving your loan; isn't that

12   right?

13       A.    That's right.

14       Q.    If we could go, still within Exhibit J19,

15   I think about two pages, and we're looking for

16   Form 4506-T.  Do you see that in front of you now?

17       A.    I do.

18       Q.    Could we drop down to the bottom half?

19   And that your signature at the bottom of that form?

20       A.    Yes, it is.

21       Q.    And the title of that form is, at the top?

22       A.    Form 4506-T, Request for Transcript of Tax

23   Return.

24       Q.    All right.  And if we could back up about

25   six pages to Form 8821 and drop to the bottom of

3783008a-8798-417a-ac0e-724123da26d0

Page 168

1    that page, is that your signature again?

2        A.    Yes, it is.

3        Q.    And there's a date next to your signature?

4        A.    2/16/06.

5        Q.    Okay.  Now, do you recall if you signed

6    the other two forms on the same date, February 16,

7    '06?

8        A.    I would have to look.  I don't recall.

9        Q.    All right.  Well, let's go quickly back to

10   4506.

11       A.    Yes.

12       Q.    The date of your signature is what?

13       A.    2/16/06.

14       Q.    And then go a couple more pages to 4506-T.

15       A.    2/16/06.

16       Q.    Okay.  Now could we back up to

17   Exhibit J17, also stipulated to?

18       A.    (Witness complies.)

19       Q.    Okay.  Can you tell me what the title is

20   of J17?

21       A.    It says Borrower's Certification and

22   Authorization.

23       Q.    Okay.  If you could look at the top half

24   of that form, and the top half seems to be entitled

25   Certification.

Page 169

1            And when you signed this form -- we

2    haven't gotten to your signature yet.  But when you

3    signed this form, were you signing this making a

4    certification by Joan Prouty to Worldwide Mortgage?

5        A.    To Worldwide Mortgage?

6        Q.    Yes.

7        A.    I don't know exactly --

8        Q.    Well, do you see on paragraph 1 --

9        A.    Okay, yes.

10        Q.    -- it says, "I/we" -- but in this case, it

11    was just I -- "I have applied for a mortgage loan

12    through Worldwide Mortgage," period?

13        A.    It would be through them, yes.

14        Q.    Okay, and then it goes on.  I won't read

15    all the language.  But if could you drop down to

16    paragraph 3, could you read that part of the

17    certification?

18        A.    Sure.  It says, "I/we fully understand

19    that it is a federal crime, punishable by fine or

20    imprisonment or both, to knowingly make any false

21    statements when applying for this mortgage as

22    applicable under the provisions of Title 18, United

23    States Code, Section 1014."

24        Q.    Okay.  And when you were contacted by the

25    FBI or by the US Attorney's Office, isn't it true

3783008a-8798-417a-ac0e-724123da26d0

Page 170

1    that you told them that you didn't think you had

2    done anything wrong in connection with these

3    proceedings?

4         A.    That's right.

5         Q.    And when you spoke with your attorney,

6    Richard --

7         A.    David Freedman.

8         Q.    David Freedman, I'm sorry.  Did you also

9    tell him that you did not think you did anything

10   wrong?

11        A.    That's right.

12        Q.    And did you at some later time after

13   February 16th, make any certifications like this

14   one, except you made those certifications to the

15   lenders that you eventually got your loans from?

16        A.    Apparently in all the closing documents,

17   there were these similar statements.

18        Q.    Okay.  But first and foremost, you gave

19   this assurance to Worldwide Mortgage that you were

20   telling the truth, and you signed it.

21             And you still believe you don't think

22   you've done anything wrong; is that right?

23        A.    I now believe I've done something wrong,

24   but at the time I did not.

25        Q.    At that time, did you have any kind of

3783008a-8798-417a-ac0e-724123da26d0

1    criminal intent when you signed this document that

2    is J17 in favor of Worldwide Mortgage?

3         A.    No, I didn't.

4              MS. HIGGINS:  Objection, Your Honor.

5    Calls for a legal conclusion.

6              MR. TALLON:  I think it's a state of mind,

7    Your Honor.

8              THE COURT:  Overruled.

9              At the time, did you have any kind of

10   criminal intent when you signed this document that's

11   J17 in favor of Worldwide Mortgage?

12             THE WITNESS:  No, I didn't have any

13   criminal intent.

14             MR. TALLON:  Could we go now to

15   Exhibit I24, which I believe is stipulated to?

16             THE COURT:  Received.

17        Q.   (By Mr. Tallon)  I believe the page number

18   at the bottom of this is AHL515.  Do you see that at

19   the bottom?

20        A.   I do.

21        Q.   Okay.  And if you could look towards the

22   top half of that document -- maybe you could bring

23   it in a little bit, because it's small print -- do

24   you see the representative of Worldwide Mortgage

25   that this was sent to?

Page 172

1       A.    Jodi Powers.

2       Q.    And did you work with Jodi Powers during

3    the processing of your three loans?

4       A.    Yes.

5       Q.    Did you work with Natalie Martinez during

6    the processing of your three loans?

7       A.    Yes.

8       Q.    Do you recall any other staff members or

9    team members at Worldwide Mortgage on the processing

10   of your three loans?

11      A.    On these loans, it was just Jodi and

12   Natalie.

13      Q.    All right.  And did they handle most of

14   the paperwork in connection with the processing of

15   these loans?

16      A.    Yes.

17      Q.    And you did have conversations with both

18   of these in connection with the processing of these

19   loans, didn't you?

20      A.    Daily.

21      Q.    Daily?  Okay.

22          MR. TALLON:  Could we move about three

23   pages to page AHL518?  It's within the same exhibit,

24   I believe, and it's stipulated to.  And if we could

25   drop to the bottom of that page, 518.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1         And if I could direct your attention --

2    it's a little small, but there's two lines that

3    begin with the word "indicated."  And maybe we need

4    to zoom in on that.

5         Q.    You have a better look than I do,

6    actually.  But do you see the two lines indicated?

7         A.    Yes.

8         Q.    Okay.  And the first one, it says,

9    "Indicated value by sales comparison approach,

10   $495,000"?

11        A.    Yes.

12        Q.    And then, "Indicated value by sales

13   comparison approach, $495,000"?

14        A.    Yes.

15        Q.    And you didn't buy any of these three

16   properties for any more than $490,000?

17        A.    Each was 490.

18        Q.    So in effect, this appraisal by Heidi

19   Chavez -- you said she did all the appraisals --

20   valued this property at a price a little higher than

21   what you paid?

22        A.    That's right.

23        Q.    And without looking at all three of these

24   appraisals, they are -- well, your recollection is

25   that the other two appraisals were for at least

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1   $490,000; is that correct?

2        A.    They're up at the top, and so let's look

3   at those.  That way, I can recall exactly.  Can I go

4   to the top of the page?

5        Q.    Sure.

6        A.    That's great.  Thank you.

7              And your question was, they're all 490 or

8   above?

9        Q.    No.  The other two houses that you

10  purchased were appraised at at least $490,000; is

11  that correct?

12       A.    I'd have to look at them again, but I

13  think so.  One of them is the first one on here.

14  This is the subject property.

15       Q.    Okay, so we can stay right there at the

16  top of the page.  Do you see, towards the top of the

17  page, there's three columns?  One says, "Comparable

18  Sale No. 1."  Next is, "Comparable Sale No. 2," and

19  the third is, "Comparable Sale No. 3."

20             Do you see that?

21       A.    Yes.

22       Q.    And those three properties are 8201 Villa

23  Alegre, Northeast; the next is 7435 Hawthorne

24  Avenue, Northeast; the next is 9121 Silverwood

25  Drive, Northeast; all in Zip code 87113.

3783008a-8798-417a-ac0e-724123da26d0

Page 175

1              Do you see those?

2       A.    Yes.

3       Q.    And your property is also located in the

4  Zip code 87113?

5       A.    Right.

6       Q.    And these three properties whose names or

7  addresses I just mentioned, those are the three

8  comparables that were used to reach your appraised

9  value of $495,000?

10      A.    Appraised value 495,000, yes.

11      Q.    Okay.  And you are familiar with the

12 phrase "comparable sales," aren't you?

13      A.    Yes.

14      Q.    And just to cover all the bases, if we

15 could back up from page 518 to 516, who was this

16 appraisal prepared by?

17      A.    Heidi Chavez.

18      Q.    Of Williams Appraisal?

19      A.    Yes.

20      Q.    Could we go to 529 of that same exhibit?

21      A.    (Witness complies.)

22      Q.    Do you see a copy of what appears to be

23 Heidi Chavez's real estate license?

24      A.    Yes.

25            MR. TALLON:  Could we turn to the next

Page 176

1    page, 530 of this appraisal -- let me see if I've

2    got that right.  Actually, we'd have to go to

3    Exhibit J25 to reach page 530.  Okay, we've got it.

4    All right, we just had it.

5            And I believe this is stipulated to, as

6    well.

7            MR. KRAEHE:  What is it?

8            MR. TALLON:  I believe this is stipulated

9    to as well.  This is J25 -- no, I25.  I'm very

10   sorry.

11           MR. KRAEHE:  Yes.

12      Q.   (By Mr. Tallon)  Okay.  So directing your

13   attention, Ms. Prouty, to I25, if you could take a

14   few moments to look at this and see if you recognize

15   what it is.

16      A.   Well, it's titled Residential Appraisal

17   Review, short form.

18      Q.   And does it give the name in that top box

19   of somebody called a review appraiser?

20      A.   Yes.

21      Q.   What's his name?

22      A.   Robert -- I don't know how to say it.  I'm

23   going to butcher it, I'm sure, but Fabianes.

24      Q.   Yeah, I think it's Fabianes as well.  And

25   it's spelled F-A-B-I-A-N-E-S.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 177

1          And on the next line, Mr. Fabianes appears
2  to reside where, what town?
3     A.    San Diego, the same as the lending
4  institution.
5     Q.    And the lending institution is who?
6     A.    Accredited Home Lenders.
7     Q.    And does this seem to be an appraiser who
8  reviewed Ms. Chavez's work on behalf of Accredited
9  Home Lenders?
10    A.    I don't know.  I don't know what that
11  represents.
12    Q.    All right.  Could we go down to the bottom
13  box, called Reviewer's Summary at the bottom of the
14  page?
15    A.    (Witness complies.)
16    Q.    And the reviewer's recommendation is a
17  number.  What's that number?
18    A.    The reviewer's recommendation is 490,000.
19    Q.    All right.  So this gentleman in San Diego
20  reviewed Ms. Chavez's appraisal and appears to have
21  revised it or adjusted it a little bit by $5,000; is
22  that correct?
23    A.    That's how it appears, yes.
24    Q.    Now, one of the points that you made with
25  Ms. Higgins was your statement to the effect that

Page 178

1    Mr. Powers told you to pay the mortgage with the

2    money you received.  Do you remember saying that?

3        A.    Yes.

4        Q.    And do you remember when you first became

5    delinquent or I should say when you first defaulted

6    on any of those three mortgages?

7        A.    It was in November of '07.

8        Q.    Okay.  Have you had an opportunity to look

9    at your credit report recently?

10       A.    I have not pulled my credit report since

11   my bankruptcy.

12       Q.    All right.  Would that perhaps refresh

13   your recollection as to the date of your first

14   default?

15       A.    It may.

16             MR. TALLON:  May I approach, Your Honor?

17             THE COURT:  Sure.

18             THE WITNESS:  What is it you want me to

19   look for here?

20       Q.    (By Mr. Tallon)  I'd just like you to

21   review this column and then continue your review on

22   to the next page.

23       A.    Okay.

24       Q.    Have you had an opportunity to review it?

25       A.    I looked at it briefly, yes.

3783008a-8798-417a-ac0e-724123da26d0

Page 179

1      Q.    Does it refresh your recollection as to

2    when you may have first defaulted on the mortgage

3    loans that relate to these three transactions?

4          And maybe if I could take it back for a

5    minute, I'll just ask you a question:  Do you

6    recal,l, what was the date of your first default on

7    a $127,200 mortgage loan to Mid Century Mortgage?

8      A.    Maybe I don't understand the term default,

9    but New Century was who I believe who the lender was

10   for the Vista del Rey property.  And they

11   transferred it to someone else, so I don't know that

12   that ever defaulted.

13          Well, maybe I don't understand the term

14   "default," but that was paid.

15     Q.    Do you remember Cameron Financial Group,

16   the lender on 6701 Glenlochy?

17     A.    Yes.

18     Q.    Do you recall when you first defaulted on

19   the loans with Cameron lenders?

20     A.    Pretty much everything stopped being paid

21   in November of '07.  So I can't justify what's in

22   there.  Maybe that's when they started acknowledging

23   it.

24     Q.    All right.  Accredited Home Lenders was

25   one of your lenders, yes?

3783008a-8798-417a-ac0e-724123da26d0

1      A.    With one of the Oakland Estates

2   properties, yes.

3      Q.    Okay.  We'll focus on two Accredited loans

4   at the same time.  And you said one of them was an

5   Oakland Estates property.  I'll direct your

6   attention to these two numbers --

7      A.    All right.

8      Q.    And two those two dates.  And once you've

9   had a chance to take a look at it, I'll ask again

10  the question.

11     A.    I think if you're asking about default,

12  these were --

13          MR. TALLON:  Wait for my question.

14     Q.   (By Mr. Tallon)  Does this report, your

15  credit report, indicate that you first defaulted

16  on --

17          MS. HIGGINS:  Your Honor, objection.  I

18  thought that he was giving the witness for

19  recollection --

20          THE COURT:  Rephrase the question.

21     Q.   (By Mr. Tallon)  Does this report refresh

22  your recollection as to the date of your first

23  default on the first loan given to you by Accredited

24  Home Lenders?

25     A.    I wasn't ever aware that I defaulted.

1    They were sold by Accredited to other companies, and

2    so this is my first knowledge of any default.  I

3    paid the other company that they sold the loans to.

4        Q.   All right.  What is the date at the top of

5    this credit report?

6            MS. HIGGINS:  Your Honor, objection.  I

7    don't know what that is.  It's not in evidence.

8    He's just using it to refresh recollection.

9            THE COURT:  Okay.

10       Q.   (By Mr. Tallon)  So you don't remember?

11           MS. HIGGINS:  Objection, Your Honor.  I

12   believe the witness has said --

13           THE COURT:  There's no question.

14       Q.   (By Mr. Tallon)  All right.  In going back

15   to your bankruptcy, Ms. Prouty, I wanted to know if

16   you'd ever heard the term "strategic default."

17       A.   No.

18       Q.   Have you ever heard that in reference to

19   someone making a choice about --

20           MS. HIGGINS:  Objection, Your Honor.  I

21   believe the answer was no.

22           THE COURT:  Stick to the question.  Have

23   you ever heard that in reference to someone making a

24   choice about?

25           So again, I need to hear a question before

3783008a-8798-417a-ac0e-724123da26d0

1    I can overrule it.

2        Q.   (By Mr. Tallon)  A choice about which loans

3    to pay and which loans not to pay?

4            MS. HIGGINS:  And Your Honor, objection,

5    based on her prior answer of not knowing what that

6    term means.

7            THE COURT:  Well, no, not really.  She was

8    asked if she had heard the term "strategic default."

9    She said no.

10           This is a different question.  It may mean

11   the same thing, but it may mean something else to

12   her.  Overruled.

13       A.   I'm understanding you to ask if I've heard

14   the term strategic default in relationship to

15   something.  But I've never heard the term "strategic

16   default," so I haven't heard it in relationship to

17   anything else.

18       Q.   (By Mr. Tallon)  Okay.  But it's true that

19   you made a choice in your bankruptcy petition to

20   hang on to three properties and default on the other

21   three?

22       A.   That would be accurate.

23       Q.   And we talked about Tim Lesley earlier.

24   Did Mr. Lesley buy a house in Oakland Estates on the

25   same street you did?

1      A.    I think so.  I actually don't know where

2    his is.  I think it was on Glenlochy, but I'm not

3    100 percent sure.

4      Q.    Isn't it true that Mr. Lesley's house, the

5    one that he bought, was across the street from the

6    house you bought on Glenlochy?

7      A.    I really don't know.

8      Q.    Do you know if Mr. Lesley is still paying

9    the mortgage on the house he bought there?

10     A.    I don't know.

11            MR. TALLON:  Could I have a moment, Your

12   Honor?

13            THE COURT:  Sure.

14     Q.   (By Mr. Tallon)  Ms. Prouty, when we were

15   looking at your lease before, the one that you and

16   Mr. Barnett signed, do you recall the amount of the

17   rent that you and Mr. Barnett listed on that lease?

18     A.    If I recall, it was 1,600.  Can we look at

19   it again?

20     Q.    Sure.  Let's see if I can find it.

21            Okay, if you could look at Exhibit J16.

22     A.    Thank you.

23            MR. KRAEHE:  Has that one been --

24            MR. TALLON:  Actually, it's another copy

25   of that lease, and it is stipulated to.  And it's

Page 184

1    part of J14; is that correct?

2         MR. KRAEHE:  I'm okay with it.

3         THE WITNESS:  Can you go to page 2,

4    please?

5         MR. TALLON:  If you could go to page 2,

6    please.

7         THE WITNESS:  1,600, yes.

8    Q.  (By Mr. Tallon)  All right.  Now when you

9    were speaking with Ms. Higgins about one of your

10   loan applications, let me just --

11        MR. TALLON:  Okay.  If we could go to

12   Exhibit 96, page 492.  And we need to cue the

13   government on this one.

14        THE WITNESS:  Will that come up on here?

15        MR. TALLON:  Yes, it will come up.

16   Q.  (By Mr. Tallon)  And if I could direct your

17   attention to the portion of the page that shows

18   Income, up at the top, I believe?

19   A.   All right.

20        MR. TALLON:  And if I could just step up

21   here, Your Honor, because my eyes are failing.

22   Q.  (By Mr. Tallon)  Do you see a figure for

23   gross rental income?

24   A.   It says "net rental income."

25   Q.   Well, the column to the left.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1          MR. TALLON:  Your Honor, if I may

2   approach?

3          THE COURT:  Sure.

4      A.    This one looks like net rental income

5   there.  Is that gross?

6      Q.   (By Mr. Tallon)  It is a bad copy, but I'll

7   let your eyes be the judge.

8      A.    Is that the line that you want?

9      Q.    Yes.

10     A.    Yes.

11     Q.    It appears to read, "gross rental income"?

12     A.    Okay.

13     Q.    And the figure that the team at Worldwide

14  Mortgage used to prepare your application was

15  $1,200?

16     A.    It appears that way, yes.

17     Q.    So they actually assigned you $400 less

18  income than was represented by the lease that you

19  and Mr. Barnett created?

20     A.    Apparently, yes.

21     Q.    Now, if we could look at -- I don't know

22  what exhibit -- excuse me.  It's Exhibit 23,

23  Government Exhibit 23.  And the best I can tell you

24  is page 31, line 24.

25          Do you recognize what's shown in

3783008a-8798-417a-ac0e-724123da26d0

1    Exhibit 23?

2        A.    Yes.

3        Q.    And what is it?

4        A.    It's a Nonprosecution Agreement relating

5    to Joan Prouty.

6        Q.    And the date on that agreement is?

7        A.    September 22, 2009.

8        Q.    And would you agree that you didn't

9    believe you had done anything wrong at the time you

10   signed this agreement?

11       A.    By the time this agreement was presented,

12   I had already met with Mr. Freedman once.  And he

13   had outlined where there were issues that then were

14   brought my attention were wrong.  So no, I knew that

15   when I signed this agreement.

16       Q.    Okay.  So you felt that you signed this

17   agreement to avoid some risks that Mr. Freedman

18   thinks you might have faced?

19       A.    Mr. Freedman and me.

20             MR. TALLON:  Okay.  Your Honor, I'd like

21   to at this time offer into evidence all of the

22   exhibits set forth in my exhibit list under

23   category G, category H, category I, category J, that

24   are that have already been stipulated to by the

25   United States.

3783008a-8798-417a-ac0e-724123da26d0

1           There are a few exhibits within those

2    categories that are not that I would like to offer

3    at this time, those exhibits which are stipulated

4    to.  And I have no further questions.

5           THE COURT:  Received.

6           Redirect?

7                REDIRECT EXAMINATION

8    BY MS. HIGGINS:

9       Q.    Ms. Prouty, I'm going to try to talk with

10   you without bringing any of these exhibits back up

11   because we've all looked at them.

12          On the letter signed by your father having

13   to do with the gift, did you draft that letter?

14      A.    No.

15      Q.    Did you ask your father to sign it?

16      A.    I told him that Kevin was going to be

17   faxing him a letter.  And we he had agreed to help

18   me out with the money, so I did ask that he sign it

19   so we had documentation, yes.

20      Q.    And I believe you just said Mr. Powers was

21   going to be faxing the letter.  Whose idea was it to

22   get this loan from your father?

23      A.    Well, Mr. Powers would be the answer to

24   that question.

25      Q.    Okay.  And what was the purpose of getting

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 188

1    the $30,000 to put in your bank account?

2        A.    To show that I had money available so that

3    it would appear I could pay for the mortgages.

4        Q.    Essentially, that you had the ability to

5    repay the loan?

6        A.    Yes.

7        Q.    And I said loan, singular, because each

8    lender would only know about its loan?

9        A.    Right.

10       Q.    Okay.  Now on the bankruptcy documents

11   that Mr. Tallon showed you, where it listed all the

12   properties that you owned, as part of filing for

13   bankruptcy, is it true that you had to list all of

14   the properties you owned on the petition?

15       A.    Everything I owned.

16       Q.    And although you wanted to keep three of

17   those real estate properties, did you have the

18   ability to tell the Bankruptcy Court, "I'ill be

19   keeping those.  You can sell the rest for my

20   creditors?"

21       A.    No.  I had moved out of the Sprenger

22   property, because we were doing some fixup, because

23   I figured I'd have to sell it, or it needed to be

24   ready to sell.  I did not think I would end up with

25   that property, and so we moved back into the

3783008a-8798-417a-ac0e-724123da26d0

Page 189

1    townhouse at that time.

2        Q.    All right.  Who, to your understanding,

3    was going to make the decision about which of your

4    properties would be sold to pay your creditors?

5        A.    The judge or trustee in the bankruptcy.

6        Q.    And why is it, I wonder, that the three

7    properties that you kept, why were they not sold; do

8    you know?

9        A.    Because they didn't have any real value.

10       Q.    Is that because there was low equity in

11   them?

12       A.    That's right.  Excuse me.  They didn't

13   have any equity value.  They didn't have any money

14   that the trustee could get for payment of the other

15   things I owed.

16       Q.    And that decision was made by the trustee,

17   you're telling us?

18       A.    That's right.

19       Q.    Why did you go into bankruptcy?

20       A.    I didn't have a choice.  I couldn't pay

21   for the houses on Oakland Estates.  I couldn't make

22   those mortgages anymore, and that's what I had to

23   do.

24       Q.    All right.  Did you decide on your own to

25   go into bankruptcy?  Did anybody advise you?

Page 190

1     A.    My friend Dawn came over and said, "Joan,

2   get your head out of the sand.  We have to go and

3   talk to some people about the predicament we've

4   gotten ourselves into."

5     Q.    All right.  Had you considered any

6   alternatives to going into bankruptcy?

7     A.    Suicide was a reasonable option, excuse

8   me.  But I did think of it a lot.

9     Q.    All right.  Mr. Tallon mentioned Kathy

10  Winston, Dr. Winston?

11    A.    Yes.

12    Q.    You all bought at least one property

13  together; did I understand that correctly?

14    A.    That's right, the property at Vista del

15  Rey.

16    Q.    Did Mr. Powers ever call you about another

17  property that Dr. Winston had bought?

18    A.    Yes.

19          MR. TALLON:  Objection, irrelevant.

20          THE COURT:  Can you describe the

21  relevancy, please?

22          MR. TALLON:  May we approach?

23          THE COURT:  All right.

24          (At the bench:)

25          MS. HIGGINS:  Your Honor, this involves

3783008a-8798-417a-ac0e-724123da26d0

Page 191

1    another property that Dr. Winston bought and

2    apparently defaulted on immediately.  Ms. Prouty was

3    in California and got a call from Mr. Powers, who

4    told her that she needed to make the mortgage

5    payments, presumably out of some of the cash back

6    she had received on her properties.  She was

7    dumbfounded and did not do so.  Mr. Tallon has

8    brought up Dr. Winston.

9              MR. TALLON:  Your Honor, Ms. Winston,

10   Dr. Winston, wasn't mentioned on direct examination.

11   The United States attempted to offer an exhibit or

12   exhibits in relationship to Dr. Winston that were

13   objected to in pretrial proceedings.  Judge Armijo

14   excluded them.

15             But it is undeniable that Joan Prouty was

16   a co-owner of this Vista del Rey property.  And I

17   think it was proper to simply bring up the fact of

18   her co-ownership with Dr. Winston because it's one

19   of the properties that was involved in her defaults

20   and the bankruptcy proceedings and so forth.

21             To allow Ms. Higgins to now go into a

22   separate transaction that Dr. Winston engaged in for

23   a house was 8- or $900,000 -- that was the property

24   or the issue that the United States attempted to

25   interject information about and was precluded from

3783008a-8798-417a-ac0e-724123da26d0

1    doing so by Judge Armijo -- I think would be

2    inappropriate.

3           I don't feel that I have opened the door

4    to cross-examination about an entirely new

5    transaction for which the United States probably

6    doesn't have exhibits available to go through the

7    particulars of.

8           THE COURT:  You've raised a matter that

9    hasn't be raised and that's beyond the scope of

10   cross.

11          Now let's go back and talk about this one

12   thing that came out -- I don't remember if it was on

13   direct or cross -- about whether Mr. Powers had

14   asked her to make contributions or payments out of

15   this money.  I don't recall it coming up on cross.

16          MR. TALLON:  No, I didn't bring it up on

17   cross.

18          THE COURT:  It will be sustained.  Beyond

19   the scope of cross-examination.

20          MS. HIGGINS:  Okay.

21          (In open court:)

22      Q.  (By Ms. Higgins)  Ms. Prouty, although

23   Mr. Tallon has talked about your intimate partner,

24   Gene Barnett, you are in fact legally a single

25   woman; are you not?

1       A.    That's right.

2       Q.    Do you know -- well, you have said you

3    know Shaunna Ramply.  Is she also single?

4       A.    Yes.

5       Q.    Do you know Dawn Tuschhoff?

6       A.    Yes, I do.

7       Q.    Is she also single?

8       A.    Yes, she is.

9       Q.    And was she also another client of

10   Mr. Powers?

11      A.    Yes.

12      Q.    Now at the time you bought the three

13   properties we'ave been talking about, did you intend

14   to live in any one of them as your primary residence

15   at the time you bought them in March 2006?

16      A.    The ones I bought in March 2006 I never

17   intended to live in.  As far as other properties

18   that he was my broker, no.  I wanted to live in

19   Sprenger.

20      Q.    And speaking about that, when you got the

21   refinance on Racheleigh, did you provide Mr. Powers

22   with accurate income information?

23      A.    Yes, I did.

24      Q.    And that was not a stated income loan, was

25   it?

3783008a-8798-417a-ac0e-724123da26d0

Page 194

1      A.    That's correct.

2      Q.    And at the time you bought the three

3   properties through Mr. Powers, we'll call them the

4   three --

5      A.    Okay.

6      Q.    -- meaning the two on Glenturret and the

7   one on Glenlochy, did you intend to do $240,000 in

8   repairs and renovations through K&E Construction?

9      A.    No.

10     Q.    Is it your testimony today that the three

11  houses in Oakland Estates were found by Mr. Powers?

12     A.    Yes.

13     Q.    And was he your Realtor on all three?

14     A.    Yes.

15     Q.    And was he your mortgage broker on all

16  three?

17     A.    Yes.

18     Q.    And was he the one who knew you were

19  buying three properties within roughly two weeks of

20  each other?

21     A.    It was a week of one after another, and

22  yes.

23     Q.    You and Mr. Tallon talked about a concept

24  that sounded like buy low, sell high.  That was not

25  the exact wording, but I believe you said you were

3783008a-8798-417a-ac0e-724123da26d0

1   familiar with the concept of finding a house that

2   was being offered for sale at less than its probable

3   value.  Did you say that?

4       A.   Yes.

5       Q.   At the time you bought these homes in

6   March 2006, were you familiar with the idea of

7   finding such a house that was being offered for sale

8   at under its probable value?

9       A.   Yes.

10      Q.   But were you also aware of the concept of

11  buying it at a higher price so that you could get

12  money back at closing?

13           MR. TALLON:  Objection.  Mischaracterizes

14  the concept that Ms. Higgins thinks I was relying

15  on.

16           THE COURT:  Overruled.

17           THE WITNESS:  Am I supposed to answer

18  that?

19           MS. HIGGINS:  Yes, you are.

20      A.   Yes, I think, is the answer.

21      Q.  (By Ms. Higgins)  All right.  And where did

22  that idea come from to you?

23      A.   I originally heard about the idea when

24  Shaunna and Gene were working on buying these kinds

25  of homes for flippers, to buy, fix up and then

Page 196

1    resell.

2        Q.    All right.  And when you talked with

3    Mr. Powers, did he also espouse the idea of buying

4    low and building in an amount that would come back

5    to the buyer after closing?

6        A.    Yes.

7        Q.    I believe you told Mr. Tallon that you

8    never discussed different kinds of loan products

9    with Mr. Powers; is that right?

10       A.    That's right.

11       Q.    Did you ever discuss with him why you

12   would -- well, whether a full doc loan was possible

13   for you to buy these three homes?

14       A.    I knew that that wasn't possible, and I

15   knew there were options of these stated loans.  And

16   so we didn't really have that conversation.  It was

17   just what was going to have to happen.

18       Q.    All right.  Why was a full doc loan not

19   possible for you?

20       A.    Because I could not support payment.  I

21   wouldn't have enough income to support payment.

22       Q.    Well, why did you agree to having the

23   boxes for primary residence checked?  Why did these

24   have to be bought as primary residences?

25       A.    To get a lower mortgage -- or interest

3783008a-8798-417a-ac0e-724123da26d0

1    rate.  And that's how I understood that --

2        Q.    All right.

3        A.    -- even though they weren't very low.

4        Q.    Did Mr. Powers tell you that you could get

5    a lower interest rate if you bought as a primary

6    residence?

7        A.    Right.

8        Q.    You and Mr. Tallon also talked about the

9    lease agreement having to do with Mr. Barnett --

10       A.    Yes.

11       Q.    -- renting from you?

12             Who prepared that lease agreement?

13       A.    Mr. Powers did.

14       Q.    Why is that lease agreement showing up in

15   lenders' records and other places?

16       A.    As I recall, it was to show that I had

17   additional income coming in and also that the

18   Racheleigh property would be rented.

19       Q.    So that Racheleigh could not be seen as

20   your primary residence; is that correct?

21       A.    Right.  But I think, more than anything,

22   to show that there was income coming in.

23       Q.    All right.  In buying three houses at

24   once, whose advice did you rely on for that?

25       A.    Kevin Powers.

3783008a-8798-417a-ac0e-724123da26d0

1    Q.    Do you know what a silent partner is?

2    A.    Not really.  I mean I think I have a

3    layman's idea of what it is.  Someone who's there

4    with money, and that's about it.

5    Q.    Was Mr. Barnett there with money?

6    A.    No.

7    Q.    In fact --

8    A.    He was also poor.

9    Q.    Okay.  And actually, whose name was on the

10    mortgages?

11    A.    All of them have my name alone on them.

12    Q.    Mr. Tallon talked with you about letters

13    in his exhibits.  They are also I believe in the

14    lenders' exhibits.

15        The one where you talked about earning

16    11,000 a month and another one where you talked

17    about being able to make payments, who typed these

18    letters?

19    A.    I didn't type them.  I think they were

20    typed by Natalie or Jodi.

21    Q.    All right.  And the purpose of these

22    letters was what?

23    A.    To represent to the lenders that I could

24    make the mortgage repayments.

25    Q.    And there was some reference, I believe,

3783008a-8798-417a-ac0e-724123da26d0

1    to Gene Barnett possibly paying rent to you.

2         At any point, did he pay -- or not at any

3    point.  In March of '06, was he paying you any rent

4    anywhere?

5    A.   No.

6    Q.   Did Mr. Powers know that you were buying

7    these three properties as investment properties?

8    A.   Yes.

9    Q.   Did Mr. Powers know that you were not

10   planning on making renovations on these properties,

11   at least not to the tune of 240,000?

12   A.   Yes.

13        MR. TALLON:  Objection.  Assumes facts not

14   in evidence and lack of foundation.

15        THE COURT:  Well, I'll overrule on those

16   two grounds.

17   Q.   (By Ms. Higgins)  I believe you said yes?

18   A.   Right.  We talked about what needed to be

19   done, and it certainly wasn't at that much of a

20   cost.

21   Q.   And Mr. Tallon showed you a page from a

22   Web page called salary.com?

23   A.   Uh-huh.

24   Q.   Was that ever pulled up for you while you

25   were giving income information to Mr. Powers or

Page 200

1    anyone at his office?

2        A.    I never saw that.  He said that he was

3    using a computer program to do the cost -- or the

4    salary information.

5        Q.    Okay.  But you were not making the

6    $101,164 a year?

7        A.    No.

8              MS. HIGGINS:  Your Honor, may I have a

9    moment, please?

10             THE COURT:  Sure.

11             MS. HIGGINS:  That's all the questions we

12   have, Your Honor.

13             THE COURT:  Ms. Prouty, you're excused.

14             We're going to take a 15-minute break.  Do

15   not discuss the case among yourselves or with others

16   or in anyone's presence.  If anyone tries to talk to

17   you about the case, advise me immediately.  Do not

18   read, watch or listen to radio, television or news

19   reports of the trial or do research on your own.

20   Keep an open mind until all the evidence has been

21   received and you've heard the closing arguments and

22   instructions.

23             Court is in recess for 15 minutes.

24             (Court in recess from 2:15 to 2:31.)

25             (Whereupon the jury entered the

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    courtroom.)

2           THE COURT:  Please be seated.

3           MR. KRAEHE:  Your Honor, the United States

4    calls Dawn Tuschhoff.

5           THE COURT:  Good afternoon.  Would you

6    please remain there for just a moment and state and

7    spell your first name and last name for me and the

8    jury and for the court reporter?

9           THE WITNESS:  My name is Dawn Tuschhoff.

10   The first name is  D-A-W-N.  The last name is

11   T-U-S-C-H-H-O-F-F.

12          THE COURT:  Please raise your right hand.

13                   DAWN TUSCHHOFF,

14   having been first duly sworn, testified as follows:

15                   DIRECT EXAMINATION

16   BY MR. KRAEHE:

17       Q.   Good afternoon, ma'am.  Where do you

18   currently reside?

19       A.   Here in Albuquerque, up in the Northeast

20   Heights.

21       Q.   How long have you resided in Albuquerque?

22       A.   Since I was four.

23       Q.   Did you purchase a single-family dwelling

24   at 11801 Eagle Rock Road in April of 2007?

25       A.   Yes.

3783008a-8798-417a-ac0e-724123da26d0

Page 202

1       Q.    Who was your real estate agent for

2    purchase of that property?

3       A.    Kevin Powers.

4       Q.    What caused you to want to purchase the

5    property on Eagle Rock?

6       A.    Real estate investment.

7       Q.    Was it your intent to purchase that

8    property as a primary residence?

9       A.    No.

10      Q.    Was that property intended as an

11   investment?

12      A.    Yes.

13      Q.    Did Kevin Powers know it was your intent

14   to purchase that property for investment purpose?

15      A.    Yes.

16      Q.    How did he know that?

17      A.    We had discussed it in his office several

18   times.

19      Q.    Did you have a plan as to how you would

20   make money on that property as an investment?

21      A.    On that particular property, we were going

22   to renovate it and then sell it for a profit.  We

23   were going to remodel the home.

24      Q.    And who came up with that plan?

25      A.    Kevin.

3783008a-8798-417a-ac0e-724123da26d0

Page 203

1      Q.    Who found the property for you?

2      A.    Mr. Powers.

3      Q.    Did you have anything to do with locating

4    that property?

5      A.    I did not.

6      Q.    Do you recall who was selling the property

7    on Eagle Rock?

8      A.    I think Kiva Assets was the owner.

9      Q.    And do you know for how much Kiva Assets

10   originally listed the property?

11     A.    I do not.

12     Q.    Have you since learned about how much they

13   had listed it for?

14     A.    No.

15     Q.    Did you ultimately enter into a contract

16   for the purchase of Eagle Rock?

17     A.    Yes.

18     Q.    Behind you are a bunch of binders that

19   contain government exhibits.  And I'd like you to

20   pull off the binder that contains Government

21   Exhibit 139.  That has already be entered into

22   evidence, and I'd like you to turn to page 174 of

23   that.

24           And by the way, ma'am, just for the

25   record. how old are you?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 204

1      A.    Forty-eight.

2      Q.    And are you married?

3      A.    No.

4      Q.    Have you ever been married?

5      A.    No.

6      Q.    Are you there at page 174?

7      A.    Yes.

8      Q.    Okay.  And this is kind of -- it's not the

9   best copy in world.  But can you tell us what that

10  document is?

11     A.    It's a purchase agreement.

12     Q.    Is that the purchase agreement for the

13  property at Eagle Rock?

14     A.    Yes.

15     Q.    And who is listed as the purchaser on that

16  agreement?

17     A.    Myself.

18     Q.    And who is listed as the seller?

19     A.    It's hard to say, but it looks like Kiva

20  Assets.

21     Q.    And what is the purchase amount?

22     A.    I don't see it on this page.

23     Q.    All right.  And --

24     A.    Oh.  Is that it, 760?

25     Q.    $760,000?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1      A.    Yes.

2      Q.    And could you flip around through the

3   pages until you find the page that contains all the

4   signatures?

5      A.    I found it.

6      Q.    And is your signature on that contract?

7      A.    Yes, it is.

8      Q.    And on what day did you sign that

9   contract?

10      A.    March 2nd.

11      Q.    And does that page also indicate who your

12   real estate agent is in connection with the purchase

13   of that property?

14      A.    Yes, Kevin Powers.

15      Q.    Who negotiated this contract on your

16   behalf?

17      A.    Kevin Powers.

18      Q.    Did anyone else negotiate that contract on

19   your behalf?

20      A.    No.

21      Q.    Was Kevin Powers your real estate advisor

22   for purposes of this particular transaction?

23      A.    Yes.

24      Q.    Was anyone else your real estate advisor

25   for purposes of this particular transaction?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 206

1    A.    No.

2    Q.    Did you apply for a mortgage loan in

3    connection with the purchase of Eagle Rock?

4    A.    Yes.

5    Q.    Who was your mortgage broker?

6    A.    Kevin Powers.

7    Q.    I would like you now to turn to page 254.

8    A.    Okay.

9    Q.    And are you there?

10   A.    Yes.

11   Q.    And can you tell the jury what that is?

12   A.    Uniform Residential Loan Application.

13   Q.    Is that a loan application that was

14   submitted on your behalf by Worldwide Mortgage?

15   A.    Yes.  Or actually, was this Powers

16   Mortgage?

17   Q.    It was Powers Mortgage, then?

18   A.    I think it was Powers Mortgage.

19   Q.    Can you look at the last page?

20   A.    I'm not seeing it.

21   Q.    Look at page 259, please.

22   A.    Okay.

23   Q.    Does it say there?

24   A.    It's all very blurry.

25   Q.    And I've blown it up on the screen for

3783008a-8798-417a-ac0e-724123da26d0

1   you.

2        A.     Powers Mortgage.

3        Q.     Okay.  And on what date did you sign that

4   application?

5        A.     April 9, 2007.

6        Q.     Do you recall that as being the date on

7   which you closed on this property?

8        A.     Yes.

9        Q.     And if you could flip back to the first

10  page of that application, please?

11       A.     (Witness complies.)

12       Q.     And tell me the amount that you were

13  applying for, as far as the loan.

14       A.     It's very blurry.

15       Q.     Does that look like $608,000 to you?

16       A.     Either 608 or 808, with an 8 percent

17  interest.  It's hard to read.

18       Q.     Okay.  And if you could look at -- it's

19  kind of right there at the bottom of the screen.  On

20  the right-hand side, there are three choices there

21  as to what purpose you're buying the property for,

22  and one of the boxes is checked.

23              Can you tell the jury what box is checked?

24       A.     Again, I can't read it.  But it was

25  primary residence when we were purchasing the home.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1     Q.    And are the other choices there secondary

2   residence and investment?

3     A.    Yes.

4     Q.    And again, what was the box that was

5   checked?

6     A.    Primary residence.

7     Q.    Okay.  Now, if you could turn to the

8   second page, please, and I'll blow up the part for

9   you that addresses income.

10          Can you tell what net income was stated on

11  your behalf by Powers Mortgage on that application?

12    A.    I can't make out the numbers.

13          MR. KRAEHE:  Can you blow that up so we

14  can get better clarity on that?

15    Q.    (By Mr. Kraehe)  Is that any better?

16    A.    Is that 11,000?

17    Q.    At the bottom there, where it says Total?

18    A.    I can't read that.

19          MR. KRAEHE:  Can you blow it up again,

20  please?

21          THE COURT:  Is the paper any clearer?

22    Q.    (By Mr. Kraehe)  I don't want you to guess.

23  Let me have you look at page 335.  Hopefully this

24  one will be a little clearer.

25          Are you looking at page 335?

1      A.    Yes.

2      Q.    And is that the first page of another loan

3  application?

4      A.    Yes.

5      Q.    Is that the loan application for the

6  second loan that you applied for on this property?

7      A.    Yes.

8      Q.    And what's the amount of the loan that you

9  are applying for here?

10      A.    152,000.

11      Q.    Okay.  And what's the interest rate that

12  you're applying for?

13      A.    9.276.

14      Q.    All right.  And what did you mark down as

15  the purpose for which you were purchasing this

16  property?

17      A.    Primary care residence.

18      Q.    And just to be clear, did you mark that

19  down or did someone mark that for you?

20      A.    I don't recall.

21      Q.    Okay.  And then if you could look at the

22  second page of your income part, can you tell us

23  what income was stated on your behalf on that loan

24  application?

25            Is that not clear enough for you?

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 210

1      A.    It looks like either 11 or 14.

2      Q.    All right.  I'm going to try to find a

3  better copy.  I apologize.

4            Can you please go to Government Exhibit

5  No. 62, page 294?

6      A.    (Witness complies.)

7      Q.    What's the loan amount on that first loan

8  application?

9      A.    608,000.

10     Q.    At what percent?

11     A.    8 percent.

12     Q.    Okay.  And you can see that clearly now?

13     A.    Yes.

14     Q.    All right.  And again, what was the

15  purpose for which you purchased it, as indicated on

16  that application on your behalf?

17     A.    Primary residence.

18     Q.    All right, let's go to the second page.

19  Look at the income information.

20           What's the income information there?

21  What's the net income stated for you?

22     A.    16,500.

23     Q.    Okay.  And you can see that clearly?

24     A.    Yes.

25     Q.    All right.  And turn to the last page, and

3783008a-8798-417a-ac0e-724123da26d0

Page 211

1    please let me know what the date that you signed

2    that is, so we can be certain about that, too?

3        A.    It was April 7, 2007.

4        Q.    Okay.  And that again is the date of

5    closing?

6        A.    Yes.

7        Q.    Now flip to page 539, please.

8        A.    In this same binder?

9        Q.    No.  That would be Government Exhibit 63.

10   It may be in the same binder.  Page 539.

11       A.    Okay.

12       Q.    Is that the application for the second

13   loan?

14       A.    Yes.

15       Q.    And just so that we're absolutely certain

16   about this, can you read that clearly?

17       A.    Yes.

18       Q.    Can you read the loan amount?

19       A.    152,000.

20       Q.    And the interest rate on that?

21       A.    9.375.

22       Q.    And how is the box checked as for purpose?

23   It's there on the first page.  If you look at the

24   screen, it's pointed out for you.

25       A.    Primary residence.

3783008a-8798-417a-ac0e-724123da26d0

Page 212

1      Q.    Okay.  And if you could flip to the second

2   page and tell me what income is stated on your

3   behalf.

4      A.    16,500.

5      Q.    Okay.  If could you turn to the last page,

6   and tell me if you signed that application.

7      A.    Yes.

8      Q.    And on what date?

9      A.    April 7, 2007.

10      Q.    Okay.  Now, were these the only two loan

11   applications that you signed in connection with your

12   purchase of the property at Eagle Rock?

13      A.    Yes.

14      Q.    All right.  Were these loan applications

15   presented to you for signature by anyone?

16      A.    Yes.

17      Q.    Who?

18      A.    Mr. Powers, I'm sure.

19      Q.    Okay.  And was your income at the time

20   that you signed these applications $16,500 a month?

21      A.    I don't know what the monthly was, but,

22   that's a little too high.  It would have been closer

23   to 2,000 a month.

24      Q.    You made about 2,000 a month back then?

25      A.    2,000, 3,000 a month.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 213

1      Q.    All right.  What do you do for a living?

2      A.    I'm a Registered Nurse.

3      Q.    Okay.  And how long have you been a

4   Registered Nurse?

5      A.    Since 1986, so for 20-some years.

6      Q.    And where were you working in 2006?

7      A.    Lovelace.

8      Q.    And did you have any other sources of

9   income at that time?

10     A.    No.

11     Q.    The only source of income you had was as a

12   Registered Nurse, working for Lovelace?

13     A.    Yes.

14     Q.    And what was your true income at that

15   time, your true monthly income?

16     A.    Around 60,000.

17     Q.    60,000 a year?

18     A.    Uh-huh.

19     Q.    So your net income before taxes on a

20   monthly basis would have been no more than $5,000 a

21   month?

22     A.    Correct.

23     Q.    Did Mr. Powers know that?

24     A.    Yes.

25     Q.    How do you know he knew that?

Page 214

1      A.     I told him my income when we filled out

2   forms, loan applications.

3      Q.     Can you tell me why you signed the loan

4   application, knowing that your income was not

5   properly stated?

6      A.     I didn't read my income.

7      Q.     You didn't see it on there?

8      A.     No.

9      Q.     And why did you sign the loan application,

10  even though the primary residence box was checked?

11     A.     I was told that we could purchase the home

12  as a primary residence.  We just have to live in the

13  house for 24 hours, possibly have a pizza party.

14  And then you can decide you don't like it, and it's

15  not fraud.

16     Q.     Okay.  And who told you that?

17     A.     Mr. Powers.

18     Q.     In signing these loan applications, did

19  you think you were doing anything wrong or illegal?

20     A.     No.

21     Q.     Why not?

22     A.     I trusted what Mr. Powers was telling me.

23     Q.     Now, did you have any knowledge as to what

24  your mortgage payments were going to be on this

25  house that you bought in April of 2007 for $760,000?

1      A.    Not until I got to closing and they showed

2    me.

3      Q.    And about how much was that?  What were

4    the mortgage payments?

5      A.    I don't recall.  It was close to 600,000 a

6    month.

7      Q.    $6,000 a month?

8      A.    Yeah, 6,000.  Yeah, that makes more sense.

9      Q.    And given that your monthly income before

10   taxes was only $5,000 a month, was there any way you

11   could pay that mortgage every month?

12     A.    No.

13     Q.    So did you have a plan as to how you were

14   going to pay that mortgage?

15     A.    Yes.

16     Q.    And what was that plan?

17     A.    We obtained money back from closing.  And

18   the money was to be used to renovate the home and to

19   pay the mortgage.

20     Q.    All right.  And who came up with this

21   plan?

22     A.    Mr. Powers.

23     Q.    All right.  And did he explain this plan

24   to you before the closing?

25     A.    Yes.

3783008a-8798-417a-ac0e-724123da26d0

Page 216

1      Q.    Did you have any expectation as to how

2   much money you were going to be getting back at

3   closing?

4      A.    Closer to closing, yes.  He e-mailed me

5   that I would be getting around 210,000.

6      Q.    Okay.  And you said part of that was going

7   to go for renovations and part was going to go to

8   pay the mortgage?

9      A.    Correct.

10      Q.    How much was going to be for renovations,

11   and what part was going to be for mortgage payments?

12      A.    100,000 was set aside for renovations.

13      Q.    And then the rest?

14      A.    And the rest was set aside for mortgage

15   payments.

16      Q.    Okay.  Now, I'd like you to take look

17   at -- go back to Government Exhibit 139, please?

18   And I really hope it's a clear copy.

19          Could you turn to page 76?

20      A.    (Witness complies.)

21      Q.    All right.  Do you know what that is?

22      A.    It's the closing papers.

23      Q.    Have you seen that before?

24      A.    Yes.

25      Q.    And that's a HUD-1 settlement statement,

1    right?

2        A.    And yes.

3        Q.    That's for the property on Eagle Rock that

4    you purchased?

5        A.    Correct.

6        Q.    Could you turn to the second page of that,

7    please?

8        A.    Uh-huh.

9        Q.    Take a look down towards the bottom.  I

10   think it's on line 1305.  There's a line item

11   referencing K&E Construction?

12       A.    Yes.

13       Q.    And what does it say?

14       A.    "Renovations, K&E Construction, 210,000."

15       Q.    Okay.  Is this something you took note of

16   at closing?

17       A.    I was aware of it.

18       Q.    Okay.  And was it your understanding that

19   was how you were going to get your money back after

20   closing?

21       A.    Yes.

22       Q.    All right.  And when did you become aware

23   that that's how you were going to get your money

24   back after closing?

25       A.    In a discussion I had with Joan Prouty.

3783008a-8798-417a-ac0e-724123da26d0

Page 218

1    Q.    Okay.  And did you in fact get some money

2    back after closing from K&E Construction?

3    A.    It was a cashier's check that Kevin had

4    made out from the bank.  I don't recall it saying

5    K&E.  It was just a cashier's check from the bank.

6    Q.    Okay.  And who did you get that check

7    from?

8    A.    From Kevin's staff, Mr. Powers' staff.

9    Q.    Now, you said that you were going to do

10   some renovations to the property at Eagle Rock?

11   A.    Yes.

12   Q.    And did the property at Eagle Rock need

13   some renovations?

14   A.    It could have been lived in the way it

15   was, but we wanted to expand it.

16   Q.    Okay.  And you set aside $100,000 for that

17   purpose?

18   A.    Yes.

19   Q.    Were you planning on doing any renovations

20   that would have required more than 100,000?

21   A.    The plan was not to.  It was to use just

22   what we had.

23   Q.    Which was no more than 100,000?

24   A.    Correct.

25   Q.    And tell me, what did you do with the

1    money once you got it from Kevin Powers?

2        A.    I cashed the check and put it into an

3    account at New Mexico Federal Educators.  I withdrew

4    5,000 of that, and then I put some of the money into

5    a money market account that I had.

6        Q.    How much money did you put into a money

7    market account?

8        A.    I think 105,000.

9        Q.    Okay.  And was that account intended for

10   the mortgage payments?

11       A.    Yes.

12       Q.    Okay.  And then what did you do with the

13   other 105 or 110 or whatever it was, 100?

14       A.    Kevin asked that we have a joint account

15   so that we could buddy up on this property and he

16   would have access to the money to make it easier to

17   do the renovations.  And so I opened up a joint

18   account.

19       Q.    Okay.  And is that where you put that

20   other $100,000?

21       A.    Yes.

22       Q.    All right.  And was that also a Federal

23   Educators Credit Union account?

24       A.    Yes.

25       Q.    And did Mr. Powers have access to that

3783008a-8798-417a-ac0e-724123da26d0

Page 220

1    account?

2        A.    Yes.

3        Q.    And when you say he wanted to buddy up

4    with you on the project, what exactly did that mean?

5        A.    He wanted to partner up with me.  And I

6    would purchase the home, and he would help me with

7    the renovations.  And then we would sell it and

8    split the profit.

9        Q.    Did he ever help you with the renovations?

10       A.    We never did any renovations.

11       Q.    Turn to page 76, please.

12       A.    (Witness complies.)

13       Q.    What is that?

14       A.    The HUD.

15       Q.    Oh, is that the HUD?  I'm sorry, page 91.

16       A.    (Witness complies.)

17       Q.    What is that?

18       A.    It's a K&E Construction invoice.

19       Q.    All right.  And what's the date on it?

20       A.    March 5, 2007.

21       Q.    Okay.  And does it reference the property?

22       A.    Yes, 1101 Eagle Rock.

23       Q.    All right.  And have you ever seen that

24    before?

25       A.    Not until Mary Higgins showed it to me.

3783008a-8798-417a-ac0e-724123da26d0

1      Q.    Okay.  So you didn't see that at the

2   closing or any time near the closing?

3      A.    No.

4      Q.    Just so we're clear on this, did you ever

5   intend to have K&E Construction do any of those

6   renovations that are mentioned on that invoice?

7      A.    No.

8      Q.    Okay.  And you didn't intend to have

9   anyone do any renovations in the amount of $210,000

10   to the property on Eagle Rock?

11      A.    No.

12      Q.    And I think you just testified that no

13   renovations were ever done on the property on Eagle

14   Rock.

15      A.    No, they were not.

16      Q.    Did Mr. Powers ever take any money out of

17   the joint account in which you placed the $100,000?

18      A.    Yes, he did.

19      Q.    What amount did he take out?

20      A.    He took out some money to purchase another

21   home.

22      Q.    Do you know how much that was?

23      A.    Around 60,000.

24      Q.    Okay.  And did he ever take any money out

25   to do any renovations?

3783008a-8798-417a-ac0e-724123da26d0

```
 1        A.    No.

 2        Q.    Did he pay that money back that he took

 3   out?

 4        A.    Yes.

 5        Q.    What did you do with the cash that you

 6   took out at closing ultimately?

 7        A.    I used the money to pay the mortgage

 8   payments, and I had given 5,000 of it to Kip Powers.

 9        Q.    All right.  And who's Kip Powers?

10        A.    Kevin Powers' brother.

11        Q.    And why did you give $5,000 to him?

12        A.    He was going to help me with the

13   demolition of the house and help me with the

14   property.

15        Q.    Were you going to demolish the house?

16        A.    At one point, we thought about demolishing

17   it and building a brand new home.

18        Q.    Did you ever do that?

19        A.    No.

20        Q.    And did Kip Powers ever do anything to

21   earn 5,000 you gave him?

22        A.    He took down some light fixtures and took

23   out the appliances.

24        Q.    Okay.  Would that be the extent of

25   anything he did to the house?
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1       A.    Yes.

2       Q.    Did you rent the house out during the time

3   that you owned it?

4       A.    No.

5       Q.    Did you do anything at all with the house

6   during the time that you owned it?

7       A.    Some friends liked the tile that was in

8   the kitchen.  So they removed all the tile that was

9   in the kitchen on the countertops, and a few light

10  fixtures were sold.

11      Q.    Could you flip now to page 222?

12      A.    (Witness complies.)

13      Q.    Is that the note that you signed in

14  connection with the loan on that property?

15      A.    Yes.

16      Q.    Okay.  And who is the lender?

17      A.    Suntrust Mortgage.

18      Q.    All right.  What was the amount of that

19  note?

20      A.    608,000.

21      Q.    And the interest rate again?

22      A.    8 percent.

23      Q.    Okay.  And just flip to the second page,

24  and let me know when you signed that.

25      A.    There is no date.

Page 224

1      Q.    Okay.  It might say actually on the top of

2   the first page, that I recall.

3      A.    April 9, 2007.

4      Q.    Okay.  And can you flip to page 304?

5      A.    (Witness complies.)

6      Q.    And is that the second note?

7      A.    Yes.

8      Q.    And what's the amount of that note?

9      A.    152,000.

10     Q.    And the interest rate?

11     A.    9.375.

12     Q.    Did you also sign that on April 9, 2007?

13     A.    Yes.

14     Q.    Okay.  And by signing those notes that we

15  just looked at, were you promising to pay back that

16  760,000 to Suntrust Mortgage?

17     A.    Yes.

18     Q.    So you were on the hook for this property?

19     A.    Yes.

20     Q.    Was anyone else on the hook for it?

21     A.    No.

22     Q.    Can you take a look at Exhibit 155?  And I

23  think that's going to be in another binder.

24           Can you flip to page 80 of that, please?

25     A.    (Witness complies.)

Page 225

1      Q.    What is that?

2      A.    This is a statement from New Mexico

3   Federal Educators.

4      Q.    Okay.  Is that a copy of the check, or a

5   cashier's check, rather?

6      A.    No.  It's a statement, a bank statement.

7      Q.    Okay.  What's the amount on it?

8      A.    (No audible response.)

9      Q.    Are you looking at the right page, 155,

10   page 80?

11      A.    Sorry.

12      Q.    Is it not there?

13      A.    I don't see it.

14      Q.    Take a look at the screen.  Do you

15   recognize that?

16      A.    This is a cashier's check for 210,000.

17      Q.    And you got that from whom?

18      A.    Kevin Powers.

19      Q.    And again, that's the money you used to

20   make mortgage payments on the property at Eagle

21   Rock?

22      A.    Correct.

23      Q.    How long did that money last, as far as

24   making mortgage payments with?

25      A.    Until January of the following year.

3783008a-8798-417a-ac0e-724123da26d0

Page 226

1    Q.    January of 2008?

2    A.    Correct.

3    Q.    And did you run out of money to pay the

4    mortgage on Eagle Rock?

5    A.    No.  I was asked to not use any more of

6    the money.

7    Q.    Okay.  Who asked you not to use that?

8    A.    The FBI.

9    Q.    All right.  And what happened to the

10   property at Eagle Rock?

11   A.    It went into short sale.

12   Q.    Do you know how much it sold for?

13   A.    I really don't know.  It was 270-some

14   thousand.

15   Q.    And so that's about $500,000 less than

16   what you bought it for?

17   A.    Yes.

18   Q.    And do you know who ate the difference?

19   A.    Suntrust.

20   Q.    At some point, were you visited by the

21   FBI?

22   A.    Yes, I received a phone call.

23   Q.    All right.  And did you meet with them,

24   with the agents?

25   A.    Yes.

3783008a-8798-417a-ac0e-724123da26d0

Page 227

1      Q.    And were they polite, courteous and

2  professional?

3      A.    Yes.

4      Q.    Did they ever threaten you or mistreat you

5  in any?

6      A.    No.

7      Q.    Did you voluntarily answer their

8  questions.

9      A.    Yes.

10     Q.    Were you truthful in the answers you gave

11  them?

12     A.    Yes.

13     Q.    How many times did you meet with them?

14     A.    Three or four times.

15     Q.    At some point, did you receive a

16  nonprosecution agreement?

17     A.    Yes.

18     Q.    How many times before you received the

19  nonprosecution agreement did you meet with and talk

20  to the FBI?

21     A.    Three or four times.

22     Q.    What is Dawn's early light?

23     A.    My e-mail address.

24     Q.    Was that ever a business?

25     A.    No.

3783008a-8798-417a-ac0e-724123da26d0

1      Q.    Was that ever anything that earned you any

2    income?

3      A.    No.

4      Q.    Did you trust Kevin Powers when you

5    entered into this real estate transaction?

6      A.    Yes.

7      Q.    Okay.  Did you rely on his professional

8    advice?

9      A.    Yes.

10     Q.    Did you rely on his expertise and

11   experience as a real estate agent/mortgage broker?

12     A.    Yes.

13     Q.    Did you trust him to act in your best

14   interests?

15     A.    Yes.

16     Q.    Did you believe he had your best interests

17   at heart?

18     A.    At the time, yes.

19     Q.    Did you believe that you were doing

20   anything wrong when you signed the loan

21   applications?

22     A.    No.

23     Q.    Okay.  Did you believe you were doing

24   anything wrong at all when you engaged in this

25   transaction on the advice of Mr. Powers?

1    A.    No.

2    Q.    Do you believe now that Mr. Powers had

3  your best interests at heart?

4    A.    No.

5    Q.    Do you regret having placed your trust in

6  him?

7    A.    Yes.

8    Q.    Why is that?

9    A.    It has shattered my life.

10    Q.    In what way?

11    A.    I've had to file bankruptcy.  I've lost

12  the trust of my family and friends.

13        (Discussion off the record.)

14    Q.  (By Mr. Kraehe)  I just want you to look at

15  one more thing.

16    A.    Sure.

17    Q.    Take a look at Government Exhibit 62,

18  page 294.  We'll pull it up for you.

19    A.    Okay.

20    Q.    And what we're showing for you here is

21  part of that -- that's the first the first loan

22  application?

23    A.    Yes.

24    Q.    Okay.  And there is a -- given there.  I

25  think it's on the address line.

Page 230

```
 1      A.   It says, "Dawn's early light."
 2      Q.   Did you see that at all when you signed
 3   that application?
 4      A.   No.
 5      Q.   Why didn't you read the application when
 6   it was presented to you for signature?
 7      A.   Kevin went through and explained things to
 8   me and told me, "Sign here, sign here."  And I
 9   thought he was explaining everything thoroughly to
10   me, and I trusted him.
11           MR. KRAEHE:  I pass the witness.
12           THE COURT:  You may inquire.
13                  CROSS-EXAMINATION
14   BY MR. TALLON:
15      Q.   Good afternoon, Ms. Tuschhoff.
16      A.   Hello.
17      Q.   Are you composed enough to continue?  Are
18   you okay?
19      A.   Yeah.  Fine thank you.
20      Q.   Ms. Tuschhoff, when the FBI first
21   contacted you in January of 2008, were you current
22   on your mortgage at the Eagle Rock property?
23      A.   Yes.
24      Q.   And it was after you were contacted by the
25   FBI that they told you that you should not use the
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 231

1    money you had to pay the mortgage; isn't that

2    correct?

3         A.    Correct.

4         Q.    And because they told you not to use the

5    money to pay the mortgage, you defaulted on the loan

6    with Suntrust, yes?

7         A.    Correct.

8         Q.    And after that, the property went into

9    foreclosure?

10        A.    It went into a short sale.

11        Q.    It went into a short sale, and it was

12   eventually sold for a very low price?

13        A.    Yes.

14        Q.    And would you agree that the Eagle Rock

15   property is a very unique property?

16        A.    Yes.

17        Q.    It was an older home out in North

18   Albuquerque Acres?

19        A.    Yes.

20        Q.    Did you learn from any source that the

21   land that that property sat on was very, very

22   valuable?

23        A.    No.

24        Q.    You just didn't know?

25        A.    I did not know that, no.

3783008a-8798-417a-ac0e-724123da26d0

Page 232

1      Q.    Would you be surprised if a person

2  estimated the land that the property was sitting on

3  at $300,000?

4      A.    Yes.

5      Q.    All right.  Now, you were talking about

6  the fact that you had made some changes in your

7  intentions about that property.

8            Which did you intend to do first?  Did you

9  intend to renovate the property, or did you intend

10  to demolish the property?

11      A.    At first, we talked about demolishing the

12  property and rebuilding.

13            And then Mr. Powers had spoken with

14  somebody who was familiar with the home who thought

15  that a renovation would be nice for the house, would

16  work just as well as it demolishing it.

17      Q.    Okay.  And from the outset, you were

18  comfortable with the idea of buddying up with

19  Mr. Powers to do something positive with this

20  property; isn't that correct?

21      A.    Yes.

22      Q.    And whose thought was it to demolish the

23  property?

24      A.    Mr. Powers.

25      Q.    And who consulted with somebody else who

3783008a-8798-417a-ac0e-724123da26d0

Page 233

1    recommended an alternative?  That is, renovation.

2         A.    Mr. Powers.

3         Q.    And who was the person that Mr. Powers

4    consulted with concerning the alternative of

5    renovating the house?

6         A.    I don't know who that was.

7         Q.    Did you ever obtain or did Mr. Powers ever

8    obtain on your behalf architectural plans --

9         A.    Yes.

10        Q.    -- for renovations to the Eagle Rock

11   property?

12        A.    Yes.

13        Q.    Do you remember the name Eric Spurlock?

14        A.    Yes.

15        Q.    And do you remember Mr. Spurlock to be an

16   architect?

17        A.    I never met him but I heard the name.

18        Q.    And there were in fact blueprints

19   developed for renovation of the Eagle Rock house;

20   isn't that correct?

21        A.    Correct.

22        Q.    And the only money that Mr. Powers ever

23   spent from that joint account was approximately

24   $5,400, which was paid to Mr. Spurlock for the

25   architectural plans for the renovations; isn't that

1    correct?

2        A.    No.

3        Q.    What is incorrect about what I said?

4        A.    He used the money for blueprints.  He also

5    borrowed money out of that account to purchase

6    another home, but then he put the money back.

7        Q.    All right.  So the one expenditure he made

8    was for the blueprints that related to

9    Mr. Spurlock's work; isn't that right?

10       A.    Correct.

11       Q.    And would $5,400 be approximately correct?

12       A.    I don't recall the price.

13       Q.    But if someone looked at your bank

14   statements, which will be in evidence, they could

15   check, couldn't they?

16       A.    Yes.

17       Q.    Now, the second expenditure, which was in

18   fact a short-term loan, wasn't it, the other

19   expenditure?

20       A.    Yes.

21       Q.    That occurred in about November of 2007;

22   isn't that correct?

23       A.    Yes.

24       Q.    And in November of 2007, bank records

25   would show that Mr. Powers borrowed -- I think it

Page 235

1    was about $60,000?

2        A.    Something like that, yes.

3        Q.    From your joint account?

4        A.    Yes.

5        Q.    Mr. Powers was a signatory on that

6    account?

7        A.    Yes.

8        Q.    Mr. Powers borrowed that money with your

9    express permission; isn't that correct?

10       A.    Yes.

11       Q.    And wouldn't the bank records show that

12   approximately two days after he borrowed the money

13   from, you he paid you back?

14       A.    Yes.

15       Q.    And wouldn't those bank records show that

16   when he paid you back two days later, he actually

17   gave you $2,000 more than he borrowed?

18       A.    Yes.

19       Q.    Now, when Mr. Powers made those efforts to

20   make inquiries about the alternatives to demolition

21   and renovation, did you think he had your best

22   interests at heart?

23       A.    Yes.

24       Q.    And in fact, he was a partner with you in

25   this venture, in a sense?

Page 236

1       A.     Yes.

2       Q.     And did you trust him in respect to that?

3       A.     Yes.

4       Q.     Did Mr. Powers ever take any money from

5    you?

6       A.     No.

7       Q.     Now, in connection with your discussion

8    about possibly demolishing the house, you mentioned

9    that you paid $5,000 -- round number, I suppose --

10   to Kip Powers to do some renovation work, to do some

11   demolition-related work to the house?

12      A.     Yes.

13      Q.     And who was the person who made the

14   decision to sell the light fixtures?

15      A.     Me.

16      Q.     And who was the person who allowed her

17   friends to remove tile from the countertops?

18      A.     That would have been me.

19      Q.     And did those two actions make the house,

20   say, less habitable or less marketable?

21      A.     Yes.

22      Q.     Did you do those two things because you

23   were anticipating demolishing the house?

24      A.     I was anticipating remodeling the house.

25      Q.     And when you remodeled the house, you

3783008a-8798-417a-ac0e-724123da26d0

1    weren't expecting to need those light fixtures or to

2    need that tile anymore?

3         A.    No.  I was told that we would have a

4    complete new light package and that the kitchen

5    would be torn apart.  I asked Kevin's permission

6    before I had my friends take the tile down.

7         Q.    All right.  And you asked his permission

8    because the two of you were partners in this

9    venture?

10        A.    Yes.

11        Q.    But at the time those things were done,

12   the fixtures were taken out the tile was sold and so

13   forth, at that point, had you and Mr. Powers made

14   the decision together to go ahead with renovations?

15        A.    Yes.

16        Q.    And in that connection or in that regard,

17   you know, did Mr. Powers take the blueprints that

18   Mr. Spurlock had developed and put them out for

19   bids?

20        A.    Yes.

21        Q.    And do you remember there being a couple

22   of bids to do those renovations at the Eagle Rock

23   house?

24        A.    Yes.

25        Q.    And do you remember to whom -- or excuse

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

Page 238

1   me, from whom the bids were given?

2       A.    No, I do not.

3       Q.    You don't remember the names of the

4   businesses that did that?

5       A.    No.

6       Q.    Okay.  You don't remember what their bids

7   were?

8       A.    I know they were more than what we had set

9   aside.

10      Q.    All right.  But there were two contractors

11  that were interested in doing the work on the house;

12  isn't that correct?

13      A.    Yes.

14      Q.    Would it be accurate to say that those

15  bids didn't come in until probably the fall of 2007?

16      A.    I don't recall the date.

17      Q.    But if you had chosen to move ahead with

18  the renovations pursuant to either one of the bids

19  or possibly even another, if you had gone further,

20  if you had chosen to have gone ahead with the

21  renovations, you could have been doing that, say, in

22  January of 2008?

23      A.    At that point, there wasn't enough money.

24      Q.    All right.  So the bids came in higher

25  than what you were hoping for?

3783008a-8798-417a-ac0e-724123da26d0

1     A.    Yes.

2     Q.    Do you think that had anything to do with

3   Mr. Powers, or do you think that might have had

4   something to do with the nature of the business?

5     A.    Well, there was a change in the economy,

6   and things were more expensive.  So the original

7   quote that we got from Eric Spurlock was no longer

8   relevant.

9     Q.    All right.  So that change in the economy

10   that made things more expensive, did that have

11   anything to do with Mr. Powers?

12     A.    No.

13     Q.    Did he cause the change in the economy?

14     A.    No.

15     Q.    And when the change in the economy made

16   your plans to as to Eagle Rock impractical or less

17   practical, that change was also making things

18   more -- excuse me, less practical for Mr. Powers,

19   your partner, as well?

20     A.    Yes.

21     Q.    Now when you were speaking to the United

22   States Attorney, I think you said it was your plan

23   or your joint plan to rehabilitate the property and

24   resell it?

25     A.    Yes.

Page 240

1    Q.    When you started with that plan, okay,

2    when you got your head together with Mr. Powers to

3    discuss that plan, were you planning on failing?

4    A.    No.

5    Q.    Were you planning on succeeding?

6    A.    Yes.

7    Q.    Was Mr. Powers planning on succeeding?

8    A.    Yes.

9    Q.    Was he optimistic that this would succeed?

10   A.    Yes.

11   Q.    Did he move ahead with purposeful effort

12   to try to make your joint plan succeed?

13   A.    Yes.

14   Q.    Now before this change in the economy,

15   isn't it true that you had bought the several

16   different properties with Mr. Powers' assistance?

17   A.    Yes.

18   Q.    And about what year did you buy the first

19   property you bought with Mr. Powers' assistance?

20   A.    2006.

21   Q.    And what property was that?

22   A.    Amhurst.

23   Q.    And that property was in the Nob Hill

24   area?

25   A.    Yes.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1     Q.    And what was the second property you

2  bought?

3     A.    That would have been Kielich.

4     Q.    And that would be when, what year?

5     A.    2006.

6     Q.    And then the third property you bought was

7  where?  What was the address?

8     A.    Palomas.

9     Q.    And that was when?

10    A.    2006.

11    Q.    And was there a fourth?

12    A.    That was Eagle Rock.

13    Q.    All right.

14    A.    I had a current property.

15    Q.    All right.  Before you started buying

16  properties, the first property you owned was on

17  Pawnee?

18    A.    Correct.

19    Q.    Now when you Mr. Kraehe talked about your

20  reliance on Mr. Powers, I have a question for you.

21       When you bought Amhurst, the first

22  property you bought, were you relying on the

23  continued appreciation in the real estate market?

24    A.    Yes.

25    Q.    When you bought Kielich, were you also

Page 242

1    relying on the continued appreciation in the real

2    estate market?

3        A.    Yes.

4        Q.    When you bought Palomas, were you also

5    relying on, I guess I should say, the expectation of

6    continued appreciation in the real estate market?

7        A.    Yes.

8        Q.    And when you owned those three properties,

9    you were renting them out, weren't you?

10       A.    I was living in one.  And the one

11   property, my niece and her friends were living in.

12       Q.    Okay, let me just take them one at a time.

13   You started this series with the first house on

14   Pawnee; is that right?

15       A.    Well, that's my current property.

16       Q.    Okay.

17       A.    The first property with Kevin was on

18   Amhurst.

19       Q.    All right.  But did you own Pawnee before

20   you bought Amhurst?

21       A.    Yes.

22       Q.    And when you bought Amhurst, did you buy

23   that as an investment or as a primary residence?

24       A.    On the loan,, it was as a primary

25   residence.  But the intent was for investment.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 243

1      Q.    All right.  And you had tenants in the

2   Amhurst property; isn't that correct?

3      A.    Yes.

4      Q.    And did those tenants include college

5   students?

6      A.    Yes.

7      Q.    The Amhurst property is in the Nob Hill

8   area?

9      A.    Yes.

10      Q.    And was there market for student tenants

11   in that area for that house?

12      A.    Yes.

13      Q.    And was one of the tenants in fact one of

14   your relatives?

15      A.    Yes.

16      Q.    Which relative?

17      A.    My niece.

18      Q.    And were there any other relatives besides

19   that one niece?

20      A.    No.

21      Q.    Were any of the tenants in the Amhurst

22   property related to the medical profession or people

23   you knew from the medical profession?

24      A.    No.

25      Q.    Were there any other family members that

3783008a-8798-417a-ac0e-724123da26d0

1    resided in Amhurst?

2        A.    No.

3        Q.    Now after you bought Kielich, did you move

4    from Pawnee to Kielich?

5        A.    Yes.

6        Q.    And you made Kielich your primary

7    residence?

8        A.    Yes.

9        Q.    And you rented out Pawnee?

10        A.    Correct.

11        Q.    Did Mr. Powers tell you that if you were

12    to use Kielich as a primary residence, you would

13    have to reside in Kielich?

14        A.    For 24 hours.

15        Q.    And when Mr. Powers told you, when you

16    bought Amhurst as a primary residence, that you

17    would have to reside at Amhurst?

18        A.    For 24 hours.

19        Q.    And what happened when you bought Kielich

20    and moved into it, you rented Pawnee?

21        A.    Yes.

22        Q.    To whom?

23        A.    To Kip Powers.

24        Q.    And did you have a personal relationship

25    with Kip Powers?

1       A.    Yes.

2       Q.    By personal, what do you mean?

3       A.    We were friends.

4       Q.    All right.  Did you ever date?

5       A.    We went out once.

6       Q.    And then when you moved -- or excuse me.

7    When you bought the Palomas property, how did you

8    buy that?

9       A.    As a primary residence.

10      Q.    And who did you rent that out to, if you

11   did?

12      A.    We were trying to flip the house and were

13   not able to.  So my niece moved out of Amhurst and

14   moved into Palomas.

15      Q.    Okay.  When you say, "We were trying to

16   flip the house," who were you talking about?

17      A.    My friend, Christy Rauth.

18      Q.    Okay.  Christy Rauth, that's R-A-U-T-H,

19   right?

20      A.    Correct.

21      Q.    Now your friend Christy Rauth, let me make

22   sure I understand.  She moved into Palomas?

23      A.    No.  No one moved into Palomas.

24      Q.    I'm sorry.  Christy rehabbed Palomas?

25      A.    Yes.

Page 246

1      Q.    And was Palomas habitable when you first

2    bought it?

3      A.    Yes.

4      Q.    All right.  Now what else did Christy

5    Rauth do in connection with the work you did?

6      A.    She worked with the contractor to redo the

7    kitchen, and we painted and.

8      Q.    All right.  Who was the contractor?

9      A.    Paul Barragan, from Your Son.

10     Q.    Okay, so you're doing a lot of work here.

11   You're renting Pawnee, you've moved to Kielich,

12   you're renting Amhurst, you're fixing up Palomas.

13          At the time you were doing did all these

14   things were you still relying on the expectation

15   that the real estate market would continue on its

16   positive path?

17     A.    Yes.

18     Q.    Now, prior to the time you bought Eagle

19   Rock, weren't you already in the process of trying

20   to resell at least one of these properties?

21     A.    No.

22     Q.    All right.  When did you list Amhurst for

23   sale?

24     A.    Not until August.  And there was an

25   agreement from Kevin that he already had a buyer.

3783008a-8798-417a-ac0e-724123da26d0

Page 247

1    So it never went into listing, as far as I was

2    aware.

3        Q.    Okay.  So you started to list or tried to

4    start selling Amhurst in August of 2007?

5        A.    Yes.

6        Q.    And was that when the real estate market

7    was beginning to go downhill?

8        A.    Yes.

9        Q.    And when did you list Kielich, or did you?

10       A.    I didn't.

11       Q.    And when did you list Palomas?

12       A.    Palomas was in February of that year,

13   2007.

14       Q.    All right.  So you listed Palomas, the one

15   that Christy Rauth and Mr. Barragan were renovating

16   or had renovated, you listed that in February of

17   2007, before you put an offer down for Amhurst; is

18   that right?

19       A.    For --

20       Q.    Excuse me.  For Eagle Rock?

21       A.    -- Eagle Rock, yes.

22       Q.    And had you closed the sale on Palomas

23   yet?

24       A.    No.  There were no buyers.

25       Q.    All right.  Now on Pawnee, what was its

3783008a-8798-417a-ac0e-724123da26d0

1    status at about the time you made the offer on Eagle

2    Rock?  Was that for sale?

3         A.    No.

4         Q.    Was it rented out?

5         A.    Yes.

6         Q.    Now, if one or two or three of these

7    properties that you owned had sold, did it ever

8    occur to you that you might take the profits and

9    perhaps do a better renovation or even build a new

10   house at Eagle Rock?

11        A.    I could have.

12        Q.    And so that thought did cross your mind,

13   didn't it?

14        A.    No.

15        Q.    It didn't?

16        A.    I'm just answering.

17        Q.    Okay.  Would Eagle Rock have been, say,

18   the nicest address of all of the five properties

19   we're talking about?

20        A.    Yes.

21        Q.    And did you ever consider the possibility

22   that if you sold all four of your other properties,

23   you might be able to put quite a special house up on

24   Eagle Rock?

25        A.    It never occurred to me.  But I could

3783008a-8798-417a-ac0e-724123da26d0

1    have, yeah.

2        Q.    Would it be accurate to say that the Eagle

3    Rock house, even though it was a bit run down, was

4    surrounded by some very expensive houses?

5        A.    Yes, it was.

6        Q.    And one of the principles that you and

7    Mr. Powers acted on from the start of your buying of

8    Amhurst, one of those principles was to look for a

9    house that was selling for much less per square

10   foot, dollars per square foot, than houses that were

11   surrounding it?

12       A.    Yes.

13       Q.    Are you familiar with that principle?

14       A.    Yes.

15       Q.    And until the real estate market tanked,

16   did you expect that that principle would be a

17   principle that worked for you?

18       A.    Yes.

19            THE COURT:  We're going to go ahead and

20   take a recess.  Do not discuss the case among

21   yourselves or with others or in anyone's presence.

22            Court is in recess for ten minutes.

23            (Court in recess from 3:30 to 3:44.)

24            (Whereupon the jury entered the

25   courtroom.)

Page 250

1           THE COURT:  Please be seated.

2      Q.   (By Mr. Tallon)  Ms. Tuschhoff, I just want

3   to back up to a few questions I asked you about

4   before the break and examine into those questions a

5   little bit further.

6           MR. TALLON:  Could we cue the monitor up?

7   Could we take a look at Defendant's Exhibit R3?

8           And I believe it is stipulated to.

9           THE COURT:  Is this stipulated?

10           MR. TALLON:  I believe this is stipulated

11   to, yes.

12      Q.   (By Mr. Tallon)  Do you see that as a

13   letter from the United States Department of Justice,

14   Federal Bureau of Investigation, in Washington, DC?

15      A.   Yes.

16      Q.   Now, I realize this letter is not written

17   to you, but I have a couple of questions for you

18   about the letter.  The date is April 8, 2010?

19      A.   Yes.

20      Q.   And it appears to be written to Mr. Kevin

21   Powers?

22      A.   Yes.

23      Q.   And could you read the first paragraph of

24   that letter?

25      A.   "On February 11, 2010, property was seized

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 251

1    by the Federal Bureau of Investigation at

2    Albuquerque, New Mexico."

3        Q.    For forfeiture?

4        A.    "For forfeiture of violation of proceeds

5    of a specified unlawful activity.  The property was

6    appraised at 66,944.32."

7        Q.    All right.  Is that 66,000, almost

8    $67,000, is that the money that was frozen by the

9    FBI in February of2008?

10       A.    Yes.

11       Q.    So does that appear to be a typographical

12   error to you, February 11th, 2010?

13       A.    Probably.

14       Q.    Because your recollection is that that

15   money was seized from you in February of 2008; isn't

16   that right?

17       A.    I wrote out a check to my attorney,

18   correct.

19       Q.    And that was shortly after you met with

20   the FBI, without your attorney being present, in

21   January of 2008?

22       A.    Correct.

23       Q.    And you met with the FBI what, three or

24   four times before you met with your attorney?

25       A.    Yes.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 252

1        Q.    And this letter refers to your attorney

2    Robert Lohbeck, Esquire, in the second paragraph?

3        A.    Yes.

4        Q.    Okay.  And that money that you signed a

5    note for that you borrowed has never been returned

6    to you; is that right?

7        A.    Correct.

8        Q.    Now, in connection with your income, isn't

9    it true that you were self-employed, doing some

10   activities like selling -- I don't know the best

11   word for it -- mementos that you made or objects or

12   art-type things that you made?

13       A.    No.

14       Q.    You didn't have any business selling like

15   cookies, varieties -- I really didn't know how to

16   describe it.

17       A.    As a hobby, I did some catering.  But I

18   rarely got paid for it.

19       Q.    Okay, so you did some catering.  And

20   wasn't there in connection with your application for

21   this mortgage on Eagle Rock, didn't you obtain a

22   letter from a CPA by the name of Steven Sanders?

23       A.    There was a letter, but it was not sent to

24   me.

25       Q.    Okay.  But was the letter obtained for the

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 253

1    purpose applying for this mortgage?

2         A.    I didn't know that at the time.  But I

3    have found that to be true, yes.

4         Q.    Okay.  Did Mr. Sanders describe your

5    occupation as not only being a nurse, but also being

6    a real estate investor and that the Dawn's Early

7    Light was a real estate business?

8         A.    I don't recall that.

9              MR. TALLON:  Could we look at Defense

10   Exhibit R5, which I believe has been stipulated to?

11        Q.    (By Mr. Tallon)  Okay.  You're looking at

12   Exhibit R5, which has been stipulated to.  The date

13   on that letter is April 2, 2007?

14        A.    Yes.

15        Q.    And it's written by letter C, initial

16   C. Steven Sanders, Certified Public Accountant?

17        A.    Yes.

18        Q.    And could you read that letter to the

19   jury?

20        A.    "Regarding Dawn Tuschoff, I am in the

21   process of preparing the 2006 tax returns for

22   Ms. Tuschoff.  I have reviewed the 2004 and 2005 tax

23   returns as part of that process.  Ms. Tuschhoff is

24   jointly employed by Lovelace Healthcare and as a

25   sole proprietor in her real estate company, Dawn's

3783008a-8798-417a-ac0e-724123da26d0

Page 254

1    Early Light.  If you require any further

2    information, please feel free to contact me as

3    listed below."

4         Q.    And it's signed C. Steven Sanders?

5         A.    Correct.

6         Q.    And did you have your 2004, 2005 and 2006

7    tax returns prepared by Mr. Sanders?

8         A.    No.

9         Q.    You didn't?

10        A.    My 2006 were.  But the 2004 and 2005, he

11   just reviewed.

12        Q.    Oh, I see.  And that's what he says in the

13   letter, actually.  So he had that information

14   available to him?

15        A.    Yes.

16        Q.    And would Mr. Sanders have also available

17   to him information related to the fact that at the

18   time he was preparing the 2006 tax return for you,

19   that you owned four properties?  And that would be

20   Palomas, Kielich, Pawnee and Amhurst.

21        A.    Yes.

22        Q.    Mr. Sanders would have known that when he

23   wrote that letter on April 2, 2007?

24        A.    Yes.

25        Q.    And that was just prior to your

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    application for the Eagle Rock loan?

2        A.    Yes.

3        Q.    And the Eagle Rock loan was a stated

4    income loan, yes?

5        A.    Yes.

6        Q.    And you had done stated income loans

7    before, hadn't you?

8        A.    Yes.

9        Q.    Were all the properties you bought, other

10   than Pawnee,, stated income loans?

11       A.    Yes.

12       Q.    Was Pawnee a stated income loan?

13       A.    No.

14       Q.    You had owned that for quite some time,

15   hadn't you?

16       A.    Yes.  I don't understand.

17       Q.    Well, how long had you owned Pawnee?

18       A.    Since 1994.

19       Q.    And did they have stated income loans in

20   1994, to your knowledge?

21       A.    Not that I'm aware of, no.

22       Q.    Now, in connection with applying for

23   stated income loans --

24            MR. TALLON:  Could we bring up Defense

25   Exhibit R9?  And that has been stipulated to.

3783008a-8798-417a-ac0e-724123da26d0

Page 256

1      Q.   (By Mr. Tallon)  In your discussions with

2   Mr. Powers in the course of your, I think, four

3   applications for stated income loans on four

4   properties, did he ever discuss with you a Web site

5   called salary.com?

6      A.    No.

7      Q.    Did you understand that a stated income

8   loan was basically to be an estimate of the income

9   that your profession would typically earn?

10     A.    No.

11     Q.    Did you know what the rules and

12  regulations were that would inform anybody of what

13  their stated income would be?

14     A.    No.

15     Q.    Could you take a look at this page for a

16  moment?

17     A.    Yes.

18     Q.    Now, if I could direct your attention to

19  the middle, sort of top of the page, where there's a

20  bar that says "Salary Wizard"?

21     A.    Yes.

22     Q.    Could you read the first line beneath

23  that?

24     A.    "A median expected salary for a typical

25  head nurse in Albuquerque, New Mexico" --

3783008a-8798-417a-ac0e-724123da26d0

1      Q.    87122?

2      A.    Yes. -- "is 105,000."

3      Q.    $56?

4      A.    Yeah.

5      Q.    And when you're talking about median, I

6   think that means that half the nurses in that

7   position might make less than that and half the

8   nurses in that position might make more than that?

9      A.    Yes.

10      Q.    Is that the way you understand it?

11      A.    Yes.

12      Q.    And going down from there, do you see sort

13   of a breakdown of elements of what this median

14   expected salary could be that is some people could

15   earn more some people could earn less but do you see

16   base salary bonuses disability healthcare pension,

17   time Ms. Tuschhoff maybe that is paid time

18   Ms. Tuschhoff I'm trying to think of the term that

19   they use what is the PTO?@@

20      A.    PTO.

21      Q.    So all of those things have a value when

22   you're an employee, right?

23      A.    Yes.

24      Q.    Now, do you know whether or not

25   Mr. Sanders or Mr. Powers was estimating your

1   collected rents from your three properties when they

2   were estimating your income on your loan application

3   the Form 10-03.

4        Q.   I do not?

5        A.   And do you recall when you looked at the

6   Form 10-03 with Mr. Kraehe that the Form 10-03

7   didn't show rental income but do you know whether or

8   not that rental income might have been included in

9   the gross figure that your Mr. Kraehe was pointing

10  out to us.

11       A.   I'm not sure, I don't recall.

12       Q.   Okay.  Now, when you were talking about

13  making two or $3,000 a month as a nurse was that

14  you're take-home pay?

15       A.   Yes.

16       Q.   And that number didn't give any value the

17  3,002 to 3,000-dollar figure didn't give any dollar

18  value to Social Security   01K, 403(b) disability

19  healthcare pension, time Ms. Tuschhoff it didn't

20  give any value to that did it?

21       A.   No.

22       Q.   That doesn't show up as part of your

23  take-home pay does it?

24       A.   No, it does not.

25       Q.   But in effect but in effect when you work

Page 259

1    for a company like Ardent health services or

2    Presbyterian health services if you're not just a

3    contract employee and you are an employee you

4    actually are getting some value in these different

5    categories aren't you?

6        A.    Yes.

7        Q.    And.  Sand all leery .com appears to

8    recognize that there's some value to those elements

9    of your compensation; is that right?

10       A.    It appears so.

11       Q.    All right.  Okay if we could pull up for a

12   moment Exhibit R12 which is stipulated to, I believe

13   that's Exhibit R12.

14            And could I direct your attention to say

15   the upper third of the page where there's a box that

16   is entitled remarks?

17            THE COURT:  Is this an MLS.

18            MR. TALLON:  Yes it's called can you read

19   the title on the top.

20            THE WITNESS:  Agency daily display.

21            MR. TALLON:  It says agent full detail.

22            THE WITNESS:  It just says detail display.

23       Q.   (By Mr. Tallon)  Could we look at

24   page 6SW1502.

25            It is actually a two page Exhibit okay.

3783008a-8798-417a-ac0e-724123da26d0

Page 260

1    So that's page at the bottom does it say 6SW1501?

2        A.    Two.

3        Q.    All right.  Could we back up to page 1 or

4    should I say 1501.

5        Q.    Okay.  Do you see that?

6        A.    Yes.

7        Q.    All right.  And could we go to the top

8    just so we get the title of the first page?

9        A.    Agent daily display.

10       Q.    All right.  And could we drop down to oh,

11   about the bottom third of the page there's a box

12   that says IN T Ms. Tuschhoff only remarks do you see

13   that?

14       A.    Yes.

15       Q.    And do you see the listing agent for the

16   property?

17       A.    Allstate realty.

18       Q.    All Star realty?

19       A.    All Star.

20       Q.    All right.  Could we turn to page 1502 and

21   could I direct your attention to the box that is in

22   yellow it says remarks?

23       A.    Okay.

24       Q.    And I think you and I just touched briefly

25   on what I believe is a fact that is that the Eagle

1    Rock property was a fairly unique property?

2        A.    Yes.

3        Q.    And is one of the things that made it

4    unique was that it was a doubled-walled adobe?

5        A.    Yes.

6        Q.    And they don't make too many of those, do

7    they?

8        A.    No.

9        Q.    And sometimes people will pay an awful lot

10   of money for an double-walled adobe?

11       A.    Yes.

12       Q.    Especially if it's in an area with

13   excellent schools which is the next thing written

14   there do you see that?

15       A.    Yes.

16       Q.    Especially if is right across the street

17   from Double Eagle elementary school it might be a

18   good school.  Do you know that to be in the La Cueva

19   school district?

20       A.    I don't know.

21       Q.    All right.  What else describes this house

22   could you continue at open floor plan?

23       A.    Open floor plan mountain views kitchen

24   needs T LC great upside two fireplace separate guest

25   house can kitchen netback and deck for views wine

Page 262

1    cellar brick floors oversized two car garage with

2    workshop.  Loads of potential, plans CLA make offer

3    can sell on REC with 10 percent down or lease

4    purchase CLE reduce 20K100 percent money back

5    guaranty.

6         Q.    Okay.  Does that sound like an attractive

7    description of the Eagle Rock property?

8         A.    Yes.

9         Q.    A property that was not only unique but

10   had potential?

11        A.    Yes.

12        Q.    But it also had some pretty substantial

13   problems that at one point in time put you on the

14   fence as to whether or not it should be razed

15   destroyed or rehabilitated; isn't that right?

16        A.    Yes.

17        Q.    And that created a little bit of

18   indecision about what to do with that property;

19   isn't that correct?

20        A.    Yes.

21        Q.    Is that a property that could have worked

22   out very well if the market hasn't gone out?

23        A.    It may have.

24        Q.    Now, could we take a look now at

25   defendant's Exhibit R14 and I believe that's wait,

Page 263

1    no that's not take it down, take it down.

2        Q.    Okay.

3              MR. TALLON:  The government stipulate to

4    R4.

5              THE COURT:  Yes, I think I have in that

6    last stipulation.

7              MR. KRAEHE:  We don't stipulate to it.

8        Q.   (By Mr. Tallon)  Very good we already

9    talked about Eric Spurlock do you remember the exact

10   amount of money you paid for those plans?

11       A.    No, Kevin took care of that.

12       Q.    And the amount of money that was paid for

13   those plans those would be reflected in your bank

14   records isn't that right?

15       A.    Yes.

16       Q.    And?

17             MR. KRAEHE:  I may have no objection once

18   I see it.

19             We have no objection to R14, Your Honor.

20             THE COURT:  R14 all right greed.

21       Q.   (By Mr. Tallon)  Okay if we could go back

22   to R14 it's okay to put it up.

23       Q.    Do you see the name Eric Spurlock LLC on

24   the top of that Exhibit?

25       A.    Yes.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 264

1    Q.    And if you could take a look at that

2    invoice and it appears to be a paid invoice if I

3    could direct your attention to the line that says

4    524-2007?

5    A.    Yes.

6    Q.    And it looks like the amount opposite

7    that's $5,093.13?

8    A.    Correct.

9    Q.    Okay.  I'm not sure I might have said 5400

10   earlier but I don't remember does that rewell does

11   that represent what was paid for Mr. Spurlock's

12   services and his blueprints?

13   A.    According to the invoice I had never seen

14   it before.

15   Q.    Okay.  Do you trust the voice?

16   A.    Yes.

17   Q.    Okay. did you see blueprints?

18   A.    Yes.

19   Q.    In fact didn't you personally carry

20   blueprints to a contractor in an attempt to obtain a

21   bid from that contractor for rehabilitation

22   renovation services?

23   A.    Yes.

24   Q.    And isn't it true that after a period of

25   time, I don't remember the contractors name maybe

**PAUL BACA PROFESSIONAL COURT REPORTERS**

1    you will but after a period of time this contractor

2    never made a bid on the plans?

3         A.    Correct.

4         Q.    And Mr. Powers went and retrieved the

5    blueprints from the contractor didn't he?

6         A.    Yes.

7         Q.    But if we could turn to the next page of

8    Exhibit R4 one of the contractors that did build on

9    the plans was a contractor named I can riel Leon

10   builders.  Do you see that?

11        A.    Yes.

12        Q.    And it seems to give a pretty

13   comprehensive workup well it's about two pages, of

14   what they thought the cost of the work would be.

15   And if we could turn to the three page of that

16   Exhibit and drop down a little bit okay.  I realize

17   there's a couple of numbers there's a typewritten

18   number and there's handwritten sort of bomb line but

19   it looks like the typewritten bottom line next to

20   construction total which is the total of the job tax

21   and management fee is $193,169.34 is that what it

22   seed?

23        A.    Yes.

24        Q.    And then next to that $193,000 there's

25   another figure as if someone reworked it and I don't

3783008a-8798-417a-ac0e-724123da26d0

1   know if, you know, who reworked it but that new

2   number is $197,000.1976589 is that right?

3       A.    Yes.

4       Q.    Do you remember that to be one of the bids

5   that you received with respect to the renovation

6   work?

7       A.    No.

8       Q.    You don't remember that?

9       A.    I have never seen this, no.

10      Q.    Okay?

11      A.    Kevin handled all of that.

12      Q.    Okay.  Do you have any doubt that

13  Mr. Powers was attempting to obtain some responsible

14  bids for?

15      A.    No.

16      Q.    The work on the house that related to the

17  blueprints that had been developed?

18      A.    No.

19      Q.    Okay.  You don't believe that?

20      A.    No, I know he was.

21      Q.    Oh, he was okay?

22      A.    I'm sorry I misunderstood the question.

23      Q.    So there's no doubt in your mind that he

24  actually was going out there and trying to find a

25  solution to the renovation problem at Eagle Rock,

3783008a-8798-417a-ac0e-724123da26d0

1    yes?

2        A.    Yes, he was.

3        Q.    All right.  And if we turn too, I think

4    the next page of that Exhibit.  There is a you see a

5    letter from Eric Spurlock dated July three, 2007?

6        A.    Yes.

7        Q.    And it's written to Mr. Powers?

8        A.    Yes.

9        Q.    And it's concerning RE Coal lending

10   institution core riel Leon builders?

11       A.    Yes.

12       Q.    And could you read the first paragraph?

13       A.    I would like to first apologize for

14   referring you to core Lillian builders as of

15   June 1st, 2007 Eric Spurlock LLC is no longer

16   affiliated with core Lillian builders as you may

17   know CJ rob Bennett of core Lillian builders has not

18   only be dishonest with me but he's also be dishonest

19   with you.

20       Q.    All right.  Second paragraph first

21   sentence could you read that?

22       A.    Therefore any financial issue with them

23   must be handled with Sam act kin son who's part

24   owner of the company.

25       Q.    Okay.  I actually meant the very first

Page 268

1    sentence I think it says core Lillian build series a

2    separate company from Eric Spurlock LLC?

3        A.    Correct.

4        Q.    And then the last sentence of that

5    paragraph, Mr. Atkins is working very diligently to

6    make sure your project will be taken care of do you

7    see that?

8        A.    Yes.

9        Q.    And in the final paragraph I'll just read

10   the last sentence again I send my deepest apologies

11   and regrets for referring you to core Lillian

12   builders however I'll assist you in any way to make

13   sure you're home is completed as per your plans so

14   do you remember a problem with core riel Leon Leon

15   builders?

16       A.    No.

17       Q.    Did Mr. Powers not recommend poor kill

18   Leon builders to you as a contractor?

19       A.    No.

20       Q.    Well, maybe I'm being misleading again or

21   in precise.  But you and Mr. Powers in your joint

22   venture decided not to use this company wild Leon

23   builders?

24       A.    The few builders that he spoke with he

25   told me that the bid was too much and we could not

3783008a-8798-417a-ac0e-724123da26d0

1    proceed with them.

2        Q.    Okay.  Based on the letters you just read

3    do you think that was bad advice from Mr. Powers?

4        A.    No.

5        Q.    Okay could we look at defense Exhibit Q8

6    which I believe is stipulated to and could we turn

7    to that portion of Q8 which is entitled summary of

8    appraisal report beginning on page 500?

9            THE COURT:  What would you call this

10   Exhibit .

11            MR. TALLON:  The Exhibit is Q8, Your

12   Honor.

13            THE COURT:  The identity of it.

14            MR. TALLON:  It is actually has three

15   elements I'm directing the jury's attention to one

16   element it's called summary appraisal report

17   starting at page 611-801-500 to page 522 it's

18   actually 23 pages long.

19            THE COURT:  Okay.  I see it.

20            MR. TALLON:  Do you see on page 500, can

21   you read page 500 on the bottom of that.

22       Q.    (By Mr. Tallon)  Do you see page 500 there?

23       A.    Yes.

24       Q.    And does this appear to be an appraisal

25   report it's titled summary appraisal report dated

Page 270

1    March 16, 2007?

2        A.    Yes.

3        Q.    And do you see what appears to be the name

4    of the appraiser Melissa Duran I think it's a

5    female?

6        A.    Yes.

7        Q.    Okay.  Could we turn to the next page

8    page 501 if I could direct your attention to say the

9    middle of that page could you read the part the

10   sentence that begins with an inspection of the

11   property?

12       A.    An inspection of the property and a study

13   of the pertinent factors including valuation trends

14   and analysis of neighborhood data led the appraiser

15   so the conclusion that the market value as of

16   March 16, 2007 is.

17       Q.    And the number?

18       A.    760,000.

19       Q.    And could we go two pages to page 5303 and

20   look down at the bottom of that page and if I could

21   direct your attention to two lines that begin with

22   the word indicated and I'll read them to you tell me

23   if I am correct indicated value by sales comparison

24   approach $760,000?

25       A.    Correct.

3783008a-8798-417a-ac0e-724123da26d0

1      Q.    And you know I've got a pretty bad copy it

2   almost seems that the next line says indicated value

3   by sales comparison approach is also   hundred

4   $60,000?

5      A.    Yes.

6      Q.    And then immediately to the right of that

7   do you see something that says cost approach if

8   developed $706,200,800?

9      A.    Yes.

10      Q.    A little higher number did you understand

11   that to be the appraisal which was the basis for

12   your offer and for the money that you borrowed for

13   Eagle Rock?

14      A.    I never saw appraisal.

15      Q.    Do you know if the lender saw that

16   appraisal?

17      A.    I would assume so I don't know.

18      Q.    Do you know if the lender reviewed that

19   appraisal?

20      A.    I don't know.

21      Q.    It it it it it it it it it it if.

22      Q.    If we could turn for a moment to defense

23   Exhibit R21 and I believe it's stipulated to?

24          THE COURT:  R21 is received.

25      Q.    (By Mr. Tallon)  And if we could turn to

3783008a-8798-417a-ac0e-724123da26d0

1    page 19 of 55 of that Exhibit.  Do you have that in

2    front of you?

3        A.    Yes.

4        Q.    Is that page that has a top current income

5    of individual debtors?

6        A.    Yes.

7        Q.    And remember Mr. Kraehe asked you what

8    your income was in 2007, you said 2 to $3,000 it

9    appears if you look at the very bottom of this page

10   that there's a date there that says November 3,

11   2008, so this was about, 18 month after you bought

12   Eagle Rock?

13       A.    Uh-huh.

14       Q.    Would November 3, 2008 seem to be about

15   the time that you filed your bankruptcy petition?

16       A.    That was November first of 2008.

17       Q.    Okay.  All right.  This document happens

18   to read November 3 I am just going by that document

19   stamp?

20       A.    Yes.

21       Q.    And on the line one on this page it says

22   current monthly gross wages, salaries and

23   commissions prorate if not paid monthly.  And you

24   indicate a monthly income of $6,779.90; is that

25   correct?

Page 273

1      A.    That's what's written here, yes.

2      Q.    All right.  Was that correct when you

3   signed this petition?

4      A.    Yes.

5      Q.    And that seems to be substantially higher

6   than the two to $3,000 a month that you were talking

7   about with Mr. Kraehe doesn't it?

8      A.    Yes.

9      Q.    And you didn't receive a four to $5,000 a

10   month raise between the spring of 2007 and the fall

11   62008 did you?

12      A.    I switched jobs and I did have an increase

13   in income.

14      Q.    Did you have an increase to almost $7,000

15   as you indicated here?

16      A.    I could have at that point.

17      Q.    Well, would it be accurate to say that

18   this say $6,800 a month in in do was pretty close to

19   what you were earning in the spring of 2007 when you

20   bought Eagle Rock?

21      A.    I get confused with numbers I can't.

22      Q.    That's all right, I'm not calling you a

23   liar or anything.  I just wanted to ask you, does

24   that number there the 6,779, does that is that a

25   number that includes those kind of fringe benefits

Page 274

1    like 401(k)s 403(b)s over time, health insurance

2    that number doesn't include any of those?

3        A.    I don't know.

4        Q.    Well.  It says current monthly gross wages

5    salary and commissions that's what that number is

6    right there, yes?

7        A.    Yes.

8        Q.    And that number that you see there on

9    page 19 of 35 if we could go to page 7 of 35 it it.

10   Is that page 7 of 35?

11       A.    Yes.

12       Q.    All right.  That number about $6,700 a

13   month in income from your employment that doesn't

14   include any rental income that you may have been

15   collecting from four of the five properties listed

16   on this page Pawnee, Kielich, Palomas and Amhurst;

17   is that right?

18       A.    Yes.

19       Q.    And you were getting some rental income

20   from those property?

21       A.    They didn't pay the mortgages but there

22   was.

23       Q.    Rental income?

24       A.    Rental income.

25       Q.    And if we could turn to page well it's

1    actually yes, it's an Exhibit R21.  It is I think

2    the last page in the Exhibit it's entitled page 1 of

3    1 document seven page   of one it's also part of the

4    stipulated Exhibit.

5        Q.    Okay. do you see that in front of you?

6        A.    Yes.

7        Q.    That's statement of intention?

8        A.    Yes.

9        Q.    And it appears that there's a column that

10   says property will be surrendered do you see that it

11   has got the checkmarks under it?

12       A.    Yes.

13       Q.    And every property is going to be

14   surrendered but all checked accept the property at

15   1020 Pawnee, Northeast; is that right?

16       A.    Correct.

17       Q.    You had Countrywide loan homes and you

18   retained that property?

19       A.    Yes.

20       Q.    Isn't it true that you had an election to

21   make as to the other loans you had here and you

22   elected not pay them?

23       A.    I no longer had fund to pay them.

24       Q.    Okay.  Can you read Ms. Tuschhoff the

25   names of the lenders who had made you loans stated

1    in come loans on the properties you bought starting

2    with Bank of America?

3        A.    Bank of America, City mortgage, E trade

4    green point, Indy Mac, National City residential

5    funding company, Suntrust Mortgage and Suntrust

6    Mortgage.

7        Q.    Did you understand those companies to be

8    what they call subprime lenders?

9        A.    For.

10       Q.    You're not familiar with that?

11       A.    No.

12       Q.    Did you think the interest rates they

13   charged were a little bit hi?

14       A.    I didn't know any different.

15       Q.    Do you remember getting a bid from

16   roadrunner construction for the renovation of Eagle

17   Rock?

18       A.    No.

19       Q.    Did you consult with your friend Christy

20   Rauth at all in connection with the renovation of

21   Eagle Rock that's the lady who renovated the other

22   property?

23       A.    No.

24       Q.    I know Mr. Kraehe asked you, you know, if

25   you were single and how old you were do you have any

3783008a-8798-417a-ac0e-724123da26d0

1    family in town?

2        A.    Yes.

3        Q.    Is your dad in town?

4        A.    Yes.

5        Q.    Most of your family lives in Albuquerque

6    don't they?

7        A.    Yes.

8        Q.    You have a brother who lives in

9    Albuquerque don't you?

10       A.    Yes.

11       Q.    And didn't he do business with Mr. Powers?

12       A.    Yes.

13       Q.    And did you know Mr. Powers to be a

14   married man at the time you did business with him?

15       A.    Yes.

16       Q.    Was he always a gentleman with you?

17       A.    Yes.

18       Q.    Did he have a daughter?

19       A.    Yes.

20           MR. TALLON:  I have nothing further.

21           THE COURT:  Redirect.

22               REDIRECT EXAMINATION

23   BY MR. KRAEHE:

24       Q.    Ms. Tuschhoff, did Mr. Powers lead to you

25   believe that you and him would be in a partnership

3783008a-8798-417a-ac0e-724123da26d0

1    together?

2        A.    Yes.

3        Q.    And did he lead you to believe that that

4    would be an equal partnership?

5        A.    Yes.

6        Q.    Is that one of the reasons you trusted

7    him?

8        A.    Well I agreed to do it because I trusted

9    him.

10       Q.    Okay.  And did you sign any partnership

11   agreement with him?

12       A.    No.

13       Q.    So this partnership you had with him was

14   just based on what he told you?

15       A.    Yes.

16       Q.    And what he made you believe?

17       A.    Yes.

18             MR. TALLON:  Objection to the form of the

19   question.

20             THE COURT:  Sustained as to the last part.

21       Q.   (By Mr. Kraehe)  Now this partnership you

22   had with Mr. Powers was it centered around real

23   estate investments?

24       A.    Yes.

25       Q.    And with him you purchased I believe how

1   many houses was it three or four?

2       A.    Four.

3       Q.    Do you have any of those four houses any

4   more?

5       A.    No.

6       Q.    When you lost those houses did it cause to

7   you go into bankruptcy?

8       A.    Yes.

9       Q.    Did Mr. Powers borrow any of the money to

10  buy those houses?

11      A.    Of the houses that I purchased, no.

12      Q.    That were part of your partnership with

13  Mr. Powers?

14      A.    No, he did not purchase any of them.

15      Q.    He didn't borrow any money to purchase any

16  of those properties?

17          MR. TALLON:  Objection, Your Honor, to the

18  mischaracterization of the partnership.

19          THE COURT:  Yes, I think so I don't

20  understand the testimony so far to be that

21  Mr. Powers was in partnership when she bought the

22  other houses I thought she about the those

23  independently from him that he was just a real

24  estate agent.

25          MR. TALLON:  That's correct, Your Honor,

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 280

1    and I move to strike the question and the answers to

2    the extent that it's misleading.

3            THE COURT:  Okay sustained.

4        Q.   (By Mr. Kraehe)  Let me just focus on the

5    house at Eagle Rock did you have a partnership with

6    Mr. Powers involving the property at Eagle Rock?

7        A.   Yes.

8        Q.   And did Mr. Powers lead to you believe

9    that was an equal partnership?

10       A.   Yes.

11       Q.   Did Mr. Powers borrow any money to

12   purchase that property?

13       A.   No.

14       Q.   Who borrowed the money?

15       A.   I it.

16       Q.   You borrowed all of it?

17       A.   Yes.

18       Q.   $760,000?

19       A.   Yes.

20       Q.   And earlier we showed you those notes that

21   you signed?

22       A.   Yes.

23       Q.   Did Mr. Powers sign those notes?

24       A.   No.

25       Q.   Who was on the hook if the market went

3783008a-8798-417a-ac0e-724123da26d0

1    down and you weren't able to pay the mortgage on

2    that or sell that property?

3        A.    Me.

4        Q.    Was Mr. Powers in the least bit liable for

5    any losses that were incurred by this partnership

6    you had with him?

7        A.    No.

8        Q.    And I believe correct me if I'm wrong but

9    the partnership also involved $100,000 in a joint

10   bank account with Mr. Powers?

11       A.    Yes.

12       Q.    All right.  Did Mr. Powers sign any

13   documents that restricted his access to that bank

14   account?

15       A.    No.

16       Q.    Or that required your approval before

17   taking any money out of that bank account?

18       A.    We had a verbal agreement that we should

19   have double signatures.

20       Q.    Okay.  And did Mr. Powers use that bank

21   account as though it were his own?

22       A.    No.

23       Q.    Okay.  Did he take money out of that bank

24   account?

25       A.    He did borrow some money from the account.

1     Q.    It was around $67,000.60000?

2     A.    Something like that.

3     Q.    Did he use that money for purposes of the

4  partnership you had with him?

5     A.    No.

6     Q.    Did Mr. Powers get a real estate

7  commission when he purchased the house on your

8  behalf?

9     A.    Yes.

10    Q.    And that is the one on Eagle Rock?

11    A.    Correct.

12    Q.    And did he get a mortgage commission or

13  some kind of fees in connection with his role as

14  mortgage broker in connection with the purchase of

15  the property on Eagle Rock?

16    A.    Yes.

17    Q.    As part of your partnership was it your

18  belief that if you sold the property after it being

19  renovated who would be the real estate broker on

20  that?

21    A.    Mr. Powers.

22    Q.    And would he get a commission for that?

23    A.    Yes.

24    Q.    And who would be the mortgage broker on

25  that.

3783008a-8798-417a-ac0e-724123da26d0

1     Q.    Would that be Mr. Powers as well?

2     A.    Could be, yes.

3           MR. TALLON:  Objection speculative.

4           THE COURT:  If you know, don't guess.

5     Q.  (By Mr. Kraehe)  What.  Was that your

6  understanding?

7     A.    Yes.

8     Q.    And did Mr. Powers get to use your house

9  that you bought on Eagle Rock as partnership of this

10  partnership?

11     A.    No.

12     Q.    Okay.  Would you call this an equal

13  partnership with Mr. Powers?

14           MR. TALLON:  Objection asked and answered.

15           THE COURT:  Overruled.

16     Q.  (By Mr. Kraehe)  You may answer was that an

17  equal partnership?

18     A.    I thought so at the time.

19     Q.    Okay.  Now in retrospect was it an equal

20  partnership?

21           MR. TALLON:  Objection in retrospect.

22           THE COURT:  Overruled.

23           THE WITNESS:  No.

24     Q.  (By Mr. Kraehe)  Was that fair partnership?

25     A.    No.

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 284

1       Q.    Was Dawn's Early Light a business?

2       A.    No, it was my e-mail address.

3       Q.    Was it anything every that was anything

4    more than just an e-mail address?

5       A.    No.  Not as far as I was aware.

6       Q.    Did you ever see it referenced on a tax

7    return?

8       A.    No.

9       Q.    Did you ever include it on a tax return?

10      A.    No.

11      Q.    Did you do any business with the firm of

12   Sanders and Sanders that's the accountancy firm

13   before 2006?

14      A.    No.

15      Q.    How did you learn about Sanders and

16   Sanders?

17      A.    Through Mr. Powers.

18      Q.    Was Sanders and Sanders Mr. Powers

19   accountant?

20      A.    Yes.

21      Q.    That letter that was brought up before

22   from sanders and Sanders, I believe that was defense

23   Exhibit R5 do you recall that Exhibit?

24      A.    Yes.

25      Q.    Had you seen that before?

Page 285

1       A.      Not until Mary Higgins showed it to me.

2       Q.      Okay.  Did Mr. Powers every show that

3   letter to you?

4       A.      No.

5       Q.      Do you know where that letter came from?

6       A.      I assume from Mr. Sanders.

7       Q.      Do you know how it was generated why it

8   was generated?

9       A.      No.

10       Q.      Or who caused it to be generated?

11       A.      No.

12       Q.      All right the facts stated on that letter

13   correct?

14       A.      No.

15       Q.      I'm pulling up the 1003 on your first loan

16   application in connection with Eagle Rock?

17       A.      Okay.

18       Q.      And that references Dawn's Early Light

19   again what is the monthly income that's stated for

20   Dawn's Early Light?

21       A.      $5,000.

22       Q.      $5,000.  Did you make $5,000 from your

23   e-mail address at any time in your life?

24       A.      No.

25       Q.      Is that just a complete fabrication?

3783008a-8798-417a-ac0e-724123da26d0

Page 286

```
 1      A.    Yes.

 2      Q.    And did you see that when you signed that

 3  1003?

 4      A.    No.

 5      Q.    And who again presented that 1003 to you

 6  for signature?

 7      A.    It would probably have been Mr. Powers.

 8      Q.    Let me ask you about your rental

 9  properties?

10      A.    Yes.

11      Q.    You had how many rental properties was it

12  three?

13      A.    Three.

14      Q.    Did you have a mortgage on those rental

15  properties?

16      A.    Yes.

17      Q.    And you purchased those rental properties

18  on stated in come loans?

19      A.    Yes.

20      Q.    Were those 100 percent loan to value

21  rental loans?

22      A.    Yes.

23      Q.    Did you have much equity at all in those

24  rental properties at the time that you applied for

25  your loan on Eagle Rock?
```

Page 287

1    A.    I don't know whatever money we had pulled

2    out.

3    Q.    Okay.  And how much were you making a

4    month net on those rental properties after you paid

5    the mortgages and any expenses on them?

6    A.    I was not making any money.

7    Q.    You were losing money?

8    A.    Yes.

9    Q.    So were you making any income at all on

10   those rental properties?

11   A.    No.

12   Q.    Mr. Tallon showed you a something from a

13   salary.com Web page?

14   A.    Yes.

15   Q.    And I think that referenced salary ranges

16   for a head nurse is that correct?

17   A.    Yes.

18   Q.    Are you a head nurse?

19   A.    No.

20   Q.    Were you a head nurse in 2006?

21   A.    No.

22   Q.    Have you ever made I think the low end of

23   that salary range was around 80 some how to dollars

24   have you ever made $80,000 a year?

25   A.    I do now.

3783008a-8798-417a-ac0e-724123da26d0

1    Q.    You do now did you in 2006?

2    A.    No.

3    Q.    And I think the high range on that was

4  over100,000 is that correct?

5    A.    Yes.

6    Q.    Have you ever made $100,000?

7    A.    No.

8    Q.    And again what was your salary in 2006 at

9  the time that you signed the loan application?

10    A.    Around 60,000.

11    Q.    And that is $5,000 a month?

12    A.    I don't really recall how much I took home

13  but.

14    Q.    But?

15    A.    I am bad with numbers.

16    Q.    All right.  Do you recall what you were

17  taking home back then?

18    A.    Probably about maybe 1400 every two weeks

19  I'm trying to remember based on what I'm taking home

20  now.

21    Q.    Did you go into bankruptcy because you

22  wanted to?

23    A.    No.

24    Q.    Was that just a decision you made one day

25  without because you wanted to just for the heck of

3783008a-8798-417a-ac0e-724123da26d0

Page 289

```
 1   it?

 2       A.    No.

 3       Q.    Were you compelled to go into bankruptcy?

 4       A.    Yes, I was advised.

 5       Q.    Okay.  And why did you go into bankruptcy?

 6       A.    Because I could no longer afford the

 7   mortgages.

 8       Q.    And those were mortgages that you took out

 9   on who's advice?

10       A.    Mr. Powers.

11             MR. KRAEHE:  Nothing further, Your Honor.

12             MR. TALLON:  Your Honor, May I approach?

13             (At the bench:)

14             MR. TALLON:  Your Honor, on redirect

15   Ms. Tuschhoff was asked who processed her 1003ings

16   referenced her 1003 and the come she said probably

17   Mr. Powers and the 1003 that she was returning to

18   and that her attention was being deflected to

19   reflects that she signed this 1003 in front after

20   Michael Delgado whose signature appears on to and

21   Michael Delgado a government witness who might have

22   testified today but he's going to testify on Monday

23   I would like an opportunity to I just want to be

24   able to clear that up because it's.

25             THE COURT:  I'll tell the jury to
```

**PAUL BACA PROFESSIONAL COURT REPORTERS**

Page 290

1    disregard.

2            MR. KRAEHE:  Although, Your Honor, I asked

3    who presented it to her not who filled it out.

4            MR. TALLON:  Just one question, Your

5    Honor.

6            THE COURT:  All right one question.

7            MS. HIGGINS:  Your Honor, just for

8    scheduling purpose we do not have Mr. Delgado he's

9    in the National Guard so we had Mr. Sena who has

10   been waiting he's going to be a lengthy witness and

11   even if we were to start Mr. Sena today the

12   recording we hope to get in through him last for an

13   hour and 15 minutes.

14           THE COURT:  How many more witnesses do you

15   have.

16           MS. HIGGINS:  We don't.

17           THE COURT:  No, I mean total.

18           MS. HIGGINS:  I think Mr. Sena and

19   possibly Mr. Delgado and also possible we may call

20   an agent but we are still thinking about that.

21           THE COURT:  Okay.  Well, I'll let the jury

22   you ask your one question and then maybe one

23   redirect and then we'll talk about scheduling.

24           (In open court:)

25

Page 291

```
 1                  RECROSS-EXAMINATION
 2   BY MR. TALLON:
 3       Q.    I don't recall what Mr. Case heys exact
 4   words were I remember what your answer was I'd like
 5   to return your attention to Government Exhibit 62
 6   and it starts on page S T R294 do you have that up
 7   there.
 8       Q.    Okay.  Do you recognize that as the 1003
 9   that Mr. Kraehe was discussing with you on redirect
10   examination that's the loan application?
11       A.    Yes.
12       Q.    Do you recall that?
13       A.    Uh-huh.
14       Q.    Do you recall your saying that probably
15   Mr. Powers either presented that to you or made that
16   application for you?
17       A.    Yes.
18       Q.    Do you remember that answer.  Would you
19   turn now to page 299 which is page 4 of 5 of that
20   same Exhibit if we direct your attention to the
21   bottom of the page and do you see a signature there
22   and a name?
23       A.    Michael Delgado.
24       Q.    And would that be the person who witnessed
25   your signing this application?
```

3783008a-8798-417a-ac0e-724123da26d0

1      A.    Possibly.

2      Q.    So you don't have an independent

3   recollection of who was present when you signed your

4   application for this loan do you?

5      A.    No, it was either Michael or Kevin.

6      Q.    Well, you're familiar with Mr. Powers'

7   signature from your partnership on eagle the Eagle

8   Rock property that Mr. Powers' signature and is that

9   Mr. Powers' name on that application?

10      A.    No.

11            MR. TALLON:  I have nothing further.

12            THE COURT:  Any redirect?

13            MR. KRAEHE:  Nothing further, Your Honor.

14            THE COURT:  You're excused.  Thank you

15   very much for your service here.

16            We're going to be talking about some

17   scheduling.  Actually, what I'd like to do is just

18   dismiss you back to the jury room.  I'd like to give

19   you some indication of scheduling, as far as next

20   week is concerned, before you leave today, and I

21   can't Ms. Tuschhoff the top of my head at this time.

22            I want to talk to counsel briefly.  And

23   then I'll either send Juan back to talk to you or

24   bring you back, I'm not sure which.  But it won't be

25   very long, maybe five, ten minutes max.  Thank you.

Page 293

1              Court is in recess.  Don't discuss the

2    case among yourselves or with others.

3              (Whereupon the jury left the courtroom.)

4              (Court in recess at 4:42 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PAUL BACA PROFESSIONAL COURT REPORTERS**

3783008a-8798-417a-ac0e-724123da26d0

1

2

3               REPORTER'S CERTIFICATE

4          I, Paul Baca, Official Court Reporter for

5    the US District Court, District of New Mexico, do

6    hereby certify that I reported the foregoing

7    proceedings in stenographic shorthand and that the

8    foregoing pages are a true and correct transcript of

9    those proceedings and was reduced to printed form

10   under my direct supervision.

11          I FURTHER CERTIFY that the transcript fees

12   and format comply with those prescribed by the Court

13   and the Judicial Conference of the United States.

14

15   Date:   July 6, 2011

16

17          _____

                PAUL BACA
18              NM Certified Court Reporter #112
                License Expires: 12/31/2011
19

20

21

22

23

24

25

**PAUL BACA PROFESSIONAL COURT REPORTERS**