IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal No.: 09-3065 MCA |
| ) | |
| KEVIN POWERS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the United States' Motion for Order of Restitution. [ECF No. 309]. Defendant Kevin Powers has filed a Response. [ECF No. 314]. The United States has filed a Reply. [ECF No. 316].

**I.    Background**

A jury found Defendant guilty of 17 counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. The evidence presented at trial established that Defendant, an Albuquerque-area real estate agent and mortgage broker, fraudulently secured mortgage loans from various lenders by operating a "cash back" scheme.[1] In this scheme, Defendant recruited "investors" who purchased residential homes as investment properties. Because the investors were unqualified to obtain the loans necessary to purchase the homes, Defendant directed them to submit loan applications that misrepresented their personal finances and occupancy intentions. These material

---

[1] The Court has comprehensively discussed and analyzed Defendant's scheme in previous Orders. *See* ECF No. 203, ECF No. 204, and ECF No. 304. Defendant's scheme appears to be identical in all material and relevant aspects to the mortgage loan fraud schemes of *United States v. James*, 564 F.3d 1237 (10th Cir. 2009) and *United States v. James*, 592 F.3d 1109 (10th Cir. 2010), and very similar to the scheme at issue in *United States v. Washington*, 634 F.3d 1180 (10th Cir. 2011).

misrepresentations caused the lenders to approve the investors' loan applications and to wire the loan monies. The home purchased served as collateral for each of these loans. Defendant and his investors utilized this scheme to purchase nine houses, which required obtaining a total of 17 loans.

The Court held a sentencing hearing on September 16, 2011, at which the Court entered judgment against Defendant and sentenced him to a term of 56 months in prison. [ECF No. 289]. The Court did not resolve the matter of restitution at this hearing; instead, the Court ordered that restitution would be determined within 90 days, pursuant to 18 U.S.C. § 3664(d)(5), and that the United States was to provide to Defendant within 30 days updated information on the losses incurred on the 17 fraudulent loans. The United States now returns to the Court, asserting that it has presented Defendant with the loss information and that Defendant has objected to its restitution proposal.

Accordingly, the United States has filed the pending Motion, in which it requests that the Court impose an order of restitution against Defendant for losses incurred on 14 of the loans underlying Defendant's conviction.[2] [ECF No. 309]. The United States asserts that six mortgage finance institutions ("Financiers") incurred losses on these loans, because for each loan on which the investor defaulted for his or her payments the subsequent sale of the collateral property was insufficient to satisfy the loan's outstanding principal balance. The United States calculates that these losses amount to a total of $2,100,804.24, and requests that Defendant be ordered to pay

---

[2] Although Defendant was convicted of 17 counts of wire fraud, the United States has been unable to obtain any loss information for the loans underlying counts three, four, and eight of his conviction. As a result, the United States is seeking to recover restitution only on the loans underlying counts one and two, four through seven, and nine through seventeen.

restitution in this amount to the six "Financiers" who incurred losses on the loans Defendant fraudulently obtained.  As set forth more fully below, these six Financiers fall into two categories.  First, one Financier is an original lender: SunTrust Mortgage Company ("SunTrust").  Secondly, five Financiers are successor holders or servicers of loans: the Federal Deposit Insurance Corporation ("FDIC"); Specialized Loan Servicing ("SLS"); U.S. Bank National Association ("U.S. Bank"); Amercia's Servicing Company ("ASC"); and Ocwen Loan Servicing, LLC ("Ocwen").

Defendant raises numerous objections to the United States' restitution proposal, including that it is not possible, based on the documentation presented, to determine to whom and in what amount restitution should be ordered.

## II.     Restitution under the Mandatory Victims Rights Act

The United States seeks restitution under the Mandatory Victims Rights Act ("MVRA"), 18 U.S.C. §§ 3663A-3664.  Section § 3663A states:

> Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to ... any other penalty authorized by law, that the defendant make restitution to the victim of the offense ... .

18 U.S.C. § 3663A(a)(1). Subsection (c) states that § 3663A "shall apply in all sentencing proceedings for convictions of [certain enumerated crimes] in which an identifiable victim or victims has suffered a ... pecuniary loss."  *Id*. at §§ 3663A(c)(1)(A)-(B).  Accordingly, it is mandatory that a court order a defendant to pay restitution when: (1) a defendant has been convicted of an offense that falls within § 3663A(c); and (2) the defendant's offense has caused pecuniary losses to identifiable victims.  In addition, the United States must prove "the amount of

the loss sustained by a victim as a result of the [defendant's] offense[.]" *Id*. at § 3664(e). If a court orders restitution, then it must specify "the manner in which, and the schedule according to which, the restitution is to be paid[.]" *Id*. at § 3664(f)(2).

### A. Offense

For restitution to be mandatory, the defendant must have committed "an offense described in subsection (c)" of § 3663A. *Id*. at § 3663A(a)(1). One offense set forth in subsection (c) is "an offense against property under this title, ... including any offense committed by fraud or deceit[.]" *Id*. at § 3663A(c)(1)(A)(ii). Wire fraud is an offense against property committed by fraud or deceit. *United States v. Gallant*, 537 F.3d 1202, 1250 (10th Cir. 2008) ("An individual may qualify as a victim under the MVRA if the underlying offense is wire fraud."). Because Defendant was convicted of 17 counts of wire fraud, he may be ordered to pay restitution to any "victims" of his criminal offenses.

### B. Victim

Next, restitution is mandatory when the defendant's offense has caused harm or loss to "an identifiable victim or victims[.]" 18 U.S.C. § 3663A(c)(1)(B). The MVRA defines "victim" as follows:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id*. at § 3663A(a)(2). In *United States v. Speakman*, 594 F.3d 1165 (10th Cir. 2010), the Tenth Circuit interpreted this language as establishing two distinct ways in which a person can qualify as a victim under the MVRA: The first focuses on the "as a result of" statutory language, whereas

the second focuses on "in the course of". *Id*. at 1169-70. As discussed below, the United States asserts that the six Financiers qualify as a victims under each of these alternate interpretations.[3]

### 1. Victim "as a result of" Defendant's Offense

Under the first interpretation set forth in *Speakman*, a person qualifies as a victim when he is "'directly and proximately harmed *as a result of* the commission of an offense' covered by the MVRA[.]" *Id*. at 1169 (*quoting* 18 U.S.C. § 3663A(a)(2)) (emphasis added). To satisfy this standard, the United States "must show both that the defendant's conduct is the 'but-for' cause of the individual's harm and that the defendant 'proximately' caused the harm. *Id*. at 1171. A person is "'proximately harmed as a result of' the defendant's crime if either there are no intervening causes, or, if there are any such causes, if those causes are directly related to the defendant's offense." *Id*. at 1172.

First, it is clear that Defendant's fraudulent cash-back scheme was the "but-for cause" of the Financiers' losses. The essence of Defendant's scheme was to secure mortgage loans by directing his investors to submit loan applications that contained fraudulent misrepresentations. As the Tenth Circuit has written, these "transactions would not have occurred ... but for perpetration of the fraud." *United States v. Washington*, 634 F.3d 1180, 1185 (10th Cir. 2011).

Next, the Court must determine whether Defendant's criminal conduct was also the "proximate cause" of the Financiers' losses. Defendant raises several general arguments in an attempt to avoid this conclusion. First, Defendant argues that his investors' individual financial decisions were not within his control, and thus their failure to make loan payments is an

---

[3] The Court conducts this analysis with a recognition that in *James I*, the Tenth Circuit affirmed in part an award of restitution, thus seeming to imply that lenders who suffer losses due to a defendant's mortgage fraud scheme qualify as "victims" under the MVRA.

independent intervening cause of the Financiers' losses.  Defendant's entire scheme, however, was built upon using investors who were unqualified to obtain loans to do so through fraud.  Therefore, even if an investor's default can be considered to be an intervening cause, then it is an intervening cause "that is directly related to the defendant's offense."  *Speakman*, 594 F.3d at 1172.  Next, Defendant argues that the Financiers can be considered victims under the MVRA only if they "demonstrably relied upon a representation made by" Defendant.  [*See* ECF No. 314 at 9-11].  In support of this proposition Defendant cites *United States v. Cutter,* 313 F.3d 1, 6-7 (1st Cir. 2002). A reading of *Cutter*, however, shows that it stands for no such principle.  Finally, Defendant argues that a transfer of loan rights from an original lender to a subsequent holder or servicer should be considered an intervening cause of a Financier's loss. A mere transfer of rights, however, does nothing to cause a Financier to incur a loss on a fraudulent loan; instead, it is Defendant's scheme that remains the source of any losses that are incurred.[4]

Defendant also raises one more individualized argument concerning the loan underlying count two.[5]  Defendant argues that with respect to this particular loan, SunTrust purchased mortgage insurance, and that evidence "strongly suggests" that SunTrust would have been able to

---

[4] Defendant also argues that two related events -- the unanticipated and extraordinary depreciation experienced in the real estate market, and the unusually low prices received for the properties in foreclosure and short sales -- must also be considered intervening causes.  In addition, he suggests that a transfer of loan rights affects the amount of a Financier's loss.  These arguments address the calculation of a Financiers' loss, not the determination of whether a Financier is a "victim", and thus the Court will address them in a later section.

[5] In making this argument, Defendant repeatedly refers the Court to documents evidently disclosed by the United States to Defendant on September 6, 2011.  But Defendant has not attached these documents as exhibits to its Response.  In addition, the Court has searched the docket and been unable to locate these documents elsewhere.  Suffice it to say that the absence of these documents from the record severely hampers the Court's ability to assess this argument.

redeem this insurance policy had it not violated the terms of its insurance agreement. SunTrust's alleged violation of the insurance agreement cannot be an intervening cause of its loss on the loan, because its inability to benefit from that agreement leaves it in precisely the same position it would have been in had the agreement never existed. *See* 18 U.S.C. §§ 3664(f)(1)(B); 3664(j)(1). Defendant's argument is without merit and gives no basis for finding that SunTrust's actions are an intervening cause its loss on the loan underlying count two.

Based on the discussion set forth above, the United States has shown that each of the Financiers has incurred losses on the loans "as a result of" Defendant's criminal conduct. The Financiers are therefore victims under the MVRA, and Defendant properly may be ordered to pay restitution for the losses they have incurred.

*2. Victim "in the course of" Defendant's Criminal Conduct*

The United States also argues that the Financiers qualify as victims under the second interpretation set forth in *Speakman*. Under this interpretation, "if the defendant's crime includes an element that the defendant engaged in 'a scheme, conspiracy or pattern of criminal activity,' then the person will be a victim if he is 'directly harmed by the defendant's criminal conduct *in the course of* the scheme, conspiracy, or pattern of criminal activity.'" *Speakman*, 594 F.3d at 1170 (*citing* 18 U.S.C. § 3663A(a)(2)) (emphasis added). Because wire fraud "includes as an element a 'scheme' to defraud", the Court must determine only whether the Lenders were "directly harmed in the course of [Defendant's] scheme". *Id*.

Defendant asserts that "the [United States'] theory at trial was that [Defendant's] was 'accomplished' at the time of the closing on each house and that his specific criminal intent existed concurrently with those closing." [ECF No. 314 at 4-5.] Defendant's arguments appears

7

to be that because his criminal intent did not exist after he closed on a house, he could not have caused the Lenders' losses "in the course of" his fraudulent cash back scheme.

In reviewing Defendant's argument, a comparison of the Tenth Circuit cases of *Speakman* and *Gallant* is instructive. In *Speakman*, the defendant, an employee of Merrill Lynch, made a series of unauthorized wire transfers of money and securities from a client's account. 594 F.3d at 1166-70. The client initiated an arbitration proceeding against Merrill Lynch and it was found liable for the value of the unauthorized transfers. *Id*. at 1168. The United States also indicted the defendant and he pled guilty to one count of wire fraud. *Id*. The district court concluded that Merrill Lynch was a victim of the defendant's crime and it ordered him to pay it restitution. *Id*. The Tenth Circuit held that "Merrill Lynch's harm cannot be said to have arisen 'in the course of [the defendant's] scheme'", because "the harm that the government claims Merrill Lynch endured occurred when Merrill Lynch was found liable to [the client in the arbitration proceeding], well after the conclusion of [the defendant's] scheme." *Id*. at 1170. The *Speakman* court contrasted this situation with *Gallant*, in which the Tenth Circuit ordered defendants who had committed wire fraud to pay restitution to an individual. *Id*. (*discussing Gallant*, 537 F.3d 1202, 1249 (10th Cir. 2008)). The Tenth Circuit stated that restitution was appropriate because the individual had been "directly harmed in the course of [the defendants'] scheme", reasoning that the individual's "participation was essential to the scheme" and that the individual would not have incurred losses "if the defendant had not committed wire fraud". *Id*. (*discussing and citing Gallant*, 537 F.3d at 1249).

On the facts presented, Court finds that the Financiers were "directly harmed in the course of" Defendant's cash back scheme. The facts presented are unlike *Speakman*, because the

8

Financiers' losses did not result from a collateral proceeding.  In addition, execution of a mortgage loan gives rise to a recurring and long-term obligation to pay, and so it cannot be said that the Financiers' losses occurred "well after" the completion of Defendant's scheme.  Instead, this case is similar to *Gallant*, because the Financiers' authorization of the loans was "essential" to Defendant's cash back scheme, and because evidence presented at trial established that the Financiers would not have approved the loans if they had received applications containing accurate information.

Accordingly, the United States has also shown that each of the Lenders has incurred losses on the loans "in the course of" Defendant's fraudulent cash back scheme.  This conclusion provides an additional and independent basis for finding that the Financiers are victims under the MVRA, so that Defendant properly may be ordered to pay restitution for the losses they have have incurred on the loans.

### C.     Amount of Loss

Finally, the Court must determine the amount of the Financiers' loss.  The MVRA states:

> In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

18 U.S.C. § 3664(f)(1)(A).  "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  *Id*. at § 3664(e).  "The government bears the burden of proving the amount of loss by a preponderance of the evidence."  *Gallant*, 537 F.3d at 1247.  "In the case of fraud or theft, the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the information available."  *United States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009).  Even so,

it is clear that a "restitution order must be based on actual loss[.]" *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (quotation omitted). "In cases where the defendant has pledged collateral to secure a fraudulent loan, actual loss should be measured by the net value, not the gross value, of what was taken." *United States v. James*, 592 F.3d 1109 (10th Cir. 2010) (internal quotations omitted) (hereinafter "*James II*").

The United States seeks to recover as restitution for each loan the principal balance that the Financiers have been unable to recoup. The United States does not seek to recover costs, expenses, or unpaid interest. Thus, the United States calculates the Financiers' actual losses on each loan using the following formula:

> Original loan principle
> minus   loan payments made;
> minus: gross sales proceeds generated by sale of property;
> minus: <u>credit due to Defendant;                        </u>
> equals: **actual loss**.

As discussed above, the United States seeks to recover restitution on the behalf of six Financiers that it claims have incurred losses on Defendant's fraudulent loans. These Financiers fall into two categories. The first category is for a lender who originated and retained the rights to a loan, rather than selling or otherwise transferring those rights. One Financier falls into this original lender category: SunTrust. In contrast, the second category is for a successor holder or servicer of a loan. These parties did not originate the loans they hold, but instead received rights to those loans through purchase or some other transfer. Five Financiers fall into this second category: the FDIC, SLS, U.S. Bank, ASC, and Ocwen. The Court will determine whether the United States has proved the amount of loss for each of these two groups, in turn.

*1. Original Lenders*

The United States seeks restitution on behalf of one original lender: SunTrust. The United States asserts that SunTrust was the original lender of the loans underlying Counts 1, 2, 12, 13, 14, 15, 16, and 17. The United States asserts that SunTrust retained these loans and suffered losses on them. In support, the United States submits financial statements, housing settlements, and other documentation from SunTrust, the U.S. Department of Housing and Urban Development, and Fannie Mae. The United States seeks to recover a total of $1,155,317.50 in restitution for SunTrust, as set forth below:[6]

**Restitution requested for SunTrust:**

Count 1: 6600 Glenturret Way, Albuquerque, NM, 87113

| | |
|---|---|
| Original loan value, issued by SunTrust: | $392,000.00 |
| Unpaid principal balance at time of property sale: | $392,000.00 |
| Proceeds from sale on July 15, 2009: | $265,000.00 |
| **Actual loss:** | **$127,000.00** |

Count 2: 6600 Glenturret Way, Albuquerque, NM 87113

| | |
|---|---|
| Original loan value, issued by SunTrust: | $98,000.00 |
| Unpaid principal balance at time of sale of property: | $97,174.66 |
| Loan charged off: | -- |
| **Actual loss:** | **$97,174.66** |

Count 12: 10444 Oso Ridge, Albuquerque, NM 87114

| | |
|---|---|
| Original loan value, issued by SunTrust: | $256,000.00 |
| Unpaid principal balance at time of property sale: | $255,132.29 |
| Proceeds from sale: | $199,000.00 |
| **Actual Loss:** | **$ 56,132.29** |

---

[6] In its Motion, the United States requested that SunTrust be awarded $1,155,318.20 in restitution. Based on the documentation provided, this amount appears to be in error due to a minor error in calculation with regard to counts 12 and 13. The Court has provided the proper total – $1,155,317.50 – above and in the discussion that follows.

Count 13: 10444 Oso Ridge, Albuquerque, NM 87114

    Original loan value, issued by SunTrust: $64,000.00
    Unpaid principal balance at time of property sale: $63,927.66
    Loan charged off: --
    **Actual loss:** **$63,927.66**

Count 14: 12514 Holly, Albuquerque, NM 87122

    Original loan value, issued by SunTrust: $975,000.00
    Unpaid principal balance at time of property sale: $975,000.00
    Proceeds from sale: $890,000.00
    **Actual loss:** **$ 85,000.00**

Count 15: 12514 Holly, Albuquerque, NM 87122

    Original loan value, issued by SunTrust: $325,000.00
    Unpaid principal balance $325,000.00
    Loan charged off: --
    Credit, check turned over by investor Sena $ 16,750.00
    **Actual loss:** **$308,250.00**

Count 16: 11801 Eagle Rock, Albuquerque, NM 87122

    Original loan value, issued by SunTrust: $608,000.00
    Unpaid principal balance at time of property sale: $608,000.00
    Proceeds from sale: $269,500.00
    **Actual loss:** **$338,500.00**

Count 17: 11801 Eagle Rock, Albuquerque, NM 87122

    Original loan value, issued by SunTrust: $152,000.00
    Unpaid principal balance at time of property sale: $151,277.21
    Proceeds from sale: $ 5,000.00
    Credit, check turned over by investor Tushhoff: $ 66,944.32
    **Actual loss:** **$ 79,332.89**

**Total restitution requested for SunTrust:** **$1,155,317.50**

    In *James II*, the Tenth Circuit explained how to calculate the "actual loss" of a lender who originates and retains loans -- like SunTrust -- and has incurred losses due to a mortgage fraud

scheme.[7] 592 F.3d 1109, 1113-16. For such a lender, "loss is calculated by subtracting the value of the collateral-or, if the lender has foreclosed on and sold the collateral, the amount of the sales price-from the amount of the outstanding balance on the loan." *Id*. at 1114. The Court finds that the United States' formula for calculating restitution conforms with *James II*, and that the records submitted are evidence of SunTrust's actual losses.

Defendant raises numerous objections in an attempt to avoid this conclusion. First, Defendant argues that the United States has provided insufficient evidence of the amount of SunTrust's losses. The Court finds the documentation presented to be credible, and notes that Defendant has made no argument and presented no evidence that challenges the accuracy of this documentation. This is not case in which restitution is sought based upon a victim's mere "uncertain estimate" of loss. *Cf. United States v. Young*, 272 F.3d 1052, 1056 (8th Cir. 2001). Therefore, the United States has met its burden of proving SunTrust's actual losses. For the same reasons, Defendant's attempt to invoke the complexity exception to mandatory restitution is misplaced and without merit. *See* 18 U.S.C. § 3663A(c)(3)(B); *see also United States v. Galloway*, 509 F.3d 1246, 1254 (10th Cir. 2007) (remanding case for determination of restitution, and stating that "if the district court finds [that a victim has] sustained an actual loss", then the complexity provision of § 3663(c)(3)(B) is inapplicable and the district court "must impose restitution").

Next, Defendant asks the Court to calculate restitution not based on the actual losses

---

[7] The Court recognizes that *James II* expressly concerned the calculation of a lender's "actual loss" for purposes of the United States Sentencing Guidelines, § 2B1.1, rather than the MVRA. The Court follows the Tenth Circuit's analysis, however, because the operative inquiry in both *James II* and here is "actual loss", and because the schemes in each case are alike in all material respects. For the similar reasons, the Court also relies upon *Washington*, 634 F.3d 1180.

SunTrust has incurred, but instead based on either the gain Defendant realized from his scheme or the appraised values of the collateral properties. Defendant's arguments are in clear conflict with Tenth Circuit precedent. First, as established above, *James II* clearly states that for a lender such as SunTrust, loss is to be calculated based on the foreclosure sales price and not on the value of the collateral. 592 F.3d at 1113-16; *see also Washington*, 634 F.3d at 1185 ("But in a mortgage fraud scheme such as this, the loss is not the decline in value of the collateral; the loss is the unpaid portion of the loan as offset by the value of the collateral."); *United States v. James*, 564 F.3d 1237, 1247 (10th Cir. 2009) (for purposes of the MVRA, calculating a lender's "actual loss using the foreclosure sale amount more accurately measures its loss than using the property's assessed value.") (hereinafter "*James I*"). Moreover, "[u]nlike loss under the [Sentencing] Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain." *Gallant*, 537 F.3d at 1247.

In addition, Defendant argues at great length that the difference between the properties' appraised values and their foreclosure sale prices suggests that SunTrust sold the properties for far less than they were worth. Defendant argues that in doing so, SunTrust failed to conduct commercially reasonable sales and failed to mitigate the losses it incurred. Restitution under the MVRA is mandatory, however, and it must be based on a victim's actual losses. *Masek*, 588 F.3d at 1287. Defendant has not cited any authority, either within the MVRA or the caselaw, that allows a court to depart from this rule and award less than a victim's actual losses. Moreover, even if such an equitable principle does exist, Defendant has not shown that it would apply here: Defendant has presented no evidence that suggests the Lenders took any action -- such as turning away interested and willing buyers -- that prevented the Lenders from receiving the highest price

possible for each property, and he has not explained why a commercial enterprise such as SunTrust would sell a property for less than that amount.

Defendant also argues that the United States is improperly attempting to collect consequential damages. Defendant is correct that the MVRA does not permit recovery of consequential damages. *See, e.g., United States v. Wilfong*, 551 F.3d 1182, 1186 (10th Cir. 2008). "Consequential damages are damages that are not the direct and immediate result of the injury, but depend in part on factors outside the control or expectation of the parties." *Id*. at 1187 (citation omitted). Here, however, the United States merely seeks to recover the unpaid principle balance for each loan.[8] Such losses are the "direct and immediate result" of Defendant's wire fraud crimes; they are not consequential damages.

Finally, Defendant asks the Court to order that liability for restitution be apportioned among the investors who carried out his scheme, rather than imposed against him alone. Defendant relies upon § 3664(h):

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h). As Defendant seems to acknowledge, however, the individuals he recruited as investors are not "defendants" who have been found criminally liable for their actions in Defendant's scheme. Thus, by its language, the MVRA and § 3664(h) do not apply to them. In contrast, § 3664(h) states that "the court may make each defendant liable for payment of the full amount of restitution". *Id*. Because Defendant orchestrated and executed the cash back scheme,

---

[8] In addition, the United States does not seek to recover any interest on the loans that has accrued, or any costs, expenses or fees the Financiers have incurred.

it is not improper to hold him liable for all losses caused by that scheme. *See United States v. Meredith*, 370 Fed.Appx. 930, 934 (10th Cir. 2010) (upholding district court's decision to hold defendant liable for all losses caused by credit card fraud scheme, because defendant served as the scheme's "organizer, leader, and teacher").

The United States seeks to recover only the actual losses SunTrust has incurred, and it has properly calculated and proven the amount of those losses. Defendant's arguments against this conclusion are without merit. The Court will order Defendant to pay restitution to SunTrust, in the amount set forth above.

## 2. *Successor Lenders or Servicers*

Next, the United States seeks to recover restitution on behalf of five Financiers who are successor lenders or servicers for the loans Defendant fraudulently obtained. As explained above, these Financiers did not originate the loans, but instead possess rights in them as purchasers, receivers, trustees, or the like. The United States seeks to recover restitution on these loans as follows: count 5, to the FDIC; count 6, to SLS; count 7, to U.S. Bank; counts 9 and 11, to ASC; and count 10, to Ocwen.[9] To determine the losses incurred on these loans, the United States seeks to employ the same formula and means of calculation set forth above. The United States has provided documentation establishing the original value of each loan and the ultimate sale price or other disposition of the corresponding collateral property. The United States has not provided information detailing the transfer of loan rights from the original lenders to successor parties, and, in particular, has not provided the price paid by the successor lenders or servicers to

---

[9] The United States does not seek restitution for the lending institutions who originated these loans, as those institutions apparently are no longer in business.

purchase those rights.

*James II* established the proper means of calculating restitution for successor lenders who received loan rights from original lenders prior to foreclosure sales. 592 F.3d 1109, 1113-16. The Tenth Circuit wrote:

> The successor lenders' actual loss, then, is the difference between what they paid the original lenders for the loans (less principal repayments by borrowers, if any) and what they received for the properties at the foreclosure sales, plus reasonably foreseeable expenses relating to the foreclosure proceedings.

*Id*. at 1115. The Tenth Circuit wrote that it was "improper" to calculate a successor lenders' loss based on the amount financed by the original lenders, unless there was some "evidence suggesting that the loans were sold to the successor lenders for sums approximating the original loan amount." *Id*. Because no such evidence was presented in *James II*, the Tenth Circuit ruled it was error for the district court "to subtract the foreclosure sales prices of the properties from the amount of the original loans in order to calculate the actual loss sustained by the successor lenders." *Id*.

Accordingly, *James II* instructs that in the instant case, the losses incurred by the five successor Financiers should be calculated by subtracting the price paid by a Financier to obtain the loan rights from the price received by that Financier in a foreclosure sale. However, the United States has not provided any information establishing the amount these Financiers paid to obtain rights to the loans they hold. Therefore, the Court cannot employ the formula set forth in *James II* to calculate these Financiers' actual losses.

In its pending motion, the United States instead seeks to calculate these Financiers' actual losses by employing the formula set forth above -- that is, subtracting the foreclosure sales price

received for the property (or, alternatively, the amount of the loan that was charged off) from the loan's unpaid principal balance at the time of the foreclosure or charge-off. Under *James II*, however, this formula is a reasonable method of calculating the successor parties' actual costs only if there is some "evidence suggesting that the loans were sold to the successor lenders for sums approximating the original loan amount." *Id*. The United States has provided no such evidence. Without this evidence, *James II* prohibits the Court from calculating losses according to the United States' formula.

The Court appreciates that it may be difficult, or even impossible, for the United States to obtain the information required to properly calculate restitution. For instance, it appears that many of the original lenders of the loans Defendant fraudulently secured are no longer in business. In addition, "today's banking realities-the bundling of mortgages into securities, for example-may make it difficult to identify precisely the proceeds a lender received for a specific mortgage loan." *Id*. at 1116. For such reasons, "absolute precision is not required" to calculate a loss under the MVRA; instead, "[t]he court need only make a reasonable estimate of the loss, given the information available." *Gallant*, 537 F.3d at 1252. However, the MVRA does require restitution based on actual losses – "in other words, the difference in value between what was given and what was obtained." *James II*, 592 F.3d at 1115. Without some evidence in this case of "what was given" for the loan rights by the FDIC, SLS, U.S. Bank, ALS, and Ocwen, circuit precedent prohibits the Court from awarding them restitution.

### D.     Manner and Schedule of Restitution

If a defendant is ordered to pay restitution, then the court must "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid[.]"

18 U.S.C. § 3664(f)(2). That determination must be made in light of the defendant's financial resources, projected earnings and income, and other financial obligations. *Id*. at § 3664(f)(2)(A)-(c). The court may direct a defendant to make payment in a wide variety of ways. *Id*. at § 3664(f)(3).

The Court is familiar with Defendant's employment history, educational background, and financial circumstances. The Court notes that Defendant currently possesses limited financial resources, though he has obtained a significant amount of education and has been employed in diverse capacities. The Court also notes that Defendant has a variety of existing financial obligations that limit his ability to pay restitution. Accordingly, pursuant to 18 U.S.C. § 3664(f)(3)(A), Defendant will be ordered to pay restitution in partial payments in specified intervals, as follows: one payment per month in the amount of either $1,000 or 10 % of Defendant's gross income, whichever is greater.

### III.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the United States' Motion for Order of Restitution [ECF No. 309] is **GRANTED, in part, and DENIED, in part**.  The United States' request that Defendant be ordered to pay restitution to SunTrust Mortgage Company in the amount of $1,155,317.50, is **GRANTED**.  The United States' request for restitution in all other respects is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant is ordered to make restitution payments to SunTrust Mortgage Company in the following manner: one payment per month in the amount of either $1,000 or 10 % of Defendant's gross income, whichever is greater.  Defendant shall make payment at the following address:

>   Clerk of the Court
>   Attn: Intake, Case No. 1:09CR03065-001MCA
>   333 Lomas N.W. Suite 270
>   Albuquerque, New Mexico 87102

Dated this 13th day of December, 2011.

                                                                                                   _E. Richard Webber_
                                                                                                   E. RICHARD WEBBER
                                                                                                   SENIOR UNITED STATES DISTRICT JUDGE